Appeal No. 2016-1077

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

INTELLECTUAL VENTURES I LLC,
AND INTELLECTUAL VENTURES II LLC,

*Plaintiffs-Appellants,*

v.

CAPITAL ONE FINANCIAL CORPORATION, CAPITAL ONE BANK (USA),
NATIONAL ASSOCIATION, CAPITAL ONE, NATIONAL ASSOCIATION,

*Defendants-Appellees.*

Appeal from the United States District Court for the District of Maryland in
Case No. 8:14-cv-00111-PWG, Judge Paul Grimm

## CORRECTED OPENING BRIEF OF APPELLANTS INTELLECTUAL VENTURES I LLC AND INTELLECTUAL VENTURES II LLC

Marc Belloli
Elizabeth Day
Clayton Thompson
FEINBERG DAY ALBERTI &
    THOMPSON, LLP
1600 El Camino Real, Suite 280
Menlo Park, CA 94025
Telephone:  650.618.4360

Eric F. Citron
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD  20814
Phone: 202-362-0636
Fax: 866-574-2033

*Attorneys for Appellants Intellectual
Ventures I LLC and Intellectual
Ventures II LLC*

Date:  January 13, 2016
Corrected:  January 14, 2016

# CERTIFICATE OF INTEREST

Counsel for the Appellants Intellectual Ventures I LLC and Intellectual Ventures II LLC certifies the following:

1.    The full name of every party or amicus represented by me is:

Intellectual Ventures I LLC and Intellectual Ventures II LLC.

2.    The name of the real party in interest (if the party named in the caption is not the real party of interest) represented by me is:

None.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus represented by me are:

None.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

**Feinberg Day Alberti & Thompson LLP**: Ian Feinberg, Elizabeth Day, David Alberti, Clayton Thompson, Sal Lim, Yakov Zolotorev, Nickolas Bohl, Jeremiah Armstrong, Marc Belloli, Vinay Malik

**Goldstein & Russell, P.C.**:  Eric F. Citron

**Funk and Bolton PA**:  Bryan D. Bolton, Michael Edward McCabe, Jr.

Dated:  January 14, 2016

Respectfully submitted,

*/s/ Marc Belloli*

Marc Belloli
FEINBERG DAY ALBERTI & THOMPSON, LLP
1600 El Camino Real, Suite 280
Menlo Park, CA 94025
Telephone:  650.618.4360

*Counsel for Appellants, Intellectual Ventures I LLC and Intellectual Ventures II LLC*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ........................................................ iv

STATEMENT OF RELATED CASES ........................................ 1

JURISDICTIONAL STATEMENT .......................................... 3

STATEMENT OF THE ISSUES ............................................... 4

INTRODUCTION ...................................................................... 4

STATEMENT OF THE CASE .................................................. 6

    I.   Proceedings Below ........................................................ 6

    II.  The District Court's Entry of Final Judgment Under Rule 54(b) ................................................................................ 8

    III.  The '081 Patent ............................................................ 8

    IV.  The '002 Patent .......................................................... 12

SUMMARY OF THE ARGUMENT ...................................... 15

STANDARD OF REVIEW ..................................................... 16

ARGUMENT ........................................................................... 18

    I.   The District Court Erred In Finding That There Was No Just Reason for Delay and Certifying this Appeal Under Rule 54(b) ........................................................ 18

    II.  The District Court Erred in Finding Issue Preclusion With Respect to the '409 and '084 Patents ................ 23

    III.  The '081 and '002 Patents Satisfy the Standard for Patent Eligibility Under §101 .................................... 24

        A.  Determining Patent-Eligibility ............................ 24

           1.  Step One:  Whether the Claims Are Directed To an Abstract Idea ...................................... 25

2.   Step Two:  Does the Claim Contain an
     Inventive Concept? ....................................................... 28

B.   The '081 Patent is Eligible Under §101 ..................................... 31

     1.   Dynamically Managing and Modifying
          Otherwise Incompatible XML Documents
          Based on MRTs, PRTs and Data Objects
          From Components of XML Documents is
          Not an Abstract Idea .................................................... 32

          (a)  The Plain Claim Language and The
               Record Evidence Confirms That The
               Asserted Claims Are Not Directed to
               an Abstract Idea ................................................... 32

          (b)  In Order to Find an Abstract Idea, the
               District Court Ignored the Invention
               and Claim Language and Instead
               Resorted to Inapt Analogies ................................ 35

     2.   The '081 Patent Discloses an "Inventive
          Concept" ........................................................................ 39

          (a)  The '081 Patent Discloses A New and
               Useful Application ............................................. 40

          (b)  The '081 Patent Unconventionally
               Improves a Technological Process ...................... 41

          (c)  The '081 Patent Does Not Raise Undue
               Preemption Concerns .......................................... 46

C.   The '002 Patent is Eligible Under §101 ..................................... 47

     1.   Accessing and Retrieving User-Specific
          Electronic Resources and Information is Not
          an Abstract Idea ............................................................ 48

     2.   The '002 Patent Discloses an "Inventive
          Concept" and Claims a New Use of
          Computer Pointers ........................................................ 55

CONCLUSION ................................................................................................ 63

CERTIFICATE OF SERVICE ....................................................................... 64

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE
REQUIREMENTS ......................................................................................... 65

INDEX TO ADDENDUM ............................................................................. 66

## TABLE OF AUTHORITIES

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Intern.*,
  134 S. Ct. 2357 (2014) ................................................................ passim

*Allis-Chalmers Corp. v. Philadelphia Electric Co.*,
  521 F.2d 360 (3d Cir. 1975) .............................................................. 19

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014) ........................................................ 56

*Aspex Eyewear, Inc. v. Zenni Optical LLC*,
  713 F.3d 1377 (Fed. Cir. 2013) ........................................................ 17

*Bilski v. Kappos*,
  561 U.S. 593 (2010) .................................................................... passim

*Braswell Shipyards, Inc. v. Beazer East, Inc.*,
  2 F.3d 1331 (4th Cir. 1993) ........................................... 17, 18, 19, 20

*CLS Bank Int'l v. Alice Corp. Pty.*,
  717 F.3d 1269 (Fed. Cir. 2013) ........................................................ 17

*Curtis-Wright Corp. v. General Electric Co.*,
  446 U.S. 1, 10 (1980) ................................................................. 18, 19

*DDR Holdings Inc. v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014) ................................................... passim

*Diamond v. Diehr*,
  450 U.S. 175 (1981) .................................................................... passim

*Gottschalk v. Benson*, 409 U.S. 63, 67 (1972) ..................................... 25

*Gussin v. Nintendo of Am., Inc.*,
  62 F.3d 1433 (Fed. Cir. 1995) ......................................................... 56

*Intellectual Ventures I LLC v. Capital One Bank (USA), NA*,
  792 F.3d 1363 (Fed. Cir. 2015) ................................................... passim

*Intellectual Ventures I, LLC et al. v. Citigroup, Inc. et al.*,
  No. 14-cv-4638-AKH (S.D.N.Y) ......................................................... 1

*Intellectual Ventures I, LLC et al. v. Erie Indemnity Co. et al.*,
  No. 14-cv-220-MRH (W.D. Pa.) .......................................................... 1

*Intellectual Ventures I, LLC et al. v. Highmark, Inc.*,
  No. 14-cv-1131-MRH (W.D. Pa.) ......................................................... 1

iv

*Intellectual Ventures I, LLC et al. v. Old Republic*,
  No. 14-cv-1130-MRH (W.D. Pa.) ........................................................ 1

*Intellectual Ventures II, LLC v. BBVA Compass Bancshares, Inc., et al.*,
  No. 13-cv-1106-AKK (N.D. Ala.) ...................................................... 1

*Intellectual Ventures II, LLC v. Commerce Bancshares, Inc., et al.*
  No. 13-cv-4160-NKL (W.D. Mo.) ...................................................... 1

*Intellectual Ventures II, LLC v. First National Bank of Omaha, et al.*,
  No. 13-cv-1647-LSC (D. Neb.) .......................................................... 1

*Intellectual Ventures II, LLC v. Huntington Bancshares Inc., et al.*
  No. 13-785-GLF (S.D. Ohio) ............................................................. 1

*Intellectual Ventures II, LLC v. JP Morgan Chase & Co., et al.*,
  No. 13-cv-3777-AKH (S.D.N.Y.) ...................................................... 1

*Intellectual Ventures II, LLC v. SunTrust Banks, Inc. et al.*,
  No. 13-cv-2454-WSD (N.D. Ga.) ...................................................... 1

*Intellectual Ventures II, LLC v. U.S. Bancorp et al.*,
  No. 13-cv-2701-ADM (D. Minn) ...................................................... 1

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) ................................................................. 38, 41

*Mayo Collaborative Servs. v. Premetheus Labs., Inc.*,
  132 S. Ct. 1289 (2012) ........................................................ 24, 29, 30

*Microsoft Corp. v. i4i Ltd. P'ship*,
  131 S. Ct. 2238 (2011) ........................................................ 17, 18, 23

*Morrison-Knudesen Co. v. Archer*,
  655 F.2d 962 (9th Cir. 1981) ............................................................ 18

*OIP Techs., Inc. v. Amazon.com, Inc.*,
  788 F.3d 1359 (Fed. Cir. 2015) ...................................................... 30

*Parker v. Flook*,
  437 U.S. 584 (1978) ................................................................. 25, 41

*Parks v. Booth*,
  102 U.S. 96 (1880) ................................................................. 38, 41

*Snellman v. Ricoh Co., Ltd.*,
  836 F.2d 528 (Fed. Cir. 1987) ........................................................ 17

*Sunovion Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA, Inc.*,
  731 F.3d 1271 (Fed. Cir. 2013) ...................................................... 17

*Sylvia Dev. Corp. v. Calvert Cnty.*,
  48 F.3d 810 (4th Cir. 1995) ............................................................. 17

*Vardon Golf Co., Inc. v. Karsten Manufacturing Corp.*,
  294 F.3d 1330 (Fed. Cir. 2002) ....................................................... 23

**Statutes**

28 U.S.C. § 1295(a)(1) .......................................................................... 3

28 U.S.C. § 1331 ................................................................................... 3

28 U.S.C. § 1338(a) .............................................................................. 3

35 U.S.C. § 101 ........................................................................... passim

35 U.S.C. § 112 ................................................................................. 45

35 U.S.C. § 282 ................................................................................. 17

**Rules**

Federal Rule of Civil Procedure 54(b) ......................................... passim

## STATEMENT OF RELATED CASES

The patents-in-suit are involved in other matters. United States Patent Nos. 6,314,409 ("the '409 patent") and 6,715,084 ("the '084 patent") are currently asserted in the following matters: *Intellectual Ventures II, LLC v. JP Morgan Chase & Co., et al.*, No. 13-cv-3777-AKH (S.D.N.Y.); *Intellectual Ventures II, LLC v. First National Bank of Omaha, et al.*, No. 13-cv-1647-LSC (D. Neb.); *Intellectual Ventures II, LLC v. Commerce Bancshares, Inc., et al.* No. 13-cv-4160-NKL (W.D. Mo.); *Intellectual Ventures II, LLC v. BBVA Compass Bancshares, Inc., et al.*, No. 13-cv-1106-AKK (N.D. Ala.); *Intellectual Ventures II, LLC v. Huntington Bancshares Inc., et al.* No. 13-785-GLF (S.D. Ohio); *Intellectual Ventures II, LLC v. SunTrust Banks, Inc. et al.*, No. 13-cv-2454-WSD (N.D. Ga.); *Intellectual Ventures II, LLC v. U.S. Bancorp et al.*, No. 13-cv-2701-ADM (D. Minn).

United States Patent Nos. 7,984,081 ("the '081 patent") and 6,546,002 ("the '002 patent") are currently asserted in *Intellectual Ventures I, LLC et al. v. Citigroup, Inc. et al.*, No. 14-cv-4638-AKH (S.D.N.Y). The '002 patent is also currently asserted in the following matters: *Intellectual Ventures I, LLC et al. v. Erie Indemnity Co. et al.*, No. 14-cv-220-MRH (W.D. Pa.); *Intellectual Ventures I, LLC et al. v. Old Republic*, No. 14-cv-1130-MRH (W.D. Pa.); *Intellectual Ventures I, LLC et al. v. Highmark, Inc.*, No. 14-cv-1131-MRH (W.D. Pa.). Those

three matters are currently being appealed before this Court with the following Case Numbers: 16-1128, 16-1129, and 16-1132, respectively.

Further, the patents-in-suit are involved in a number of post-grant matters. The '409 patent is involved in one CBM proceeding and two instituted IPR proceedings: CBM2014-00157, IPR2015-01322, IPR2015-01323. The '084 patent is involved in two IPR proceedings that have issued final decisions: IPR2014-00682, IPR2014-00801. Those decisions are currently being appealed before this Court, but have not yet been docketed. The '081 patent is involved in one instituted IPR proceeding: IPR2014-01385. The '002 patent is involved in two instituted IPR proceedings (IPR2015-00089 and IPR2015-00092) while a CBM and IPR petition are currently pending (CBM2015-00184 and IPR2015-01992).

## JURISDICTIONAL STATEMENT

The district court exercised jurisdiction under 28 U.S.C. §§ 1331 and 28 U.S.C. §1338(a).  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1) because it is an appeal from a ruling certified under Federal Rule of Civil Procedure 54(b) ("Rule 54(b)").  Intellectual Ventures disputes that the claims in this appeal were properly certified and contends that the appeal should be dismissed—in whole or in part—based upon the improper certification.

Intellectual Ventures filed a notice of appeal on October 8, 2015.

## STATEMENT OF THE ISSUES

First, whether the district court properly certified that there was "no just reason for delay" in entering final judgment on any or all of the patents-in-suit under Rule 54(b).

Second, if certification is upheld, whether the district court properly found that Intellectual Ventures' assertion of the '409 and '084 patents was barred by issue preclusion.

Third, if certification is upheld, whether claims 21, 22, and 24 of the '081 patent and claims 9, 11, 34 and 37 of the '002 patent are patent-eligible under 35 U.S.C. § 101 ("§101").

## INTRODUCTION

The district court erred by certifying the claims-at-issue for appeal under Rule 54(b). The certification was contrary to Fourth Circuit law and there were at least two independent grounds that precluded the district court's finding of "no just reason for delay." Most importantly, two of the patents-in-suit were invalidated here based on the preclusive effect of another district court judgment that has not yet been appealed to this Court because the district court in that case refused Rule 54(b) certification. The district court thus rushed to enter a judgment that puts the cart before the horse—a situation the leading treatise specifically tells courts to avoid—and runs afoul of a standard requiring "no just reason" for delay.

4

If this Court upholds certification, the district court erred by finding that Intellectual Ventures' claims of infringement of the '409 and '084 patents were barred by issue preclusion. The error was borne out of the erroneous finding that the partial summary judgment order from the Southern District of New York was "final" under Fourth Circuit law.

The district court also erred in finding that the asserted claims of the '081 and '002 patents are ineligible under §101. The district court's §101 analysis is wrought with errors. The district court overly generalized the subject matter of both patents in a manner that, if applied to other patents, could "swallow all of patent law." For the '081 patent, the district court improvidently analogized dynamically managing and modifying otherwise incompatible XML documents based on specific hierarchical data structures to modifying any old document on a piece of paper. It also wrongfully equated the '002 patent with an index or card catalog, ignoring the invention's paramount capability to retrieve a document automatically at the user's request. A card catalog has no such functionality and is far afield from the claim scope. The district court also improperly looked to each limitation individually when seeking to determine whether the claims were directed to an "abstract idea" or contained an "inventive concept." No patent could survive such an analysis because nearly every patent is the ordered combination of known parts.

Software patents and non-software patents are patent-eligible if they solve a technological problem or improve an existing technological process. The Supreme Court adopted this rule in *Diehr*, and endorsed it in *Alice*. In *DDR Holdings*, this Court applied the rule to find patent-eligible software claims solving a problem "specifically arising in the realm of computer technology." This rule provides some certainty to inventors as to which fields of technological progress are patent-eligible, and it demonstrates that the inventions here are patent-eligible. This Court should again apply this rule, and reverse the district court's ineligibility decisions.

## STATEMENT OF THE CASE

### I.   Proceedings Below

On January 15, 2014, Intellectual Ventures sued Capital One alleging infringement of the '409, '084, '081 and '002 patents. A0057-58, A0137-272. On March 3, 2015, in an amended answer, Capital One asserted antitrust counterclaims under the Sherman and Clayton Acts ("Antitrust Claims"). A0540-81.

On January 20, 2015, Capital One moved the district court to invalidate the asserted claims under §101. A0273. Intellectual Ventures cross-moved for a finding of eligibility under §101. A0585. Capital One further moved for summary judgment that issue preclusion estopped Intellectual Ventures from asserting that

the '409 and '084 patents were eligible under §101 based upon a partial summary judgment order from the Southern District of New York.  A1320, A1343-74.

On May 12, 2015, an appointed Special Master issued a Report and Recommendation that the '081 and '002 patents were patent-eligible under §101. A1375-1410.  On June 11, 2015, the Special Master issued a Report and Recommendation that issue preclusion with respect to the '409 and '084 patents should not apply and independently found that these patents were ineligible under §101.  A1523-73.

On September 2, 2015, the district court adopted the Report and Recommendation concerning the '081 and '002 patents with respect to the Special Master's factual findings but rejected it with respect to its conclusions of law. A0001-40; A0041-42.   The district court then granted Capital One's motion for summary judgment that the '081 and '002 patent are ineligible under §101 and denied Intellectual Ventures' cross-motion. *Id.*

On September 4, 2015, the district court rejected the Special Master's finding with respect to issue preclusion concerning the '409 and '084 patents and granted summary judgment on the grounds of issue preclusion.   A0043-54. Having granted summary judgment on issue preclusion the district court found it unnecessary to rule on the eligibility of the '409 and '084 patents. *Id.*

## II.    The District Court's Entry of Final Judgment Under Rule 54(b)

Following its summary judgment orders, the Maryland district court *sua sponte* entered final judgment on the claims concerning the '409, '084, '081, and '002 patents under Rule 54(b).  A0055-56.  In the final judgment order, the district court stated that it "expressly determined that there is no just reason for delay," but did not provide any findings or reasoning for certification.  *Id.*  On October 8, 2015, Intellectual Ventures filed its notice of appeal.  A1640-41.

Intellectual Ventures attempted to at least partially remedy the district court's improper certification under Rule 54(b).  Specifically, it moved the district court for Southern District of New York for entry of final judgment on the claims concerning the '409 and '084 patents so that the substantive order upon which the Maryland district court based its issue preclusion finding could be contemporaneously appealed, but that motion was denied.  A1574-82; A1642.  Intellectual Ventures then moved the Maryland district court for relief from judgment, so that its order based on issue preclusion would not be appealed before the order on which it relied.  The district court denied that motion, again without addressing whether there was any just reason for delay.  A1643; A1727-28.

## III.    The '081 Patent

The '081 patent concerns a system and method for dynamically managing multiple sets of extensible markup language ("XML") data.    A0137 (Title,

Abstract); A0168 (1:20-26).   In the Special Master's findings, the district court found it "indisputable that XML is a specialized, computer language."   A1378; A0663-80.   Specifically, XML is a computer language that defines a set of rules for encoding certain electronic data that "is a 'string of [Unicode] characters,' with 'markup constructs' and 'content.'"   A1387; A0665; A0895 (¶14).   XML did not exist prior to 1998 when the XML 1.0 Specification was released.   A1378; A0675.

XML "documents" have specific format requirements for the data contained in the document and for tags that define what data is stored at each position within an XML document.   A0895 (¶14).   XML documents also preserve the relationships of the data within the document using nested structures.   *Id*.   The goal of XML documents is to facilitate the transmission of data over the Internet in a way that is recognizable to a wide variety of servers and computer clients.   *Id*.

But "while XML formats [were at the time of invention] convenient for the company that creates them, the partners of that company may find them incompatible with their own XML formats, relational database schemes, and message formats and therefore difficult to work with."   A1388; A0168 (1:29-45); A0895 (¶15).   This is because, among other reasons, hundreds of document formats using XML syntax were developed.   A1387-88; A0664.

The "conventional approach" at the time was to define each XML document as a large storage object individually.   A0168 (1:37-48); A0895 (¶15); A0898-900

(¶¶21-24). But there was no means or mechanism to present data from multiple XML documents to a user who could then make modifications that could be propagated back to the XML documents. A0168 (1:45-48); A0899 (¶23). There was thus a need to somehow "allow[] the user to view and update XML documents in different formats, and allow[] the user to manipulate the data and perform actions without programming skills." A1388; A0168 (1:45-48). Accordingly, the inventor, as the title explains, set out to create a "system . . . for non-programmers to dynamically manage multiple sets of XML document data." A0137 (Title, Abstract).

The inventive solution was to create a "dynamic document" based upon "management record types" ("MRTs") and "primary record types" ("PRTs") so that multiple sets of XML data components could be modified at once. A1391-94; A0140-41, A0145, A0168-71 (Claim 21, Figs. 3, 4a, 5, 1:52-2:3, 2:4-23, 3:52-4:12, 4:35-48, 5:13-31, 5:44-46, 6:16-37, 7:5-12); A0896-97 (¶¶16-19). More specifically, the solution is an apparatus that creates separate data objects, each containing one of the many components of XML documents. A0177 (Claim 21). The data objects are in turn mapped into PRTs and organized into a hierarchy by MRTs. *Id.* This allowed the otherwise incompatible XML data types to now be comparable and compatible. *Id*. The construction of this specific data structure with interrelated PRTs and hierarchical MRTs to hold data from the XML

documents alone demonstrates that this invention is far from abstract or merely conceptual. *Id.*; A0896-901 (¶¶15, 20-26). This approach also indisputably departs from the conventional technology used to treat XML documents. *Id.*; A0168 (1:37-48).

The invention goes further as it provides a dynamic document that displays the MRTs through a user interface, and permits the modification of the displayed data that then propagates back changes to the PRTs and the data objects within the XML documents. A0169-70 (3:52-65, 6:16-37); A0896 (¶16). Neither the claimed dynamic document nor any component that uses a dynamic document to modify XML document data was conventional or routine at the time of the '081 patent. A898 (¶¶21, 23-24). A dynamic document that presents MRTs that are in turn formed of PRTs that are built on data objects from components of XML documents which are all modifiable through a single interface cannot be considered anything but a very specific technological solution to a problem in the computer arts.

This invention is memorialized in asserted claim 21:

21. An apparatus for manipulating XML documents, comprising:

a processor;

a component that organizes data components of one or more XML documents into data objects;

a component that identifies a plurality of primary record types for the XML documents;

a component that maps the data components of each data object to one of the plurality of primary record types;

a component that organizes the instances of the plurality of primary record types into a hierarchy to form a management record type;

a component that defines a dynamic document for display of an instance of a management record type through a user interface; and

a component that detects modification of the data in the dynamic document via the user interface, and in response thereto modifies a data component in an XML document.

A0177.  Asserted claim 22 involves further limitations on how the PRTs are maintained and related to the MRTs and asserted claim 24 limits what the MRTs define.  A0177-78.

## IV.    The '002 Patent

In the late 1990s, the '002 patent inventor recognized that the increasing prevalence of computers, network connections, and electronic data was giving rise to a new problem: how could a user, with one set of data, access it from multiple devices or locations.   A232; A248-249 (Abstract, 1:7-20; 3:57-4:57); A830-832 (¶¶12-13).   This issue has become pervasive since the time of the '002 invention and many ways of addressing it have been developed.   But at the time of the invention, this problem of access from multiple locations and devices was new. A250 (5:51-67); A835-836 (¶28).   Prior to the '002 Patent:

> It [wa]s not uncommon for many users to have multiple computers, PDAs, and other computer-related devices. Each individual computer or PDA may include specific menu items and bookmarks that do not exist in another computer or PDA. For example, a computer used at work may be the only device that includes a spreadsheet program while a computer used at home may be the only device that includes bookmarked URLs. Thus, the user will not have access to the bookmarks from the user's work computer and likewise, will not have access to the spreadsheet program from the user's home computer. As a result, this causes much inconvenience and inefficiency for the computer user.

A248 (2:40-46).

To solve this problem, the '002 patent discloses novel systems and methods for distributing a user's data and files to different devices irrespective of a user's location.  A250-252 (5:55-8:42); A829-833 (¶¶10-17).  Thus, a user who spent all day updating spreadsheets or files at work could access the information at home using a different device, even if it had a different operating system.  Nearly two decades after the patent was filed, this may seem commonplace.  But the electronic frontier of the late 1990s was far different than the landscape presented today.  Locating and sharing computer files across platforms involved significant hurdles that had to be overcome for regular users to access their files from anywhere:

> In order to share a particular Microsoft Word data file, it is currently necessary in the prior art to manually export the file in the required format so that a computer using one OS can read the file of the computer using the other OS. Time would be saved if there existed a mechanism allowing files to be exported to the network in a format specified using mobile interface agent application data.

A248-249 (2:63-3:9). To solve the problem the '002 patent contemplates a "mobile interface agent" ("MIA" in the patent) that retrieves the user-specific information and resources and displays them on the mobile interface through a new use of computer pointers that was not machine dependent. A250-255 (5:55-7:72; 12:27-13:32); A833-836 (¶¶20-28). Thus, the inventor claimed a unique solution that used a new type of interface and used computer pointers in a new way. Each instance of the mobile interface is tied to a machine (*i.e.*, the local computing device) it resides upon at the time, as noted both in the specification and the asserted claims. A240,247 (Figs. 8, 15); A832-833 (¶¶17-20). Asserted claim 9, which depends on claim 1, provides:

> 1. A method for retrieving user specific resources and information stored either on a
>
> local device or a network server, the method comprising the steps of:
>
> retrieving a mobile interface from the network server to the local device;
>
> displaying the mobile interface on the local device, the mobile interface including a plurality of pointers corresponding to the user specific resources and information; and
>
> retrieving the user specific resources and information using the plurality of pointers displayed on the mobile interface.
>
> 9. A method according to claim 1, wherein the step of retrieving the mobile interface from the network server comprises the step of retrieving the mobile interface via a cellular network.

A256.  Asserted claims 11, 34, and 37 also require a mobile interface that retrieves user resources and information based on a plurality of pointers.  A256-57. This improved existing technology by providing an interface that was (1) agnostic of the operating system on which the "user specific resources and information" was created; (2) could be accessed by the user from any location depending on network access; and (3) allowed the user to maintain one set of user specific resources and information while being able to review or update it from multiple devices and locations.

## SUMMARY OF THE ARGUMENT

The district court's Rule 54(b) certification was improper.  The district court must make findings of fact and provide a rationale in order to support a finding of "no just reason for delay."  The district court failed to do so.  Moreover, Rule 54(b) certification was improper in light of currently pending antitrust claims, as well as claims that were adjudicated based on issue preclusion where the substantive §101 eligibility analysis in a parallel district court proceeding is not part of a final judgment.

The district court's decision to apply issue preclusion to Intellectual Ventures' infringement claims concerning the '409 and '084 patents was also improper.  A "final judgment" in the "prior proceeding" must exist in order to apply issue preclusion.  A partial summary judgment order from the Southern

District of New York concerning these two patents is not a "final judgment" under Fourth Circuit law.

The district court improperly found that the asserted claims of the '081 and '002 patents were not subject matter eligible under §101. The inventions disclosed in the '081 and '002 patents do not implicate the patent-eligibility concerns raised in Supreme Court precedent. The patents are not directed to a mathematical formula, a basic concept, an idea devoid of concrete or tangible form or any other abstract idea, and the asserted claims are more than just a set of instructions for practicing an underlying idea on a computer.

The asserted claims of the '081 patent are directed to the inventive concept of dynamically managing and modifying otherwise incompatible XML documents based on management record types, primary record types and data objects from components of XML documents. The asserted claims of the '002 patent are directed to the inventive concept of retrieving computer files from different computer devices, even ones with different operating systems, from any location. Both patents unconventionally improve computer processes. Neither patent raises concerns of undue preemption.

## STANDARD OF REVIEW

The Federal Circuit reviews a district court's decision to certify partial final judgment under Rule 54(b) under the law of the regional circuit in which the

district court sits, here, the Fourth Circuit.  *Snellman v. Ricoh Co., Ltd.*, 836 F.2d 528, 533 (Fed. Cir. 1987).  The Fourth Circuit reviews a district court's Rule 54(b) decision under the abuse of discretion standard.  *Braswell Shipyards, Inc. v. Beazer East, Inc.*, 2 F.3d 1331, 1336 (4th Cir. 1993).

The Federal Circuit reviews issues of preclusion *de novo*, applying the law of the regional circuit.  *Aspex Eyewear, Inc. v. Zenni Optical LLC*, 713 F.3d 1377, 1380 (Fed. Cir. 2013).

The Federal Circuit reviews a district court's determination of patent eligibility under 35 U.S.C. §101 *de novo*.  *DDR Holdings Inc. v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014).  The Federal Circuit reviews the granting of a summary judgment motion under the law of the regional circuit. *Id.*; *Sunovion Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA, Inc.*, 731 F.3d 1271, 1275 (Fed. Cir. 2013).  The Fourth Circuit reviews *de novo* a district court's grant of summary judgment.  *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 817 (4th Cir. 1995).

Under 35 U.S.C. §282, issued patents are presumed valid.  Accordingly, "a defendant seeking to overcome this presumption must persuade the factfinder of its invalidity defense by clear and convincing evidence."  *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242-43 (2011).  In *CLS Bank Int'l v. Alice Corp. Pty.*, 717 F.3d 1269, 1304-05 (Fed. Cir. 2013) (Rader, C.J., and Linn, Moore, O'Malley,

JJ.), a plurality of this Court concluded that "any attack on an issued patent based on a challenge to the eligibility of the subject matter must be proven by clear and convincing evidence." While portions of this Court's opinions addressing the burden of proof have been superseded or vacated, under the Supreme Court's guidance on the presumption of validity, Appellees "must persuade the factfinder of [their] invalidity by clear and convincing evidence." *Microsoft*, 131 S. Ct. at 2242-43.

## ARGUMENT

## I. The District Court Erred In Finding That There Was No Just Reason for Delay and Certifying this Appeal Under Rule 54(b)

"Rule 54(b) certification is recognized as the exception rather than the norm. It should neither be granted routinely, *Curtis-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 10 (1980), nor as an accommodation to counsel." *Braswell*, 2 F.3d at 1335. "Judgments under Rule 54(b) must be reserved for the unusual case in which the costs and risks of multiplying the number of proceedings and overcrowding the appellate docket are outbalanced by the needs of the litigants for an early and separate judgment as to some claims or parties." *Id.* (quoting *Morrison-Knudesen Co. v. Archer*, 655 F.2d 962, 965 (9th Cir. 1981)).

Rule 54(b) certification involves two steps. "First, the district court must determine whether the judgment is final." *Id.* (citations omitted). "Second, the district court must determine whether there is no just reason for delay in the entry

of judgment"; an inquiry that is "tilted from the start against fragmentation of appeals." *Id.* (quoting *Curtis-Wright Corp.*, 446 U.S. at 8).

In determining whether there is "no just reason for delay in the entry of judgment" the district court considers "(1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in a set-off against the judgment sought to be made final; and (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like." *Braswell*, 2 F.3d at 1335-36 (quoting *Allis-Chalmers Corp. v. Philadelphia Electric Co.*, 521 F.2d 360, 364 (3d Cir. 1975)).

"Where the district court is persuaded that Rule 54(b) certification is appropriate, the district court should state those findings on the record or in its order." *Id.* at 1336 (citation omitted). "The expression of clear and cogent findings of fact is crucial." *Id.* "In fact, numerous courts have held that where the district court's Rule 54(b) certification is devoid of findings or reasoning in support thereof, the deference normally accorded such a certification is nullified." *Id.* (citations omitted). "This straightforward exercise assists not only the district

court in assessing the equities of the situation, but also appellate review of a Rule 54(b) certification." *Id.*

Here, the district court's two sentence Rule 54(b) certification did not state any findings or provide any reasoning. A0055-56. The first sentence finds no just reason for delay as to the claims involving Intellectual Ventures' assertion of the '409, '084, '081 and '002 patents. *Id.* The second sentence states that Capital One's antitrust claims remain pending. *Id.* Without any findings or reasoning from the district court, this Court should vacate the Rule 54(b) certification and remand this appeal. *Braswell*, 2 F.3d at 1336 ("This dearth of support makes appellate review of Rule 54(b) certification in this case a difficult task indeed. Perhaps the most prudent course would be to simply vacate the Rule 54(b) certification and remand (with instructions) for a statement of reasons supporting certification.").

Regardless of whether the Rule 54(b) certification is vacated for failure to provide findings and reasoning, the district court erred in making its certification. Given that the district court made no findings and provided no rationale, any deference to its decision "is nullified," and there are several factors that preclude a finding of no just reason for delay. *Braswell*, 2 F.3d at 1335-36.

First is the presence of the Antitrust Counterclaims, which remain pending. A0540-81. These counterclaims seek to preclude Intellectual Ventures from

asserting the '409, '084, '081 and '002 patents against Capital One and further seek the forced divestiture of these patents. *Id.* Given the interrelation of the patent infringement claim on appeal and the Antitrust Counterclaims, Rule 54(b) certification was improper and leads to a multiplying of appeals for this Court. Had the Antitrust Counterclaims been adjudicated and this case sent to an appeal all at once, there may never have been a need for this Court to address the issues now on appeal. This is because the Antitrust Counterclaims seek, *inter alia*, to prevent Intellectual Ventures from enforcing the patents-in-suit against Capital One regardless of their validity. Furthermore, if this Court reverses the district court on any aspect of this appeal, it will again likely have to deal with issues related to these same patents in a subsequent appeal concerning the Antitrust Counterclaims. This is why Rule 54(b) certification is the exception and why there must be a compelling reason for piecemeal appeals.

Second, the certification of Intellectual Ventures' claims concerning the '409 and '084 patents for appeal was improper because judgment was entered based on issue preclusion and the substantive order on which preclusion was based is a non-final summary judgment order in the Southern District of New York. A0043-54; A1343-74. That summary judgment order issued on April 28, 2015, but that case remains pending on another claim. In addition, that court declined to enter Rule 54(b) judgment on the claims concerning the '409 and '084 patents.

A1642.   Accordingly, it makes no sense for the Maryland district court to have entered final judgment under Rule 54(b) prior to the substantive order in New York reaching appeal.  This is particularly true when the Maryland court's Rule 54(b) certification was made *sua sponte* and when neither party provided a reason why expedited review was necessary.

The preeminent treatise on federal civil procedure—Wright & Miller—also counsels that all measures should be taken to avoid what has occurred here—an appeal on the issue of preclusion before an appeal on the order on which preclusion is based:

> Substantial difficulties result from the rule that a final trial-court judgment operates as res judicata while an appeal is pending.  The major problem is that a second judgment based upon the preclusive effects of the first judgment should not stand if the first judgment is reversed.  ***In some cases, litigants and the courts have collaborated so ineptly that the second judgment has become conclusive even though it rested solely on a judgment that was later reversed.***  This result should always be avoided ….

A1606, Wright & Miller § 4433 Finality – Appeals Foregone, Pending or Unavailable; 18A Fed. Prac. & Proc. Juris § 4433 (2d ed.) at 2 (emphasis added).

The district court's Rule 54(b) certification should be vacated as to all four patents, but particularly as to the claims concerning the '409 and '084 patents and issue preclusion.

## II.    The District Court Erred in Finding Issue Preclusion With Respect to the '409 and '084 Patents

Separately, the application of issue preclusion to the '409 and '084 patents was error because there is no "final judgment" in the Southern District of New York.  A1343-74.

In order for issue preclusion to apply, "the judgment in the prior preceding [must be] final and valid."  *Microsoft Corp. Antitrust Litigation*, 355 F.3d 322, 326 (4th Cir. 2004).  Here, the "judgment" upon which the district court based its finding of issue preclusion—*i.e.*, the partial summary judgment order in the Southern District of New York—is not "final."  A1343-74; A1642.  The case in New York remains pending and that court declined to enter judgment under Rule 54(b). *Id.*

No Fourth Circuit case holds that a partial summary judgment order is "final" for purposes of issue preclusion, and this Court has held that a partial summary judgment order is not "final."  *Vardon Golf Co., Inc. v. Karsten Manufacturing Corp.*, 294 F.3d 1330, 1334 (Fed. Cir. 2002) (a partial judgment order is not "final" because it is "subject to revision at any time before the entry of judgment adjudicating all the claims").  Applying *Vardon*, the district court improperly found issue preclusion and improperly barred Intellectual Ventures' infringement claims concerning the '409 and '084 patents in the absence of a final

judgment in the Southern District of New York. The issue preclusion finding should be reversed and the claims remanded for further proceedings.

## III. The '081 and '002 Patents Satisfy the Standard for Patent Eligibility Under §101

### A. Determining Patent-Eligibility

As this case shows, the Court's eligibility framework can be misapplied. The district court overgeneralized the asserted claims of the '081 and '002 patents and the ideas underlying the claims in a manner that would swallow all of patent law if used in every case. The district court also relied on inapt analogies that had nothing to do with the claims or the problems they sought to solve.

Three judicially created exceptions limit the broad statutory language of §101. "Laws of nature, natural phenomena, and abstract ideas" are viewed as "building blocks of human ingenuity" and not patent-eligible. *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 134 S. Ct. 2357, 2354 (2014). To distinguish between attempts to claim these exceptions from "those that integrate the building blocks into something more," the Supreme Court requires a two-part analytical framework. *Id.* (quoting *Mayo Collaborative Servs. v. Premetheus Labs., Inc.*, 132 S. Ct. 1289 (2012)). "First, we determine whether the claims at issue are directed to [] patent-ineligible concepts. If so, we then ask, what else is there in the claims before us?" *Id.* at 2355 (quotation omitted).

### 1.    Step One:  Whether the Claims Are Directed To an Abstract Idea

The common meaning of the word "abstract" is "disassociated from any specific instance," "insufficiently factual," "theoretical," or "expressing a quality apart from an object."  A0650-51, Merriam Webster Dictionary.  This meaning comports with the scope of the "abstract idea" exception gleaned from prior cases, and does not reach the patents in this case.

In *Gottschalk v. Benson*, 409 U.S. 63 (1972), claims for converting binary coded decimal numbers (BCD) to pure binary were ineligible as "a patent on the algorithm itself."  In *Parker v. Flook*, 437 U.S. 584, 586 (1978), the Supreme Court held ineligible claims drawn to a mathematical formula for computing alarm limits in a catalytic conversion process, noting that the patent lacked "any disclosure relating to the chemical processes at work, the monitoring of process variables, or the means of setting off an alarm or adjusting an alarm system."  In *Bilski v. Kappos*, 561 U.S. 593, 611 (2010), the Supreme Court found that the patent at issue claimed "the basic concept of hedging or protecting against risk," and held the claims ineligible because, "[h]edging is a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class."  And, in *Alice*, the "claims involve[d] a method of exchanging financial obligations between two parties using a third party intermediary to mitigate settlement risk," and the Court concluded that intermediated settlement "is

a fundamental economic practice long prevalent in our system of commerce" and falls "squarely within the realm of 'abstract ideas' as we have used that term." 134 S. Ct. at 2355, 2356-57.

Applying these precedents, this Court in *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014), defined abstract as "an idea, having no particular concrete or tangible form," and found claims disclosing "advertising as an exchange or currency" directed to "an abstract idea devoid of a concrete or tangible application." Conversely, in *DDR Holdings*, the patent's claims addressed "the problem of retaining website visitors that, if adhering to the routine, conventional functioning of Internet hyperlink protocol, would be instantly transported away from a host's website after 'clicking' on an advertisement and activating a hyperlink." 773 F.3d at 1257. This Court found that those claims do not recite a "fundamental economic or longstanding commercial practice," declining to equate the invention with "a store within a store" because that formulation failed to consider how the Internet worked. 773 F.3d at 1256, 1258. "Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* Under this precedent, concrete, computer-based solutions to problems that do not arise outside the computer context—like those of the patents-in-suit—are not abstract ideas.

"At some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena or abstract ideas." *Alice*, 134 S. Ct. at 2354. This is the challenge of step one which demands identification of some idea behind the patent without broadly characterizing the claims at the highest level of generality and committing error in falsely declaring an abstract idea. The goal is to avoid reducing the light bulb to "incandescence," reducing the cotton gin to "separation," or reducing the telephone to "communication."

The district court's opinion highlights the risk of overbroad generalization. An inventor is required to describe the invention with words and phrases rather than an actual physical object. Words and phrases like "organize," "identify," "map," "define," "detect modification of" and "modify," are recognizable concepts, which is why they are used to explain how software works. But simply because familiar ideas are used to describe software controlling the operation of a physical computing device does not mean it should be deemed "abstract," and using words like these in isolation leads to broad analogies divorced from the technological reality of the inventions and the problems they intended to solve.

To perform step one at the appropriate "level," the purpose of the invention and the language of the claims must be considered. In *Bilski*, for example, the claims' plain language described hedging risk. 561 U.S. at 611. In *Alice*, the claims "on their face" were "drawn to the concept of intermediated settlement."

134 S. Ct. at 2350. This Court applies the same approach, "first examin[ing] the claims because the claims are the definition of what a patent is intended to cover …" *Ultramercial*, 772 F.3d at 714; *Intellectual Ventures I LLC v. Capital One Bank (USA), NA*, 792 F.3d 1363, 1369 (Fed. Cir. 2015).

## 2.    Step Two:  Does the Claim Contain an Inventive Concept?

If "the breadth of the claims" places the patent into one of the three judicial exceptions to §101, the analysis moves to step two to determine whether the claim "include[s] additional features to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea." *Alice*, 134 S. Ct. at 2357. Step two requires courts to "examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to transform the claimed abstract idea into a patent eligible application." *Id.*

An inventive concept exists when the invention directs practitioners to perform new steps in solving a given problem or teaches practitioners to combine existing steps in novel ways that improve existing solutions. In *Diamond v. Diehr*, 450 U.S. 175, 187 (1981), the Court held as patent-eligible computer-based claims employing the "well-known" Arrhenius equation because the claims used the equation to address a specific technological problem in the rubber industry. That is, "the claims in *Diehr* were patent eligible because they improved an existing technological process, not because they were implemented on a computer." *Alice*,

134 S. Ct. at 2358.  Likewise, in *DDR Holdings*, this Court found that the claims yielded a result that "overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink" and amounted to "an inventive concept for resolving [a] particular Internet-centric problem."  773 F.3d at 1258-59; *Alice*, 134 S. Ct. at 2359 (distinguishing inventions that "purport to improve the functioning of the computer itself…[or] effect an improvement in any other technology or technical field" from ineligible ideas).

In *Mayo*, by contrast, the claimed process lacked an inventive concept because the claims did not instruct practitioners to perform new steps or combine existing steps in ways that improve existing solutions.  Instead, the claims amounted to "nothing significantly more than an instruction to apply the applicable laws when treating their patients."  132 S. Ct. at 1298.

"The introduction of a computer into the claims does not alter the analysis at *Mayo* step two," and in *Alice*, the Supreme Court asked "whether the claims here do more than simply instruct the practitioner to implement the abstract idea of intermediated settlement on a generic computer."  134 S. Ct. at 2357, 2359.  There, the computer-implemented steps did not improve intermediated settlement, and were actions performed as part of intermediated settlement before the advent of computers—creating records, tracking transactions, and issuing instructions.  *Id.* at 2359.

Thus, under *Diehr* and *DDR Holdings*, claims disclose an inventive concept if they improve an existing technological process or solve a specific problem using non-routine and unconventional steps. Claims that simply state an abstract idea while adding the words "apply it" or "apply it on a computer" do not pass step two. *Ultramercial*, 772 F.3d at 716 (claims instruct the practitioner to implement advertising as currency on the Internet); *Capital One*, 792 F.3d 1367-68 (claims implement budgeting on a computer); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015) (claims implement "offer-based price optimization" on a computer).

While notions of preemption permeate both steps of the §101 framework, concern over undue preemption prevails in step two. All patents result in a grant of rights to exclude others from practicing their claims, but the danger that a patent will inhibit future innovation "becomes acute when a patented process amounts to no more than an instruction to 'apply the natural law,' or otherwise forecloses more future invention than the underlying discovery could reasonably justify." *Mayo*, 132 S. Ct. at 1301.

There were no preemption concerns in *Diehr* because even though the claims employed a well-known mathematical equation, the patentees did "not seek to pre-empt the use of that equation. Rather, they [sought] only to foreclose from others the use of that equation in conjunction with all of the other steps in their

claimed process," a process limited to the field of rubber curing. 450 U.S. at 187.

Likewise, in *DDR Holdings*, this Court explained that "the claims at issue do not

attempt to preempt every application of the idea of increasing sales by making two

web pages look the same…. Rather, they recited a specific way to automate the

creation of a composite web page by an 'outsource provider' that incorporates

elements from multiple sources in order to solve a problem faced by websites on

the Internet." *Id.* at 1259; *Capital One*, 782 F.3d at 1371 (patent in *DDR Holdings*

eligible because it "did not foreclose other ways of solving the problem").

Accordingly, claims that permit practicing an unclaimed idea without necessarily

practicing the claimed invention prove that the patent is "more than a drafting

effort designed to monopolize the abstract idea." *Alice*, 134 S. Ct. at 2357.

### B.    The '081 Patent is Eligible Under §101

Claims 21, 22 and 24 of the '081 patent do not cover long-standing business

practices, basic theoretical concepts, or buildings blocks of human ingenuity. The

claims are not directed to business practices at all – focusing instead on the

dissection of XML documents for display and modification in a manner that is

efficiently managed within computer technology. Rather than reciting a long-

standing practice or basic concept, the claims provide a concrete solution to a

recent problem in computer programming and usage – how to "dynamically

manage multiple sets of XML document data." A0137 (Title); A0897-900 (¶¶20-

26). They also improve an existing technological process in a way that departs from convention without unduly preempting any underlying, but unclaimed, abstract idea.

### 1. Dynamically Managing and Modifying Otherwise Incompatible XML Documents Based on MRTs, PRTs and Data Objects From Components of XML Documents is Not an Abstract Idea

Making XML documents of varying syntax compatible and modifiable despite their different formats is a problem that did not exist before, or outside of, computers. A0168 (1:33-41); A0895, A0898, A0900 (¶¶14, 21-22, 25). It is "indisputable that XML is a specialized, computer language" that did not exist prior to 1998, just three years before the 2001 priority date for the '081 patent. A1378; A0675. Accordingly, solving the problem of making incompatible XML documents modifiable in a novel and non-obvious way is not an abstract and age-old idea like "intermediated settlement" as in *Alice*, 134 S. Ct. at 2355, or "hedging" as in *Bilski*, 561 U.S. at 611. There is also no evidence of a long-standing, decades old, fundamental precept of dynamically managing and modifying XML documents of varying format and syntax, nor could there be given the limited history of XML prior to the date of invention of the '081 patent.

### (a) The Plain Claim Language and The Record Evidence Confirms That The Asserted Claims Are Not Directed to an Abstract Idea

The '081 patent specification describes the problems facing users of XML and the deficiencies in the existing technology at the time of the invention. Companies use XML documents to transmit "various types of information for use by customers and partners," but these documents reflect the "technical manner" of their design. A0168 (1:28-34). The XML documents may be incompatible with the recipient's own systems, whether such system is based on another XML format, a relational database scheme, or other aspect of the message format. A0168 (1:37-40). XML documents are "difficult to work with" due to the incompatibility.

The specification also describes how the invention solves these problems. The invented system "allows the user to manipulate the data and perform actions" on the XML documents through presentation of customizable views of the data. A0168 (1:45-48, 3:52-58, 10:10-28); A0896, A0899 (¶¶16, 23). Dynamic documents are used to display the data to the user. A0169 (3:55-56); A0896, A0899 (¶¶16, 23). The user enters changes through the dynamic document. A0175 (15:29-31); A0898, A0900 (¶¶21, 25). These changes are maintained in MRTs and PRTs that are expressly recited in the asserted claims. A0175 (15:35-42); A0896, A0898 (¶¶16, 21). Finally, from these records, the system updates the original XML documents. A0169 (3:63-65, 6:17-37); A0896, A0898 (¶¶16, 21). The ability of the inventive system to "merge data from multiple XML document

formats" and manipulate the inventive structure to "affect[] all [related] XML documents" separates the invention from conventionality.    A0168 (2:17-22); A0898-900 (¶¶22-24).   Moreover, this  MRT and PRT-based approach is plainly only one concrete way of solving the problem, and not an effort to claim any concept related to XML compatibility.

The asserted claims leave no doubt that the patent is not "directed to" an abstract idea.  The '081 patent first creates separate data objects, each containing one of the many components of XML documents.   A0169 (3:19-23, 3:66-4:3); A0896-97 (¶¶16-18).   The data objects are in turn mapped into PRTs and organized into a hierarchy by MRTs.   A0168-69 (2:4-22, 3:66-4:3); A0896-97 (¶¶16-18).   These steps allowed otherwise incompatible XML types to now be compatible, and thus alone demonstrate that the invention is far from abstract or conventional.  A0898-99 (¶22).

The asserted claims then build a dynamic document structure to display the data associated with the MRTs on a user interface.   A0168 (2:9-11, 3:49-56); A0897, A0899 (¶¶19, 23).  This dynamic document is a reference for modification to the data of the otherwise incompatible XML documents themselves, and the claims provide a component that detects the modifications to the dynamic document and in response propagates those changes back to the underlying XML documents. *Id*.

These claimed steps are not "devoid of a concrete or tangible application." *Ultramercial*, 772 F.3d at 715. The nature of the problem and the solutions require a software program that creates a *specific* data structure that interrelates various XML document formats and syntaxes in a *particular* way to ensure their compatibility and modifiability. This software must be designed and written to perform the desired functions that ultimately improve the dynamic management and modification of otherwise incompatible XML documents based on MRTs, PRTs and data objects from components of XML documents.

The only evidence is that the patentee cured a recent problem in computer programming indigenous to XML with an intricately claimed solution.

> **(b)**  **In Order to Find an Abstract Idea, the District Court Ignored the Invention and Claim Language and Instead Resorted to Inapt Analogies**

The '081 patent is not directed to an abstract idea. Overgeneralized readings of the claims and contrived analogies disconnected from the claims do not change that. In *DDR Holdings*, this Court rejected the "store within a store" analogy because it did not account for the technological problem being solved:

> While the concept may have been well-known by the relevant timeframe, that practice did not have to account for the ephemeral nature of an Internet "location" or the near-instantaneous transport between locations made possible by standard internet communication protocols, which introduces a problem that does not arise in the "brick and mortar" context.

773 F.3d at 1258.

Here, unlike in *DDR Holdings*, there is no possible pre-computer or even pre-XML analog to the claimed steps. There is no available concept "well-known by the relevant timeframe" that approximates the scope of the asserted claims. The district court nonetheless found the claims to be directed to the purported abstract idea of "organizing, displaying, and manipulating data related to business documents." A0016. The district court found this to be "a fundamental activity in which businesses have engaged as long as business have relied on documents." A0013.

This is an inapt analogy. It ignores the problem the patentee faced, the *claimed* solution, and essentially all of its limitations. Most critically, it ignores that the invention requires a *specific* data structure of data objects, PRTs and hierarchical MRTs to make incompatible XML documents compatible. It also ignores the document structure as a reference for modification to the data of the XML documents themselves and the component that detects the modifications to the dynamic document and in response propagates those changes back to the underlying XML documents. This is the gravamen of the claim; the inventors claimed *only* this way of solving a concrete problem in XML document compatibility, and this claim-limited approach was not conventional. A0177 (Claim 21). But the district court simply ignored these limitations, and ignored

the nature of the *invention*, gesturing instead at a highly abstracted version of what the invention *achieves*.

The only portion of the patent that the district court relied upon for its conclusion that the claims are directed to an abstract idea is a single sentence in column 1 of the background of the invention. A0013. This sentence reads: "Therefore, there is a need for a system that allows a user to view and update XML documents in different formats, and allows users to manipulate data and perform actions without programming skills." A0168. This lone sentence is a recitation of the problem that the patentee sought to solve, not how the patentee actually solved the problem, which is set forth in the remainder of the specification and *the claims*. A0137-78. If abstractness could be found based upon a recitation of the problem a patentee sought to solve, the "abstract idea" exception would swallow nearly all of what §101 identifies as patentable. The Supreme Court specifically cautioned against this result in *Alice*. 134 S. Ct. at 2355.

The district court's remaining analysis consisted of striping each limitation down to a single verb to identify an abstract idea (A0013) and a finding that the concepts of "XML documents," "dynamic documents," and "user interfaces" ***in isolation*** fail to make the claims concrete (A0015-16). Analyzing claims this way is improper. No claim would be eligible if each element is read in isolation or reduced to a single verb because all inventions are made of known parts. *DDR*

*Holdings*, 773 F.3d at 1257, n. 5 ("On a fundamental level, the creation of new compositions and products based on combining elements from different sources has long been a basis for patentable inventions") (citing *Parks v. Booth*, 102 U.S. 96, 102 (1880) ("Modern inventions very often consist merely of a new combination of old elements or devices, where nothing is or can be claimed except the new combination.") (also citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-19 (2007) ("[I]nventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.").

The '081 patent is no more related to organizing, displaying, and manipulating data (as the district court found) than the invention in *Diehr* (which stored and analyzed data) or the invention in *DDR Holdings* (which manipulated the look and feel of other websites). *Diehr*, 450 U.S. at 191; *DDR Holdings*, 773 F.3d at 1257. The patents in these cases manipulated and analyzed data as part of a very narrow and particularized inventive application. The district court's approach would overrule these cases and make all software patents ineligible—the very result that *Alice* rejects. *Alice*, 134 S. Ct. at 2359.

Moreover, the district court's finding that the claims are directed to an abstract idea is divorced from the improvements offered by the invention and the claim language, *i.e.*, "the definition of what a patent is intended to cover" or "the

breadth of the claims." *Ultramercial*, 772 F.3d at 714; *Capital One*, 792 F.3d at 1369. Contrary to the district court's conclusion, the claims are not directed to "organizing, displaying, and manipulating data related to business documents." A0016. Whether or not the XML documents are "business documents" is irrelevant to claim 21. A0177. Moreover, the purpose of the claims is to dynamically manage and modify otherwise incompatible XML documents based on MRTs, PRTs and data objects from components of XML documents. The claim language on its face is directed to this purpose in a step-by-step, component-by-component, recitation. A0177 (Claim 21). Only by eviscerating claim limitations or by reading select limitations in isolation can one improperly conclude otherwise.

What the district court found to be the underlying abstract idea does not fall within the claims, is not what the Patent Office issued, and is not what a person of ordinary skill in the art would understand the patent to cover. One must ignore the teachings of the patent and the elements recited in the claims in order to find that the '081 patent is directed to an abstract idea.

### 2.    The '081 Patent Discloses an "Inventive Concept"

If analyzed under step two, the asserted claims are patent-eligible "because they improve[] an existing technological process" and do more than state an idea along with "apply it with a computer." *Alice*, 134 S. Ct. at 2358 (internal quotations omitted). Further, the asserted claims do not implicate the Supreme

Court's preemption concerns because they recite specific, unconventional ways of dynamically managing and modifying otherwise incompatible XML documents that do not foreclose all ways of doing so in this narrow field of technology. *DDR Holdings*, 773 F.3d at 1259; *Capital One*, 792 F.3d at 1371.

The only evidence of record is that the asserted claims of the '081 patent disclose the inventive concept of dynamically managing and modifying otherwise incompatible XML documents based on MRTs, PRTs and data objects from components of XML documents.

### (a)   The '081 Patent Discloses A New and Useful Application

The claims are not drawn to an abstract idea. Regardless, the claims "supply a 'new and useful' application" and are thus patent eligible under step two as well. *Alice*, 134 S. Ct. at 2357-58 (quoting *Benson*, 409 U.S. at 67). The specification identifies the problem that the patentee sought to overcome – *i.e.*, the incompatibility of XML documents with different "XML syntax[es]" and different "XML formats, relational database schemes, and messages formats." A1388; A0168 (1:29-45). This was also a recent problem in the computer arts because the advent of XML was just three years before the '081 patent's priority date. A1378; A0675. The specification describes, and the claims are directed to, the solution to the problem – *i.e.*, the creation of a "dynamic document" based upon MRTs and PRTs that allows multiple sets of XML data components to be modified at once.

A1391-94; A0140-41, A0145, A0168-71 (Claim 21, Figs, 3, 4a, 5, 1:52-2:3, 2:4-23, 3:52-4:12, 4:35-48, 5:13-31, 5:44-46, 6:16-37, 7:5-12); A0896-97 (¶¶16-19).

The only evidence of record—the specification and expert testimony—is that this is a new and useful application that solved a problem in the computer arts. The district court did not identify contradictory evidence, nor could it.

### (b)   The '081 Patent Unconventionally Improves a Technological Process

The new and useful application disclosed by the '081 patent is more than just an instruction to apply a preexisting idea on a computer. In *Flook*, *Bilski*, and *Alice*, the mathematical formula, hedging, and intermediated settlement existed before and apart from computers, which allowed the Supreme Court to hold that the claims implemented those ideas using the computer as a tool. The same cannot be said here because the asserted claims of the '081 patent are inextricably tied to computer technology and solve a problem that arose because of computers.

The district court improperly stuck down the claims of the '081 patent on the grounds that the individual limitations were "nothing more than [] conventional, generic computer component[s]." A0017. Such an analysis is improper because virtually all patents are the composite of known parts. *DDR Holdings*, 773 F.3d at 1257, n. 5; *Parks*, 102 U.S. at 102; *KSR*, 550 U.S. at 418-19. In *Alice*, the Supreme Court was clear that "many computer-implemented claims are formally addressed to patent-eligible subject matter" and claims "purporting to improve the

41

functioning of the computer itself" may be eligible. 134 S. Ct. at 2359. The Supreme Court did not limit eligibility to specific kinds of "computer-implemented claims" or to improvements in "something other than a generic computer."

Claims implemented using generic computers have been held patent-eligible. *Diehr*, 450 U.S. at 187-190; *DDR Holdings*, 773 F.3d at 1258. Accordingly, instead of employing a blanket prohibition against "generic computer functions," courts must evaluate the claimed elements' use of the computer, *i.e.*, "the computer's participation," to determine whether the claims simply implement an abstract idea on a computer. *Alice*, 134 S. Ct. at 2359 (quoting *CLS Bank*, 717 F.3d at 1286 (Lourie, J., concurring)). Applying this test in *Diehr*, the Supreme Court found that the use of a computer improved an existing technological process:

> Obviously, one does not need a "computer" to cure natural or synthetic rubber, but if the computer use incorporated in the process patent significantly lessens the possibility of "overcuring" or "undercuring," the process as a whole does not thereby become unpatentable subject matter.

450 U.S. at 187. In *DDR Holdings*, the claims used the computer to manipulate interactions with the Internet to yield "a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." 773 F.3d at 1258. "When the limitations of the '399 Patent's asserted claims are taken together as an ordered combination, the claims recite an invention that is not merely the routine or conventional use of the Internet." *Id* at 1259.

Taken together as an ordered combination, the asserted claims of the '081 patent specified how to manage and modify XML documents of varying formats and syntaxes in a way that departed from convention. At the time of the invention, each XML document was defined as a large storage object individually, and there was no means to make modifications to the nested data objects across multiple XML documents. *See supra* pp. 9-10. The invention addressed the deficiency of the storage of XML documents individually by creating a "dynamic document" based upon MRTs and PRTs so that multiple sets of XML data components could be modified at once through a user interface. Asserted claim 21 is illustrative:

| '081 Claim 21 | Merely Routine and Conventional Use of the Internet or Computers? |
|---|---|
| [claim 21] "An apparatus for manipulating XML documents, comprising: a processor; a component that organizes data components of one or more XML documents into data objects; a component that identifies a plurality of primary record types for the XML documents; a component that maps the data components of each data object to one of the plurality of primary record types; a component that organizes the instances of the plurality of primary record types into a hierarchy to form | No. The convention was to store XML documents individually as a large storage object. A0168 (1:37-48); A0895 (¶15); A0898-900 (¶¶21-24). The invention creates an entirely new data structure for modifying XML documents where (1) the nested data components of XML document are organized into data objects, (2) the data components of the data objects are mapped to PRTs, and (3) the PRTs are hierarchically organized to form MRTs. This new and specific data structure is what permits a user to make modifications that can be propagated back to multiple XML |

| '081 Claim 21 | Merely Routine and Conventional Use of the Internet or Computers? |
|---|---|
| a management record type;" | documents as opposed to modifying each XML document individually. |
| "a component that defines a dynamic document for display of an instance of a management record type through a user interface; and<br>a component that detects modification of the data in the dynamic document via the user interface, and in response thereto modifies a data component in an XML document." | No.  The dynamic document that displays the MRTs and permits the modification of data components in the underlying XML documents was not conventional. XML documents were stored individually and there was no mechanism to make changes to underlying data components across multiple XML documents or XML documents with varying forms or syntaxes.  The dynamic document was the novel means of making use of the novel data structures' ability to dynamically change, manage and modify XML documents. |

The district court made two other improper findings that have nothing to do with the step two inquiry.  First, the district court found that claim 21 did not pass step two because the claim purportedly did not describe "how" the invention works.  A0027-30.  The district court's finding in this regard was premised on its insertion of the word "somehow" into each claim limitation.  *Id.*  This analysis has multiple errors.  Indeed, the word "somehow" could be inserted into any limitation of any claim ever written, including every limitation of the patent-eligible claims in *Diehr* and *DDR Holdings*.  *Application of Diehr*, 602 F.2d 982, 983-84 (1979); 773

F.3d at 1249-50.    It could be written into every limitation of complex pharmaceutical patents – *e.g.*, "[*somehow*] combine chemical compound A with chemical compound B" or "[*somehow*] administer the combination of compound A and B."

This practice of inserting the word "somehow" into the claims also confuses the role of the specification and the claims.  The claims "point[] out and distinctly claim[] the **subject matter** which the inventor … regards as the invention."  35 U.S.C. § 112.  The specification is the "how" as it must "contain a written description of the invention, and of the manner and process of making and using it."  *Id.*  The district court cannot impose its own requirement that the claims include all details from the specification, else there would be no need for claims.

The district court's "somehow" analysis also ignores that claim 21 does in fact set forth "how" the problem with contemporary XML documents was solved by the patentee.  It sets forth seven interrelated components that – when assembled – allow a user to dynamically manage and modify otherwise incompatible XML documents based on management record types, primary record types, and data objects from components of XML documents.

The other error is the district court's finding that "[s]imply put, the claimed invention identifies the need but not the solution."  A0030.  This is plainly incorrect.  At a minimum, the district court ignored the undisputed teachings of the

45

patent and the Special Master's factual findings (which the district court adopted) regarding the problem in the art at the time of the invention and how the patentee solved that problem. Only by ignoring both the claims and the specification did the district court arrive at the conclusion that there was no inventive concept.

### (c)    The '081 Patent Does Not Raise Undue Preemption Concerns

The district court's preemption findings are also in error. The gravamen of that error is its finding the '081 patent "broadly addresses XML document manipulation." A0028. But the claimed invention is about solving a specific problem with XML documents, not foreclosing all ways to manipulate XML documents. A900-901 (¶27). There was an identified problem in the nascent XML field and the patentee discovered a new and useful solution. There is no contradictory evidence.

The record evidence shows that preemption is not a concern. The patent does not cover the conventional approach at the time. A0899-901 (¶¶23-27). All that is foreclosed is the specific way to manage and modify XML documents using PRTs, MRTs, and a dynamic document to propagate modifications back to the data components of various XML documents. All other ways to modify XML documents are available.

### C.    The '002 Patent is Eligible Under §101

Claims 9, 11, 34 and 37 of the '002 patent are patent eligible.  The only facts in the record were that the '002 patent claimed a specific, tangible solution to a computer centric problem and did so in a way that specified how interactions with the interface and files are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily encountered by a computer user accessing computer files at the time of the invention.  *DDR Holdings*, 773 F.3d at 1258.  These were facts that the district court adopted as part of the Special Master's findings, which were supported by the intrinsic and extrinsic evidence.  The Special Master found:

- The '002 patent addresses problems faced by users who wish to access their files, programs, and the like from any one of their multiple devices or computers.  A1398.

- The invention described and claimed in the '002 Patent purports to solve these problems through the use of a "mobile interface" that permits the user to access her resources from any location or any device.  A1399.

-  [T]he general use of pointers may be generic, as evidenced by the Background Section of the '002 Patent, the Special Master agrees with Plaintiffs that this patent purports to do "significantly more." A1406-1407.

- The Special Master further finds that the claimed invention of the '002 Patent clearly identifies and solves problems unique to the computer networks field involving access to multiple types of information, documentation, programs and links from multiple locations and devices. A1407.

Despite accepting these findings, the district court held that the claims were ineligible. The district court's holding was conclusory, without citation to any evidence or analysis, despite the procedural posture of summary judgment and the fact that the patents are presumed valid. And the district court's conclusions were based on a fundamental misunderstanding of the nature of the invention. The district court analogized the invention to an electronic card catalog, finding that the invention merely directs a user to a resource. A0033. But the invention is not about pointing, but about automatically retrieving computer documents and files from any location and on any platform. Card catalogs and indices cannot retrieve, automatically or otherwise, and they cannot operate beyond the specific indexing system for which they are designed.

### 1. Accessing and Retrieving User-Specific Electronic Resources and Information is Not an Abstract Idea

The asserted claims disclose an invention for "retrieving user specific resources stored either on a local device or a network server" through a "mobile interface" that "includ[es] a plurality of pointers corresponding to the user specific resources and information" where that information is sent over a computer network or a cellular network. A0256 (claim 1). The problem solved by the invention was how to retrieve computer files and data over a network irrespective of a user's location or device. A0232 (Abstract); A0235-37 (Figs. 3-5); A0248-250 (1:22-3:63, 5:48-55). The claimed solution was a mobile interface that could be accessed

over a network and could deliver the files for the user.  A0232 (Title, Abstract); A0248-253 (1:7-20; 3:65-4:57; 5:56-6:37; 8:23-11:19).  Neither the basic character of the claims nor the inventive solution involves a longstanding practice, basic theoretical concept, or a building block of human ingenuity.  Sending files and retrieving files on desktops, laptops, or smart phones might seem common today, but it was not common in the late 1990s and it was certainly not of the "ancient lineage" or century old business practices discussed by the Supreme Court in *Alice* and *Bilski*. 134 S. Ct. at 2356.

Accessing and retrieving a user's electronic data on different, incompatible electronic devices is not a problem that existed before or outside of computers. Computer files, electronic data, and computer networks are not akin to the financial instruments at issue in *Alice* or *Bilski* and finding and sending electronic data so that it can be received anywhere on any device does not fall "squarely within the realm of 'abstract ideas' as [the Supreme Court has] used that term." 134 S. Ct. at 2357.  The patent does not claim "the performance of some business practice known from the pre-Internet world along with a requirement to perform it on the Internet."  *DDR Holdings*, 773 F.3d at 1264.  Indeed, there is no practice from the pre-computer network world that is identical or even similar to the invention.  Instead, the invention improves how computers retrieve data using techniques "necessarily rooted in computer technology."  *Id.*

The claims, the specification, and the Special Master's factual findings all support the inexorable conclusion that the issue faced was unique to computer technology, and the solution presented was also narrowly tailored to a specific computer implementation. A0232, A248 (Abstract, 1:7-20); A0829-838 (¶¶11-17, 27-28); A1398-1403. The claims require a physical manifestation through the mobile interface, which the district court and Special Master construed as a "user interface accessible on different computer devices and capable of dynamically accessing user specific data stored on a network server or a local device." A0003; A01399. In addition, the claims require retrieving the necessary information for the mobile interface over a network, displaying the mobile interface to the user (that interface including pointers to corresponding user specific resources and information) and using the interface to retrieve information. Thus, the mobile interface must be compiled based on computer data, work on different computer devices, be displayed to the user, and the user must interact with it to dynamically retrieve the requested data from either a network server or a local device. Unlike the claims in *Ultramercial*, this invention is not "devoid of a concrete or tangible application." 772 F.3d at 715. The nature of the solution requires a software program that creates a specific collection of data, transmits that over a computer network, formats it so that it is available on different devices, leverages the

underlying information found in computer pointers and retrieves and presents the data to the user.

The district court misunderstood the invention as an index, but on a computer. Instead of characterizing the invention by what it is—*i.e.*, a mobile interface that can retrieve a user's electronic data—it characterized the invention by one aspect of how it operates. The district court concluded that the '002 patent claimed nothing more than "[using] an index, table of contents, card catalog, director, or address book to find information by locating a topic or name, noting the corresponding number or location, and going to that number or location to obtain the information sought." A0033. The district court repeatedly used examples where the user had to physically retrieve the resources. A0038-40. This analysis is flawed and oblivious to the factual evidence. An index does not retrieve. A card catalog does not retrieve. But this invention does.

The district court failed to explain how the claim "is the same idea at play" as simply retrieving data. An index points to a specific page in the book or publication in which the index resides. A card catalog may point to where a specific book is placed in a specific library assuming it is not checked out. There is no guarantee that the location will be the same in other libraries or the index will work on other editions or printings of the book. If a different library uses a different cataloging system or a book uses a different pagination, then the

information is useless.  Under the district court's strained analogy, this would be akin to using different operating systems.  Card catalogs do not have operating systems.  The patent specifically solves this problem by providing the user with his or her file or information irrespective of the specific cataloging system or pagination.  The invention cannot exist apart from its claimed character or the necessary technology that allows for the "near-instantaneous transport between [computer] locations made possible by standard [network] communication protocols."  *DDR Holdings*, 773 F.3d at 1258.

The district court ignored the essential requirement that the "mobile interface" act as an agent on behalf of a user and actually retrieve the user's specific resources and information.   The agent does more than direct a user to where their files are stored and then makes the user "go[] to that number or location to obtain the information sought."  A0033.  But the claims require that the invention does that and "retriev[es] the user specific resources and information using the plurality of pointers displayed on the mobile interface."  A0256 (claim 1).  The mobile interface automatically delivers the information to the user, no matter where the user is located, no matter what device on which the mobile interface is installed.  That the mobile interface itself uses computer pointers to retrieve the information is irrelevant to the user—the user has no idea of the identifying information or any use for it. "When the mobile interface agent running

on one OS changes to a computer running a different OS, the mobile interface agent can signal a server daemon to perform an OS conversion of the data and get the data file in the proper format. ***To the user, this process would be automatic and transparent since the user can simply click a data file, which is a pointer data in his/her mobile interface agent.***" A0249 (2:61-3:9); A0836-838 (¶¶12-15, 27-28).   Contrast this to an index, where the user must see the identifying information because it is incumbent upon her to retrieve the resource.   Contrary to district court's analogy, a card catalog is simply not capable of performing the invention. This analogy does not account for the electronic elements of a network server, transporting digital resources over a network server or a cellular network, or an electronic mobile agent. The district court did not cite to any evidence of any actual card catalog or index that could do any of this because there is no such thing.

The district court's fundamental misunderstanding of the invention is also at odds with the Special Master's factual findings, which the district court adopted. The Special Master found that "the claims' use of the "mobile interface" [is] a key and integral aspect of the claimed invention…." A1404.  He further found that the mobile interface was not the same as a simply pointing:

- Calling home to have a family member look up something in a phone book, kitchen drawer, or posting on the refrigerator is not analogous to a dynamic mobile interface ***that provides an ability to access files from anywhere from any device no matter where those e-files are***

*located*.

- An index (such as the card catalog at a library) contains pointers to information (the books stored in a systematic manner), but the similarity ends there.  Those pointers are designed to direct the user to the location of the information (the location of the book on the shelf), *while a mobile interface with a programming pointer-based retrieval technique* specifies certain choices and contains the code to execute the choice made by the user.

A1405.  Based on this factual premise, the district court should not have held that the patent is nothing more than an index or a card catalog.  A0836-837 (¶¶28-31).

Nor did the district court explain why an index or a card catalog was a fundamental or long prevalent to computer technology.  The court merely concluded that it was a fundamental practice without any evidence or support.  Considering the procedural posture and the presumption of validity, the district court should be required to cite some evidence or provide some reason beyond merely parroting dissected quotes from judicial opinions that considered wholly different inventions.  The patent provides that the invention is addressed to a new problem.  A0248-249 (1:7-3:63).  The claims are directed to a new, computer-specific solution.  A0256-257 (claims 9, 11, 34, 37).  Intellectual Ventures' expert provided corroborating testimony to the same effect.  A0835-838 (¶¶28, 34-36).  The Special Master found as a factual matter that the "'mobile interface' in the invention provides a 'new and useful' means to operate a pointer retrieval system

and extends the ability to use such a system to any device." A1407. No evidence says otherwise.

The invention is not a formula, a longstanding practice, or a business or commercial practice, and it cannot happen outside of the computer network environment. It certainly cannot be limited to a mere card catalog. In short, it does not claim an abstract idea.

### 2.    The '002 Patent Discloses an "Inventive Concept" and Claims a New Use of Computer Pointers

If the Court incorrectly agrees that the '002 patent claims nothing more than an electronic card catalog and that an electronic card catalog is an abstract idea, then the asserted claims are nevertheless eligible because they disclose a very specific way of using a mobile interface to access and retrieve a user's specific computer files and data—a way that does not "foreclose other ways of solving the problem" of locating electronic files. *Capital One*, 792 F.3d at 1371.

Each claimed component of the '002 patent performs a specific task in a specific way. A0829-834 (¶¶12-17, 26-28, 33-34). When the limitations of the asserted claims are taken together as an ordered combination, the claims recite an invention that is not merely the routine and conventional use of computer technology and not simply an instruction to perform an idea on a computer. The patent does not simply claim a card catalog with the admonition to do it on a computer. Instead, it discloses "a 'new and useful' application of the idea" by

providing a mobile interface that can work on multiple different devices and types of devices from any network-accessible location to retrieve user resources and information. *Alice*, 134 S. Ct. at 2357. The mobile interface provides this functionality through using computer pointers in a new, unconventional way.

The district court failed to understand the functional distinction between a "pointer" or "label" generally and the specific "computer pointer" discussed in the patent. The specification explains that the claimed pointers are specific computer memory locations:

> A user interface in an OS generally includes "pointers" to software programs, applications, files, folders, documents, and other menu items. A pointer in this context is a reference to a type of menu item that can be accessible on the computer, PDA or a server. In the current versions of the Windows 98/NT (believed to be a registered Trademark of Microsoft Corp.) OS, pointers are commonly used to retrieve/access menu items.

A0248 (1:34-42). This Court also has discussed computer pointers as references to computer memory. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1306 (Fed. Cir. 2014) ("The district court explained that a pointer is 'a term of art in computer engineering' that 'stores a computer memory address.'"); *Gussin v. Nintendo of Am., Inc.*, 62 F.3d 1433 (Fed. Cir. 1995) (explaining that "[a] pointer is [a] data item that specifies the location of another item in memory") (quotations omitted)). In computer programming, pointers are powerful tools that allow for efficient management of a variety of information because they can reference whatever may

be stored at that location in memory. Thus, they can link to files, data, videos or even things such as other commands or subroutines. They allow a system to continually reference an object even as that object is updated or changed or even if it is saved elsewhere—pointers can recursively point to other pointers. But pointers were specific to the local system.

The genius of the '002 patent is realizing that pointers have power beyond merely using them within the context of a local system. By maintaining a master copy of all pointers linked to the mobile interface, the mobile agent can access, retrieve, update, or manage the user's files and data pointed to from anywhere on different computer devices or operating systems. Instead of the conventional use of pointers which limited access to a local machine and were therefore useful only within the context of one machine, the '002 patent overrides the routine use of pointers by intelligently accessing and combining them through the mobile interface to allow someone to access files and data from any location irrespective of their device. A0250-254 (7:30-8:44, 13:15-62); A0832-836 (¶¶15-17, 26-28).

Claim 1 and dependent claim 9 demonstrate the unique characteristics of this invention that sets it apart from the mere routine or conventional use of a computer.

| '002 Claims 1 and 9 Limitations | Merely Routine and Conventional Use of the Internet or Computers? |
|---|---|

| '002 Claims 1 and 9 Limitations | Merely Routine and Conventional Use of the Internet or Computers? |
|---|---|
| [claim 1] "A method for retrieving user specific resources and information stored either on a local device or a network server, the method comprising the steps of: | No. Sending and receiving documents and information that were stored on either a local device or network server might be conventional, but sending and receiving documents and information so that it can be received and viewed on different devices, some with different operating systems, was not conventional. There was no evidence in the record that it was conventional.

Further, this limitation is not the entire invention and claim limitations must be considered "as an ordered combination." *Alice*, 134 S. Ct. at 2359. |
| "retrieving a mobile interface from the network server to the local device;" | No. A generic user interface could be conventional. But the claimed mobile interface is a very specific type of interface that allowed users to perform tasks that had never been done before. The district court presumed mobile interface meant "A user interface accessible on different computing devices and capable of dynamically accessing user specific data stored on a network server and local device." There is no evidence that there was any other type of interface in existence.

The patent explains that usually an interface was conventionally designed to operate only with one specific system. A0248 (2:61-66) ("It is |

| '002 Claims 1 and 9 Limitations | Merely Routine and Conventional Use of the Internet or Computers? |
|---|---|
| | common for users to have two computers of two different OS's running an application such as Microsoft Word. In order to share a particular Microsoft Word data file, it is currently necessary in the prior art to manually export the file in the required format so that a computer using one OS can read the file of the computer using the other OS."). The mobile interface, which could be accessed on different computing devices, was therefore not conventional. Further, an interface that could dynamically access user specific data stored either on a network or a local device was not conventional. A0249 (3:15-22) ("In other words, besides the advantage of being cross platform, using the mobile interface agent system allows user profile, configuration and settings information to be handled intelligently by network services to export information between networks such as the Internet, cable television network, or telephone network. This allows not only cross platform advantages, but cross network advantages as well.") |
| "displaying the mobile interface on the local device, the mobile interface including a plurality of pointers corresponding to the user specific resources and information; and" | No. The mobile interface was not conventional as described above. Further, it was not conventional to use pointers for access to files or information beyond the local machine where those files or information were |

| '002 Claims 1 and 9 Limitations | Merely Routine and Conventional Use of the Internet or Computers? |
|---|---|
| | created or stored. The patent explains that pointers were OS dependent and were not used beyond references to items on a specific device. A0248 (1:34-38) ("A user interface in an OS generally includes 'pointers' to software programs, applications, files, folders, documents, and other menu items. A pointer in this context is a reference to a type of menu item that can be accessible on the computer, PDA or a server."). Using a pointer in an interface that is OS agnostic was not only unconventional, but novel and nonobvious. |
| "retrieving the user specific resources and information using the plurality of pointers displayed on the mobile interface." | No. Computing devices were not able to perform the functionality and did not do it with the claimed mobile interface using pointers in a new way. A computer user could not access their files across different computer devices, potentially having different operating systems. A0250 (5:51-55) ("As noted above, conventional systems and methods for information management, retrieval, and storage can be inefficient and burdensome. The present invention overcomes the disadvantages of prior art systems and methods."). |
| [claim 9] "A method according to claim 1, wherein the step of retrieving the mobile interface from the network server comprises the step | No. Perhaps the mere use of a cellular network was conventional in 1999 (although the district court did not cite to any evidence that said as |

| '002 Claims 1 and 9 Limitations | Merely Routine and Conventional Use of the Internet or Computers? |
|---|---|
| of retrieving the mobile interface via a cellular network." | much). But it was not conventional to send files—let alone create an instance of a mobile interface that could access files and data—across a cellular network. The smart phone was still more science fiction than fact in 1999. Blackberry did not introduce its smart phone until 2003 and did not introduce its first Apple iPhone until 2007. Importantly, the district court did not cite evidence or actually show that the claimed use of a cellular network was conventional. |

The district court failed to explain how the actual claim limitations were "routine" or "conventional" much less the claim taken as a whole. It did not cite to any evidence and it ignored the evidence presented. Instead, the district court found that the patent explained a need, but not a concrete solution. A0035. This is contrary to the intrinsic evidence and the factual findings that the court adopted. A1399 ("The invention described and claimed in the '002 Patent purports to solve these problems through the use of a 'mobile interface' that permits the user to access her resources from any location or any device."); A1407 ("The Special Master further finds that the claimed invention of the '002 Patent clearly identifies and solves problems unique to the computer network field involving access to

multiple types of information, documentation, programs and links from multiple locations and devices.").

The district court's explanation that the claims must show "how the problem is solved" is also baseless and contrary to the adopted finding of fact that the "invention provides a 'new and useful' means to operate a pointer retrieval system and extends the ability to use such a system by any device." A1407. Thus, the how is "*using the plurality of pointers displayed on the mobile interface*." A0256, Claims 1, 11, 34.

The district court discounted the patent's novel use of pointers by reading the term in isolation from the rest of the claim and the specification. The district court stated, "the use of a pointer cannot be an inventive concept because the vast majority of data retrieval on computers involves the use of pointers." A0037. The district court failed to account for the fact that the patent uses pointers in a new way, which is a finding that the court factually adopted: the "general use of pointers may be generic…[but] *this patent* purports to do significantly more." A1406-1407 (emphasis in original).

As discussed above, the district court's analysis improperly forestalls any inventive concept that relies on a known computer element, even one that is used in a novel and useful way. Using known aspects of computer technology in unconventional ways is patent eligible subject matter under §101.

62

## CONCLUSION

For these reasons, the district court's Rule 54(b) certification should be vacated.  If not, the district court's findings of issue preclusion (as to the '409 and '084 patents) and ineligibility under §101 (as to the '081 and '002 patents) should be reversed.


Dated:  January 14, 2016                 Respectfully submitted,

                                         */s/ Marc Belloli*
                                         Marc Belloli
                                         **FEINBERG DAY ALBERTI &
                                         THOMPSON, LLP**
                                         1600 El Camino Real, Suite 280
                                         Menlo Park, CA 94025
                                         Telephone:  650.618.4360

                                         *Counsel for Appellants Intellectual
                                         Ventures I LLC and Intellectual
                                         Ventures II LLC*

## CERTIFICATE OF SERVICE

I electronically filed the foregoing **CORRECTED OPENING BRIEF OF APPELLANTS INTELLECTUAL VENTURES I LLC AND INTELLECTUAL VENTURES II LLC** with the Court's CM/ECF filing system, which constitutes service, pursuant to Fed. R. App. P.25(c)(2), Fed. Cir. R. 25(a), and the Court's Administrative Order Regarding Electronic Case Filing 6(A) (May 17, 2012), to all registered CM/ECF users.

January 14, 2016

*/s/ Marc Belloli*
Marc Belloli
FEINBERG DAY ALBERTI & THOMPSON, LLP
1600 El Camino Real, Suite 280
Menlo Park, CA 94025
Telephone:  650.618.4360

*Counsel for Appellants, Intellectual Ventures I LLC and Intellectual Ventures II LLC*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.      This brief complies wit the type-volume limitation of Federal Rule of Appellate procedure 32(a)(7)(B) and Federal Circuit Rule 32(b).  The brief contains 13,995 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of the Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft® Word For Mac 2011 in 14 point Times New Roman.

*/s/ Marc Belloli*
Marc Belloli
FEINBERG DAY ALBERTI & THOMPSON, LLP
1600 El Camino Real, Suite 280
Menlo Park, CA 94025
Telephone:  650.618.4360

*Counsel for Appellants, Intellectual Ventures I LLC and Intellectual Ventures II LLC*

# INDEX TO ADDENDUM

1. September 2, 2015 Memorandum Opinion (A0001-40)

2. September 2, 2015 Order (A0041-42)

3. September 4, 2015 Memorandum Opinion (A0043-54)

4. September 8, 2015 Entry of Final Judgment and Certification of No Just Reason For Delay Pursuant to Fed. R. Civ. P. 54(b) (A0055-56)

5. U.S. Patent No. 7,984,081 (A0137-79)

6. U.S. Patent No. 6,314,409 (A0181-230)

7. U.S. Patent No. 6,546,002 (A0232-57)

8. U.S. Patent No. 6,715,084 (A259-72)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

|  |  |  |
|---|---|---|
| INTELLECTUAL VENTURES I LLC, *et al.*, | * | |
| | * | |
| **Plaintiffs,** | * | Case No.: PWG-14-111 |
| | * | |
| **v.** | * | |
| | * | |
| CAPITAL ONE FINANCIAL CORP., *et al.*, | * | |
| | * | |
| **Defendants.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

This patent litigation concerns four patents[1] that Plaintiffs/Counter-Defendants Intellectual Ventures I LLC and Intellectual Ventures II LLC (together, "Intellectual Ventures companies" or "IV") own and claim Defendants/Counterclaimants Capital One Financial Corp., Capital One Bank (USA), N.A., and Capital One, N.A. (collectively, "Capital One companies"), are infringing.  The Capital One companies admit use but insist that the patents are invalid. Currently pending are the parties' cross-motions for summary judgment on patent invalidity under 35 U.S.C. § 101, and the Special Master's Reports and Recommendations on the motions, in which he recommends findings of patent validity as to the '081 Patent and the '002 Patent, and

---

[1] The patents at issue are United States Patent No. 7,984,081, entitled "System and Method for Non-Programmers to Dynamically Manage Multiple Sets of XML Document Data" (the "'081 Patent"); United States Patent No. 6,546,002, entitled "System and Method for Implementing an Intelligent and Mobile Menu-Interface Agent" (the "'002 Patent"); United States Patent No. 6,314,409, entitled "System for Controlling Access and Distribution of Digital Property," (the "'409 Patent"); and United States Patent No. 6,715,084, entitled "Firewall System and Method Via Feedback from Broad-Scope Monitoring for Intrusion Detection" (the "'084 Patent").

findings of invalidity as to the '409 Patent and the '084 Patent.[2]  The Capital One companies also

filed, as a supplement to their summary judgment motion and their objections to the Special

Master's Report and Recommendation on the '081 & '002 Patents, ECF No. 337, the Federal

Circuit's recent decision in *Intellectual Ventures I, LLC v. Capital One Fin. Corp.*, 792 F.3d

1363 (Fed. Cir. 2015).  I have considered the parties' oral arguments and reviewed the record,

including the supplemental briefing I requested from counsel, and decided *de novo* all of the

parties' objections to the Special Master's Reports and Recommendations, pursuant to Fed. R.

Civ. P. 53(f)(3)–(4). With regard to the '081 & '002 Patents, the Special Master gave careful

consideration to the facts and the parties' arguments, and therefore I will adopt his factual

findings.  However, when he issued his Report and Recommendation, he did not have the benefit

of *Intellectual Ventures I*, 792 F.3d 1363, which is particularly relevant when evaluating the

validity of the '081 and '002 Patents.  Nor did he address in any depth the increasing number of

cases that have been decided by the Federal Circuit and District Courts around the country that

have been decided since the Supreme Court's recent decisions in *Alice Corp. Pty. Ltd. v. CLS*

---

[2] Plaintiffs seek partial summary judgment "on the third affirmative defense and counterclaim counts four, six, eight and ten, based on Capital One's claim of invalidity under 35 U.S.C. § 101." Pls.' Cross-Mot. 1.  The parties fully briefed their motions, ECF Nos. 147, 169, 227, 246, and submitted letter briefs in response to questions that the Special Master posed, ECF Nos. 298-1, 298-2.  They also submitted briefs regarding whether the '084 and '409 Patents are invalid based on issue preclusion, as a recent ruling from the Southern District of New York found them invalid in separate litigation.  ECF Nos. 297, 300, 303.  The Special Master submitted a Report and Recommendation on the '081 and '002 Patents ("R&R on '081 & '002 Patents"), ECF No. 298, and the parties fully briefed their objections, ECF Nos. 307, 313, 319, 326 (Defs.' Notice of Supplemental Authority), 337 (same); *see* ECF No. 143 (Order Appointing Special Master, providing for objections to be filed in accordance with Rule 53(f), responses to objections to be filed within fourteen days thereafter, and replies within seven days thereafter). He also submitted a Report and Recommendation on the '084 and '409 Patents and issue preclusion ("R&R on '084 & '409 Patents"), ECF No. 315, for which the parties again fully briefed their objections, ECF Nos. 324, 325, 330, 335, 336, 344.  Additionally, the parties submitted supplemental briefing at my request.  *See* ECF Nos. 366, 367.  I held a hearing on August 20, 2015.  *See* Loc. R. 105.6.

*Bank Int'l*, 134 S. Ct. 2347 (2014), and *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012), that have found patents that are highly analogous to the '081 and '002 patents to be invalid for abstractness under 35 U.S.C. § 101. Therefore, I must reject the Special Master's conclusions of law as to the '081 & '002 Patents, grant Defendants' motions as to these patents, and deny Plaintiffs' motions as to these patents. The motions regarding the '409 & '084 Patents remain pending.[3]

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Celotex v. Catrett*, 477 U.S. 317 (1986). A "genuine" dispute of material fact is one where the conflicting evidence creates "fair doubt"; wholly speculative assertions do not create "fair doubt." *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001); *see also Miskin*, *v. Baxter Healthcare Corp.*, 197 F. Supp. 2d 669, 671 (D. Md. 1999). And, the existence of only

---

[3] Because the parties' briefings and the Reports and Recommendations confine their discussions to validity under § 101, I do not reach the issues of whether the patents are novel under § 102, nonobvious under § 103, or fully and particularly described under § 112. *See Bilski v. Kappos*, 561 U.S. 593 (2010) ("The § 101 patent-eligibility inquiry is only a threshold test. Even if an invention qualifies as a process, machine, manufacture or composition of matter, in order to receive the Patent Act's protection the claimed invention must also satisfy 'the conditions and requirements of [the Patent Act]'" set forth in §§ 102, 103, and 112." (quoting 35 U.S.C. § 101)).

a "scintilla of evidence" will not defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.*

## II.    PATENT ELIGIBILTY

"[F]our independent categories of inventions or discoveries . . . are eligible for protection [under the Patent Act, 35 U.S.C. § 101]: processes, machines, manufactures, and compositions of matter." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010). Patent laws are to be "'given wide scope'" to "ensure that '"ingenuity should receive a liberal encouragement."'" *Id.* (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 308–09 (1980) (quoting 5 Writing of Thomas Jefferson 75–76 (H. Washington ed. 1871))). Nonetheless, "[l]aws of nature, natural phenomena, and abstract ideas are not patentable" because they

> are the basic tools of scientific and technological work. [M]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws We have repeatedly emphasized this . . . concern that patent law not inhibit further discovery by improperly tying up the future use of these building blocks of human ingenuity.

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (quotation marks and citations to *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. ----, ----, 133 S. Ct. 2107, 2116 (2013), and *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293, 1301 (2012), omitted)). "[D]etermining whether the section 101 exception for abstract ideas applies involves distinguishing between patents that claim the building blocks of human ingenuity—and therefore risk broad pre-emption of basic ideas—and patents that integrate those building blocks into something more, enough to transform them into specific patent-eligible

inventions." *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 2015 WL 4113722, at *22 (Fed. Cir. 2015).

*Alice* and *Mayo* provide the two-step framework for analyzing patent eligibility. *See Alice*, 134 S. Ct. at 2355; *Mayo*, 132 S. Ct. at 1294–97. In a nutshell, at the first step, the court "determine[s] whether the claims at issue are directed to one of [the] patent-ineligible concepts." *Alice*, 134 S. Ct. at 2355; *see Intellectual Ventures I*, 792 F.3d at 1366. The relevant patent-ineligible concept here is abstract ideas, a "'category [that] embodies "the longstanding rule" that "[a]n idea of itself is not patentable."'" *Intellectual Ventures I*, 792 F.3d at 1366 (quoting *Alice*, 134 S. Ct. at 2355 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972))). At the second step, the court examines the abstract idea identified at step one to assess whether the elements of the claims, individually and as a whole, transform the nature of the idea into a "patent eligible application" through the addition of an "inventive concept." *Alice*, 134 S. Ct. at 2355.

## A.    Step One Analysis

In *Alice*, 134 S. Ct. at 2357, the Court did not "delimit the precise contours of the 'abstract idea' category." But, the Federal Circuit has stated that, "[a]pplying the guidance of *Bilski*, *Mayo*, and *Alice*," it "ascertain[s] the basic character of the subject matter" at step one to determine whether there is an abstract idea. *Internet Patents Corp.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015); *see Ultramercial*, 772 F.3d at 714 (considering "the abstract idea at the heart of" the patent at issue); *Accenture*, 728 F.3d at 1344 (same). Additionally, "it is often useful to determine the breadth of the claims in order to determine whether the claims extend to cover a 'fundamental . . . practice long prevalent in our system . . . .'" *Intellectual Ventures I*, 792 F.3d at 1369 (quoting *Alice*, 134 S. Ct. at 2356). In *Diamond v. Diehr*, 450 U.S. 175, 187 (1981), for example, the Court concluded that the claims were not overly broad because the patentees did

not seek "to pre-empt the use of [the well-known mathematical] equation" that their invention employed, but rather sought "only to foreclose from others the use of that equation in conjunction with all of the other steps in their claimed process." To make this determination, courts analogize to prior patent cases. *See, e.g.*, *Alice*, 134 S. Ct. at 2356 ("It follows from our prior cases, and *Bilski* in particular, that the claims at issue here are directed to an abstract idea."); *Versata*, 2015 WL 4113722, at *23 (noting that "[i]n recent years the Supreme Court and [the Federal Circuit] have examined claims directed to abstract ideas on a number of occasions," and that "[e]xtensive discussion of these cases appears in many opinions," and discussing "a few salient points as a means of comparison to the invention and claims" before it); *Intellectual Ventures I*, 792 F.3d at 1367 (noting that "[t]he abstract idea" before it was "not meaningfully different from the ideas found to be abstract in other cases before the Supreme Court and [the Federal Circuit] involving methods of organizing human activity").

The Supreme Court has cautioned that, "at some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas,'" and too wide an application of the exception could "swallow all of patent law." *Alice*, 134 S. Ct. at 2354 (citing *Mayo*, 132 S. Ct. at 1293). Nonetheless, post-*Alice*, when analyzing inventions involving the use of computers or similar devices programmed to perform well-established activities in a faster or more efficient manner, the Federal Circuit consistently has found that the claims are directed to abstract ideas and has continued to step two.[4] For example, in *Versata*, 2015 WL 4113722, at *24, the court concluded that the claims at issue were "directed to the abstract idea of determining a price, using organizational and product group hierarchies, in the same way that

---

[4] Neither the Intellectual Ventures companies' extensive briefing and oral argument nor my independent research identified any post-*Alice* cases in which the Federal Circuit concluded that the patent at issue was not directed at an abstract idea.

the claims in *Alice* were directed to the abstract idea of intermediated settlement, and the claims in *Bilski* were directed to the abstract idea of risk hedging." Likewise, in *Intellectual Ventures I*, 792 F.3d at 1367, 1369–70, the court found that one patent at issue was "directed to an abstract idea: tracking financial transactions to determine whether they exceed a pre-set spending limit" and the second patent "generally relate[d] to customizing web page content as a function of [1] navigation history and [2] information known about the user," two "abstract, overly broad concept[s] long-practiced in our society." Similarly, in *Internet Patents Corp.*, 790 F.3d at 1348, the court concluded that "the character of the claimed invention is an abstract idea: the idea of retaining information in the navigation of online forms." Additionally, in *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362–63 (Fed. Cir. 2015), the court concluded that the claims were directed to the "abstract idea of offer-based price optimization," and in *Ultramercial*, it found that the patent at issue was directed at "the abstract idea . . . 'that one can use [an] advertisement as an exchange or currency,'" 772 F.3d at 714 (citation to district court omitted); *see also DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1257 (Fed. Cir. 2014) (stating that "identifying the precise nature of the abstract idea [was] not as straightforward as in *Alice* or some of [the] other recent abstract idea cases," noting four possible "characterizations of the abstract idea," and continuing to step two); *Accenture*, 728 F.3d at 1344 (pre-*Alice*, concluding that the patent at issue was directed at the abstract idea of "'generating tasks [based on] rules . . . to be completed upon the occurrence of an event,'" an idea that was "not as broad as the . . . abstract idea of organizing data" that the district court identified, but that was "nonetheless an abstract concept"). Further, the majority of the widely-cited Supreme Court cases have held that the underlying idea was abstract. *Compare Alice*, 134 S. Ct. at 2355 (concluding that claims were "drawn to the abstract idea of intermediated settlement"); *Parker v. Flook*, 437 U.S. 584,

585–86 (1978) (concluding that mathematical formula at core of invention was an abstract idea); *Gottschalk v. Benson*, 490 U.S. 63, 68 (1972) (concluding that claims based in algorithm were directed at abstract idea), *with Diamond v. Diehr*, 450 U.S. 175, 187 (1981) (concluding that, while the process in the claims before the Court "employ[ed] a well-known mathematical equation," the claims were directed only at "the use of that equation in conjunction with all of the other steps in their claimed process").

When applying the *Alice/Mayo* two-step analysis, it is appropriate to consider the specification of the patent to understand the nature of the claimed invention. Nevertheless, to determine patent eligibility under § 101, "the important inquiry for a § 101 analysis is to look to the claim," *Accenture Global Services, GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013), as it is the claims that have a preclusive effect, *see Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1334 (Fed. Cir. 2012); *see also Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 336 U.S. 271, 277 (1949) (holding that the claim's "text must be sufficient to 'particularly point out and distinctly claim' an identifiable invention or discovery," because "it is the claim which measures the grant to the patentee"). Thus, the specification, regardless how detailed it is, cannot "transform a claim reciting only an abstract concept into a patent-eligible system or method." *Accenture*, 728 F.3d at 1345. For example, in *Accenture*, the Federal Circuit affirmed the district court's granting summary judgment of invalidity under § 101, reasoning that, "[a]lthough the specification of the . . . patent [at issue] contain[ed] very detailed software implementation guidelines, the system claims themselves only contain generalized software components arranged to implement an abstract concept on a computer." *Id.*

**B.      Step Two Analysis**

If the inquiry at step one determines that the patents' claims are directed at an

abstract idea, the court, at step two,

> ask[s] whether the remaining elements, either in isolation or combination with the
> non-patent-ineligible elements, are sufficient to "'transform the nature of the
> claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2358 (quoting
> [*Mayo*, 132 S. Ct. at 1297]). Put another way, there must be an "inventive
> concept" to take the claim into the realm of patent-eligibility. *Id.* at 2355. A
> simple instruction to apply an abstract idea on a computer is not enough. *Alice*,
> 134 S. Ct. at 2358 ("[M]ere recitation of a generic computer cannot transform a
> patent-ineligible idea into a patent-eligible invention. Stating an abstract idea
> 'while adding the words "apply it" is not enough for patent eligibility.'" (quoting
> *Mayo*, 132 S. Ct. at 1294)).
>
>         Nor, in addressing the second step of Alice, does claiming the improved
> speed or efficiency inherent with applying the abstract idea on a computer provide
> a sufficient inventive concept. *See Bancorp Servs., LLC v. Sun Life Assurance Co.
> of Can.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) ("[T]he fact that the required
> calculations could be performed more efficiently via a computer does not
> materially alter the patent eligibility of the claimed subject matter."); *CLS Bank,
> Int'l v. Alice Corp.*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (en banc) *aff'd*, ——
> U.S. ——, 134 S. Ct. 2347 (2014) ("[S]imply appending generic computer
> functionality to lend speed or efficiency to the performance of an otherwise
> abstract concept does not meaningfully limit claim scope for purposes of patent
> eligibility." (citations omitted)).

*Intellectual Ventures I*, 792 F.3d at 1367.  Notably,

> [a]n abstract idea does not become nonabstract by limiting the invention to a
> particular field of use or technological environment, such as the Internet. *See
> Alice*, 134 S. Ct. at 2358 (limiting an abstract idea to a particular technological
> environment, such as a computer, does not confer patent eligibility); *Bilski v.
> Kappos*, 561 U.S. 593, 612 (2010) ("[L]imiting an abstract idea to one field of use
> ... d[oes] not make the concept patentable.").

*Intellectual Ventures I*, 792 F.3d at 1366.

When searching for the necessary inventive concept at step two that transforms an

abstract idea into a patent-eligible invention, courts repeatedly have emphasized the importance

of the requirement that the claims of the patent—which have preemptive impact if the patent is

valid—must do more than simply explain *what* the invention does, in functional terms; they must explain *how* it does so. *Dealertrack v. Huber*, 674 F.3d 1315, 1334 (Fed. Cir. 2012) ("In considering patent eligibility under § 101, one must focus on the claims. This is because a claim may 'preempt' only that which the claims encompass, not what is disclosed but left unclaimed."). For example, in *Mayo*, Justice Breyer, citing *Flook*, 430 U.S. 584, where the patent was not valid, explained why the patent in that case was not patent eligible by contrasting it with *Diehr*, 450 U.S. 175, where the patent was, stating that, "[u]nlike the process in *Diehr*, [the patent in *Flook*] did not 'explain how the variables used in the formula were to be selected, nor did the [claim] contain any disclosure relating to chemical processes at work or the means of setting off an alarm or adjusting the alarm limit.'" *Mayo*, 132 S. Ct. at 1299 (quoting *Diehr*, 450 U.S. at 192 n.14); *see also Diehr*, 132 S. Ct. at 192 n.14 ("We were careful to note in *Flook* that the patent application did not purport to explain how the variables in the formula were to be selected, nor did the application contain any disclosure relating to the chemical processes at work or the means of setting off an alarm or adjusting the alarm unit."); *Flook*, 437 U.S. at 586 ("The patent application does not purport to explain how to select the appropriate margin of safety, the weighting factor, or any of the other variables."); *Dealertrack*, 674 F. 3d at 1333) ("[The] Patent 'does not specify how the computer hardware and database are specially programmed to perform the steps claimed in the patent.'" (citation omitted)); *DDR Holdings*, 773 F.3d at 1258 ("Unlike the claims in *Ultramercial*, the claims at issue here specify how interactions with the Internet are manipulated to yield a desired result . . . ."); *E. Coast Sheet Metal Fabricating Corp v. Autodesk, Inc.*, No. 12-517-LM, 2015 WL 226084, at *9 (D.N.H. Jan. 15, 2015) ("Without a disclosure of how the invention does what it does, neither the specification nor the claim identifies an inventive concept.").

The Federal Circuit's recent affirmance of summary judgment of patent ineligibility in *Intellectual Ventures I*, 792 F.3d 1363, another dispute between the parties before me, guides my application of the two-step framework. There, the court reasoned that, at step one, one patent "generally relate[d] to budgeting," with its claims "directed to an abstract idea: tracking financial transactions to determine whether they exceed a pre-set spending limit," albeit in "a 'communication medium' (broadly including the Internet and telephone networks)," a "limitation [that did] not render the claims any less abstract." *Id.* at 1367. The Federal Circuit observed, at step two, that "a database, a user profile . . . and a communication medium, are all generic computer elements" that do not provide an inventive concept. *Id.* at 1368. As for the second patent, it found at step one that it "generally relate[d] to customizing web page content as a function of [1] navigation history and [2] information known about the user," *id.* at 1369, two "abstract, overly broad concept[s] long-practiced in our society," *id.* at 1370.

Relevantly, the second patent claimed an "interactive interface" that tailored information on a website based on the user, which Intellectual Ventures argued was "a specific application of the abstract idea that provide[d] an inventive concept." *Id.* The appellate court rejected that notion, reasoning at step two:

> [N]owhere does Intellectual Ventures assert that it invented an interactive interface that manages web site content. Rather, the interactive interface limitation is a generic computer element. At Intellectual Ventures' urging, "interactive interface" was broadly construed by the district court to mean "a selectively tailored medium by which a web site user communicates with a web site information provider." Intellectual Ventures describes the "interactive interface" as "tasked with tailoring information and providing it to the user." Elsewhere, Intellectual Ventures equates the "interactive interface" with the "web page manager," which "tailors the web page to the specific individual based on the profile." At oral argument, Intellectual Ventures described the interactive interface as "software" and agreed that it "is basically the brains of the outfit." Nowhere in these vague and generic descriptions of the "interactive interface" does Intellectual Ventures suggest an "inventive concept." *Alice*, 134 S. Ct. at 2355. Rather, the "interactive interface" simply describes a generic web server

with attendant software,[5] tasked with providing web pages to and communicating with the user's computer.

*Id.*

## III.    THE '081 PATENT

The '081 Patent pertains generally to manipulating data in business documents.   Claim 21, which the parties agree is representative, states:

21. An apparatus for manipulating XML[6] documents, comprising:

a processor;

a component that organizes data components of one or more XML documents into data objects;

a component that identifies a plurality of primary record types for the XML documents;

a component that maps the data components of each data object to one of the plurality of primary record types;

a component that organizes the instances of the plurality of primary record types into a hierarchy to form a management record type;

a component that defines a dynamic document for display of an instance of a management record type through a user interface; and

a component that detects modification of the data in the dynamic document via the user interface, and in response thereto modifies a data component in an XML document.

---

[5] Although some litigants and commentators have argued for software protection under patent law, to the exclusion of copyright law, while others have argued for software protection under copyright law, to the exclusion of patent law, neither the Supreme Court, the Federal Circuit, nor Congress has decided the issue, such that software may be both patentable and copyrightable. *See Oracle Am., Inc. v. Google, Inc.*, 750 F.3d 1339, 1379–81 (Fed. Cir. 2014) (noting arguments from both camps and lack of authority on the issue; respecting "the Ninth Circuit's decision to afford software programs protection under the copyright laws" and declining "to declare that protection of software programs should be the domain of patent law, and only patent law").

[6] XML stands for "Extensible Markup Language." '081 Patent, col. 1, lines 21–22.

### A.    Step One: Whether the Claims are Directed to an Abstract Idea

The claimed invention "allows the user to view and update XML documents in different formats, and allows the user to *manipulate the data* and perform actions without programming skills," '081 Patent, col. 1, lines 46–48 (emphasis added).  The representative claim (21) states that the invention is "[a]n apparatus for manipulating XML documents" through components that "organize[]," "identif[y]," "map[]," "define[]," "detect[] modification of," and "modif[y]" "data." *Id.* at col. 20, lines 43–61.  Claims 23 and 24 claim "[t]he apparatus of claim 21, wherein the management record type defines business objects" and "the business objects comprise invoices, bills of material, purchase orders, price books, forecasts [and] fund transactions." *Id.* at col. 21, lines 1–6.  Based on these claims, the patent is, at its core, directed to the abstract idea of organizing, displaying, and manipulating data related to business documents.  This concept addresses a fundamental activity in which businesses have engaged as long as businesses have relied on documents.

As the Capital One companies asserted,

[I]t is the same idea when a bank retrieves information from banking documents (checks and deposits), extracts relevant information from those documents, stores the information, and reformats the information into a new document such as a monthly statement. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) ("banks have, for some time, reviewed checks, recognized relevant data such as the amount, account number, and identity of account holder, and stored that information in their records" for later use). In addition, military officers have long received intelligence reports, extracted key information, reorganized that information into intelligence summaries, and sent the summaries back to the field officers. Accountants have long received multiple documents regarding business transactions, extracted key information, and used that information to prepare periodic balance sheets or other summaries for business owners. As all of these analogies show, the abstract idea at the heart of the '081 patent was "long prevalent" and has been used in a wide variety of contexts.

Defs.' Supp. Br. 4, ECF No. 367.  Notably, in *Content Extraction*, 776 F.3d at 1347, the court found that the claims were "drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory," and stated that "[t]he concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions."  Additionally, in *Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 992 (Fed. Cir. 2014), the Federal Circuit held that "the idea of collecting information in classified form, then separating and transmitting that information according to its classification, is an abstract idea that is not patent-eligible," and in *Versata*, 2015 WL 4113722, at *24, where the claims used organizational hierarchies, as does Claim 21, for a business purpose (price determination), the Federal Circuit again concluded that they were directed at an abstract idea.  *See also Health Trio, LLC v. Aetna, Inc*., No. 12-3229, 2015 WL 4005985, at *3 (D. Colo. June 17, 2015) (finding that "the underlying purpose of the patent claims," which pertained to "combining and organizing records from various sources," was an abstract idea).  Indeed, the Intellectual Ventures companies acknowledge that data manipulation, which "is used as part of a process to manipulate incompatible XML pages for a non-programmer," is an "abstraction[]."  Pls.' Opp'n & Cross-Mot. Mem 3, 24.  Such a "building block[] of human ingenuity" is too broad to prevent "pre-emption of basic ideas."  *See Versata*, 2015 WL 4113722, at *22; *see also Hewlett Packard Co. v. ServiceNow, Inc.*, No. 14-570-BLF, 2015 WL 1133244, at *7 (N.D. Cal. Mar. 10, 2015) ("Claiming the abstract idea of organizing information into a hierarchy would preempt any other inventor from creating a computer-based method for categorizing and organizing information by classification, no matter how the inventor achieved this result.").

Undeterred, the Intellectual Ventures companies insist that data manipulation "is not the whole of the invention." Pls.' Opp'n & Cross-Mot. Mem at 24. Specifically, they contend that the claims are not abstract because they recite a "user interface," a "dynamic document" and "XML documents." *Id.* at 19–20. Yet, the "limitation [to XML documents] does not render the claims any less abstract," as "[a]n abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment." *Intellectual Ventures I*, 792 F.3d at 1366–67); *see Alice*, 134 S. Ct. at 2358. "Dynamic document" is not defined. "Dynamic" means "[o]f or pertaining to force producing motion: often opposed to static." *See* Dynamic, Oxford English Dictionary, http://www.oed.com.[7] Thus, Plaintiffs do not suggest that "dynamic document" refers to anything other than a document that is changed repeatedly, or continuously capable of being changed. Document modification, whether electronically or by editing with pen and paper, is also a fundamental business activity and too broad to be a non-abstract patentable idea. *See Alice*, 134 S. Ct. at 2356; *Intellectual Ventures I*, 792 F.3d at 1369.

Whether the recitation of a user interface makes the invention patent-eligible is a question properly reserved for step two of this analysis, as courts regularly have concluded that the basic character of a claim reciting an interface for accessing user data was an abstract idea. *See, e.g.*, *Intellectual Ventures I*, 792 F.3d at 1369–70 (claim reciting user interface directed at abstract idea of "customizing information based on (1) information known about the user and (2) navigation data"); *Clear with Computers, LLC v. Altec Indus., Inc.* ("*Altec*"), Nos. 14-79, 14-89, 2015 WL 993392, at *4 (E.D. Tex. Mar. 3, 2015) (claims employing a "user interface" nonetheless were abstract in that they "essentially propose[d] that, instead of a human salesman

---

[7] The online edition of the Oxford English Dictionary appears at the top of Justice Scalia and Bryan Garner's list of "the most useful and authoritative for the English language generally." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 419, 423 (2012).

asking customers about their preferences and then creating a brochure from a binder of product pictures and text and using a rolodex to store customer information, a generic computer can perform those functions"); *MyMedicalRecords v. Walgreen Co.*, Nos. 13-631, 13-2538, 13-7285, 13-3560, 2014 WL 7339201, at *2 (C.D. Cal. Dec. 23, 2014) (claims that recited computer components, including a user interface, that the patent hold did not claim to have invented, were insufficient to render abstract idea patent-eligible); *CertusView Techs., LLC v. S&N Locating Servs., LLC*, --- F. Supp. 3d ----, 2015 WL 269427, at *17 (E.D. Va. Jan. 21, 2015) (claim reciting "generic computer components" including a "communication interface" was directed at "the abstract idea of creating a computer-readable file to store information, as applied in the particular technological environment of conducting locate operations"); *DietGoal Innovations LLC v. Bravo Media LLC*, 33 F. Supp. 3d 271, 288–89 (S.D.N.Y. 2014) (recitation of a system involving a user interface and other generic computer components did not render any less abstract claims directed at abstract idea of meal planning); *Clear with Computers, LLC v. Dick's Sporting Goods, Inc.* ("*Dick's Sporting Goods*"), 21 F. Supp. 3d 758, 767–68 (E.D. Tex. 2014) (claim reciting "the additional limitation of 'user interface for the computer system'" provided "a token and conventional, post-solution limitation that is insufficient to render the [otherwise abstract] claim patent eligible").

Simply put, these recitations do not alter the abstract idea at the heart of the claims, namely organizing, displaying, and manipulating data related to business documents. Patenting this overly-broad idea on its own would foreclose others from using a fundamental concept underlying various business practices. *See Alice*, 134 S. Ct. at 2356; *Intellectual Ventures I*, 792 F.3d at 1369. Therefore, I must consider step two to determine whether there is an inventive concept to make this idea patent-eligible.

16

B.    **Step Two: Whether There is an Inventive Concept**

The representative claim does not contain an inventive concept, despite its recitation of a "user interface," a "dynamic document," and "XML documents." The dynamic document is not an inventive concept, as any document can be changed. Nor are XML documents an inventive concept. Although the Intellectual Ventures companies argued that XML documents were not ubiquitous at the time of the patent, Aug. 20, 2015 Hr'g, they also stated that, at that time, "[t]here was a problem in the XML arts," *id.*, acknowledging by necessity that XML documents were well known enough to have their own field of art. Moreover, the patent states in its Background that "[c]ompanies use XML documents to publish various types of information for use by customers and partners," '081 Patent, col. 1, lines 28–29, showing commonplace business use. Further, as noted, limiting the idea to XML documents, "'one field of use[,] . . . d[oes] not make the concept patentable.'" *Intellectual Ventures I*, 792 F.3d at 1366–67 (quoting *Bilski v. Kappos*, 561 U.S. 593, 612 (2010)); *see Alice*, 134 S. Ct. at 2358.

As for the user interface, unless the claims include a sufficient explanation of how it works, it is nothing more than a conventional, generic computer component that is described in functional terms relating *what* it does, but not *how* it does it. This cannot breathe concreteness into an abstract idea. *See Intellectual Ventures I*, 792 F.3d at 1370; *MyMedicalRecords*, 2014 WL 7339201, at *2–3; *Dick's Sporting Goods*, 21 F. Supp. 3d at 768. According to the Intellectual Venture companies, "Claim 21 . . . . solves a new problem with a specific solution," that is, the user interface, which they insist is "a very specific invention." Pls.' Opp'n & Cross-Mot. Mem. 19, 23. Certainly, this need for an interface that streamlines data manipulations when working with incompatible XML documents appears to have existed at the time of the patent: The '081 Patent states that companies working with other companies' XML documents "may

find them incompatible with their own XML formats, relational database schemes, and message formats and therefore difficult to work with," and "[i]n many cases, the user is forced to have [a] programmer create a program to merge, filter and transform XML documents into the format they want" so that the user can "manipulate the data and perform actions without programming skills." '081 Patent, col. 1, lines 37–48.

Yet, a patent cannot claim a "principle of the physical or social sciences by reciting a computer system configured to implement the relevant concept," as "[s]uch a result would make the determination of patent eligibility 'depend simply on the draftsman's art.'" *Alice*, 134 S. Ct. at 2359 (quoting *Flook*, 437 U.S. at 593). Thus, there can be no inventive concept if the patent claim limitations do not give sufficient detail to show how the patent holder in fact solved the problem. *See id.* The claim must assert that the inventor developed the software, formula, or algorithm that in fact provides the solution and recite the limitations of how to do so in the claims. Otherwise the result is a draftsman's skill resulting in the preemption of an entire field. *See id.* Simply put, the claim must show "how" the apparatus works, because without the "how" limitation, a claim does no more than direct the application of an abstract idea on a computer. The question, therefore, is whether the claims sufficiently explain how the user interface works.

   *1.  Cases considering this issue*

In *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258 (Fed. Cir. 2014), the claims "specif[ied] how" the patent achieved its inventive concept, resulting in the only post-*Alice* Federal Circuit holding of patent validity of a computer/software related invention, and providing a benchmark of specificity to which other claims can be compared. There, the two patents at issue purported to "provide[] a solution to [a] problem" resulting when a third-party merchant advertised on "'host' website." *Id.* at 1248. The patents' specifications noted that

"prior art systems allowed third-party merchants to 'lure the [host website's] visitor traffic away' from the host website" and took them "to the third-party merchant's website when they clicked on the merchant's advertisement on the host site." *Id.* To solve this problem, the patents "creat[ed] a new web page that . . . '[gave] the viewer of the page the impression that she [was] viewing pages served by the host' website." *Id.* at 1249. The patents were "directed to systems and methods of generating a composite web page that combines certain visual elements of a 'host' website with content of a third-party merchant," such as systems and methods to generate a web page that "combine[s] the logo, background color, and fonts of the host website with product information from the merchant." *Id.* at 1248.

At step one, the *DDR Holdings* Court noted that the asserted claims did "not recite a mathematical algorithm" or "a fundamental economic or longstanding commercial practice," and that while "the claims address[ed] a business challenge (retaining website visitors), it [was] a challenge particular to the Internet." 773 F.3d at 1257. The court observed that "identifying the precise nature of the abstract idea [was] not as straightforward as in *Alice* or some of [the] other recent abstract idea cases," and then addressed step two without defining the abstract idea, reasoning that "under any of [various] characterizations of the abstract idea, the . . . patent's claims satisfy *Mayo/Alice* step two." *See id.* Implicit in its performing the step two analysis was the court's recognition that, at step one, the patent was directed to an abstract idea, regardless of the number of ways in which that abstract idea had been described in the briefing by the parties.

The court stated that "[d]istinguishing between claims that recite a patent-eligible invention and claims that add too little to a patent-ineligible abstract concept can be difficult, as the line separating the two is not always clear," *id.* at 1255—an accurate, but not particularly helpful observation when trying to divine exactly where that line is to be drawn in a particular

case.  It observed that the claims at issue differed from other computer-related claims that did not

add enough to provide an inventive concept

> because they [did] not merely recite the performance of some business practice
> known from the pre-Internet world along with the requirement to perform it on
> the Internet . . . Instead, the claimed solution [was] necessarily rooted in computer
> technology in order to overcome a problem specifically arising in the realm of
> computer networks.

*Id.* at 1257.  The *DDR Holdings* Court cautioned that "not all claims purporting to address

Internet-centric challenges are eligible for patents," as they still may address abstract ideas and

only offer "'routine additional steps.'"  *Id.* at 1258 (citing *Ultramercial, Inc. v. Hulu, LLC*, 772

F.3d 709 (Fed. Cir. 2014), as an example).  It reasoned that the claims before it differed from

those in cases like *Ultramercial* because they "*specif[ied] how* interactions with the Internet are

manipulated to yield a desired result—a result that *overrides the routine and conventional*

*sequence of events* ordinarily triggered by the click of a hyperlink," thereby "recit[ing] an

invention that [was] not merely the routine or conventional use of the Internet."  *Id.* at 1258–59

(emphases added).  Additionally, the claims did "not attempt to preempt every application of the

idea of increasing sales by making two web pages look the same, or of any other variant

suggested by [the defendant]," but instead "recite[d] a *specific way* to automate the creation of a

composite web page" with specific elements "to solve a problem faced by websites on the

Internet."  *Id.* at 1259 (emphasis added).  The court concluded that the "claims include[d]

'additional features' that ensure[d] the claims [were] 'more than a drafting effort designed to

monopolize the [abstract idea].'"  *Id.* (quoting *Alice*, 134 S. Ct. at 2357).  Distilled to its essence,

the reason why the patent in *DDR Holdings* is the only post-*Alice* patent involving computer-

based inventions to survive a challenge in the Federal Circuit or the Supreme Court for

abstractness is because the patent contained sufficient detail to show how the claims solved the

Internet-related problem at the heart of the patent, and that solution involved much more than programming a generic computer to interface with the Internet in the manner in which computers routinely did so. Rather, the invention described with detail how to actually change the way in which the Internet itself operated, and that was its inventive concept.

In *Dealertrack, Inc. v. Huber*, in contrast, the Federal Circuit found that the patent did "'not specify *how* the computer hardware and database [were] specially programmed to perform the steps claimed in the patent,'" and "[t]he claims [were] silent as to *how* a computer aid[ed] the method, the extent to which a computer aid[ed] the method, or the significance of a computer to the performance of the method."  674 F.3d 1315, 1333 (Fed. Cir. 2012) (citation to district court omitted) (emphasis added).   On that basis, the court concluded that the claims were drawn to "patent ineligible abstract ideas" that did "not require a specific application," and they were not "tied to a particular machine."  *Id.* at 1333–34.

Similarly, in *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1298–99 (2012), the Supreme Court compared the patent before it to the precedents it had set in *Parker v. Flook*, 437 U.S. 584 (1978), and *Diamond v. Diehr*, 450 U.S. 175 (1981), to "reinforce[] [its] conclusion" that the steps in the patent were "not sufficient to transform unpatentable natural correlations into patentable applications of those regularities" because they did not explain "how."  In *Flook*, the Court had observed that, where a claim recites a process that contains a mathematical algorithm, "[t]he process itself, not merely the mathematical algorithm, must be new and useful."  437 U.S. at 591.  It concluded that the invention at issue was not patentable, *id.* at 596, reasoning:

> The patent application does not purport to explain *how* to select the appropriate margin of safety, the weighting factor, or any of the other variables. Nor does it purport to contain any disclosure relating to the chemical processes at

work, the monitoring of process variables, or the means of setting off an alarm or adjusting an alarm system.

*Id.* at 586 (emphasis added). In *Diehr*, 450 U.S. at 192, the Court held:

> [W]hen a claim containing a mathematical formula implements or applies that formula in a structure or process which, when considered as a whole, is performing a function which the patent laws were designed to protect (e. g., transforming or reducing an article to a different state or thing), then the claim satisfies the requirements of § 101.

It concluded that the patent before it, one for curing rubber, was patentable, reasoning that it "incorporate[d] in it a more efficient solution of the equation" it employed, a solution explained though various steps "includ[ing] installing in a press, closing the mold, constantly determining the temperature of the mold, constantly recalculating the appropriate cure time through the use of the formula and a digital computer, and automatically opening the press at the proper time." *Id.* at 187–88, 192. The *Diehr* Court distinguished *Flook*, observing that it was "careful to note in *Flook* that the patent application did not purport to explain *how* the variables used in the formula were to be selected." 450 U.S. at 192 n.14 (emphasis added).

The *Mayo* Court made the same observation, stating that, "[u]nlike the process in *Diehr*," the process in *Flook* "did not 'explain how the variables used in the formula were to be selected.'" 132 S. Ct. at 1299 (quoting *Diehr*, 450 U.S. at 192 n.14; citing *Flook*, 437 U.S. at 586). Likewise, the claim before it instructed a specific audience to apply a law of nature in some way when administering a certain drug, without explaining how. *Id.* at 1299. The Court concluded that the steps of the patent at issue "add[ed] nothing specific to the laws of nature other than what is well-understood, routine, conventional activity, previously engaged in by those in the field," and consequently "present[ed] a case for patentability that [was] weaker than the (patent-eligible) claim in *Diehr* and no stronger than the (unpatentable) claim in *Flook*," as

the process "in *Flook* was characterized in roughly this way," and that in *Diehr* was not.  *Id*. at 1299–300.

*East Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc*., No. 12-517-LM, 2015 WL 226084, at *9 (D.N.H. Jan. 15, 2015), involved a similarly-deficient invention.  There, the patent

> recite[d] an apparatus composed of a computer-readable medium containing instructions that, when executed by a processor, perform the steps of: (1) obtaining visual representation of the components of a ventilation system; (2) assigning property values to those components; (3) utilizing geometrical information representing the visual representations and the property values; (4) mapping components of that geometrical information to standard fittings; and (5) generating a manufacturing blueprint.

The court concluded that it was not patentable because "that claim only says what the invention does," and "[w]ithout a disclosure of how the invention does what it does, neither the specification nor the claim identifies an inventive concept."  *Id.*  It reasoned that "the patent merely recites the use of a generic computer to perform generic computer operations, and that is not enough to establish an inventive concept."  *Id.*  The court distinguished *DDR Holdings*, noting that, unlike in *DDR Holdings*, the patents before it "describe[d] the inventions' computer programming as operating in the most generic of terms," referring to "data being processed, transferred, and stored using computer memory and a processor," but without including any "language . . . that describes the computer programming involved in the invention as operating in anything other than their 'normal, expected manner.'"  *Id.* (quoting *DDR Holdings*, 773 F.3d at 1258).

*Hewlett Packard Co. v. ServiceNow, Inc*, No. 14-570-BLF, 2015 WL 1133244 (N.D. Cal. Mar. 10, 2015), in which the court analyzed four Hewlett Packard Co. ("HP") patents and determined that each was directed to an abstract idea that lacked an inventive concept to transform it into a patent-eligible application, also is informative in analyzing step two.  The first

HP patent was "directed toward optimizing the efficiency of providing IT helpdesk services." *Id.* at *1. The representative claim recited a "computer program product" that comprised "*instructions for*" (1) "inspecting a service ticket," (2) "displaying . . . a graphical display," (3) "determining a[] deadline approaching alert time," and (4) "alerting the help desk user." *Id.* at *2 (emphasis added). HP's claim constructions, which the parties and the court adopted for summary judgment purposes, defined certain elements as being "specifically configured to." *Id.* at *6. The court observed:

> It is clear under Supreme Court precedent that simply reciting the phrase "instructions for" in front of the substantive functional limitations is insufficient to turn an otherwise ineligible abstract idea into a patent-eligible application. This is no different than simply adding the words "use a computer to" before reciting an abstract idea, which the Supreme Court has unanimously held to be insufficient. Claiming any and all "instructions for" implementing an abstract idea is substantively identical to instructing the practitioner to implement the abstract idea on a computer.
>
> . . . Reciting generic computer components "configured to" implement an abstract idea is no different than adding "instructions for" in front of the abstract idea; in either case, any and all implementations of the abstract idea are being claimed, which is essentially equivalent to claiming the abstract idea itself.

*Id.* (citing *Alice*, 134 S. Ct. at 2359–60). Additionally, "the context of IT help desks" was a field-of-use limitation that did not make the abstract idea patent eligible. *Id.* And, although the patent recited a "deadline based upon a contractually determined severity of the problem and a corresponding contractually required time for resolution of the problem," *id.* at *2, the limitation itself was abstract and HP did not argue that the idea was "innovative or non-conventional," *id.* at *6.

The second patent was "directed toward accessing information in an information repository, such as a computer database," and it "claim[ed] a method and apparatus for accessing a repository's information in a way that it may be displayed to a user in hierarchical form." 2015 WL 1133244, at *2. The representative claim recited an "[a]pparatus" that comprised "a number

of computer readable media" with "computer readable program code" that included "code for creating a hierarchy of derived containers," "code for displaying [those] containers," and "code for determining [which] containers ha[d] been selected . . . and displaying [its] contents." *Id.* HP argued that the patent was "specific and concrete" because "its claims [were] limited to implementations that use 'derived containers' and 'container definition nodes.'" *Id.* at *7. The court considered HP's proposed construction of those terms to determine whether they "really [were] specific, specialized data structures, rather than functionally defined generic computer components," but concluded that they were nothing more than "'functional and generic' description[s] of 'generic computer components configured to implement the [abstract] idea' that the Supreme Court rejected in *Alice*." *Id.* at *7–8. The court reasoned that the claim constructions did not provide "a substantive limitation on *how* the abstract idea [was] implemented" and "sa[id] nothing of *how* the data structure [was] capable of performing these operations." *Id.* at *8 (first emphasis added; second emphasis in original). Because the patent simply claimed an "abstract idea [limited] to the context of computers," it was not patent eligible. *Id.* at *9.

The third and fourth patents were directed toward creating and running "automating workflows for resolving IT incidents." *Id.* at *3. The representative claim of the third patent, which was directed at creating "automating workflows for resolving IT incidents," recited "[a] computer implemented method for facilitating a user in defining a repair workflow" by "facilitating the user in defining" (1) "steps of the repair workflow," (2) "operations for the steps," (3) "inputs and outputs of the operations," and (4) "transitions between the steps"; and "checking the defined repair workflow" by "verifying that each response of each step's operation has a transition to another step." *Id.* The court concluded that there was no inventive concept

because the step of checking the workflow to make sure it worked was "the only limitation that [was] not a recitation of the idea of automating IT incident resolution, and that limitation did "not *specify how* the verification of the workflow's correctness is to be achieved; it merely instructs that the workflow be verified." *Id*. at *10 (emphasis added).  Noting that HP gave it "no reason to suspect that this involves anything other than the routine application of conventional computing concepts," the court concluded that the limitation could not "supply the necessary 'inventive concept' to direct the claim to patent-eligible subject matter." *Id*.

The representative claim of the fourth patent, which was directed at running the repair workflow created in the third patent, recited "[a] computer implemented method" that comprised "loading [the] repair workflow," creating a repair frame" for it, "creating a repair context for the repair frame . . . and populating the repair frame with configuration data; "binding" and "processing . . . data values," "executing the step's operation, "extracting the one or more outputs of step within the context" and "selecting a transition to transition to another step."  2015 WL 1133244, at *3.  The court concluded that it was not patent-eligible because "there [were] no additional limitations beyond reciting the execution of an automated workflow to resolve IT incidents," which did not include an inventive concept.  *Id*. at *10.  It observed, with regard to its conclusion of patent invalidity on the third and fourth patents, *id*. at *11:

> This conclusion is buttressed by concerns of preemption. Granting HP a monopoly on a very specific implementation of computer-automated resolution of IT incidents would spur innovation, by creating an incentive for others to develop a different implementation in order to avoid HP's patent. But the claims in the [third and fourth] patents would have the opposite effect. They are framed in such broad, functional language as to cover any conceivable computer-automated system for resolving IT incidents. By broadly preempting any computer-automated system for the resolution of IT incidents, these patent claims would inhibit innovation, because there is no incentive to develop new systems of computer-automated resolution of IT incidents—any new system that gets developed would incur not only the cost of development, but also the cost of licensing HP's invention.

2. *Application to the '081 Patent*

In *Mayo*, Justice Breyer observed that "the claim simply tells doctors to: . . . measure (*somehow*) the current level of the relevant metabolite" and apply "(unpatentable) laws of nature," such that "the effect [was] simply to tell doctors to apply the law *somehow* when treating their patients." 132 S. Ct. at 1299–300 (emphasis added). Borrowing this approach and focusing on the claims themselves—as I must, given their potential preemptive effect—, the components of Claim 21 "organize[] [*somehow*] data components of one or more XML documents into data objects," "identif[y] [*somehow*] a plurality of primary record types for the XML documents," "map[] [*somehow*] the data components of each data object to one of the plurality of primary record types; "organize[] [*somehow*] the instances of the plurality of primary record types into a hierarchy to form a management record type," "define[] [*somehow*] a dynamic document for display of an instance of a management record type," "detect[] modification [*somehow*] of the data in the dynamic document," and "in response thereto, modif[y] a data component in an XML document." '081 Patent, col. 20, lines 46–61. The most explanation of *how* that the claim provides is that "display" is accomplished "through a user interface," and modification is detected "via the user interface." *See id.* The representative claim provides only a functional description of what the user interface does, without including steps like those in *Diehr*, 450 U.S. at 187, to explain *how* it works. Rather, like those in *Mayo*, 132 S. Ct. at 1299, and *Flook*, 437 U.S. at 586, the representative claim does "not purport to explain *how*" to accomplish the abstract idea. Specifically, like that in *Dealertrack*, the patent does "'not specify *how* the computer hardware'"—here, the processor and the user interface— are "'specially programmed to perform the steps claimed in the patent.'" *See Dealertrack*, 674 F.3d at 1333 (citation omitted).

Without the "how," the user interface is nothing more than a "generic computer element" like the database, user profile, "communication medium," and "interactive interface" in *Intellectual Ventures I*, 792 F.3d at 1368, 1370. Thus, the '081 Patent is unlike the patent in *DDR Holdings* because its representative claim does not have "'additional features'" that "specify how" it works. *See DDR Holdings*, 773 F.3d at 1258–59. Moreover, whereas the invention in *DDR Holdings* actually changed the way the Internet worked by "overrid[ing] the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink," to send a website visitor to a "hybrid web page" instead of a third-party website, *id.*, the '081 Patent does not change the way XML documents or the computer ordinarily operate. It simply employs a computer in the way that it always is used but eliminates the programmer's role. Consequently, the non-specific claim recitations, like the patent-ineligible one in *East Coast Sheet Metal*, rely on only generic terms and do not show that the generic computer components would function in anything other than "their 'normal, expected manner.'" 2015 WL 226084, at *9 (quoting *DDR Holdings*, 773 F.3d at 1258). Further, the Federal Circuit appeared to limit *DDR Holdings* to an Internet context, stating in *Intellectual Ventures I* that "*DDR* ha[d] no applicability" because "[t]he patent at issue in [*DDR Holdings*] dealt with a problem unique to the Internet," and in *Intellectual Ventures I*, "[t]he patent claims [did] not address problems unique to the Internet." 792 F.3d at 1371. The '081 Patent is not restricted to  Internet application, but rather broadly addresses XML document manipulation, such that *DDR Holdings* is of questionable support for Intellectual Ventures. *See Intellectual Ventures I*, 792 F.3d at 1371.

The claim recitations in the '081 Patent are markedly similar to those before the court in *Hewlett Packard Co.*, 2015 WL 1133244. Reciting "components," that is, software programs, that accomplish each step and claiming that that "display" is accomplished "through a user

interface" and modification is detected "via the user interface" is akin to "[r]eciting generic computer components 'configured to' implement an abstract idea," or "adding 'instructions for' in front of the abstract idea." *Id.* at *6. As the court said in HP, "in either case, any and all implementations of the abstract idea are being claimed, which is essentially equivalent to claiming the abstract idea itself." *Id.* Thus, the user interface is not an inventive concept. Indeed, as in *Intellectual Ventures I*, 792 F.3d at 1370, the claims in the t'081 Patent do not provide the details to show that Intellectual Ventures actually "invented [a user] interface" that enables a nonprogrammer to manipulate data in incompatible XML documents or explain how the interface works. Therefore, the claims do not meaningfully "restrict[] how the result is accomplished"; rather, they "describe[] the effect or result dissociated from any method by which [the underlying idea] is accomplished." *See Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015). As a result, they remain an abstract concept the patenting of which would "foreclose other ways of solving the problem." *Intellectual Ventures I*, 792 F.3d at 1371 (discussing *DDR Holdings*, 773 F.3d at 1256–59). Without enough information on how the user interface works, all similar inventions are preempted and innovation is inhibited, as no one has the opportunity to consider the process and invent a different, better way of doing it. *See Hewlett Packard Co.*, 2015 WL 1133244, at *11.

Further, the discussion of the second HP patent in *Hewlett Packard Co.*, 2015 WL 1133244, is particularly apt. That patent claimed an apparatus that employed program code, that is, software, to sort and display information. *Id.* at *2. This description roughly describes the '081 Patent also. And, just as HP argued that its claim terms added specificity to prevent overbreadth, *id.* at *7, the Intellectual Ventures companies argue that there is an inventive concept in its "user interface," "primary record types" and "management record types." A

"primary record type" is "a data type that defines a data structure to contain data extracted from XML documents," and a "management record type" is "a data type that defines a collection of primary record types," Jt. Claim Constr. Chart for '081 Patent 1–2, Jt. Claim Constr. Stmt. Ex. C, ECF No. 202-3. "User interface" is not defined on the Joint Claim Construction Chart or in Plaintiffs' Claim Construction Opening Brief, ECF No. 213, which Defendants and this Court adopt for summary judgment purposes.  As in *Hewlett Packard Co.*, these claim constructions do not provide "a substantive limitation on *how* the abstract idea is implemented" and "say[] nothing of *how* the [components are] capable of performing these operations."  *See* 2015 WL 1133244, at *8 (first emphasis added; second emphasis in original).  Thus, they are nothing more than "'functional and generic' description[s] of 'generic computer components configured to implement the [abstract] idea' that the Supreme Court rejected in *Alice*." *See id.* at *7–8.

Simply put, the claimed invention identifies the need but not the solution.  When working with multiple digital documents, a non-programmer user can be stymied by incompatible documents that cannot be merged or altered without the proper program.  A user interface that enabled a non-programmer to make changes and merge content from incompatible digital documents could be useful, but the claims do not describe how that interface works sufficiently, if at all.  The result is an "'incidental use of a computer to perform the [claimed process, which] does not impose a sufficiently meaningful limitation on the claim's scope.'"  *Intellectual Ventures I*, 792 F.3d at 1368 (quoting *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011)).  The Intellectual Ventures companies concede that a programmer can "create a program to merge, filter and transform XML documents into the format they want" so that the user can "manipulate the data and perform actions without programming skills."  '081 Patent, col. 1, lines 37–48.  Thus, the outcome already can be achieved, and the claims do

nothing more than propose using a computer to achieve the same result. Put another way, they state that the data manipulation is "computer-aided" without explaining "how a computer aids the method." *See Dealertrack*, 674 F.3d at 1333. These claims "add too little to [the] patent-ineligible abstract concept" of organizing, displaying, and manipulating data related to business documents, *see DDR Holdings*, 773 F.3d at 1258–59, as they simply state that it should be achieved through the recited "generic computer elements performing generic computer tasks." *See Intellectual Ventures I*, 792 F.3d at 1368; *see Alice*, 134 S. Ct. at 2359–60. This does not transform the abstract idea into a patent-worthy inventive concept.

To the extent that the claimed invention streamlines the XML document translation process by creating a user interface that includes a dynamic document and replaces the programmer, it is relevant that "claiming the improved speed or efficiency inherent with applying the abstract idea on a computer" does not "provide a sufficient inventive concept." *Intellectual Ventures I*, 792 F.3d at 1367. Thus, the user interface "does not meaningfully limit claim scope for purposes of patent eligibility." *CLS Bank, Int'l v. Alice Corp.*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (en banc), *aff'd*, 134 S. Ct. 2347 (2014) (citations omitted)); *see Intellectual Ventures I*, 792 F.3d at 1367 (same). Therefore, the '081 Patent is not patent-eligible under § 101. *See Alice*, 134 S. Ct. at 2355; *Mayo*, 132 S. Ct. at 1294–97.

## IV.    THE '002 PATENT

The '002 Patent pertains generally to retrieving data from a remote location using an index or similar informational device to facilitate its location. Asserted claims 9, 11, 34, and 37, and claim 1, on which claim 9 depends, state:

> 1. A method for retrieving user specific resources and information stored either on a local device or a network server, the method comprising the steps of:

retrieving a mobile interface from the network server to the local device;

displaying the mobile interface on the local device, the mobile interface including a plurality of pointers corresponding to the user specific resources and information; and

retrieving the user specific resources and information using the plurality of pointers displayed on the mobile interface.

9. A method according to claim 1, wherein the step of retrieving the mobile interface from the network server comprises the step of retrieving the mobile interface via a cellular network.

11. A method for retrieving user specific resources and information stored either on a local device or a network server, the method comprising the steps of:

displaying the mobile interface on the local device, the mobile interface including a plurality of pointers corresponding to the user specific resources and information;

retrieving user profile and configuration data from the network server to the local device, wherein the user profile and configuration data is used to update the data associated with the mobile interface;

retrieving the user specific resources and information using the plurality of pointers displayed on the mobile interface.

34. A mobile interface used for retrieving user specific resources and information stored either on a local device or a network server, the mobile interface being adapted to move from one local device to another and adapted to be displayed on the local device, the mobile interface comprising:

a plurality of pointers that correspond to the user specific resources and information, wherein upon initiating a pointer, a user specific resource or information from either the local device or the network server is retrieved.

37. A mobile interface according to claim 34, wherein the plurality of pointers access the user specific resources and information stored on the network server via a cellular network.

**A.      Step One: Whether the Claims are Directed to an Abstract Idea**

The '002 Patent enables a user "to dynamically access programs, applications, bookmarked URLs, IP addresses, telephone numbers, television channels, radio stations, user profiles, and the like [i.e., other digital files] that are specific to a user via any computer type device" through "pointers" that direct the user to the file he or she seeks. '002 Patent Abstract. "[A] pointer is a link/shortcut to an item such as a file, URL, IP address, telephone number,

television channel, radio station, application, or service." '002 Patent, col. 10, lines 8–10.[8] Although the term pointer is used in the field of computing, it is analogous to any tag that directs a person to an object or data located elsewhere. As the Special Master observed, "[a]n index (such as the card catalog at a library) contains *pointers* to information (the books stored in a systematic manner)." R&R on '081 and '002 Patents 31 (emphasis added).

Thus, at its core, this patent is directed to the abstract idea of retrieving data located in another place by using a device with information that pinpoints the data's location to facilitate its retrieval. *See Bascom Research, LLC v. Facebook, Inc.*, 77 F. Supp. 3d 940, 949–50 (N.D. Cal. 2015) (holding that "the concept of establishing and using relationships between documents is a common, age-old practice" that "is not meaningfully different from classifying and organizing data"). This is the same idea at play when someone uses an index, table of contents, card catalog, directory, or address book to find information by locating a topic or name, noting the corresponding number or location, and going to that number or location to obtain the information sought. This concept of retrieving data from a remote location by relying on a label that identifies its location is a "fundamental . . . practice long prevalent in our system." *Alice*, 134 S. Ct. at 2356; *see Intellectual Ventures I*, 792 F.3d at 1369. Patenting it would foreclose others' use of this building block and stifle the creation of improved means of implementing this abstract idea. *See Alice*, 134 S. Ct. at 2356; *Intellectual Ventures I*, 792 F.3d at 1369.

The Intellectual Ventures companies maintain that the claimed invention is not abstract because it claims "a mobile interface." Pls.' Opp'n & Cross-Mot. Mem. 33. But, like the user interface in the '081 Patent, the mobile interface's inclusion in the '002 Patent does not preclude a finding of abstraction at step one, as other courts have found when considering claims that

---

[8] For summary judgment purposes, the parties and the Court adopt Plaintiffs' claim construction.

recite interfaces.  *See, e.g.*, *Intellectual Ventures I*, 792 F.3d at 1369–70; *Altec*, 2015 WL 993392, at \*4; *MyMedicalRecords*, 2014 WL 7339201, at \*2; *CertusView Techs.*, 2015 WL 269427, at \*16–17; *DietGoal Innovations*, 33 F. Supp. 3d at 288–89; *Clear with Computers, LLC v. Dick's Sporting Goods, Inc.*, 21 F. Supp. 3d 758, 767–68 (E.D. Tex. 2014).  This is because, at step one, courts only consider claims "[o]n their face," saving consideration of "the elements of the claim" for step two.  *See Alice*, 134 S. Ct. at 2356–57.  Thus, this limitation does not alter the overly-broad, abstract idea at the heart of the claims, namely retrieving data using information that identifies another location where the data is stored to facilitate its retrieval.  Because it is abstract, I must consider step two to determine whether there is an inventive concept to make this idea patent-eligible. *See id.* at 2356; *Intellectual Ventures I*, 792 F.3d at 1369.

**B.      Step Two: Whether There is an Inventive Concept**

The '002 Patent does not offer an inventive concept even though it recites "a mobile interface."   The Intellectual Ventures companies' proposed claim construction, which Defendants and the Court adopt for purposes of determining patent eligibility, defines "mobile interface" as "[a] user interface accessible on different computing devices and capable of dynamically accessing user specific data stored on a network server and local device."  Jt. Claim Constr. Chart for '002 Patent 1, Jt. Claim Constr. Stmt. Ex. D, ECF No. 202-4.  The mobile interface "provides an ability to access files from anywhere from any device no matter where those e-files are located."  R&R on '081 & '002 Patents 31.  Plaintiffs note that "[a]n interface can be a program *or* a device, such as an electrical connector."  Jt. Claim Constr. Chart for '002 Patent 2 (emphasis added).  And, the claims refer to use across "network server[s]" as well as "cellular network[s]."  Notably, the Federal Circuit has concluded that limitations such as this that provide for more than one possible means, such as a "'communication medium' (broadly

including the Internet and telephone networks),” do not “render the claims less abstract.”  *See Intellectual Ventures I*, 792 F.3d at 1367–68.  Moreover, it concluded that the broadly-defined communication medium” was a “generic computer element[] performing generic computer tasks” that did not “make [the] abstract idea patent-eligible.”  *Id*. at 1368.  Thus, the question is whether the patent claims “additional steps” that are not “routine” to “transform [this] otherwise abstract idea into patent-eligible subject matter.”  *See Ultramercial*, 772 F.3d at 716.

As with the ’081 Patent, the claimed invention appears to have identified a need, but not a concrete solution.

> It is not uncommon for many users to have multiple computers, PDAs, and other computer-related devices. Each individual computer or PDA may include specific menu items and bookmarks that do not exist in another computer or PDA. For example, a computer used at work may be the only device that includes a spreadsheet program while a computer used at home may be the only device that includes bookmarked URLs. Thus, the user will not have access to the bookmarks from the user’s work computer and likewise, will not have access to the spreadsheet program from the user’s home computer. As a result, this causes much inconvenience and inefficiency for the computer user.

’002 Patent, col. 2, lines 35–46.  It appears that a mobile interface that allowed a user to access and modify his or her documents remotely and instantaneously would be useful.

But identifying the need is not enough; the claims must show *how* the problem is solved. Otherwise, the effect is a draftsman’s skillful presentation preempting a field.  *See Alice*, 134 S. Ct. at 2359; *Flook*, 437 U.S. at 593.  Claim 1 asserts “[a] method for retrieving user specific resources and information.”  ’002 Patent, col. 17, lines 10–11.  Unlike the representative claim for the ’081 Patent, this claim recites “steps.”  *Id.* at col. 17, line 12.  Yet the steps lack specificity, as Justice Breyer’s approach in *Mayo* makes evident:  It simply claims “retrieving [*somehow*] a mobile interface,” “displaying [*somehow*] the mobile interface on the local device,” and “retrieving [*somehow*] the user specific resources and information.”  *Id.* at col. 17, lines 13–

21.  The most detailed explanation of how the invention works that any step provides is that the information is retrieved "using [a] plurality of pointers." *Id.* at col. 17, lines 20.  Claim 9 claims the method of Claim 1, adding the detail that the mobile interface is retrieved "via a cellular network." *Id.* at col. 17, lines 46–49. Claim 11, like Claim 1, claims "[a] method for retrieving user specific resources and information" and recites unspecific steps, namely "displaying [*somehow*] the mobile interface on the local device," "retrieving [*somehow*] user profile and configuration data from the network server," "retrieving [*somehow*] the user specific resources and information." *Id.* at col. 17, lines 54–67.  Like Claim 1, Claim 11 only goes as far as to explain that the information is retrieved "using [a] plurality of pointers." *Id.* at col. 17, lines 66–67.  Claim 34 claims "[a] mobile interface used for retrieving [*somehow*] user specific resources and information stored either on a local device or a network server, the mobile interface being adapted [*somehow*] to move from one local device to another and adapted [*somehow*] to be displayed on the local device," and claims that the mobile interface comprises "pointers that correspond to the user specific resources and information," and that, when initiated, "retrieve[] [*somehow*]" the resources and information to which they correspond. *Id.* at col. 19, lines 19–28. Finally, Claim 37 claims "[a] mobile interface according to Claim 34," adding the detail that the "pointers access the user specific resources and information . . . via a cellular network." *Id.* at col. 19, lines 36–39.

In sum, Claims 1, 9, and 11 recite "steps" for a claimed method, and the steps comprise "retrieving" and "displaying" "a mobile interface," using "pointers" and, for Claim 9, "via a cellular network"; Claims 34 and 37 recite a "mobile interface" that is "adapted" and that comprises "pointers" that "retrieve[]" information, and for Claim 37, do so "via a cellular network." *Id.* at col. 17, lines 12–21, 46–49, 56–67; col. 19, lines 19–28, 36–39.  Even adopting

Plaintiffs' claim construction, there are no details about *how* the mobile interface operates, only *what* it does. Thus, as in *Intellectual Ventures I*, the claimed interface is nothing more than "a 'software' 'brain' 'tasked with . . . providing [information] to the user," the use of which "provides no additional limitation beyond applying an abstract idea, restricted to the Internet, on a generic computer." 792 F.3d at 1371. As noted, the Federal Circuit and other courts have held that, when only a "vague and generic description[]" is provided, an interface is "a generic web server with attendant software," that is, a conventional, generic computer component that does "not confer patent eligibility" to an abstract idea. *See id.* at 1370–71; *see also MyMedicalRecords*, 2014 WL 7339201, at *2–3; *Dick's Sporting Goods*, 21 F. Supp. 3d at 768.

Additionally, use of a pointer cannot be an inventive concept because the vast majority of data retrieval on computers involves the use of pointers. Indeed, the Intellectual Ventures companies concede that "[t]he patentee did not invent pointers," arguing instead that "[t]he patentee used pointers in a new, innovative way." Pls.' Reply 22. Thus, in referring to pointers and an interface, the '002 Patent, like the '081 Patent, claims "computer-aided" data retrieval without explaining "how a computer aids the method." *See Dealertrack*, 674 F.3d at 1333. And, retrieval "via a cellular network" is nothing more than use of a cellular network in the way one always is used. Thus, while these claims include steps, "the claimed sequence of steps comprises only 'conventional steps, specified at a high level of generality.'" *See Ultramercial*, 772 F.3d at 716. This is insufficient to supply an 'inventive concept.'" *Id.* None of these uses "overrides the routine and conventional sequence of events ordinarily triggered" when these computer components are employed. *See DDR Holdings*, 773 F.3d at 1258–59. Moreover, the claims "describe[] the effect or result dissociated from any method by which [the underlying idea] is accomplished." *See Internet Patents Corp.*, 790 F.3d at 1348.

37

The Intellectual Ventures companies note that what is claimed is a "*mobile* interface" and insist that "[t]he inventor conceived of the idea of taking those pointers, and the information they reference, and intelligently converting then and combining them in a unified interface so that the user could access their files from any location." Pls.' Reply 22 (emphasis added). Yet, unlike in *DDR Holdings*, 773 F.3d at 1258–59, the claims do not include any "additional features" that describe sufficiently how this result is achieved. The claims do not recite the software or formula needed to accomplish the invention in a way that limits the preemptive effect from reaching all use of a computer to access remote information via an interface using pointers. That is a far cry from the limited foreclosure permitted in *Diehr*, 450 U.S. at 187, or in *DDR Holdings*, 773 F.3d at 1259. And, again, unlike in *DDR Holdings*, "[t]he patent claims here do not address patents unique to the Internet." This further undermines any assistance Intellectual Ventures may seek from this decision.

The '002 Patent's specificity is similar to that of the patent-ineligible invention in *East Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc*., where the court found that the "claim only says what the invention does . . . . [w]ithout a disclosure of how the invention does what it does" and without including any "language . . . that describes the computer programming involved in the invention as operating in anything other than their 'normal, expected manner.'" No. 12-517-LM, 2015 WL 226084, at *9 (D.N.H. Jan. 15, 2015) (quoting *DDR Holdings*, 773 F.3d at 1258). There, as here, "the patent merely recite[d] the use of a generic computer to perform generic computer operations." *Id.*

Even if the "how" were evident, the patentability remains questionable. According to Plaintiffs, the mobile interface enables a user to access digital data remotely. Pls.' Reply 21–22. But, a person can retrieve electronically-stored information from a remote location. For

example, a user can access data without the interface by traveling to the location at which the data is stored and retrieving it, or having someone else at that location retrieve and forward the data. Significantly, computer components cannot render an abstract idea patent-eligible when, as here, the computer performs a function that a person could do. *See Altec*, 2015 WL 993392, at *4 (concluding that underlying idea was abstract, notwithstanding its "computer-implemented method," given that "[t]he steps performed by the claimed computer elements [were] functional in nature and could easily be performed by a human"); *DietGoal Innovations*, 33 F. Supp. 3d at 283, 284 (concluding that "computer-implemented" steps that "could 'be performed in the human mind, or by a human using a pen and paper'" did not render asserted claims patent-eligible); *Mortgage Grader, Inc. v. Costco Wholesale Grp.*, --- F. Supp. 3d ----, 2015 WL 778125, at *5, *6 (Fed. Cir. Jan. 12, 2015) (concluding that computer component did not introduce an inventive concept to the underlying abstract idea because the claim was not "drawn to something that could not be done by a person"); *Dick's Sporting Goods*, 21 F. Supp. 3d at 765 (stating that claim did not become patent-eligible based on the claim's "computer system with a configuration engine" limitation, because the claim could "be performed entirely by a human, mentally or with pencil and paper"); *Enfish, LLC v. Microsoft Corp.*, 56 F. Supp. 3d 1167, 1175, 1177 (C.D. Cal. 2014) (stating that the limitation of "indexing data stored in said table" was not inventive because "[h]umans engaged in this sort of indexing long before this patent").

    The Intellectual Ventures companies also argue that the mobile interface allows for instantaneous access, while "[a]n assistant in a room cannot transport a physical file anywhere in the world *instantly*." Pls.' Reply 21 (emphasis added). Yet, the fact that the mobile interface allows for faster retrieval does not transform the abstract idea into a patent-eligible concept, given that "[r]apid processing of data is a generic function of computers." *Enfish*, 56 F. Supp. 3d

at 1181.  Stated differently, "claiming the improved speed or efficiency inherent with applying the abstract idea on a computer" does not "provide a sufficient inventive concept."  *Intellectual Ventures I*, 792 F.3d at 1367; *CLS Bank, Int'l v. Alice Corp.*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (en banc) *aff'd*, 134 S. Ct. 2347 (2014).  Therefore, the '002 Patent is not patent-eligible under § 101.  *See Alice*, 134 S. Ct. at 2355; *Mayo*, 132 S. Ct. at 1294–97.

## V.    CONCLUSION

I will adopt the Special Master's factual findings but reject his conclusions of law as to the '081 & '002 Patents.  I will grant Defendants' motions as to these patents, and deny Plaintiffs' motions as to these patents.  The motions as to the '409 & '084 Patents remain pending.

A separate Order follows.

Date: <u>September 2, 2015</u>                    _____/S/_____

                                                                Paul W. Grimm
                                                                United States District Judge

lyb

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| **INTELLECTUAL VENTURES I LLC,** *et al.,* | * | |
| **Plaintiffs,** | * | **Case No.: PWG-14-111** |
| **v.** | * | |
| **CAPITAL ONE FINANCIAL CORP.,** *et al.,* | * | |
| | * | |
| **Defendants.** | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**ORDER**

For the reasons stated in the Memorandum Opinion issued this same date, it is, this 2nd day of September, 2015, hereby ORDERED that

1. The Special Master's Report and Recommendation as to the validity of United States Patent Nos. 7,984,081 (the "'081 Patent") and 6,546,002 (the "'002 Patent"), ECF No. 298, IS ADOPTED with regard to its factual findings and IS REJECTED with regard to its conclusions of law;

2. The Motion for Summary Judgment of Invalidity under 35 U.S.C. § 101 that Defendants/Counterclaimants Capital One Financial Corp., Capital One Bank (USA), N.A., and Capital One, N.A. filed, ECF No. 147, IS GRANTED as to the '081 and '002 Patents only;

3. The Cross-Motion for Partial Summary Judgment that Plaintiffs/Counter-Defendants Intellectual Ventures I LLC and Intellectual Ventures II LLC filed, ECF No. 169, IS DENIED as to the '081 and '002 Patents only;

4.  Defendants' objections to the Special Master's Report and Recommendation on the '081 & '002 Patents, ECF No. 307, ARE SUSTAINED; and

5.  The cross-motions, ECF Nos. 147 and 169, remain pending insofar as they pertain to the validity of United States Patent Nos. 6,314,409 and 6,715,084 under 35 U.S.C. § 101.

<div style="text-align: right;">

_____/S/_____

Paul W. Grimm
United States District Judge

</div>

lyb

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### *Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| **INTELLECTUAL VENTURES I LLC,** *et al.,* | * | |
| **Plaintiffs,** | * | **Case No.: PWG-14-111** |
| **v.** | * | |
| **CAPITAL ONE FINANCIAL CORP.,** *et al.,* | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

In *Intellectual Ventures v. JPMC*, Case No. 13-3777-AKH, 2015 WL 1941331 (S.D.N.Y. Apr. 29, 2015) ("*JPMC*"), the United States District Court for the Southern District of New York recently entered an order of patent invalidity under 35 U.S.C. § 101 ("the *JPMC* Order"). The ruling was against Plaintiffs/Counter-Defendants Intellectual Ventures I LLC and Intellectual Ventures II LLC (together, "Intellectual Ventures companies" or "IV"), also plaintiffs in that action, as to two patents at issue in this litigation, United States Patent No. 6,314,409 ("the '409 Patent") and United States Patent No. 6,715,084 ("the '084 Patent"). In this Court, Defendants/Counterclaimants Capital One Financial Corp., Capital One Bank (USA), N.A., and Capital One, N.A. (collectively, "Capital One companies" or "Defendants"), not parties to *JPMC*, move for summary judgment in their favor as to these two patents' validity under the doctrine of issue preclusion, based on the *JPMC* Order.

The parties fully briefed the issue, ECF Nos. 297, 300, 303; Special Master Raphael V. Lupo addressed it in his June 11, 2015 Report and Recommendation ("R&R"), ECF No. 315;

and the parties briefed their responses to Mr. Lupo's R&R regarding issue preclusion, ECF Nos. 324, 330, 335.[1]  I have reviewed the record and decided *de novo* the Capital One companies' objections to the findings of facts and conclusions of law regarding issue preclusion, pursuant to Fed. R. Civ. P. 53(f)(3)–(4).  Because I find that the *JPMC* Order was a final judgment for issue preclusion purposes, I will conclude that issue preclusion provides a basis for judgment in the Capital One companies' favor on the '084 and the '409 Patents, and I will sustain the Capital One companies' objections to the R&R.

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013).  If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts.  *See Celotex v. Catrett*, 477 U.S. 317 (1986).  A "genuine" dispute of material fact is one where the conflicting evidence creates "fair doubt"; wholly speculative assertions do not create "fair doubt."  *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001); *see also Miskin, v. Baxter Healthcare Corp.*, 197 F. Supp. 2d 669, 671 (D. Md. 1999).  And, the existence of only a "scintilla of evidence" will not defeat a motion for summary judgment.  *Anderson v. Liberty*

---

[1] *See* ECF No. 143 (Order Appointing Special Master ¶ 4, providing for objections to be filed in accordance with Rule 53(f), responses to objections to be filed within fourteen days thereafter, and replies within seven days thereafter).  A hearing is not necessary.  *See* Loc. R. 105.6.

*Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment.  *Id.*

## II.    ISSUE PRECLUSION

The doctrine of collateral estoppel, or issue preclusion, prevents "the relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom [issue preclusion] is asserted had a full and fair opportunity to litigate." *Virginia Hosp. Ass'n[] v. Baliles*, 830 F.2d 1308, 1311 (4th Cir. 1987). The Federal Circuit has held that it will "apply the law of the regional circuit to the general procedural question of whether issue preclusion applies[,]" but applies Federal Circuit precedent to substantive issues of patent law. *Soverain Software LLC v. Victoria's Secret Direct Brand Management, LLC*, 778 F.3d 1311, 1314 (Fed. Cir. 2015); *RF Delaware, Inc. v. Pacific Keystone Technologies, Inc.*, 326 F.3d 1255, 1261 (Fed. Cir. 2003).

The Fourth Circuit has held that for collateral estoppel or issue preclusion to apply, the party asserting the doctrine must establish the following five elements:
> (1) the issue or fact is identical to the one previously litigated;
> (2) the issue or fact was actually resolved in the prior proceeding;
> (3) the issue or fact was critical and necessary to the judgment in the prior proceeding;
> (4) the judgment in the prior proceeding is final and valid; and
> (5) the party to be foreclosed by the prior resolution of the issue or fact had a full and fair opportunity to litigate the issue or fact in the prior proceeding.

*Microsoft Corporation Antitrust Litigation*, 355 F.3d 322, 326 (4th Cir. 2004) (emphasis added); *Ramsey v. US Immigration & Naturalization Service*, 14 F.3d 206, 210 (4th Cir. 1994) . . . .

R&R 8–9.[2]

Here, Defendants challenge the R&R's conclusion that collateral estoppel does not bar litigation of these two patents because the judgment was not final. Defs.' Obj. 4; *see* R&R 9.

---

[2] Neither party objects to the Special Master's presentation of the legal standard.  Defs.' Obj. 2–3; Pls.' Resp. I note that "collateral estoppel [is an] affirmative defense that must be pleaded," *Blonder–Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971) (citing Fed. R. Civ. P. 8(c)), and Defendants pleaded estoppel in their Third Amended Answer.  ECF No. 196.

The Special Master reasoned that the *JPMC* Order, which granted JPMC summary judgment as to three of the five patents at issue in that case, was "the grant of a partial summary judgment and therefore not final and appealable." R&R 11. He noted that "Plaintiffs have not asked that Court to enter judgment under Rule 54(b), nor has the JPMC court certified the order [for appeal] *sua sponte*," and "the JPMC court did not direct the entry of a separate judgment." *Id*. He also observed that the *JPMC* Order "possibly may never be appealable," because it "could be revised or vacated at any time before the court enters a judgment in the entire case," and "the parties could settle the case in a manner that provides some recognition of the two patents (*i.e.*, some form of a licensing agreement that affords one or both of those patents some recognition of validity)." *Id.* at 12.

Few Fourth Circuit cases offer guidance on what constitutes a final judgment for purposes of collateral estoppel. Notably, in the numerous cases I have reviewed, the Fourth Circuit does not equate collateral estoppel finality with Rule 54(b) finality or appealability, and it distinguishes between the requirements for collateral estoppel and those for res judicata. *See Orca Yachts, L.L.C. v. Mollicam, Inc.*, 287 F.3d 316, 318 (4th Cir. 2002) ("[W]hile issue preclusion applies only when an issue has been actually litigated, claim preclusion requires only a valid and final judgment." (citing *Restatement (Second) of Judgments* §§ 17, 27 (1980))); *see also Cannon v. Wells Fargo Bank, N.A.*, No. PWG-13-1324, 2014 WL 672687, at *13 (D. Md. Feb. 20, 2014) (noting that "'[u]nlike claim preclusion, the effectiveness of issue preclusion, sometimes called collateral estoppel, does not require the entry of a judgment, final in the sense of being appealable.'" (quoting *First Jersey Nat'l Bank v. Brown (In re Brown)*, 951 F.2d 564, 569 (3d Cir. 1991))).

A useful discussion of finality for collateral estoppel purposes appears in *Swentek v. USAIR, Inc.*, 830 F.2d 552 (4th Cir. 1987), *abrogated on other grounds as recognized in Mikels v. City of Durham, N.C.*, 183 F.3d 323, 329 n.4 (4th Cir. 1999), on which Defendants rely.  The Special Master is correct that the circumstances were different in *Swentek*.  In *Swentek*, as the Special Master observed, the trial court applied collateral estoppel to bar the relitigation of facts on which findings had been made in "*the same, single litigation between the same parties*." R&R 12–13 (emphasis in R&R).  Yet, whether the litigation is the same and whether both parties are the same is not determinative for purposes of collateral estoppel analysis.  *See Microsoft Corporation Antitrust Litigation,* 355 F.3d 322, 326 (4th Cir. 2004).  And, even if *Swentek* is procedurally inapposite, the case is informative nonetheless.

In *Swentek*, the plaintiff lodged a Title VII claim against her employer and three state law tort claims against a co-worker.  *Swentek*, 830 F.2d  at 554.  The judge heard the Title VII claim, finding for the employer, while a jury heard the tort claims, finding for Swentek only on her claim for emotional distress.  *Id.* at 556.  Swentek and the co-worker defendant both moved for a new trial, and the judge granted the defendant's motion for a new trial as to the emotional distress claim only.  *Id.*  A second judge presided and held that the jury verdicts on the other two tort claims collaterally estopped the plaintiff from submitting certain evidence.  *Id.*  Thereafter, he directed a verdict for the defendant.  *Id.*

Swentek appealed, arguing, *inter alia*, that "collateral estoppel [was] inappropriate in th[e] case because the jury's and trial judge's findings in the first trial were not final judgments." *Id.* at 560.  The court observed that Rule 54(b), pursuant to which judgment on fewer than all claims may be entered as a final judgment to permit an appeal, is intended "to protect against piecemeal appeals when multiple claims are resolved during the course of a single lawsuit."  *Id.*

5

at 560–61.  It reasoned that requiring the entry of a judgment under Rule 54(b) and waiting for

an appeal "before assigning the prior jury determinations preclusive effect," instead of

proceeding with the case and applying collateral estoppel to prevent the relitigation of already-

decided issues, "would dictate the very piecemeal appeals—with the attendant drain on

resources—that Rule 54(b) was designed to prevent."  *Id.* at 561.  The Fourth Circuit held:

> it was within the discretion of the trial court to inquire at the partial new trial
> whether the parties had a full and fair opportunity to litigate the particular matter.
> *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979).  Collateral estoppel is
> appropriate where the identical issue was "actually litigated, that is, contested by
> the parties and submitted for determination by the court," where the issue was
> "actually and necessarily determined by a court of competent jurisdiction," and
> where preclusion does not work an unfairness in the second trial.  *Otherson v.
> Department of Justice*, 711 F.2d 267, 273 (D.C. Cir. 1983).  As long as the prior
> adjudication of the identical issue is conclusive, we see no reason to require the
> issue to be tried again because it lacked the formality of an express order and a
> "no just reason for delay" determination.  *See Alexander v. Chicago Park District*,
> 773 F.2d 850, 855 (7th Cir. 1985); *O'Reilly v. Malon*, 747 F.2d 820, 823 (1st Cir.
> 1984); *Chemetron Corp. v. Business Funds, Inc.*, 682 F.2d 1149, 1191 (5th Cir.
> 1982) *vacated on other grounds*, 460 U.S. 1007 (1983).  Finality for purposes of
> collateral estoppel is a flexible concept and "may mean little more than that the
> litigation of a particular issue has reached such a stage that a court sees no really
> good reason for permitting it to be litigated again."  *Lummus Co. v.
> Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir. 1961); *Restatement
> (Second) of Judgments* ¶ 13 (1982).

*Id.* at 561–62; *see also ePlus, Inc. v. Lawson Software, Inc.*, ---- F.3d ----, 2015 WL 3772472, at

*19 (Fed. Cir. 2015) (O'Malley, J., dissenting) ("[F]inality often may be applied less strictly for

preclusion purposes than for purposes of appeal . . . . *See Miller Brewing Co. v. Joseph Schlitz

Brewing Co.*, 605 F.2d 990, 996 (7th Cir. 1979) ("To be 'final' for purposes of collateral

estoppel the decision need only be immune, as a practical matter, to reversal or amendment.

'Finality' in the sense of 28 U.S.C. § 1291 is not required."); *see also Syverson v. Int'l Bus.

Mach. Corp.*, 472 F.3d 1072, 1079 (9th Cir. 2007); *Henglein v. Colt Indus. Operating Corp.*, 260

F.3d 201, 209–10 (3d Cir. 2001) ("[W]e commented that finality for purposes of issue preclusion

is a more 'pliant' concept than it would be in other contexts."); *Swentek v. USAIR, Inc.*, 830 F.2d

552, 561 (4th Cir. 1987) ("Finality for purposes of collateral estoppel is a flexible concept....")
. . . ; *Pye v. Dep't of Transp. of Georgia*, 513 F.2d 290, 292 (5th Cir. 1975) ("To be final a
judgment does not have to dispose of all matters involved in a proceeding."); *Zdanok v. Glidden
Co.*, 327 F.2d 944, 955 (2d Cir. 1964).

Also relevant is the one case I found in which the Fourth Circuit addressed the finality of
a partial summary judgment order: *Saudi v. Ship Switzerland, S.A.*, 93 F. App'x 516 (4th Cir.
2004) (unpublished). There, in an admiralty and maritime personal injury action in the Southern
District of Texas, one of multiple defendants, Osprey, had moved for summary judgment on the
general negligence claims brought against it. *See Saudi v. S/T/Marine Atl.*, 2001 WL 893871, at
*1–2 (S.D. Tex. Feb. 20, 2011), *aff'd*, 2003 WL 22838776 (5th Cir. 2003). The trial court
granted Osprey's motion, leaving three causes of action, asserted against other defendants,
pending. *Id.* at *6–7. The plaintiff then filed suit in this Court, bringing negligence and
premises liability claims against defendants that included Automar, Osprey's parent company.
*See Saudi*, 93 F. App'x at 517. This Court granted summary judgment in Automar's favor,
reasoning that *res judicata* barred the relitigation of the negligence claims previously decided in
favor of Automar's subsidiary. *Id.* at 518, 519. Affirming the district court on appeal, albeit
considering the propriety of a *res judicata* holding, not a collateral estoppel holding, the Fourth
Circuit stated that "the Texas district court clearly reached a final decision on the merits when it
granted Osprey's motion for summary judgment against Saudi on Saudi's maritime negligence
and unseaworthiness claims." *Id.* at 520. Thus, the Fourth Circuit considered a partial summary
judgment order to be a final judgment. *See id.*

The issue of the finality of a partial summary judgment order on patent validity has arisen
in the Federal Circuit. In *Vardon Golf Co. v. Karsten Manufacturing Corp.*, 294 F.3d 1330, 1331

(Fed. Cir. 2002), the Federal Circuit considered whether a partial summary judgment order in a prior case that the defendant had not infringed two claims of the plaintiff's patent "collaterally estopped Vardon from bringing a new action against Karsten based on certain claims of Vardon's reissue patent." The Federal Circuit applied Seventh Circuit issue preclusion law, under which "in order '[t]o be "final" for purposes of collateral estoppel the decision need only be immune, as a practical matter, to reversal or amendment,'" and "the possibility of appeal contributes directly to this determination of finality." *Id.* at 1333 (citation omitted). It concluded that the prior, interlocutory decision which had not been certified under Rule 54(b) "clearly was not 'immune . . . to reversal or amendment." *Id.* at 1334. Yet, given the Fourth Circuit's holdings in *Swentek* and *Saudi* (which did not adopt the Seventh Circuit's "immune, as a practical matter, to reversal or amendment" test), the Seventh Circuit standard does not apply.

More persuasive is *Dana v. E.S. Originals, Inc.*, 342 F.3d 1320, 1321 (Fed. Cir. 2003), in which the Federal Circuit considered Eleventh Circuit law to determine whether a partial summary judgment order of patent enforceability in a prior suit against the defendants precluded the defendants from challenging the patent's validity in the pending suit. The prior suit ended in a settlement in which the parties agreed that "the partial summary judgment orders '[would] have no collateral estoppel or res judicata effect with respect to or in favor of any third party,' but added that the court '[took] no position with respect to this intent.'" *Id.* at 1322 (quoting agreement). Under Eleventh Circuit law, the standard for issue preclusion differs from the Fourth Circuit's, as the Eleventh Circuit does not include the fourth element, the final and valid judgment, *id.* at 1323, which, here, is central to the analysis. Notwithstanding that standard, the court considered whether the partial summary judgment order was a final order for issue preclusion purposes. Quoting on *Restatement (Second) of Judgments* § 13 & cmt. g, which the

Fourth Circuit cited in *Swentek*, *see supra*, and in *Hunter Douglas Inc. v. Sheet Metal Workers Int'l Ass'n, Local 159*, 714 F.2d 342, 346 (4th Cir. 1983), the Federal Circuit observed that "'for purposes of issue preclusion ... final judgment includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect,'" and that "[t]he test for finality is whether the prior decision was 'adequately deliberated and firm' or 'avowedly tentative,' and whether the parties were fully heard in the prior proceeding." *Dana*, 342 F.3d at 1323.

Moreover, the Federal Circuit has stated that, in the realm of patent litigation, "the legal standard for determining whether a patentee is collaterally estopped from asserting its alleged patent right was established by the Supreme Court in *Blonder–Tongue*." *Pharmacia & Upjohn Co. v. Mylan Pharmas., Inc.*, 170 F.3d 1373, 1379 (Fed. Cir. 1999) (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313 (1971)). Under the *Blonder–Tongue* streamlined analysis, collateral estoppel can be asserted defensively "by one facing a charge of infringement of a patent that has once been declared invalid." *Blonder–Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 323–24, 350 (1971). Thus, "'once the claims of a patent are held invalid in a suit involving one alleged infringer, an unrelated party who is sued for infringement of those claims may reap the benefit of the invalidity decision under the principles of collateral estoppel.'" *Pharmacia*, 170 F.3d at 1379 (quoting summary of *Blonder–Tongue* holding in *Mendenhall v. Barber–Greene Co.*, 26 F.3d 1573, 1577, 31 USPQ2d 1001, 1003 (Fed. Cir. 1994); *see Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1315 (Fed. Cir. 2015) (same). In holding that defensive collateral estoppel is available to alleged patent infringers, the Supreme Court reasoned that the "number of recent, significant examples of repeated litigation of the same patent" and the fact that "patent trials . . . tend to be of

disproportionate length" made such a defense all the more necessary. *Blonder–Tongue*, 402 U.S. at 330, 348; *see also id.* at 329, 334–48 (discussing length and cost of patent litigation).

In the *Blonder–Tongue* analysis, "whether the party against whom an estoppel is asserted had a full and fair opportunity to litigate" its patent is of utmost significance and is "not a simple matter." *Id.* at 329. To make this determination, the court should consider "choice of forum and incentive to litigate" and the standard that the trial court applied to assess the patent, among other factors, but "no one set of facts, no one collection of words or phrases, will provide an automatic formula for proper rulings on estoppel pleas," and "[i]n the end, decision will necessarily rest on the trial courts' sense of justice and equity." *Id.* at 333–34.

Here, the thirty-two page *JMPC* Order includes a comprehensive analysis of both the '409 and '084 Patents' validity under § 101. It is labeled "ORDER AND OPINION GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT," and it dismisses the claims with respect to those patents, thereby fully resolving the issues with regard to those patents. *See JPMC* Order 1, 32. The court issued it after receiving and reviewing the parties' briefings and exhibits, *id.* at 1–7, and holding a hearing, *see* Defs.' Obj. 7–8. Thus, the *JPMC* Order is a final order for purposes of issue preclusion. *See Swentek*, 830 F.2d at 561–62; *Restatement (Second) of Judgments* § 13 & cmt. G; *Hunter Douglas Inc.*, 714 F.2d at 346; *Dana*, 342 F.3d at 1323. Moreover, through the briefing, hearing, and presentation of exhibits on summary judgment, Plaintiffs clearly "had a full and fair opportunity to litigate," standing before the *JPMC* Court in the same posture that they now stand before this Court. *Blonder–Tongue*, 402 U.S. at 329, 333–34. The Capital One companies are entitled to judgment in their favor on the '084 and the '409 Patents on the basis of issue preclusion. *See Swentek*, 830 F.2d at 561–62; *Restatement (Second) of Judgments* § 13 & cmt. G; *Hunter Douglas Inc.*, 714 F.2d at 346; *Dana*, 342 F.3d at 1323.

Plaintiffs, in their Response to Defendants' Objection to the R&R, assert for the first time that issue preclusion is not a bar because the *JPMC* Order did not address identical issues, as it did not invalidate claims 15 and 18 of the '084 Patent. Pls.' Resp. 14–15. Plaintiffs also argue that "the record here is far more comprehensive than what was before the court in the JPMC case," as Plaintiffs have presented expert testimony and Defendants have presented deposition testimony. *Id.* at 15. But, in the Objection that Plaintiffs filed to the R&R, ECF No. 325, Plaintiffs did not address issue preclusion or lodge any objection to the Special Master's issue preclusion analysis. Rather, they only raise this issue, after the deadline for objections, in response to Defendants' objection. *See* Fed. R. Civ. P. 53(f)(2) ("A party may file objections to . . . the master's order, report, or recommendations no later than 21 days after a copy is served, unless the court sets a different time."); Order Appointing Special Master ¶ 4; ECF No. 157 (Order setting deadline for parties to file objections simultaneously), 165 (same). An objection that is not timely presented to the Court is waived. *See In re Under Seal*, 749 F.3d 276 (4th Cir. 2014) (noting also that "'an objection on one ground does not preserve objections based on different grounds'") (quoting *United States v. Massenburg*, 564 F.3d 337, 342 n.2 (4th Cir. 2009))). Therefore, I will not consider this objection. *See id.*

Because I have determined that the Capital One Defendant have prevailed on their collateral estoppel affirmative defense, I need not reach the issues regarding the Special Master's conclusion that the '409 and '084 Patents are invalid pursuant to 35 U.S.C. § 101.

### ORDER

Accordingly, it is, this <u>4th</u> day of <u>September</u>, <u>2015</u>, hereby ORDERED that

1. The Capital One companies' objections, ECF No. 324, to the June 11, 2015 Report and Recommendation as it pertains to issue preclusion, ARE SUSTAINED;

11

2.  The June 11, 2015 Report and Recommendation, ECF No. 315, IS REJECTED as it pertains to issue preclusion;

3.  Defendants' Motion for Summary Judgment, ECF No. 147, IS GRANTED as to the '409 and '084 Patents on the basis of issue preclusion;

4.  Plaintiffs' Motion for Summary Judgment, ECF No. 169, IS DENIED as to the '409 and '084 Patents; and

5.   In light of this ruling, it is not necessary either to rule on the objections to the June 11, 2015 Report and Recommendation as it pertains to patent invalidity or to adopt or reject the Report and Recommendation as it pertains to patent invalidity.


         /S/
Paul W. Grimm
United States District Judge


lyb

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| **INTELLECTUAL VENTURES I LLC,** | | |
| *et al.,* | * | |
| | | |
| **Plaintiffs,** | * | **Case No.: PWG-14-111** |
| | | |
| **v.** | * | |
| | | |
| **CAPITAL ONE FINANCIAL CORP.,** | * | |
| *et al.,* | | |
| | * | |
| **Defendants.** | | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**ENTRY OF FINAL JUDGMENT AND CERTIFICATION OF NO JUST REASON FOR**
**DELAY PURSUANT TO FED. R. CIV. P. 54(b)**

Having issued Memoranda and Orders that dispose of the issues relating to the '002, '081, '084 and '409 Patents ("the Patent Claims"), ECF Nos. 377, 378, & 382, the substance of which is incorporated herein by reference, and having expressly determined that there is no just reason for delay, it is, this 8th day of September, 2015, hereby ORDERED that final judgment is entered in favor of Defendants/Counterclaimants Capital One Financial Corp., Capital One Bank (USA), N.A., and Capital One, N.A. (collectively, "Capital One companies") and against Plaintiffs/Counter-Defendants Intellectual Ventures I LLC and Intellectual Ventures II LLC with respect to the Patent Claims only. The counterclaims brought by the Capital One companies remain pending.

It is FURTHER ORDERED that

1. The Capital One companies' Objection, ECF No. 310, to the Special Master's Decision Regarding Limitations On Prior Art, ECF No. 286, IS OVERRULED AS MOOT in light of the Memoranda and Orders disposing of the issues relating to the Patent Claims;

2. The Motions to Seal that the parties have filed, ECF Nos. 229, 306, 341, 355, and 371, ARE GRANTED, given that no objections have been filed, the briefs and exhibits referenced in the motions contain confidential business information, and the parties have filed redacted versions for the public.

_____/S/_____
Paul W. Grimm
United States District Judge

lyb

2



US007984081B1

(12) **United States Patent**
VanderDrift

(10) **Patent No.:** **US 7,984,081 B1**
(45) **Date of Patent:** **Jul. 19, 2011**

(54) **SYSTEM AND METHOD FOR NON-PROGRAMMERS TO DYNAMICALLY MANAGE MULTIPLE SETS OF XML DOCUMENT DATA**

(75) Inventor: **Richard William VanderDrift**, Larkspur, CA (US)

(73) Assignee: **Yardley, Benham and Rasch, LLC**, Wilmington, DE (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 188 days.

(21) Appl. No.: **11/523,746**

(22) Filed: **Sep. 18, 2006**

**Related U.S. Application Data**

(63) Continuation of application No. 09/976,710, filed on Oct. 15, 2001, now Pat. No. 7,117,220.

(51) Int. Cl.
*G06F 17/30* (2006.01)
*G06F 17/00* (2006.01)

(52) U.S. Cl. ......... 707/805; 707/802; 707/803; 707/804

(58) Field of Classification Search .......... 707/100–102, 707/1, 2, 3, 802–805; 709/203; 715/241, 715/235; 719/313
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,502,101 | B1 | 12/2002 | Verprauskus et al. | 707/101 |
| 6,581,062 | B1 | 6/2003 | Draper et al. | 707/100 |
| 6,618,727 | B1 | 9/2003 | Wheeler et al. | 707/10 |
| 6,635,089 | B1 * | 10/2003 | Burkett et al. | 715/235 |
| 6,654,737 | B1 | 11/2003 | Nunez | 707/3 |
| 6,681,221 | B1 * | 1/2004 | Jacobs | 1/1 |
| 6,745,206 | B2 * | 6/2004 | Mandler et al. | 1/1 |
| 6,754,648 | B1 * | 6/2004 | Fittges et al. | 707/684 |
| 6,799,184 | B2 | 9/2004 | Bhatt et al. | 707/102 |
| 6,874,146 | B1 * | 3/2005 | Iyengar | 719/313 |
| 7,120,663 | B2 * | 10/2006 | Maesuka et al. | 709/203 |
| 7,191,394 | B1 * | 3/2007 | Ardeleanu et al. | 715/241 |
| 2002/0013792 | A1 | 1/2002 | Imielinski et al. | 707/523 |
| 2003/0074419 | A1 | 4/2003 | Vanderdrif | 709/218 |
| 2003/0101169 | A1 | 5/2003 | Bhatt et al. | 707/3 |
| 2005/0055633 | A1 | 3/2005 | Ali et al. | 715/513 |
| 2005/0278270 | A1 | 12/2005 | Carr et al. | 706/25 |

OTHER PUBLICATIONS

Varlamis et al. Bridging XML-schema and relational databases: a system for generating and manipulating relational databases using valid XML documents, Nov. 2001.*

* cited by examiner

*Primary Examiner* — Yicun Wu
(74) *Attorney, Agent, or Firm* — Woodcock Washburn LLP

(57) **ABSTRACT**

A system and method for dynamically retrieving, manipulating, updating, creating, and displaying data from sources of Extensible Markup Language (XML) documents. The program memory comprises system-user entered data definitions and business rules. The system imports XML document data into the system data definitions, processes the data using the business rules definitions and exports XML documents. The system can automatically create XML document formats from its data definitions and can automatically create its data definitions from XML document formats. The system-user can also define the mapping between XML document formats and the system data definitions. The system data definition is the combination of a Relational data model, an Object data model, and an XML data model.

**29 Claims, 30 Drawing Sheets**



Figure 1



**U.S. Patent**    Jul. 19, 2011    Sheet 2 of 30    US 7,984,081 B1

Figure 2



Figure 3

U.S. Patent          Jul. 19, 2011          Sheet 4 of 30          US 7,984,081 B1

Figure 4A





Figure 4B



Figure 4C

Figure 4D



Figure 5



Figure 6



**U.S. Patent**     Jul. 19, 2011     Sheet 10 of 30     US 7,984,081 B1



Figure 7A

Figure 7B



Figure 8A



# Figure 8B



**U.S. Patent**       Jul. 19, 2011       Sheet 14 of 30       US 7,984,081 B1



Figure 9A

Figure 9B

Figure 10



Figure 11A



Figure 11B



Figure 11C





Figure 12A

Figure 12B



Figure 13



Figure 14



Figure 15A



# Figure 15B





Figure 16A

Figure 16B





Figure 17

Figure 18A



Figure 18B



US 7,984,081 B1

1

# SYSTEM AND METHOD FOR NON-PROGRAMMERS TO DYNAMICALLY MANAGE MULTIPLE SETS OF XML DOCUMENT DATA

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 09/976,710, filed Oct. 15, 2001, in the name of Richard VanderDrift, titled "System and Method for Non-Programmers to Dynamically Manage Multiple Sets of XML Document Data," now U.S. Pat. No. 7,117,220, which is hereby incorporated by reference as if fully set forth herein.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates generally to systems and methods for interfacing with and using Extensible Markup Language (XML) documents; still more particularly, the present invention relates to systems and methods that allow the non-programmer to easily modify the display format, functions, and filters operating upon data extracted from XML documents.

### 2. Description of the Related Art

Companies use XML documents to publish various types of information for use by customers and partners. The type of information in such XML documents is frequently common transactions such as invoices and purchase orders and common reference documents such as customer profiles and price lists. Computer programmers design these XML document formats in a technical manner. People and programs that extract data from corporate databases typically create the XML documents containing actual data.

While XML formats are convenient for the company that creates them, the partners of that company may find them incompatible with their own XML formats, relational database schemes, and message formats and therefore difficult to work with. In many cases, the user is forced to have programmer create a program to merge, filter and transform XML documents into the format they want. Thus, XML documents are very difficult for the businessperson or non-technical user to operate. Therefore, there is a need for a system that both allows the user to view and update XML documents in different formats, and allows the user to manipulate the data and perform actions without programming skills.

## SUMMARY OF THE INVENTION

The present invention overcomes the limitations and short-comings of the prior art with a system and methods for dynamically retrieving, manipulating, updating, creating, and displaying data from sources of Extensible Markup Language (XML) documents comprises a central processing unit, an input device, a program memory, a display device, mass storage, and a network. The program memory comprises system-user entered data definitions and business rules. The system imports XML document data into the system data definitions (an integrated combination of Relational and Object), processes the data using the business rules definitions and exports XML documents. The system can automatically create XML document formats from its data definitions and can automatically create its data definitions from XML document formats; the system-user can also define the mapping between XML document formats and the system data

2

definitions. The system data definition is the combination of a Relational data model, an Object data model, and an XML data model.

The system has three major data types: primary record types (PRTs), management record types (MRT), and dynamic documents (DD). A PRT is similar to a relational database table; they contain most of the data. A MRT is a grouping of PRTs; they contain pointers to individual PRT records and some calculated data. A DD is a restructuring of a set of MRT instances for analysis and presentation; they contain pointers to the MRT components and some calculated data. The system's data structure is much more sophisticated than that of a relational database or a set of XML documents. Unlike a relational database, the business rules can use the complex data relationships of the MRTs and DDs, and system-users can easily define views of the data that do not conform to the constraints of the relational data model. Unlike a set of XML documents, the system-user can easily merge data from multiple XML document formats. Also the system stores only one instance of duplicate XML components; manipulating the one instance automatically affects all XML documents that include that instance.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a preferred embodiment of the system for extracting and dynamically displaying data in accordance with the present invention.

FIG. 2 is a graphical representation illustrating the context in which the system and methods of the present invention operate.

FIG. 3 is a graphical representation of an exemplary embodiment for a management record.

FIGS. 4A, 4B, 4C, and 4D are a flowchart of an overview of the preferred method for initializing and operating the system in accordance with the methods of present invention.

FIG. 5 is a flowchart of the preferred method for generating management record pointer families.

FIG. 6 is a flowchart of the preferred method for fetching data from an underlying data source and constructing management records.

FIGS. 7A and 7B are a flowchart of the preferred method for executing functions for a new set of management records.

FIGS. 8A and 8B are a flowchart of the preferred method for executing a filter for any number of management records and their pointer families.

FIGS. 9A and 9B are a flowchart of the preferred method for creating a dynamic document pointer for a new set of dynamic documents.

FIG. 10 is a flowchart of the preferred method for updating a management record for a new primary record instance.

FIGS. 11A, 11B, and 11C are flowcharts of the preferred method for updating a management record pointer instance for a changed primary record instance.

FIGS. 12A and 12B are a flowchart of the preferred method for executing a function for a changed primary record instance.

FIG. 13 is a flowchart of the preferred method for maintaining a function for a changed management record type or dynamic document.

FIG. 14 is a flowchart of the preferred method for maintaining a filter definition for changed management record type or dynamic document.

FIGS. 15A and 15B are a flowchart of the preferred method for executing a function for a changed management record pointer instance.

US 7,984,081 B1

3

FIGS. 16A and 16B are a flowchart of the preferred method for executing a function for new dynamic document pointers.

FIG. 17 is a flowchart of the preferred method for executing a function for a new or changed set of dynamic document pointers.

FIGS. 18A and 18B are a flowchart of the preferred method for executing a filter for a changed dynamic document pointer.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

In accordance with the present invention, a system for dynamically retrieving, manipulating, updating, creating, and displaying data from sources of Extensible Markup Language (XML) documents is shown in FIG. 1. A central processing unit (CPU) 12 connects with a display and input device 16 and a program memory 18. The CPU 12 is also coupled to the Internet 33 and an intranet 31 in a conventional manner. XML documents 37 fetched from the Internet 33 and intranets 31 are temporarily stored until they are converted into Primary Record Types (PRTs) 26 and Management Record Types (MRTs) 24. The system 10 also creates XML documents 37 that it exports to the Internet 33 and intranets 31 in a conventional manner.

The memory 18 also stores a Dynamic Document (DD) 20, a MRT 24, pointers for constructing and displaying DDs and MRTs 24, and functions, filters & sorts 42 along with an operating system. The CPU 12, under the guidance of instructions received from the program memory 18, imported XML formats 38, and from the user through the input device 16, creates MRTs 24 and DDs 20, XML documents 37, and XML formats 38 and displays data on the display device 16. The methods of the present invention preferably extract data from the Internet 33 and intranets 31, perform functions and filters on the data, and store the extracted data as PRTs 26 in the program memory 18. The MRTs 24 are then further processed with other routines in memory 18 to be displayed as DDs 20 that include a user interface to display information on the display 14. Those skilled in the art will be aware that various equivalent combinations of devices can achieve the same results when used in accordance with the present invention.

Referring now to FIG. 2, the context in which the system and methods of the present invention operate will be described. As has been noted above, the present invention overcomes the problems associated with presently available tools for non programmers to easily modify the display format, functions, and filters operating upon information extracted from XML documents 37, In particular, the present invention removes the problems of interfacing with and analyzing data from XML documents 37 by providing DDs 20 and MRTs 24. A DD 20 is a mechanism for displaying, manipulating, and printing MRTs, and for mapping how changes to the MRTs should update one or more XML documents. The DDs provide user interfaces as well as display and organization rules for displaying the data to the user 36. In the preferred embodiment, a DD 20 has the form of window on the display device 16 with a hierarchy of display panes. Each pane is used to display one or more or the PRTs that comprise a MRT. The present invention also includes procedures for entering data changes using DDs. As will be described, the process for modifying data with DDs is very simple for the user. A change entered with a DD automatically updates the MRTs to update other related MRTs and updates and create XML documents.

The present invention interfaces with the underlying XML documents by copying the XML data components into nor-

4

malized data objects referred to as PRTs and organizing the PRTs into recognizable business objects referred to as MRTs 24. Examples of business objects that are modeled as MRTs with the present invention include, but are not limited to: invoices, bills of material, purchase orders, price books, forecasts, and fund transactions. The present invention advantageously works in conjunction with underlying data sources 38, 40 to reconstitute data stored therein into a structure recognizable by and easily manipulated by the businessperson. The user can define functions (calculations), filters (selection criteria), sorts, and DDs (display and organization rules) over MRTs.

A MRT is a user-defined collection of PRTs organized into a hierarchy. One and only one of the PRTs uniquely define a node in the hierarchy. A single instance of a PRT results in a single instance of a MRT hierarchy node. A single instance of the PRT assigned to the top hierarchy node results in a single instance of the MRT. An instance of an MRT is a Management Record Pointer Family (MRPF) 90. In the example of FIG. 3, the Order Header is the PRT that uniquely defines the MRT. A PRT is where the invention stores the data extracted from XML documents; PRTs are similar to relational database tables. A "hook" 44 refers to the method used for linking or showing relationships between records stored in different PRTs. Such hooks include pointers and foreign keys. A hook typically provides a one to many relationship between a parent record and a child record. As shown in FIG. 3, the hooks are represented by lines where a single occurrence of a connecting line attaches to the parent, and multiple occurrence of the connecting line attach to child. A hook not only specifies which fields of a PRT point to which fields of another PRT, but also specifies the number of hooks any particular instance of one PRT can and must have with the instances of the other PRT.

It should be understood that PRTs are unlike XML components. First an XML component instances are not shared with other XML document instances. In other words, two XML documents may have identical values in all its elements. Unlike XML components, no two PRTs have identical values in the fields that uniquely identify a PRI. Second an XML component type has at most one parent component type where as a PRT can have multiple parent PRTs. It should be understood that MRTs are different than XML documents. First, a MRT can be comprised of multiple XML documents; for example a MRT can incorporate the data in both an Order XML document, and Customer XML document, and Product XML document. Second unlike an XML document, a MRT does not have any redundant data. For example an Open Orders XML document would contain duplicate customer information for every order for the same customer and duplicate product information on every order line for the same product, A MRT does not actually include the customer and product data but has a pointer to the single instance of data for each customer and each product. MRTs require less storage space than XML documents and when users change the product information and it is immediately reflected in all MRTs that point to the changed product.

MRTs also have significant advantages XML documents elements, and object database composite objects. A system administrator predetermines hierarchies of XML documents and object-oriented databases, typically. The users manually maintain the pointers between the individual records. Family trees (which do not show spouses) are examples of hierarchies. The relationships are rigid and only movement from parent to child and visa versa is permitted. Any new hierarchy is empty until parent and child records are explicitly linked to each other either manually or by writing a custom program to

US 7,984,081 B1

5

build the links. MRTs, on the other hand, automatically populate a hierarchy of PRTs using PRT hooks 81 according to definitions set by the user.

Also, unlike in an XML document component hierarchy where relationships are rigid, a parent PRT can be the child node in a MRT hierarchy. For example in FIG. 3, customer order header is typically a child component to a customer component but with the present invention, the user can define a customer order MRT where the customer order header is the parent. In this example, the customer order header is the top node for this MRT while the customer is a single occurrence child.

FIG. 3 illustrates an example of the pointer structure of the present invention that is used with the MRT 24. The pointer structure is preferably used to improve the speed for processing filters, sorts and functions. As has been noted above, one PRT 52, in this case order header, is used to uniquely identify the MRT 24. Each PRT 26 is linked either directly or indirectly by hooks 44 to the order header PRT. The present invention also produces pointer families 46-49 to divide the PRTs 26 in the MRT 24 into groups. Each of the management record pointer families (MRPF) has a lead PRT 50 that directly or indirectly through another lead PRT 50 has a many to one relationship with the unique identifying PRT 24. The PRTs that have a one to many relationship 44 with a lead PRT 50 or the one PRT 52 are included in the PRT pointer family 46-49. The example of FIG. 3 will be used below to illustrate the operations performed by the present invention on MRTs 24.

Referring now to FIG. 4, an overview of the preferred method of the present invention is described. The preferred method begins with a series of steps in which the user inputs defining information described in FIG. 4A. In step 80, the user defines or imports the XML format. In step 81 the invention creates PRTs by identifying the XML format components that have at least one child component. When the PRT already exists, the user maps the XML format components to the data elements of the already existing PRT.

In step 82, the invention creates hooks between every PRT that it creates and the XML component and the PRT it creates for its immediate parent XML component. The user can also define hook definitions between two PRTs by specifying the fields in the child PRT that corresponds to the unique identifying fields of the parent PRT. Next in step the invention creates the MRT definition and its Management Record Pointer Family (MRPF) as described in FIG. 5. To manually create a MRT, the user selects a first PRT. After the user selects the PRT, the system presents the user with a list of all PRTs that have a hook with the first PRT or any PRTs in the list. The user then selects any of the listed PRT for inclusion in the MRT. After the user has completed selection of PRTs, the user specifies which one of the PRTs selected is the unique identifier for this MRT.

Next, in step 83, the invention creates a DD for the XML format as defined in FIG. 5B. In step 84, the user can manually enter additional DDs. The user can now enter definitions for the rules that manipulate the data in the MRTs and DDs. Enter definitions for functions in step 85, for filters in step for 86, and for sorts in step 87. The methods used for defining these definitions are similar to those typically used in the art.

In FIG. 4B, an overview of the preferred method for managing the import and processing of new XML documents is described. In step 89, a user imports an XML document of a format previously imported into the invention. In step 90, the invention creates the PRIs and Management Record Pointer Instances (MRPIs) as described in FIG. 6 below. The preferred method, in step 91, next executes MRT pre-function

6

filters on the fetched data, as discussed below with reference to FIG. 8. Then in step 92, the MRT functions are executed using the fetched and filtered data as described in FIG. 7 below. Next in step 93, MRT post-function filters are executed. These filters are executed with a similar process used in step 91. Now that the data from the data sources has been retrieved, the preferred method creates dynamic document pointers (DDP) for displaying the data in step 94 (See FIG. 9 and discussion below). As with MRTs, pre-function filters (See FIG. 18 and discussion below), functions (See FIG. 16 and discussion below), post-function filters, and sorts are executed in steps 95, 96, 97, and 98, respectively. Then in step 98, the dynamic document pointer's (DDP's) calculated fields, MRPF's calculated fields, and the PRIs are organized into panes and records for display in a window or for writing of XML document for each DD instance.

In FIG. 4C, an overview of the preferred method for managing the processing of data changes entered by users is described. The user can now enter revisions to update the data using the DD displays in step 100. In step 101, the method first determines whether the change includes a new PRI record because the user entered new unique identifier values for the affected PRT. If a new PRI, step 102 updates the existing affected PRI. If a new PRI is required step 103 created the new PRI, and step 104 determines if the PRIs PRT is the lead PRT for a Management Record Pointer Family. If it is not a lead PRT, step 105 updates the appropriate MPRI to now include the new PRI. While if it is a new lead PRT, step 106 creates the new MRPI. Next, in step 107, the present invention executes the functions and filters for the revision. If any of the functions changes data values, step 108 sends those revisions to step 101 to be processed in the same manner as user entered revisions. If the functions produced no data revisions, step 109 follows where the DDs 20 are updated to reflect the revision. Then in step 110, the method updates DDP records for display in a window or writing of an XML document.

In FIG. 4D, an overview of the preferred method for managing user changes to processing rules is described. In step 111, the user enters a change to one of the rules that manage the data. In step 112 the preferred method tests whether the revision is a function revision. If not, the process continues to step 114. However, if the revision is a function revision, the function is executed with the revision in step 113, and as described below with reference to FIG. 13. In step 114, the preferred method determines whether the revision is a filter revision. If not, the process continues to step 116. However, if the revision is a filter revision, the filter is reexecuted using the revision in step 115, and as described below with reference to FIG. 14. Then in step 116, the preferred method test whether the revision is a sort revision. If not, the method continues to step 118. However, if the revision is a sort revision, the sort is executed in step 117. In step 118, the preferred method tests if processing the revision as described above resulted in revisions to data. If there are, the method loops to step 101. If the revision did not generate other revisions, the method moves to step 119 where it updates the display of the DDs to reflect changes to the sequence of data and the inclusion or omission of data affected by the changes to the filter criteria.

In FIG. 5, the preferred method for generating MRTs and their and their corresponding Management Record Pointer Families (MRPFs) is described. The process begins in step 120 where the user imports or enters an XML format. In step 121 where the invention identifies all the PRTs that comprise the XML document format. For every component within the XML document format that contains one or more components, the invention identifies a potential PRT. In step 122, the

US 7,984,081 B1

7

user indicates if the PRT already exists. If it does exist, in step **124** the user maps the field level components in the XML document to the fields in an existing PRT. The method then proceeds to step **129**. If it does not exist the method automatically creates a new PRT. Step **126** checks the PRTs to determine if it is a multiple occurrence component: a multiple occurrence component can have more than one instance in a single XML document. If it is a multiple occurrence PRT, step **127**, it creates a new MRPF with that PRT as its lead PRT (item **50** in FIG. 3). If it is a single occurrence PRT, step **128**, the invention assigns the PRT to the MRPF where its parent PRT is the lead PRT. In step **129**, the method determines if the XML format has any remaining PRTs to process. If any remain the method proceeds to step **121** to process the next PRT.

In FIG. 6, the preferred method for copying the data in XML documents into the invention's DDs, MRTs, and PRTs. This process begins when the method receives a new XML document the user queried or some other program sent to the invention. In step **130**, the XML document is read. In step **131** the components within the XML document that comprise one of its PRIs are read. Step **132** determines if the read components are for a new or existing PRI. If the PRI already exists, step **133**, updates the existing PRI to reflect the new data values and step **134** updates the MRPF instance records (MRPIs) that use the changed PRI as described in FIG. 11. If the XML document includes a new PRI, step **135** creates it and step **136** updates the MRPIs that use the new PRI as described in FIG. 10. Step **137** determines if any additional PRIs exist within the XML document. If any remain, the invention returns to step **131** to process the next PRI. When all the PRIs are processed, step **138** recreates the DDs as described in FIG. 11.

Referring now to FIGS. 7A and 7B, the preferred method for executing functions will be described. A function is one or more mathematical, financial, and statistical calculations performed using the fields of the MRT's PRTs. Examples of functions include: add, subtract, multiply, divide, round, test, join, summarize, generate a random number, log, remainder, and calculate present value. Examples of "group by functions" include: any occurrence, first occurrence, last occurrence, sum, average, count, maximum, minimum, standard deviation, variance, and net present value. The present invention is particularly advantageous because any combination of PRT fields and any MRPF calculated fields can be used in a function. If the field being used is not in the pointer family or one of the fore parents of the pointer family to which the results are assigned, the present invention requests that the user enter the "group by function" it should perform on that field prior to using it in the calculation. For example, if a user wishes to calculate an order discount by multiplying the order line dollar amounts by the order header discount and then store the results in the order header, the user would specify the "sum" group by function for the order line dollar amounts because order lines are children not fore parents of the order header where the result is stored.

The user specifies if particular functions should be executed prior to or after the filters are executed. If the user wants, for example, to not display tax order lines but wants to include the tax amount from those lines in the total order amount, the function to calculate total order amount from the order lines occurs prior to filtering out the tax order lines. If the user wants, for example, to not display tax order lines and does want to include the tax amount from those lines in the total order amount, the function is executed after filtering out the tax order lines.

8

The present invention attempts to minimize the time it takes to run the functions for a new set of management record instances (MRIs) by running each function only once and by reading each PRI as few times as necessary. Because functions can include the results (calculated fields) of other functions, the present invention "restates" functions to improve calculation speed. The present invention first ensures that all functions are restated as only PRT fields and group by functions of PRT fields. Restatement eliminates (except for group by functions) one function being dependent upon another function because that function uses the result of the other function. Restatement occurs for each function when the user first defines (enters or maintains) it or one of its component functions. Besides replacing calculated fields with the fields from which they are calculated, the present invention also determines in which pass a specific function should be processed. For a particular MRI, the present invention must make multiple passes when a group by field from one level in the MRPF hierarchy is used in a function in another level in the MRPF hierarchy and the result of that function is used in another function in the original group by function hierarchy level. For each function, the present invention checks to see if that function is comprised of any function which uses a group by fields from a different hierarchy or uses a calculated field from a hierarchy level higher than the current level. If either of the above two conditions exist, the present invention adds one to the calculation pass sequence number. The present invention then runs the same routine on the subfunctions that meet the test conditions. The present invention continues this process until it has no more sub-functions to test. As a result of this process, each function has a pass sequence number.

As shown in FIGS. 7A and 7B, the method starts with step **150** in which the MRT definitions are read. The present invention processes each MRI separately. Then, in step **151**, a MRI is read and the pass sequence number is set equal to zero. In step **152**, the method reads the lowest unprocessed MRPF level for this pass. First, the method executes for each MRPI all the functions with a pass sequence number of zero at the same time. It starts with the MRPFs that are lowest in the hierarchy and works its way up. In step **153**, the method reads the MRPF's functions. Then in step **154**, the method reads other MRPF's group by functions that use this level. Group by functions are executed with the MRPF they summarize, not the MRPF where the result is stored. The MRPIs of the MRPF are then read in step **155**. Then in step **156**, the functions for this MRPF are executed and added to the MRPI. The group by accumulators is then updated. Group by accumulators store not only the results of the group by calculation, but also enough information to recalculate the amount without rereading all the MRPIs if one of the component MRPI changes. For example, a "mean" group by accumulator includes not only the means but also the total number of MRPIs. Next in step **158**, the system determines whether the MRPI being used to execute the functions is the last MRPI for this MRPF. If not, the method returns to step **155**, otherwise the process continues in step **159**. In step **159**, the group by results is added to the parent MRPI. Then in step **160**, the method test whether this is the last MRPF for this MRT. If not, the process loops to step **152** to process any unprocessed MRPFs, otherwise the process continues in step **161**. In step **161**, the method determines if this is the last pass. The higher the pass sequence number that a group by function has the latter it gets processed. The sequence number is based on the nesting of the group by function. If it is not the last pass, then 1 is added to the pass sequence number in step **162** and the method returns to step **152** for further processing. After each pass of all the MRPIs, the method executes the functions with the next highest pass

9          10

sequence number until all functions are executed. However, if it is the last pass, the method continues in step 163 where the process tests whether this is the last MRI to perform functions for. If not, the process returns to step 151, otherwise the execution of the functions for the MRT is complete.

The present invention also provides for manipulation of the data using filters. The filters of the present invention are advantageous because the user does not need to join the underlying tables together in his/her select statement. Users can select a subset of all possible MRTs and a subset of the MRPFs that comprise the selected MRTs. Section criteria are applied against any PRT or calculated field in the MRT. Where there could be multiple occurrences of the field in a MRT (such as quantities ordered on one customer order), the user must also specify a group by filter just as with functions. The present invention has the two special group by filters "any" and "all". The other selection criteria are: equal to, not equal to, greater than, less than, like, and exists in dynamic document X. Filters can be comprised of multiple selection criteria. The criteria can be nested and include AND/OR conditions. An example of a filter is give me all MRTs where the customer is in California, and the total of the order line amounts is greater than $10,000, and any of the Salespersons are in territory one, or the order is on hold.

Any number of filters for a MRT or its MRPFs can be active at any time. The user defines as many filters as he/she wishes and then activates and deactivates them whenever he/she wants. Filters are executed either when the MRIs are fetched by the production data source or after they are stored in memory 18. The user specifies which filters should be part of the fetch. Because of performance concerns, fetches with group by functions cannot be used for fetches. The user can also indicate if the filter is for just temporarily hiding the data or for deleting the data. If a parent MRPI is filtered out, so are its children MRPIs. Filters for MRTs are handled exactly like filters on the top most MRPF in the hierarchy.

FIGS. 8A and 8B illustrate the preferred process for executing filters. The process begins by reading any new or changed MRPI in step 170. Then a filter from the MRT definition is read in step 171. Next, in step 172, an operand is tested, and the result is saved. Since all filters operate on fields in the MRPF or on fields which have been grouped by a function into the MRPF, each MRPI can be fully tested to see if it should be filtered out by reading only the MRPI's calculated fields and its PRT's PRI field values. For improved processing efficiency, the present invention executes all of a MRPI's filter tests one after the other. The operation tests are simple Boolean tests to see if the field's value equals the value stored in the filter, or stored in the specified variable, or is in the list (Dynamic Document) specified. The present invention stores the result (true or false) of each operation. The method then determines if this operand is the last operand to test in step 173. If not, the process returns to step 172 to test the next operand. If all the operands have been tested, then the process continues to step 174. In the step 174, the method looks at the results of each operand to determine if the entire filter results in a pass or fail. If the MRPI passed the filter, the method proceeds to step 177 where the method appends to the MRPI a flag for each filter indicating if the filter includes that particular MRPI. If the MRPI fails the filter, the method jumps to step 178 to evaluate the filter type. In step 178, further tests are performed to determine if the filter is a delete type. If the filter a delete type (i.e., MRPIs that are filtered out are deleted instead of not being displayed), the MRPI and its children MRPIs are immediately deleted in step 179 so no other filter need process them. Any MRPI that has any parent MRPI that is excluded is itself excluded. If the filter is not a delete type,

then the flag is set to exclude in step 180 for this filter in the current MRPI's MRPF filter affects list. Any MRPI that is excluded by any active filter is not displayed in the currently open DDs 20. Next, step 181 determines whether there are additional filters to be processed. If so the method loops to 171, otherwise the method tests whether this is the last MRPI to be processed in step 182. If there are more MRPIs to process, the method returns to step 170, otherwise, the process is complete.

As been noted above, Dynamic Documents are used to display XML document data to the user. Essentially, DDs are a rearranged and reformatted MRT. A DD is a window on the display device 14 comprised of a hierarchy of display panes. Each pane displays one or more of the MRT's PRTs and calculated fields. The user can define functions, sorts, and filters for each DD. A DD is also a tool for users to update a PRI and thereby the MRs and DDs that reference the PRT. Each DD corresponds to one MRT and each DD pane corresponds to one or more of the PRTs used by its MRT. The advantage of using DDs to create multiple data view and update transactions is that the data relationships can be radically restructured from that of the MRT. Child records can become parents, records can share fields, calculated fields can be created, and sets of records can be summarized into single records and values.

The DDs are created by the user based on the types of information that the user wants to view and update. The user selects which of the PRTs in the MRT to include in the dynamic document pointer (DDP). For user viewing or update, the invention creates DDP records by accessing the field values in its underlying PRT's PRIs and its underlying MRPI's calculated fields. Any PRT in the MRT can be used in the DDP and can be used more than once in a single DD. While their shared hook predefines the relationship between any two PRTs in a MRT, the user defines the relationship between any two PRTs in a DD. By putting a PRT in a parent hierarchy pane, the user is making that PRT the parent of all the PRTs in the children panes even if the PRTs have a different relationship in the MRT. This capability allows the user to represent the data in virtually anyway they want even though that representation is not supported by the production data source in which the data is stored. For example, a customer order MRT that has its Items PRT hooked to its Order Lines PRT which in turn is hooked to its Order Header PRT and also has Salespersons separately hooked to its Order Header PRT, as described above with reference to FIG. 3, can have a DD where the Item PRT is in the top level pane and the Salesperson is in a child pane. In this example, the Item has become the parent of Salesperson. The DD displays in the top pane any Item used in any Customer Order MRT, and displays in the child pane all the Salespersons that sold that Item on any Customer Order.

When the user places a PRT in a DDP, the user gains access not only to the PRT's fields in that pane and any of its child panes, but also access to all the calculated field of the PRT's MRPF. These calculated fields are comprised of fields of the selected PRT and also any field from any other PRT in the MRT. In the above example of the Items pane, the user could display the total amount of orders for each item even though the DD does not include the order lines or order header PRTs which are required for this calculation.

The user creates the DD Pane definition by entering the pane's name, its position in the pane hierarchy and then by selecting as many of the PRTs of the MRT that are to appear in the pane. The system then automatically joins the PRT's MRPIs together to create the DDPs. These DDPs are the DD

US 7,984,081 B1

11

equivalent of MRT's MRPIs. Each DDP corresponds to a single pane display row and can roll up into display subtotal rows.

The user specifies how to update production data sources (other than the PRTs) by defining as many separated transactions types as desired. Then the system, for any single update to the DD, automatically creates Production Data source Update Transactions Instances (UTs) and posts them to the appropriate data source. Each Production Data source Update Transaction Type (PDUTT) can update as many PRTs as the user wishes; the only restriction is that they all be in the same instance of a production data source. A DD's PDUTTs are similar to its pane attributes and report attributes in that it formats the field into an output medium. One primary difference is that a PDUTT does not always request the current value; it can also get the amount a value has changed by as a result of a transaction, or a literal amount stored in the PDUTT. Also, a PDUTT is different in that its instances (UTs) are only created when the DDs underlying MRIs are changed. The user can have all MRI changes result in UTs or can limit them to only changes entered through the DD of the PDUTT, or only when the DD is active (i.e. opened by the user).

Referring now to FIGS. 9A and 9B, the preferred method for creating DDPs is described. First, the DD 20 is read in step 190. Then the highest hierarchy level pane definition not yet processed is read in step 191. In step 192, the pane's PRT and MRPF are read. Next, the method tests whether the MRPF is already used in an existing pane in step 193. If so, the method jumps to step 196 and avoids having to initialize the pane. On the other hand, if the pane does not exist, it must be created. The method creates the pane in steps 194 and 195. In step 194, the method runs the pre-join filters on the MRPF's MRPIs. In step 195, the method joins the MRPIs to previously selected MRPI's for this pane, and the one from the parent pane. The panes are preferably joined on MRT identification and parent MRPF ID fields. The method then continues in step 196. In step 196, the method determines if this is the last PRT to be processed. If not, the process returns to step 192 and reads other PRTs. Otherwise, the method continues in step 197. In step 197, the method runs all post join filters. Then in step 198, the method tests whether any child panes for this PRT exist. If there are child panes, the method saves a copy of the joined MRPI for each child pane and continues directly to step 200. If there are no child panes the method proceeds directly to step 200. In step 200, the method determines if this pane or its parent panes include lead PRT for all its MRPFs. If lead PRTs are included, the method executes steps 201 and 202. In step 201, the system summarized the joined MRPI's by identification of the PRTs in this and the parent panes. If all the panes include lead PRTs for each MRPF, the summarization step 201 would have no effect; that is why it is shipped. The system in step 202 then runs all post summarize filters, and moves to step 203. If lead pointers are not included, the method moves directly to step 203 and determines whether this is the last pane to modify. If not, the method loops to step 191, otherwise the process ends.

FIG. 10 illustrates the preferred method for updating a MRT for a new PRI. The method starts by reading the new PRI in step 210. Then in step 211, the PRT definition and the where used list of this PRI are read. Next in step 212, the definition of the MRT listed in the where used list of step 211 is read. Next, the method determines if the PRT is a lead PRT of a MRPF in step 213. If it is a lead PRT, the method continues in step 214 where a MRPI is created. Then in step 215, the function and filters for the MRPI are executed. If it determined not to be a lead PRT in step 213, then the MRPI of

12

the MRPF is read in step 218. Then in step 219, the method tests if the PRI's hook field is in an MRPI. It will rarely be true because this means the PRI was then referenced before it was created. If so, the PRI pointer is added to the MRPI in step 220 and then method proceeds to step 221. If the PRI's hook field is not a MRPI, the method proceeds directly to step 221 where the method determine if this is the last MRPI to process. If there are additional MRPIs, the method returns to step 218 otherwise the method continues to step 216. In step 216, the method tests whether there are additional MRTs to process. If there are, the method jumps to step 212. If not, the method test for additional PRI to process in step 21. For any more PRI, the method returns to step 211, or else the process is completed.

Referring now to FIGS. 11A, 11B, and 11C, the preferred method for updating a MRT for a changed PRI is described. Similar to the method of FIG. 10, the process begins by reading the changed PRI in step 230, reading the PRT definition and the where used list of this PRI in step 231, and reading the definition of the MRT listed in where used list in step 232. The method next tests whether this a lead PRT for a MRPF in step 234. If the PRT is a lead PRT for a MRPF, the method continues with step 244 of FIG. 11C. In step 244, the process determines if a key field was changed. If a key field was changed, the method executes step 245, 246 and 247, to respectively find the old MRPI, remove the old MRPI, and create a new MRPI by executing the new PRI routine of FIG. 17A for this MRT. However, if a key field was not changed, the method finds the old MRPI in step 248, changes the MRPI single occurrence pointer for the changed hook fields in step 249, and then runs the functions and filter for the changed PRIs and MRPIs. After competition of either branch, the method returns to step 241 of FIG. 11B.

Referring back to 11A, if the PRT is not a lead PRT for a MRPF, the method continues in step 235 by reading the lead PRIs for the MRPF. Then in step 236, the method compares the old hook fields values to determine if they match. If there is a match, the PRI is changed by removing the pointer in the MRPI in step 237 before proceeding to step 238. In step 238, the method tests if the new hook values match. If there is no match the method jumps to step 241. If there is a match, the PRI is changed by creating new pointer in the MRPI in step 239. Then the method runs the functions and filters for the changed PRIs and MRPIs in step 240. Then the method test whether the current process involves the last PRT, the last MRT or the last changed PRI in steps 241, 242, and 243, respectively. If this is not the last PRT of the last MRT for the last changed PRI, then the method loops to the appropriate step (i.e., steps 235, 231 and 230) for further processing.

The preferred method for executing a function for a changed PRI is shown in FIGS. 12A and 12B. The present invention handles PRT fields that are used in a group by function or used in the function of a child MRPF especially for recalculation purposes. Whenever one of these PRT's fields change, present invention not only recalculates the functions for its own MRPIs but also recalculates the group by function value and the other functions in which it is used. In other words, present invention treats these fields as calculated fields by finding where they are used and making sure that the additional appropriate recalculations take place. The present invention does this by keeping pointers to the group by functions and functions of the other MRPFs that use the field.

The preferred method begins by reading the PRI and the PRT definition in steps 260 and 261, respectively. Then in step 262, the function using the PRI is read. Next in step 263, the MRT's MRPF for the function is read. Whenever a PRT's PRI changes, the present invention finds the MRPFs that use that

US 7,984,081 B1

**13**

PRT and tests whether any of its functions use the changed fields. In step 264, the method determines if the PRT is a lead PRT of the MRPF or used in a group by function. If so, the method continues in step 269 by reading the MRPI to which the PRI points. In each MRPI, the present invention stores the MRPI for each MRPF parent. Each parent MRPI that has group by functions using any of the changed fields has its group by value recalculated. Recalculation does not require reprocessing of all the records that are included in the group. The present invention stores enough information about each group by field to recalculate the correct balance for the before and after image of the changed field. For example, for the average field, present invention also stores the number of values used as well as the actual average. New averages are calculated by multiplying the number of values times the average then subtracting the old value and adding the new value and then dividing by the stored number of values. Then the function is executed in step 270. There functions are executed in a conventional manner. The process is similar to that used in spreadsheets and third generation languages. In step 271, the functions for any changed MRPI are executed, after which the method jumps to step 268. However, if the PRT is not a lead PRT of a MRPF or in a group by function, the method proceeds to step 265 where the MRPI is read. Next, in step 266, the method tests whether the MRPI points to a PRI. Next, the present invention checks to see if any of the calculated fields that the present invention just updated are used in other group by functions. If so, it recalculates the group by value in the appropriate parent MRPF's MRPI. The present invention continues this loop of cascading group by executions until the set of calculated fields that are recalculated have no impact on any other function because those group by fields are not used in any other function. If it does point to a PRI, the function is executed in step 272, and the functions for any changed MRPI are executed in step 273. The method then continues in step 267 or arrived at step 267 directly from step 266. In step 267, the method tests whether there are any other MRPI for the changed PRI. If there are additional MRPIs, the method returns to step 265 to read another MRPI and process it as has been described above. If there are no more MRPIs, the method moves to step 268 and tests whether this is the last function for the modified PRI. If not, the method returns to step 262 to retrieve and process the next function. Once all the functions have been processed the present method is complete.

Generally functions are executed whenever the user accepts some changes made to a pane row. The user has the option of deferring the execution of the affected functions until he/she wishes. Deferring changes can speed up entry of changes. The present invention knows which other functions to run because whenever a function is defined or maintained, the present invention adds a pointer to the Where Used Pointers of the PRT Fields Definition and the Where Used Pointers of the Function Definition.

FIG. 13 illustrates the preferred method for maintaining a function and its corresponding calculated fields in MRPIs and DDPs. The process begins by accepting user changes to the function in step 280. Then the method replaces the calculated fields used in the function with its function. Next, in step 282 the method updates the PRTs used in the function to point to the function. Then in step 283, the MRPF or the DDP targeted to point to the function is updated. In step 284 the MRPI, pane row for the MRPI, or the DDP is read. Finally, the function is run in step 285. Then the method tests for other MRPI or PRTs affected by the function change and returns to step 284 to process them. Once all the MRPIs and PRT have been processed, this method ends.

**14**

FIG. 14 illustrates the preferred method for executing a filter if the filter has been modified. The method starts by accepting the user's changes to the filter in step 290. Then in step 291, the method updates the MRT definition or DD 20 pane definition to point to the filter. Next, the method reads a MRPF, a pane row, or a MRPI for filters pane in step 292. The filter is then executed with the changes in step 293. The method then test whether there are other MRPI or PRT affected by the filter changes and then returns to step 292 to process them if they are present.

Referring now to FIGS. 15A and 15B, the preferred method for executing a function for a change to the MRPI, as used in FIG. 17 below, is described. In step 300, the images of the MRPIs before and after the changes to the MRPI are read. The present method preferably saves images of the MRPI whenever anything is changed. These images are saved until the changes have been processed. In step 301, the MRPF of the changed MRPI is read. Then in step 302, the calculated field of the before and after images are compared. In step 303, the method tests whether the value for each calculated image has changed. If there is no change, the method repeats step 302 to get the next calculated field. However, if there is a change, the method moves to step 304. In step 304, the function(s) that use this calculated field are retrieved. In step 305, the method tests whether any of the functions using this calculated field are group by functions. If a group by function is involved, the method first reads the MRPI's parent MRPI where the calculated amount is stored in step 307. Then in step 308, the group by value is recalculated. If a group by function is not involved, the method recalculates the function for this MRPI in step 306. Next in step 309, the method tests whether this is the last function affected by the change. If more functions are affected, the method returns to step 304 to process those other functions. Otherwise, the method continues to step 310 to determine if this is the last calculated field that has been modified. If there are more calculated fields to process the method returns to step 302. If not the process is complete and all the values are function value.

FIGS. 16A and 16B illustrate a preferred method for executing a filter for a new or changed set of DDPs. DD functions work almost identically to MRT functions. The calculation logic is the same except DDPs correspond to MRPIs. Panes correspond to MRPFs, and top pane DDPs correspond to MRIs. MRT functions are always executed prior to DD functions. Also, if a pane does not include in itself or its parents, the lead PRT for its own lowest level MRPFs, it must be summarized. Summarization is just the process of grouping then the pane and its parent panes. Calculated fields from the pane's MRPFs must be grouped by one of the standard group by operands (See Appendix A). The user specifies the group by operand when he/she defines the DD.

The method starts in step 320 with the DD definition being read. The present invention processes each dynamic document instance (DDI) separately beginning with the lowest level panes in the pane hierarchy and working upward.

In step 231, the top-level pane DDI is read and the variable PASS LEVEL is set equal to zero. In step 322, the method reads the lowest unprocessed pane hierarchy level for this pass. In step 323, the method reads the pane's functions. Then in step 324, the method reads other pane's group by function (s) that use this level. Group by functions are executed with the pane they summarize not the pane where the result is stored. The DDPs for this pane are then read in step 325. Then in step 326, the function for this pane are executed. The group by accumulators are then updated in step 327. Next in step 328, the system determines whether the DDP being used to execute the functions is the last DDP for this pane. If not, the

US 7,984,081 B1

| 15 | 16 |

method returns to step 325, otherwise the process continues in step 329. In step 329, the group by accumulator values are added to the DDI. Then in step 330, the method test whether this is the last pane for this DD 20. If not, the process loops to step 322 to process any unprocessed panes, otherwise the process continues in step 331. In step 331, the method determines if this is the last pass. If it is not the last pass, then 1 is added to the PASS LEVEL in step 332 and the method returns to step 322 for further processing. After each pass of all the DDI, the method executes the functions with the next highest pass sequence number until all functions are executed. However, if it is the last pass, the method continues in step 332 where the process tests whether this is the last top DDI to perform functions for. If not, the process returns to step 321, otherwise the execution of the functions for the DD is complete.

All changes to any data is entered by the user through DDs or fetches from a production data source. All changes can affect multiple DDs and MRTs. For example, if the user changes a customer's discount percentage and multiple MRTs use that field in their calculations, the present invention must update many MRPIs and DDPs for that one change. Therefore, when the user enters a change, the present invention first updates the affected PRT and then the MRPIs and finally the DDPs that use that PRT. The updates to the MRPIs have been described above with reference to FIGS. 4 and 5.

FIG. 17 illustrates the preferred method for updating a DD pane's dynamic documents pointers (DDPs) and the displayed records for data changes. Users enter data changes through any of a MR's DDs. Newly imported XML documents also create data changes. The preferred method identifies data changes and ensures that all affected DDP records are either updated with the new values or recreated. (The method for identifying and displaying DD pane data is described in FIG. 18.) In step 340, the method maintains PRIs for data enter through a DD or imported as XML documents. The changed values can be changes to existing PRI field values including field values that are also hooks to other PRIs, as well as changes that are also new PRIs. In step 341, the method maintains the MPRIs for the changes PRIs as described in FIG. 10 for new PRIs and FIG. 11 for existing PRIs.

Next the method checks every DD that is currently activated to determine the changes, if any to make to its DDP and the displayed records. In step 342, the method tests whether the PRT is used by the DD; if not used for further processing is done on that DD. If the DD does use the PRT, step 343 checks to see if any hook fields were changed. If so step 344 deletes all the DDP records that references the changed PRT. The method also deletes all DDP records in DD panes lower in the DD pane hierarchy than that of the affected DDP. Step 344 then it recreates the DDP records as described in FIG. 9 and proceeds to step 347. When a hook field was not changed, step 345 updates the DDP record field values with the new PRI field values and runs the DD filters and functions on the changed record. Then in step 346, the method runs the filters and functions for all records in DD panes that are lower in the DD pane hierarchy and also reference the changed DDP record. In step 347, the method runs the filters and functions for all records that are higher in the DD pane hierarchy and reference any DDP record changed by steps 344, 345, or 346. When step 348 determines the method changed any field value in a DDP record used by the sort rules, it sorts the DD pane in step 349. Finally the method redisplays all DDP records that it modified or resorted.

As an alternate method, steps that would determine which DDP records were affected by the change in a hook value

could replace step 344. This alternate method would not reconstruct all the DDP records, but would modify, delete, and insert only the records required by the field value changes. This method could be more efficient when the ratio of changed DDP records to the total number of records is very low.

FIGS. 18A and 18B illustrate the preferred process for executing filters when a dynamic document pointer is created or revised. DDs have three sets of filters: filters for determining what data to display on the screen, filters for determining what data to print on a report, and filters to determine which changes to send to targeted production data sources. All three types of DD filters work almost identically to MRT filters. The calculation logic is the same except DDPs correspond to MRPIs, Panes correspond to MRPFs. MRT filters are always executed prior to DD filters. Unlike MRT filters, DD filters are not all executed at the same time for a single DDP. When first constructing a DD's DDPs to minimize the number of MRPFs processed in arriving at the pointers for a pane, the present invention categorizes filters into four categories and executes them at different times during the creation and updating of DDPs: 1) Prejoin filters are executed on a pane's MRPF's MRPIs prior to joining them with the other MRPIs for the pane. Filters that have operands on only the fields in the PRTs for the MRPF are in this category. Also filters which meet the first criteria and also use a calculated field from the MRPF and lead PRT for the MRPF is in the current pane or any parent pane are in this category; 2) Post join filters are executed after all of a pane's MRPIs are joined together with its parent pane's MRPIs. Filters that meet the above criteria but used fields from more than one MRPF are in this criteria; 3) Post summarize filters are executed after the joined MRPIs are summarized into Pane Pointers. Filters which do not use calculated fields from DD functions are not in either of the above two categories; and 4) Post function filters are executed after the select functions but prior to the display filters. All filters that use calculated fields that are the result of DD functions are in this category.

The process begins by reading any new or changed DDP in step 380. Then a filter from the DD definition is read in step 381. Next, in step 382, an operand is tested, and the result is saved. Since all filter operations are on fields in the DD, each DD can be fully tested to see if it should be filtered out by reading only the DDP's calculated fields. For improved processing efficiency, the present invention executes all of a DDPs filters one after the other. The operation tests are simple Boolean tests to see if the field's value equals the value stored in the list (Dynamic Document) specified. The present invention stores the result (true or false) of each operation. The method then determines if this operand is the last operand to test in step 383. If not, the process returns to step 382 to test the next operand. If all the operands have been tested, then the process continues to step 384. In the step 384, the method looks at the results of each operand to determine if the full filter results in a pass or fail. If the DDP passes the filter, the method proceeds to step 386 where the method appends to the DDP a flag for each filter indicating the filter includes that particular DDP. If the DDP fails the filter, the method jumps to step 388 to evaluate the filter type. In step 388, further tests are performed to determine if the filter is a delete type. If the filter is a delete type, the DDP and its children DDPs are deleted in step 389. Any DDP which has any parent DDP which are excluded is itself excluded. If the filter is not a delete type, then the flag is set to exclude for this filter in the current DDP's filter affects list in step 390. Any DDP that is excluded by any active filter is not displayed in the currently open DDs. Next, step 391 determines whether there are addi-

US 7,984,081 B1

17

tional filters to be processed. If so the method loops to 381, otherwise the method tests whether this is the last MRPI to be processed in step 392. If there are more MRPIs to process, the method returns to step 380, otherwise, the process is complete.

Finally, it should be understood that the present invention also uses conventional sorting and display techniques. Sorting occurs dynamically when the DDPs are joined to the PRTs and displayed as pane rows. Sorting is done pane by pane in the same manner employed by conventional report write and query tools. The rows in a pane can be sorted by any of PRT and/or calculated fields in the pane. The user specifies the order in which each field sort is executed and whether to use an ascending or descending order. The user can also specify which, if any, sort levels should have total lines and what group by operand to use for each field for each level. The user can also have the present invention suppress displaying the row details and just display the totals. When the user selects (highlights) a total row in a pane, that pane's child panes display the rows for all the parent pane's detail rows that comprise the selected total row.

The display and reporting component of the present invention works similarly to many conventional query and reporting tools. By the time the present invention hands over the data to be displayed, it has already organized it, executed its calculations, filtered and sorted it. The present invention hands over one record (a DDP and its corresponding PRIs) to the screen forms display tool. All that remains is to place the record's values in the proper fields. Display rules entered by the user control the appearance of the panes, positioning the format of the PRT's fields, and what type of maintenance users can do to actual field values.

Users can open as many DDs at once as their hardware supports. Each DD can be autonomous or any DD can be linked to another. To link DD all the user need do is specify which on PRTs within the two DDs the link occurs. The two PRTs must be hooked together, or the PRT in both DD must be identical. At least one of the DDs must be linked at its top pane and a core linked DD must be designated as the controlled DD. Any DD can have only one controlling DD and circular controls are not permitted. When the user selects a new record instance in the controlling DD, the controlled DD is updated to display the record instance(s) that are hooked to the new controlling record instance. The present invention does this by executing the "find" function on the controlled DD; the find parameter is the foreign key or pointer of the controlling DD's current record type instance.

The present invention can save all the contents of memory it is currently using as a single file. If the user wishes to leave the terminal for a while, the user can save it and then recall it whenever required. This save is not shared with other users. Multiple copies of a session can be made and later modified just like as can be done with spreadsheets an word processors. In a multiple user environment, the changes to PRTs are stored in a relational database or XML documents and multiple users can access those changes. The definitions of MRTs, hooks, DDs, functions, filters, and sorts are also stored in the same database in special tables or XML documents setup by the present invention. Optionally MRPIs and DDPs can also be stored and maintained by the present invention in the same relational database or XML documents. It is useful to store these pointers in the repository because they do not need to then be regenerated for each user when he/she resumes working on the shared model.

While the present invention has been described with reference to certain preferred embodiments, those skilled in the art will recognize that various modifications may be provided.

18

For example, there may be other embodiments for the method of executing the functions, filters and sorts used in FIG. 4 in addition to those described above. Similarly, there may be other embodiments for the particular structure used for the MRTs, the pointer families, and DDs. These and other variations upon and modifications to the preferred embodiment are provided for by the present invention that is limited only by the following claims.

I claim:

1. A computer-implemented method of manipulating XML documents, comprising:
organizing data components of the XML documents into data objects;
identifying a plurality of primary record types for the XML documents;
mapping the data components of each data object to one of the plurality of primary record types;
organizing instances of the plurality of primary record types into a hierarchy to form a management record type;
defining a dynamic document for display of an instance of the management record type through a user interface; and
detecting modification of the data in the dynamic document via the user interface, and in response thereto modifying a data component in at least one of the XML documents.

2. A method as in claim 1,
wherein an instance of a one of the primary record types includes or points to a relational database table of that primary record type; and
wherein the instance of the management record type points to instances of the primary record types.

3. A method as in claim 1, wherein the management record type defines business objects and the instances of the management record type comprises the business objects.

4. A method as in claim 3, wherein the business objects comprise invoices, bills of material, purchase orders, price books, forecasts, or fund transactions.

5. A method as in claim 1, further comprising:
organizing the instances of the primary record types into a second hierarchy to form a second management record type;
creating a second dynamic document, the second dynamic document comprising a second user interface and an instance of the second management record type; and
detecting modification of the data in the second dynamic document via the second user interface, and in response thereto modifying a data component in at least one of the XML documents.

6. A method as in claim 5, wherein the instance of the management record type points to an instance of a first primary record type of the primary record types, and the instance of the second management record type points to the instance of the first primary record type.

7. A method as in claim 6, wherein no two instances of the primary record types have identical values.

8. A method as in claim 1, wherein the management record type defines multiple XML documents.

9. A method as in claim 1, wherein the mapping comprises performing the following for each of the data objects:
determining whether any of the plurality of primary record types corresponds to the data object;
mapping the data components of the data object to a first primary record type of the plurality of primary record

US 7,984,081 B1

**19**

types if the determining results in a determination that the first primary record type corresponds to the data object; and

creating a second primary record type corresponding to the data object and including the second primary record type in the plurality of primary record types if the determining results in a determination that none of the plurality of primary record types corresponds to the data object.

10. A program memory having instructions stored thereon, the instructions comprising:

instructions for organizing data components of one or more XML documents into data objects;

instructions for identifying a plurality of primary record types for the XML documents;

instructions for mapping the data components of each data object to one of the plurality of primary record types;

instructions for organizing instances of the plurality of primary record types into a hierarchy to form a management record type;

instructions for defining a dynamic document for display of an instance of the management record type through a user interface; and

instructions for detecting modification of the data in the dynamic document via the user interface, and in response thereto modifying a data component in at least one of the XML documents.

11. The program memory of claim 10,

wherein an instance of a one of the primary record types includes or points to a relational database table of that primary record type; and

wherein the instance of the management record type points to instances of the primary record types.

12. The program memory of claim 10, wherein the management record type defines business objects and the instances of the management record type comprises the business objects.

13. The program memory of claim 12, wherein the business objects comprise invoices, bills of material, purchase orders, price books, forecasts, or fund transactions.

14. The program memory of claim 10, the instructions further comprising:

instructions for organizing the instances of the primary record types into a second hierarchy to form a second management record type;

instructions for creating a second dynamic document, the second dynamic document comprising a second user interface and an instance of the second management record type; and

instructions for detecting modification of the data in the second dynamic document via the second user interface, and in response thereto modifying a data component in at least one of the XML documents.

15. The program memory of claim 14, wherein the instance of the management record type and the instance of the second management record type point to one or more same instances of the primary record types.

16. The program memory of claim 15, wherein no two instances of the primary record types have identical values.

17. The program memory of claim 10, wherein the management record type defines multiple XML documents.

18. The program memory of claim 10, wherein the instructions for mapping comprise instructions for performing the following for each of the data objects:

determining whether any of the plurality of primary record types corresponds to the data object;

mapping the data components of the data object to a first primary record type of the plurality of primary record

**20**

types if the determining results in a determination that the first primary record type corresponds to the data object; and

creating a second primary record type corresponding to the data object and including the second primary record type in the plurality of primary record types if the determining results in a determination that none of the plurality of primary record types corresponds to the data object.

19. An apparatus for manipulating XML documents, comprising:

means for organizing data components of one or more XML documents into data objects;

means for organizing the relational data into object model data;

means for identifying a plurality of primary record types for the XML documents;

means for mapping the data components of each data object to one of the plurality of primary record types;

means for organizing instances of the plurality of primary record types into a hierarchy to form a management record type;

means for defining a dynamic document for display of an instance of the management record type through a user interface;

means for detecting modification of the data in the dynamic document via the user interface, and in response thereto modifying a data component in an XML document.

20. The apparatus of claim 19, wherein the means for mapping comprises means for performing the following for each of the data objects:

determining whether any of the plurality of primary record types corresponds to the data object;

mapping the data components of the data object to a first primary record type of the plurality of primary record types if the determining results in a determination that the first primary record type corresponds to the data object; and

creating a second primary record type corresponding to the data object and including the second primary record type in the plurality of primary record types if the determining results in a determination that none of the plurality of primary record types corresponds to the data object.

21. An apparatus for manipulating XML documents, comprising:

a processor;

a component that organizes data components of one or more XML documents into data objects;

a component that identifies a plurality of primary record types for the XML documents;

a component that maps the data components of each data object to one of the plurality of primary record types;

a component that organizes the instances of the plurality of primary record types into a hierarchy to form a management record type;

a component that defines a dynamic document for display of an instance of a management record type through a user interface; and

a component that detects modification of the data in the dynamic document via the user interface, and in response thereto modifies a data component in an XML document.

22. The apparatus of claim 21,

wherein an instance of one of the primary record types includes or points to a relational database table of that primary record type; and

wherein the instance of the management record type points to instances of the primary record types.

US 7,984,081 B1

21

**23.** The apparatus of claim **21,** wherein the management record type defines business objects and the instances of the management record type comprises the business objects.

**24.** The apparatus of claim **23,** wherein the business objects comprise invoices, bills of material, purchase orders, price books, forecasts, or fund transactions.

**25.** The apparatus of claim **21,** further comprising:

a component that organizes the instances of the primary record types into a second hierarchy to form a second management record type;

a component that creates a second dynamic document, the second dynamic document comprising a second user interface and an instance of the second management record type; and

a component that detects modification of the data in the second dynamic document via the second user interface, and in response thereto modifying a data component in at least one of the XML documents.

**26.** The apparatus of claim **25,** wherein the instance of the management record type and the instance of the second management record type point to one or more same instances of the primary record types.

22

**27.** The apparatus of claim **26,** wherein no two instances of the primary record types have identical values.

**28.** The apparatus of claim **21,** wherein the management record type defines multiple XML documents.

**29.** The apparatus of claim **21,** wherein the component that maps the data components is configured to perform the following for each of the data objects:

determining whether any of the plurality of primary record types corresponds to the data object;

mapping the data components of the data object to a first primary record type of the plurality of primary record types if the determining results in a determination that the first primary record type corresponds to the data object; and

creating a second primary record type corresponding to the data object and including the second primary record type in the plurality of primary record types if the determining results in a determination that none of the plurality of primary record types corresponds to the data object.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,984,081 B1
APPLICATION NO.     : 11/523746
DATED               : July 19, 2011
INVENTOR(S)         : VanderDrift

Page 1 of 1

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 18, line 31, in Claim 2, delete "a one" and insert -- one --.

Column 19, line 28, in Claim 11, delete "a one" and insert -- one --.

Column 20, line 52, in Claim 21, delete "the instances" and insert -- instances --.

Signed and Sealed this
Twenty-second Day of November, 2011

David J. Kappos
Director of the United States Patent and Trademark Office

US006314409B2

(12) **United States Patent**
Schneck et al.

(10) **Patent No.:**     **US 6,314,409 B2**
(45) **Date of Patent:**     **\*Nov. 6, 2001**

(54) **SYSTEM FOR CONTROLLING ACCESS AND DISTRIBUTION OF DIGITAL PROPERTY**

(75) Inventors: **Paul B. Schneck**, Potomac; **Marshall D. Abrams**, Silver Spring, both of MD (US)

(73) Assignee: **Veridian Information Solutions**

( \* ) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 10 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/178,606**

(22) Filed: **Oct. 26, 1998**

**Related U.S. Application Data**

(62) Division of application No. 08/968,887, filed on Nov. 5, 1997, which is a continuation of application No. 08/584,493, filed on Jan. 11, 1996, now abandoned.

(51) Int. Cl.[7] ..................................................... H04L 9/00
(52) U.S. Cl. ............................ 705/54; 705/57; 380/259; 380/287; 380/59; 713/182; 713/189; 713/193; 713/194; 713/200
(58) Field of Search ........................... 395/186, 187.01, 395/188.01; 380/4, 23, 25, 49, 50, 59, 200–204, 210, 255, 259, 277, 278, 279, 29, 30, 287; 705/43, 51, 52, 54, 57, 58; 713/150–152, 182, 189, 193, 194, 200, 201, 202

(56)     **References Cited**

**U.S. PATENT DOCUMENTS**

3,504,132   3/1970   Wallace, Jr. .

3,648,020   \*   3/1972   Tateisi et al. ........................... 705/43
(List continued on next page.)

FOREIGN PATENT DOCUMENTS

0332707   9/1989   (EP) .
(List continued on next page.)

OTHER PUBLICATIONS

Weber, R., "Metering Technologies For Digital Intellectual Property," A Report to the International Federation of Reproduction Rights Organization, Oct. 1994, pp. 1–29.

(List continued on next page.)

*Primary Examiner*—Bernarr E. Gregory
(74) *Attorney, Agent, or Firm*—Pillsbury Winthrop

(57)     **ABSTRACT**

A method and device are provided for controlling access to data. Portions of the data are protected and rules concerning access rights to the data are determined. Access to the protected portions of the data is prevented, other than in a non-useable form; and users are provided access to the data only in accordance with the rules as enforced by a mechanism protected by tamper detection. A method is also provided for distributing data for subsequent controlled use of those data. The method includes protecting portions of the data; preventing access to the protected portions of the data other than in a non-useable form; determining rules concerning access rights to the data; protecting the rules; and providing a package including: the protected portions of the data and the protected rules. A user is provided controlled access to the distributed data only in accordance with the rules as enforced by a mechanism protected by tamper protection. A device is provided for controlling access to data having protected data portions and rules concerning access rights to the data. The device includes means for storing the rules; and means for accessing the protected data portions only in accordance with the rules, whereby user access to the protected data portions is permitted only if the rules indicate that the user is allowed to access the portions of the data.

**43 Claims, 26 Drawing Sheets**



**US 6,314,409 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,764,742 | 10/1973 | Abbott et al. . |
| 3,798,359 | 3/1974 | Feistel . |
| 3,878,331 | 4/1975 | Morgan et al. . |
| 3,906,460 | 9/1975 | Halpern . |
| 3,911,216 | 10/1975 | Bartek et al. . |
| 3,944,976 | 3/1976 | France . |
| 3,958,081 | 5/1976 | Ehrsam et al. . |
| 3,996,449 | 12/1976 | Attanasio et al. . |
| 4,004,089 | 1/1977 | Richard et al. . |
| 4,028,678 | 6/1977 | Moran . |
| 4,037,215 | 7/1977 | Birney et al. . |
| 4,074,066 | 2/1978 | Ehrsam et al. . |
| 4,087,856 | 5/1978 | Attanasio . |
| 4,120,030 | 10/1978 | Johnstone . |
| 4,168,396 | 9/1979 | Best . |
| 4,183,085 | 1/1980 | Roberts et al. . |
| 4,193,131 | 3/1980 | Lennon et al. . |
| 4,206,315 | 6/1980 | Matyas et al. . |
| 4,238,854 | 12/1980 | Ehrsam et al. . |
| 4,246,638 | 1/1981 | Thomas . |
| 4,264,782 | 4/1981 | Konheim . |
| 4,278,837 | 7/1981 | Best . |
| 4,281,215 | 7/1981 | Atalla . |
| 4,306,289 | 12/1981 | Lumley . |
| 4,319,079 | 3/1982 | Best . |
| 4,323,921 | 4/1982 | Guillou . |
| 4,433,207 | 2/1984 | Best . |
| 4,446,519 | 5/1984 | Thomas . |
| 4,454,594 | 6/1984 | Heffron et al. . |
| 4,458,315 | 7/1984 | Uchenick . |
| 4,465,901 | 8/1984 | Best . |
| 4,471,163 | 9/1984 | Donald et al. . |
| 4,529,870 | 7/1985 | Chaum ....................... 235/380 |
| 4,558,176 | 12/1985 | Arnold et al. . |
| 4,646,234 | 2/1987 | Tolman et al. ............... 380/4 |
| 4,658,093 | 4/1987 | Hellman ..................... 380/25 |
| 4,757,533 | 7/1988 | Allen et al. ................. 380/25 |
| 4,796,181 | 1/1989 | Wiedemer .................. 380/4 X |
| 4,827,508 | 5/1989 | Shear . |
| 4,924,378 | 5/1990 | Hershey et al. . |
| 4,932,054 | 6/1990 | Chou et al. ................. 380/4 |
| 4,937,863 | 6/1990 | Robert et al. ............... 380/4 |
| 4,953,209 | 8/1990 | Ryder, Sr. et al. .......... 380/23 |
| 4,961,142 | 10/1990 | Elliott et al. . |
| 4,977,594 | 12/1990 | Shear ......................... 380/4 |
| 5,010,571 | 4/1991 | Katznelson ................. 380/4 |
| 5,014,234 | 5/1991 | Edwards, Jr. . |
| 5,023,907 | 6/1991 | Johnson et al. ............. 380/4 |
| 5,027,396 | 6/1991 | Platteter et al. . |
| 5,047,928 | 9/1991 | Wiedemer . |
| 5,050,213 | 9/1991 | Shear . |
| 5,058,162 | 10/1991 | Santon et al. . |
| 5,058,164 | 10/1991 | Elmer et al. ............... 380/50 |
| 5,103,476 | 4/1992 | Waite et al. ................ 380/4 |
| 5,113,519 | 5/1992 | Johnson et al. . |
| 5,146,499 | 9/1992 | Geffrotin .................. 380/23 |
| 5,159,182 | 10/1992 | Eisele ....................... 235/492 |
| 5,191,193 | 3/1993 | LeRoux ..................... 235/379 |
| 5,204,897 | 4/1993 | Wyman ...................... 380/4 |
| 5,222,134 | 6/1993 | Waite et al. ................ 380/4 |
| 5,235,642 | 8/1993 | Wobber et al. . |
| 5,247,575 | 9/1993 | Sprague et al. . |
| 5,260,999 | 11/1993 | Wyman . |
| 5,263,157 | 11/1993 | Janis . |
| 5,263,158 | 11/1993 | Janis . |
| 5,291,596 | 3/1994 | Mita ......................... 395/600 |
| 5,301,231 | 4/1994 | Abraham et al. . |
| 5,319,705 | 6/1994 | Halter et al. . |
| 5,337,357 | 8/1994 | Chou et al. . |
| 5,339,091 | 8/1994 | Yamazaki et al. . |

| | | |
|---|---|---|
| 5,345,588 | 9/1994 | Greenwood et al. . |
| 5,347,578 | 9/1994 | Duxbury . |
| 5,369,702 | 11/1994 | Shanton . |
| 5,386,469 | 1/1995 | Yearsley et al. . |
| 5,386,471 | 1/1995 | Bianco . |
| 5,388,156 | 2/1995 | Blackledge, Jr. et al. . |
| 5,392,351 | 2/1995 | Hasebe et al. . |
| 5,394,469 | 2/1995 | Nagel et al. . |
| 5,400,403 | 3/1995 | Fahn et al. . |
| 5,410,598 | 4/1995 | Shear . |
| 5,432,849 | 7/1995 | Johnson et al. . |
| 5,438,508 | 8/1995 | Wyman . |
| 5,442,541 | 8/1995 | Hube et al. . |
| 5,450,489 | 9/1995 | Ostrover et al. . |
| 5,457,746 | 10/1995 | Dolphin . |
| 5,473,687 | 12/1995 | Lipscomb et al. . |
| 5,504,814 | 4/1996 | Miyahara . |
| 5,530,235 | 6/1996 | Stefik et al. . |
| 5,574,648 | 5/1998 | Ryan et al. . |
| 5,592,549 | 1/1997 | Nagel et al. ............... 380/4 |
| 5,594,491 | 1/1997 | Hodge et al. . |
| 5,594,936 | 1/1997 | Rebec et al. . |
| 5,615,264 | 3/1997 | Kazmierczak et al. . |
| 5,629,980 | 5/1997 | Stefik et al. . |
| 5,638,443 | 6/1997 | Stefik et al. . |
| 5,646,992 | 7/1997 | Subler et al. . |
| 5,671,276 | 9/1997 | Eyer et al. . |
| 5,673,316 | 9/1997 | Auerbach et al. .......... 380/4 |
| 5,677,953 | 10/1997 | Dolphin . |
| 5,703,951 | 12/1997 | Dolphin . |
| 5,754,649 | 5/1998 | Ryan et al. . |
| 5,787,172 | 7/1998 | Arnold . |
| 5,796,839 | 8/1998 | Ishiguro . |
| 5,870,474 | 2/1999 | Wasilewski et al. . |
| 5,892,900 | 4/1999 | Ginter . |
| 5,910,987 | 6/1999 | Ginter . |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 2236604 | 4/1991 | (GB) . |
| 9500355-4 | 8/1996 | (SE) . |
| WO9220022 | 11/1992 | (WO) . |
| WO93/01550 | 1/1993 | (WO) . |
| 96/27155 | 9/1996 | (WO) . |

## OTHER PUBLICATIONS

Clark, P.C. and Hoffman, L.J., "Bits: A Smartcard Protected Operating System," Communications of the ACM, Nov. 1994, vol. 37, No. 11, pp. 66–70, and 94.

Saigh, W.K., "Knowledge is Sacred," Video Pocket/Page Reader Systems, Ltd., 1992.

Kahn, R.E., "Deposit, Registration And Recordation In an Electronic Copyright Management System," Corporation for National Research Initiatives, Virginia, Aug. 1992, pp. 1–29.

Hilts, P. Mutter, J., and Taylor, S., "Books While U Wait," Publishers Weekly, Jan. 3. 1994, pp. 48–50.

Strattner, A., "Cash register on a chip" may revolutionize software pricing and distribution; Wave Systems Corp., Computer Shopper. Copyright, Apr. 1994, vol. 14; No.4; p. 62.

O'Conner, M.A., "New distribution option for electronic publishers; iOpener data encryption and metering system for CD–ROM use; Column," CD–ROM Professional Copyright, Mar. 1994, vol. 7; No. 2; p. 134; ISSN:1049–0833.

**US 6,314,409 B2**
Page 3

Willett, S., "Metered PCs:Is your system watching you?"; Wave Systems beta tests new technology, InfoWorld, Copyright, May 2, 1994, p. 84.

Linn, R.J., "Copyright and Information Servicces in the Contest of the National Research and Education Network," IMA Intellectual Property Project Proceedings, Jan. 1994, vol. 1, Issue 1, pp. 9–20.

Perritt, Jr., H.H., "Permissions Headers ad Contract Law," IMA Intellectual Property Project Proceedings, Jan. 1994, vol. 1, Issue 1, pp. 27–48.

Upthegrove, L., and Roberts, R., "Intellectual Property Header Descriptors: A Dynamic Approach," IMA Intellectual Property Project Proceedings, Jan. 1994, vol. 1, Issue 1, pp. 63–66.

Sirbu, M.A., "Internet Billing Service Design and Prototype Implementation, IMA" Intellectual Property Project Proceedings, Jan. 1994, vol. 1, Issue 1, pp. 67–80.

Simmel, S.S., and Godard, I., "Metering and Licensing of Resources: Kala's General Purpose Approach," IMA Intellectual Property Project Proceedings, Jan. 1994, vol. 1, Issue 1, pp. 81–110.

Kahn, R.E., "Deposit, Registration and Recordation in an Electronic Copyright Management System," IMA Intellectual property Project Proceedings, Jan. 1994, vol. 1, Issue 1, pp. 111–120.

Tygar, J.D., and Bennet, Y., "Dyad: A System for Using Physically Secure Coprocessors," IMA Intellectual Property Project Proceedings, Jan. 1994, vol. 1, Issue 1, pp. 121–152.

Griswold, G.N., "A Method for Protecting Copyright on Networks," IMA Intellectual Property Project Proceedings, Jan. 1994, vol. 1, Issue 1, pp. 169–178.

Nelson, T.H., "A Publishing and Royalty Model for Networked Documents," IMA Intellectual Property Project Proceedings, Jan. 1994, vol. 1, Issue 1, pp. 257–259.

European Search Report for Corresponding European Application 95308420.9.

U. Flasche et al., Decentralized Processing of Documents, Comput. & Graphics, vol. 10, No. 2, 1986, pp. 119–131.

R. Mori et al., Superdistribution: The Concept and the Architecture, The Transactions of the IEICE, vol. E 73, No. 7, 1990, Tokyo, JP, pp. 1133–1146.

Rosse, P.E., "Data guard", Forbes, Jun. 6, 1994, pp. 101.

Xiao–Wen Yang et al., Key distribution system for digital video signal, ICSP '96. 1996 3rd International Conference on Signal Processing Proceedings (Cat. No. 96TH8116), vol. 2 1996, pp. 847–50.

E.A.I. Claus, Digital network for video surveillance and video distribution, Proc. SPIE—Int. Soc., Opt. Eng. vol. 2952 1996, pp. 194–204.

R. J. Bankapur et al., Switched digital video access networks, Bell Labs Tech. J. vol. 1 No. 1 Summer 1996, pp. 66–77.

C.A. Mandel et al., Intellectual access to digital documents:joining proven principles with new technologies, Cat. Classif. Q., vol. 22, No. 3–4 1996, pp. 25–42.

B.J. Goldsmith et al., Digital video distribution and transmission, International Broadcasting Convention (Conf. Publ. No. 428) 1996, pp. 26–31.

D. Van Schooneveld, Standardization of conditional access systems for digital pay television, Philips, J. Res. (UK), vol. 50, No. 1–2, 1996, pp. 217–25.

H.D. Wactlar, Intelligent access to digital video: Informedia projectComputer, vol. 29, No. 5, May 1996, pp. 46–52.

J.E. Dail et al., Adaptive digital access protocol: A MAC protocol for multiservice broadband access networks INS, IEEE Commun. Mag. vol. 34, No. 3, Mar. 1996, pp. 104–12.

S. Stevens et al., Informedia: improving access to digital video—Ins, Interactions, vol. 1, No. 4, Oct. 1994, pp. 67–71.

B. Hein et al., RACE 1051: a multigigabit transport and distribution technology for provision of digital video services—INS, Proc. SPIE—Int. Soc. Opt. Eng., vol. 1974, 1993, pp. 26–33.

Chen Ching–Chin et al., Analog, digital and multimedia: implications for information access INS, Online Information 91. 15th International Online Information Meeting Proceedings, 1991, pp. 283–92.

Abrams, M.D. et al., "Cryptography", Information Security—An Integrated Collection of Essays, Abrams M.D. et al eds., IEEE Computer Society Press 1995, pp. 350–384.

Choudhury, A.K. et al, "copyright Protection for electronic Publishing Over Computer Networks", IEEE Network, May/Jun. 1995, pp. 12–20.

Ciciora, W.S., "Inside the Set–Top Box", IEEE Spectrum, Apr. 1995, vol. 32, No. 4, pp. 70–75.

Department of Defense Standard, Department of Defense Trusted Computer System Evaluation Criteria, DOD 2500.28–STD,GPO 1986–623.

Marshall Abrams, et al, Generalized Framework For Access Control, Towards Prototyping the ORGCON Policy, Oct. 1991, pp. 1–20, Proc 1991 Nat'l Computer Security Conf.

Marshall D. Abrams, et al, Mediation and Separation in Contemporary Information Technology Systems, 1992, pp. 1–15, Proc. 1991 Nat'l Compute Security Conf.

Marshall D. Abrams, et al, Generalized Framework for Access Control: A Formal Rule Set for The ORGCON Policy, MITRE, Apr. 1992, pp. 1–58.

Marshall D. Abrams, Renewed Unserstanding of Access Control Policies, 1993, pp. 1–10, Proc. 16th National Computer Security Conference.

Leonard J. LaPadula, A Rule–Set Approach to Formal Modeling of a Trusted Computer System, Computing Systems Journal, Winter 1994, vol. 7, No. 1, pp. 113–167, pp. 1–38.

Graubart, R., "On the Need for a third form of Access control", Proceedings of the 12th National Computer Security Conference, 1989, pp. 296–303.

K. Brunnstein and P. P. Sint, eds., KnowRight'95, Intellectual Property Rights and New Technologies: Proceedings of the KnowRigt'95 conference, austrian Computer.

Low, S.H. et al, "Document Marking and Identification using both Line and Word shifting", 1995 INFOCOM Proceedings, IEEE, 1995, pp. 853–860.

McCollum, C.J. et al, "beyond the Pale of MAC and DAC:Defining New Forms of Access Control", Proceedings of the Symposium on Research in Security and Privacy, IEEE Computer Society Press, 1990, pp. 190–200.

US 6,314,409 B2

Page 4

National Institute of Standards and technology (NIST) and National Security Agency (NSA), Federal Criteria for Information Technology Security: vol. 1, Protection Profile Development, vol. 11, Registry of Protection Profiles, Version 1.0, Dec. 1992.

Samuelson, P., "Copyright and Digital Libraries", Communications of the AMC, Apr. 1995, vol. 38, No. 3, pp. 15–20 & 110.

Samuelson, P. et al, "A Manifesto Concerning the Legal Protection of Computer Programs", Columbia Law Review, vol. 94, No. 8, pp. 2308–2431.

Sandhu, R.S. "The Typed Access Matrix Model", Proceedings of the Symposium on Research in Security and Provacy, IEEE Computer Society, 1992, pp. 122–136.

Sandhu, R.S. et al., "Implementation Considerations for the Typed Access Marix Model in a Distributed Environment", Proceedings of the 15th National Computer Security Conference, 1992b, pp. 221–235.

Yee, B., "Using Secure Coprocessors", Carnegie Mellon University, School of Computer Science, CMU–CS–94–149, May 1994, (also available Defense Technical Information Center as AD–A281 255).

Maxem Chuk, N.F., Sep. 1994, "Electronic Document Distribution," AT&T technical Journal, pp. 73–80.

* cited by examiner



FIG. 1

PACKAGED DATA — 108

120  ENCRYPTED BODY PART

122  UNENCRYPTED BODY PART

124  ENCRYPTED RULES

126  ENCRYPTED ANCILLARY INFORMATION

*FIG. 2*

116

Version number 127

Authentication (hash) 128

License number of these rules 130

Intellectual property identifier 132

First valid generation of the product 134

Last valid generation of the product 136

Encrypted data key 138

Standard permissions 140

Extended permissions 142

Custom permissions 144

Co-requisite rules (permissions) for source data 145

Token/biometrics 146

System IDs/Public keys 147

Fig. 3



FIG. 4



*FIG. 5*

PACKAGED DATA

150

120 ENCRYPTED BODY PART

122 UNENCRYPTED BODY PART

126 ENCRYPTED ANCILLARY INFORMATION

*FIG. 6*



FIG. 7



FIG. 8



FIG. 9



FIG. 10(a)



FIG. 10(b)



FIG. 11



FIG. 12

FIG. 13



*FIG. 14*



FIG. 15



*FIG. 16*



*FIG. 17(a)*

*FIG. 17(b)*

FIG. 18(b)

108

| 120 | CHAPTERS |
| 122 | ABSTRACT INDEX |
| 124 | TEXT RESTRICTIONS FIGURES: FULL RES. |
| 126 | ENCRYPTED ANCIL. INFORMATION |

FIG. 18(a)

192 ABSTRACT

194 INDEX

196 CHAPTERS

198 SECTIONS

202 FIGURES

200 TEXT

191 BOOK



FIG. 19(b)

| 120 | 122 | 124 | 126 |
|-----|-----|-----|-----|
| G, R and X-RATED PARTS | TRAILER | G - OKAY R: AGE > 13 X: AGE > 18 | ENCRYPTED ANCIL. INFORMATION |

108



FIG. 19(a)

206 TRAILER

208 G-RATED PARTS

210 R-RATED PARTS

212 X-RATED PARTS

204 MOVIE



FIG. 19(d)

108

| 120 | COMMON SEQUENCE PLUS G, R AND X-RATED PARTS |
| 122 | TRAILER |
| 124 | G - OKAY<br>R: AGE > 13<br>X: AGE > 18 |
| 126 | ENCRYPTED ANCIL. INFORMATION |



FIG. 19(c)

206 TRAILER
208 G-RATED PARTS
210 R-RATED PARTS
212 X-RATED PARTS
207 COMMON SEQUENCE

204 MOVIE

**U.S. Patent**  Nov. 6, 2001  Sheet 22 of 26  US 6,314,409 B2



FIG. 20(b)

FIG. 20(c)



FIG. 20(a)



| | |
|---|---|
| 120 | REDACTED DATA |
| 122 | NON-REDACTED DATA |
| 124 | NO ACCESS TO REDACTED DATA |
| 126 | ENCRYPTED ANCIL. INFORMATION |

108

*FIG. 21(b)*

226 *PARAGRAPHS*

228 *WORDS*

224 *LEGAL DOCUMENT*

*FIG. 21(a)*

FIG. 22(b)

108

| 120 MEDIUM AND HIGH RESOLUTION ADDITIONAL IMAGE DATA | 122 LOWEST RESOLUTION IMAGE DATA | 124 DISPLAY AT RESOLUTION | 126 ENCRYPTED ANCIL. INFORMATION |

FIG. 22(a)

230 MAP IMAGE DATA

*FIG. 23(b)*

108

| 120 | RESOLUTION CALCULATION ROUTINE |
| 122 | OTHER PARTS OF GPS SOFTWARE |
| 124 | RESOLUTION OF RESULT |
| 126 | ENCRYPTED ANCIL. INFORMATION |

*FIG. 23(a)*



230
GPS SOFTWARE

232
RESOLUTION CALCULATION ROUTINE



FIG. 24

US 6,314,409 B2

1

# SYSTEM FOR CONTROLLING ACCESS AND DISTRIBUTION OF DIGITAL PROPERTY

This is a division of application Ser. No. 08/968,887, filed Nov. 5, 1997 which is a continuation of Ser. No. 08/584,493, filed Jan. 11, 1996, now abandoned.

## 1. FIELD OF THE INVENTION

This invention relates to the control of distribution and access of digital property as well as to the payment therefor.

## 2. BACKGROUND OF THE INVENTION

The development and deployment of digital information networks is accompanied by new concerns for the protection of rights to data and information. The U.S. Congress Office of Technology Assessment identified the following key developments relevant to the area of this invention: there has been an overall movement to distributed computing; boundaries between types of information are blurring; the number and variety of service providers has increased. *Information Security and Privacy in Networked Environments*, Congress, Office of Technology Assessment, OTA-TCT-606, Washington, DC: U.S. Government Printing Office, September 1994.

Computer networks allow more interactivity; and, most significantly, electronic information has opened new questions about copyright, ownership, and responsibility for information. Technology, business practice, and law are changing at different rates, law arguably being the slowest.

Intellectual property, or information, is different from real property. A major difference between intellectual property and real property is that intellectual property can be embodied in forms which can be copied from the owner while the owner still retains the original. For example, a broadcast or performance of a musical composition can be recorded (and copies made of the recording) while the composer retains the original composition; a photograph can be reproduced while the owner retains the original negative.

In the past, when information was stored in analog form, the copying and redistribution of such information, while problematic, did not account for as much economic loss as is possible today. The storage of information in analog form uses a physical medium that is made to have some characteristic vary in proportion with the information to be stored. For instance, the groove on a vinyl record captures the frequency and intensity (volume) of a sound by the extent of its excursion. At each stage in the process of playing a record: the stylus tracing the groove, generation of a small voltage, amplification of the voltage, and reproduction of the sound, small errors are introduced. Today's high fidelity systems are very accurate, but they are not flawless.

Indeed, copying a vinyl record to a cassette tape results in a small, but noticeable, reduction in sound quality. If multiple generations of recording (e.g., cascaded recordings) were undertaken, the resulting product would be noticeably inferior to the original. Similarly, when multiple generations of photocopies of an image are made, the quality of the resulting image is typically poor, with many dark and light areas that were not present in the original image.

It is the inevitable gradual degradation of quality that has proven to be a practical disincentive to large scale copying of analog information. Notwithstanding this observation, where the potential profits are high, such copying is undertaken even though the resulting product's quality is significantly below that of the original. Videotape copies of movies

2

represent a good example. Some fraction of the marketplace is willing to accept a lower quality product in exchange for a significantly lower price. The logistics associated with making large numbers of copies (an inherently serial process), including obtaining the raw materials (cassettes), the reproduction equipment, and the distribution channels also have served to limit illicit production. Finally, the quality of the product as well as the markings on the package distinguish it from the original and may also serve as a disincentive (for some) to purchase an illicit copy.

Just as the invention of the printing press changed the way in which society interacted with information on paper, the technical advances in digital computers and communications in the closing years of the twentieth century have a potential for high impact on legal, moral, and business practice. The printing press is often credited as an enabling mechanism for the Renaissance and the Reformation in Europe. The advances in digital information technology will similarly impact commerce and law. Digital technology enables changing the representation of information without changing the content. (Of course the content can be changed too.)

The storage of information in digital form depends on the ability to encode information in binary form to arbitrary precision and to record that binary form in a physical medium that can take on two distinct characteristics. Preserving the fidelity of information recorded in binary (using media with two distinct and easily-differentiated characteristics) is easily accomplished. For instance, a compact disc stores information (each binary digit or bit) as the presence or absence of a hole (depression or pit) that reflects or does not reflect light. Compared to the analog recording of phonograph records, the information stored in each hole is unambiguously a binary digit, the value of which is either zero or one. No other values are possible. A digital tape stores each bit as a magnetic spot that is oriented either north/south or south/north. Today's digital sound systems use sufficiently many bits to capture sound levels beyond the ability of the human ear to distinguish a difference and in so doing attain so-called "perfect" fidelity.

A digital file can be copied with no loss of fidelity (as the mechanism need only distinguish between two easily-differentiated states). With straightforward and well-known error-correction mechanisms, even inevitable flaws can be made so improbable as to occur fewer than once in ten billion bits.

As a result of the ability to copy a file with no loss of fidelity, it is now almost impossible to differentiate a digital copy from the digital original. In a network environment recording materials, reproduction equipment and distribution are not impediments to copying. Consequently, in the digital domain the threshold inhibiting the making of illicit copies is significantly lowered. Evidence that this is the case is presented by the Software Publishers Association and by the Business Software Alliance, each of which indicates that billions of dollars of software is pirated (in the sense of being illicitly copied) each year. Additionally, print publishers hesitate to expand into the network marketplace because they are unable to control (in the sense of receiving compensation in return for rights) secondary distribution of their products as well as incorporation of their products into derivative products. Digitally stored information may include binary data, computer software, text, graphics, audio, and video. The uses of this information include news, entertainment, education, and analysis. Information may be distributed in many ways, including networks, magnetic media, CD-ROM, semiconductor memory modules, and wireless broadcast.

US 6,314,409 B2

**3**

Copying and distributing large volumes of digital information over long distances is becoming easier and less costly. Such changes in cost and convenience of necessity impact business decisions concerning producing, distributing, promoting, and marketing. The commercial relationship among information producers (such as authors, performers, and artists), distributors (such as publishers, promoters, and broadcasters), and consumers must change in response to the technology.

The law concerning intellectual property is in ferment. Major revisions in the laws regarding the protection of computer programs have been suggested. *A Manifesto Concerning the Legal Protection of Computer Programs*, Samuelson, P. R. et al., *Columbia Law Review*, vol. 94, no. 8, pp. 2308–2431, December 1994. The European Union is working on harmonizing protection of intellectual property rights with respect to technology and differences in civil and common law countries. Commission of the European Union, Jul. 19, 1995, *Green Paper on Copyright and Neighboring Rights in the Information Society*, catalogue number CB-CO-95-421-EN-C, ISSN 0254-1475, ISBM 92-77-92580-9, Office for Official Publications of the European Communities, L-2985 Luxembourg. In the United States, the issue of protection of intellectual property rights is being addressed in the context of the National Information Infrastructure. The uncertainty of legal protection over time and from country to country only serves to emphasize the importance of and need for technical protection of intellectual property rights in information and data.

The principal technology which has been used for protecting intellectual property is cryptography. However, devising practical retail systems for delivery of intellectual property from distributor to consumer, as distinct from confidential transmission in national security and business activities among trusted and cleared personnel, has required innovation.

Executable software-based cryptography can ensure that data are distributed only to authorized users. The information to be protected is encrypted and transmitted to the authorized user(s). Separately, a decryption key is provided only to authorized users. The key is subsequently used to enable decryption of the information so that it is available to the authorized user(s).

Other ways of controlling access to portions of data or software have included the use of external devices or tokens (dongles) needed in order to access the data or selected features of a program. Possession of the token is made evident to the computer system by physical attachment of the token to the computer. A token is generally attached to a printer, game, or network port where executable software can check on its presence prior to authorizing access. Diskettes have also been used as dongles; their presence in the diskette drive is checked by the executing software. Because they must be actively interrogated, dongles are generally used to limit access to program features and not to limit access to information.

Of those prior art systems which make some use of encryption, none protects the data after it has been decrypted. Thus, secondary distribution and multiple uses are possible.

Further, in all of the prior art, access is all or nothing, that is, once access is granted, it cannot be controlled in any other ways. This makes it difficult to control copying, secondary distribution, as well as to obtain payment for all uses.

Originator controlled data dissemination is desirable. Several policies for control of dissemination of paper documents

**4**

are specified in *Control of Dissemination of Intelligence Information*, Directive No. 1/7, Director of Central Intelligence, 4 May 1981. This Originator-Controlled (ORCON) policy has motivated development of computerized access controls. ORCON requires the permission of the originator to distribute information beyond the original receivers designated by the originator. The Propagated Access Control (PAC) policy and the related Propagated Access Control List (PACL) were proposed as one way of implementing ORCON. "On the Need for a Third Form of Access Control," Graubart, R., *Proceedings of the 12th National Computer Security Conference*, pp. 296–303, 1989. Whenever an authorized subject reads an object with an associated PACL, that PACL becomes associated with the subject. Any new object created by the subject inherits the PACL. PACLs are associated with both subjects and objects.

Owner-Retained Access Control (ORAC) (described in "Beyond the Pale of MAC and DAC: Defining New Forms of Access Control," McCollum, C. J., et al. *Proceedings of the Symposium on Research in Security and Privacy*, IEEE Computer Society Press, 1990) is similar to PAC in propagating ACLs with non-discretionary enforcement. ORAC goes further, retaining the autonomy of all originators associated with a given object in making access decisions, while basing mediation of requests on the intersection of the access rights that have been granted. ORAC is motivated to implement several of the DCID 1/7 policies in addition to ORCON, namely NO_CONTRACTOR, NO_FOREIGN, and RELEASABLE_TO.

Originator-Controlled Access Control (ORGCON) (described in "Generalized Framework for Access Control: Towards Prototyping the ORGCON Policy", Abrams, M. D., et al. *Proceedings of the 14th National Computer Security Conference*, October 1991) is a strong form of identity-based access control—it explicitly defines authority and delegation of authority, provides for accountability, and has an explicit inheritance policy. In ORGCON, the distribution list is indibibly attached to the object (i.e., the distribution list cannot be disassociated from the object, even in the limited cases where copying is permitted). ORGCON is a read, no-copy policy. Its formal model (taught in "A Rule-Set Approach to Formal Modeling of a Trusted Computer System," LaPadula, L. J., *Computing Systems Journal*, Vol. 7, No. 1, pp. 113–167, Winter 1994) distinguishes among device types in order to deal with the policy that no storage copy of an object is permitted. Information may be copied only to the display and printer, but not to any other device types.

The Typed Access Matrix (TAM) Model (described in "The Typed Access Matrix Model," Sandhu, R. S., *Proceedings of the Symposium on Research in Security and Privacy*, IEEE Computer society, pp. 122–136, 1992; and "Implementation Considerations for the Typed Access Matrix Model in a Distributed Environment," Sandhu, R. S., and G. S. Suri, 1992, *Proceedings of the 15th National Computer Security Conference*, pp. 221–235) incorporates strong typing into the access matrix model to provide a flexible model that can express a rich variety of security policies while addressing propagation of access rights and the safety problem. The safety problem is closely related to the fundamental flaw in Discretionary Access Control (DAC) that malicious code can modify the protection state. Types and rights are specified as part of the system definition; they are not predetermined in TAM.

The prior art, including cryptographic processses, tokens, dongles, so-balled "uncopyable" media, various executable software protection schemes, and executable software for

US 6,314,409 B2

5

printing that places an identifier on all printed output in a fashion not apparent to a human, fails to limit either secondary distribution or distribution of derivative works.

This shortcoming is not a failure of mechanism, but rather it is an architectural design omission. The problem of copying by the authorized user is simply not addressed. In each case, once the data are available to an authorized user, they are basically unprotected and may be copied, modified, or transmitted at will. Schemes that include identifiers on printed material, although they may aid in identifying the source of copied material, do not prevent secondary distribution.

Executable software-based cryptography can ensure that data are distributed only to authorized users. However, once data are received they may be freely manipulated and redistributed.

The information to be protected is encrypted and transmitted to the authorized user(s). In some systems the encrypted information is made freely available. Separately, a decryption key is provided only to authorized users. The key is subsequently used to enable decryption of the information so that it is available to the authorized user(s). It is at this point that the information is subject to manipulation and redistribution without further limitation.

As mentioned above, a dongle or token can be used to authorize access to executable software. However, once access has been granted to information that information is subject to manipulation and redistribution without further limitation. Further, dongles have proven to be unpopular because of the need to keep track of them and ensure that they are separately secured.

Uncopyable media, generally used either to control distribution of information or to control usage of executable software, are unpopular because of the user's inability to create a backup copy. Further, most so-called uncopyable disks have fallen victim to general-purpose duplication programs, rendering their protection useless. Sometimes, as in early releases of Lotus 1-2-3, an uncopyable disk was provided with the executable software release and had to be inserted in a floppy-disk drive for the executable software to function (operating as a disk dongle). Users soon learned how to by-pass the executable software so that the disk need not be present. Even where partially effective, the uncopyable disk did not serve as a deterrent to capturing information and redistributing it.

The degree of protection of data is typically made by the data owners and/or distributors based on their security analysis. It is common to perform security analysis in terms of risks, threats, vulnerabilities, and countermeasures. An owner's estimate of the probability that a particular threat will materialize is crucial to selecting appropriate rules to protect property rights.

Threat can be characterized as the intensity of attack on the data, which can be described as low, medium, and high.

| | |
|---|---|
| Low | For a security function to be rated as "suitable for use in a low threat environment," it shall be shown that the security function provides protection against unintended or casual breach of security by attackers possessing a low level of expertise, opportunities, resources and motivation. However, such a security function may be capable of |

6

-continued

| | |
|---|---|
| Medium | being defeated by a knowledgeable attacker. For a security function to be rated as "suitable for use in a medium threat environment," it shall be shown that the security function provides protection against attackers possessing a moderate level of expertise, opportunities, resources and motivation. |
| High | For a security function to be rated as "suitable for use in a high threat environment," it shall be shown that the security function provides protection against attackers possessing a high level of expertise, opportunity, resources and motivation. A successful attack is judged as being beyond normal practicality. |

The following list covers some common anticipated threats to data and processing systems.
Threat: Capture of Output Signal
No matter what method is used to protect a data file, the data stored therein can be captured as a signal en route to an output device. Capture of an analog output results in some degradation of signal quality. But the market for bootleg copies of videos, for example, appears to be insensitive to such quality if the price is right. A captured digital signal suffers degradation of quality only as a result of bit errors (i.e., if the data capture was not completely accurate).

This threat is well known to the entertainment industry. Various approaches to protection have been incorporated in set-top boxes discussed in "Inside the Set-Top Box," Ciciora, W. S., *IEEE Spectrum*, pp. 70–75, April 1995.
Threat: Digital Copying
Once data have been decrypted, the resulting cleartext must be protected from unauthorized copying. Creating an unauthorized local copy, or disseminating the data without authorization each results in an original-quality copy without compensation to the owner.
Threat: Deliberate Attack Via Legacy (Pre-Existing) and Customized Hardware
High-intensity attack by attackers possessing a high level of expertise, opportunity, resources and motivation must be considered. Attackers in this category might include foreign governments and industrial espionage agents, teenage crackers, and resellers of pirated intellectual property. One manifestation of this threat is in uncontrolled hardware. The nominally protected information would be available in the memory and could be accessed via dual-ported memory or even by DMA (direct memory access) from a peripheral.

A strong indication of the usefulness and desirability of the present invention can be found in the legislation pending before the U.S. Congress to make illegal the by-passing or avoiding of copyright protection schemes. See S.1284, 104th Congress, 1st sess. (1995).

It is desirable to have a system of distributing data (intellectual property) that prevents copying, restricts re-distribution of the data and provides controlled access to the data.

SUMMARY OF THE INVENTION

This invention controls access to and use and distribution of data.

For example, when the data are in the form of textual and graphical information, this invention can control how much of the information is displayed and in what form; or, when

US 6,314,409 B2

7

8

the data represents a computer software program, this invention can control how much of the software's functionality is available. Classified data are similarly controlled.

In addition, this invention controls secondary distribution and creation of derivative works. Prior art systems rely on software for security. Without the tamper detection/reset mechanism of this invention, software can be modified or data can be intercepted rendering useless any attempts at control.

Degrees of protection utilized in the computer system hardware (for example, tamperproof and tamper-detect features) and the cryptographic tools will depend on the nature of the data to be protected as well as the user environment.

In one preferred embodiment, this invention is a method of controlling access to data by protecting portions of the data; determining rules concerning access rights to the data; preventing access to the protected portions of the data other than in a non-useable form; and permitting a user access to the data only in accordance with the rules as enforced by a tamper detecting mechanism.

In another preferred embodiment, this invention is a device for controlling access to digital data, the digital data comprising protected data portions and rules concerning access rights to the digital data. The device includes storage means for storing the rules; and means for accessing the protected data portions only in accordance with the rules, whereby user access to the protected data portions is permitted only if the rules indicate that the user is allowed to access the portions of the data.

In another aspect, this invention is a method of distributing digital data for subsequent controlled use of the data by a user. The method includes protecting portions of the digital data; preventing access to the protected portions of the data other than in a non-useable form; determining rules concerning access rights to the data; protecting the rules; and providing the protected portions of the digital data and the protected rules. The user is provided controlled access to the data only in accordance with the rules as enforced by a tamper detecting access mechanism.

In another aspect, this invention is a storage device, readable by a machine, tangibly embodying a package of digital data comprising protected portions of digital data; and rules concerning access rights to the digital data, whereby a user is provided controlled access to the digital data only in accordance with the rules as enforced by a tamper detecting access mechanism.

The data represent computer software, text, graphics, audio, and video, alone or in combinations.

The protecting is done by encrypting the portions of the data, and access is prevented to the encrypted portions of the data other than in encrypted form.

In some embodiments the rules are provided with the data, whereas in others the rules are provided separately. The rules can specify various access rights and controls, including rights of further distribution of the data.

In preferred embodiments, data are destroyed when tampering is detected.

The device containing the mechanism of the present invention can be a stand-alone device such as a facsimile machine, a television, a VCR, a laser printer, a telephone, a laser disk player, a computer system or the like.

As noted above, the rules, policies and protections of data are typically made by the data owners and/or distributors based on their security analysis of various threats. The various threats listed above are dealt with by countermeasures in the present invention.

Threat: Capture of Output Signal

Countermeasure: Encrypt or Scramble Output Signal

Protection of the output signal is accomplished with encryption of a digital signal (as is done in the present invention) and scrambling of an analog signal. This solution requires installing decryption or unscrambling capability in the output device, TV or monitor, along with appropriate tamper-detection capability. Encryption or scrambling might be effected using a public key associated with the output device (although, to prevent so-called "spoofing," obtained from a certification authority and not from the output device). Alternatively, the output might be encrypted or scrambled using a private key only available to the designated output device (again ensured via some certification mechanism). The output signal is decrypted or unscrambled by the output device using its private key and is not available in plaintext form outside of the device's protected enclosure.

Countermeasure: Protect Output Signal by Packaging

The output signal is protected by making it unavailable outside the access mechanism. A sealed-unit computer with tamper detection provides the necessary protection. Examples of the acceptability of such packaging include lap-top computers and the original Macintosh computer, as well as integrated televisions, VCRs and video or audio laser disk players.

Threat: Digital Copying

Countermeasure: Secure Coprocessor

Selection of a secure coprocessor is indicated to implement protection against unauthorized use when an operating system (OS) is determined to be untrustworthy—that is, when the OS cannot provide adequate resistance to the anticipated threat. When the OS is untrustworthy, any measures implemented in the OS, or protected by it, can be circumvented through the OS or by-passing it.

Countermeasure: Detection of Unsealing

The protection provided by a coprocessor could be circumvented by tampering. The coprocessor is protected by tamper detection that causes the rules, cryptographic data, and decrypted protected data to be destroyed. Both passive and active means are used to effect such destruction. Semiconductor memory is volatile and does not retain data when power is removed. A long-life battery provides energy sufficient to allow rewriting (zeroizing) nonvolatile memory containing, for example, the private key. Without the private key the system will be unable to decrypt any protected data and it must be returned to an authorized service facility for installation of a new private key.

Threat: Deliberate Attack Via Legacy and Customized Hardware

Countermeasure: Keep the Information on the Coprocessor Board

Access may be controlled if the information leaves the coprocessor board only for output purposes. Deciphered information is retained in memory on the coprocessor board, not in main memory. Program execution occurs in the coprocessor on the board (e.g, operating in the same manner as did so-called "accelerator" coprocessors that allowed a user to install an 80286 processor in an 80186 system, allowing the user to shift all functions to or from the faster coprocessor using a software command). Where information must leave the coprocessor board, e.g., to be sent to an output device, it may, depending on the associated rules, be encrypted. To receive and process encrypted data, the output device must have an access mechanism as well as public and private keys and tamper detect capability. Because some

US 6,314,409 B2

9 | 10

output peripheral devices do not have the capability of retransmission, the device may be a subset of the full access mechanism associated with a processor or computer system.

## BRIEF DESCRIPTION OF THE DRAWINGS

The above and other objects and advantages of the invention will be apparent upon consideration of the following detailed description, taken in conjunction with the accompanying drawings, in which the reference characters refer to like parts throughout and in which:

FIG. 1 is a schematic block diagram of an embodiment of a digital data access and distribution system according to the present invention;

FIGS. 2 and 3 show logical data structures used by the system depicted in FIG. 1;

FIG. 4 is a flow chart of the authoring mechanism of the embodiment of the present invention depicted in FIG. 1;

FIG. 5 is a schematic block diagram of another embodiment of a digital data access and distribution system according to the present invention;

FIG. 6 is a logical data structure used by the embodiment depicted in FIG. 5;

FIG. 7 is a flow chart of the authoring mechanism of the embodiment of the present invention depicted in FIG. 5;

FIGS. 8 and 9 show schematic block diagrams of embodiments of the access mechanism according to the present invention;

FIGS. 10(a)–13 are flow charts of the data access using the access mechanisms shown in FIGS. 8, 9 and 15;

FIG. 14 shows an embodiment of the invention which uses an external user status determination mechanism;

FIG. 15 is a schematic block diagram of an embodiment of a distribution system for derivative works according to the present invention;

FIG. 16 is a flow chart of the data access using the access mechanism shown in FIG. 15;

FIGS. 17(a) and 17(b) show packetized data according to the logical data structures shown in FIGS. 2 and 6;

FIGS. 18(a)–23(b) show various examples of data and their packaging according to the present invention; and

FIG. 24 shows various implementation levels of a typical computer system employing an access mechanism according to the present invention.

## DETAILED DESCRIPTION OF THE PRESENTLY PREFERRED EXEMPLARY EMBODIMENTS

A schematic block diagram of a presently preferred exemplary embodiment of a digital data access and distribution system 100 according to the present invention is depicted in FIG. 1. System 100 includes two main components: a data distributor 102 and a user 104. The data distributor 102 takes data 106 and produces packaged data 108 which are provided to the user 104 via communication channel 105, perhaps in return for some form of payment 110.

Corresponding to each of the distributor 102 and the user 104 are the system's authoring mechanism 112 and access mechanism 114, respectively. The authoring mechanism 112 of the distributor 102 takes the data 106 to be packaged and produces packaged data 108 which is provided to user 104 by a distribution mechanism 118. The packaged data 108 may include access rules 116 in encrypted form encoded therewith, or the access rules 116 may be provided to the user 104 separately (as shown in the embodiment of FIG. 5).

The access mechanism 114 of the user 104 takes the packaged data 108, either including an encrypted version of the access rules 116 or having the access rules provided separately, and enables the user to access the data in various controlled ways, depending on the access rules.

Data 106 provided to or generated by the distributor 102 can be any combination of binary data representing, for example, computer software, text, graphics, audio, video and the like, alone or in combinations. As described below (with respect to the embodiment shown in FIG. 15), in some embodiments data 106 can also include other packaged data produced by an authoring mechanism according to this invention.

The difference between the embodiments of the distributors 102 and 190, shown in FIGS. 1 and 15, respectively, is that the distributor 102 (FIG. 1) does not include an access mechanism 114. Accordingly, distributor 102 deals only with newly created data (that is, with non-derivative data). The embodiment shown in FIG. 15 (discussed below) includes the functionality of the embodiment shown in FIG. 1, and can also deal with input of protected data (previously packaged by a distributor). The embodiment of distributor 102 shown in FIG. 1 can be implemented purely in software (depending on the trust level of the employees of the publisher), whereas the embodiment of distributor 190 shown in FIG. 15 requires some hardware implementation.

Data 106 can also be provided to the distributor in non-digital form and converted to digital form by the distributor in a known and suitable fashion. The content of the data 106 can include, for example, news, entertainment, education, analysis and the like, alone or in combinations.

Note, as used herein, computer software refers to any software program used to control any computer processor. This includes, but is in no way limited to, processors in stand-alone computers; processors in video and audio devices such as televisions, video recorders and the like; processors in output devices such as printers, displays, facsimile machines and the like; and processors in appliances, automobiles, telephones and the like.

The data 106 are typically intellectual property subject to control. In some cases, distributor 102 may receive some form of payment 110 from the user 104 for accessing the data. This payment, or some part thereof, may then be provided directly to the actual owner (not shown) of the data 106. Further, the payment or part thereof may be made before, during or after use of the data.

As noted above, the packaged data 108 may include an encrypted version of the access rules 116, or these rules may be provided to the user separately. The logical data structure for the packaged data 108 is shown in FIG. 2 and includes an encrypted body part 120, an unencrypted body part 122, encrypted rules 124 (if provided with the packaged data), and encrypted ancillary information 126. Encrypted rules 124 are an encrypted version of access rules 116.

The actual format and layout of the data is dependent on the type of data, their intended use, the manner in which they are to be accessed and the granularity of control to be exercised on the data. An encyclopedia, for example, would likely be organized differently from a movie or a musical selection. Since the data can be any combination of binary data, different parts of the packaged data 108 may be structured differently, as appropriate. Accordingly, encrypted body part 120 is potentially made up of encrypted body elements, and similarly, unencrypted body part 122 is potentially made up of unencrypted body elements.

It is, however, envisaged that in presently preferred embodiments the data will be structured such that some data

US 6,314,409 B2

**11**

parts or elements have header information which enables the data to be traversed or navigated according to whatever rules are to be applied and in a manner appropriate for those data.

An example of the structure of rules 116 is shown in FIG. 3, wherein the rules include various forms of validity checking and identification information such as version number 127, authentication data 128, license number 130, intellectual property identifier 132, first and last valid generations of the product 134, 136. The rules 116 further include an encrypted data key 138 as well as the actual rules 140, 142, 144–146 to be applied when access is made to the data by a user. The actual rules include, but are not limited to, standard, extended and custom permissions 140, 142, 144–146, and co-requisite rules (permission lists) of source data 145.

The function of each field in the rules shown in FIG. 3 is given in TABLE I, below.

TABLE I

| Field | Function |
|-------|----------|
| Version number 127 | Defines internal configuration template |
| Authentication (hash) 128 | Validates integrity of this data file. |
| License number of these rules 130. | Used by publisher to identify owner. |
| Intellectual property identifier 132. | Identifies the intellectual property product. |
| First valid generation of the product 134. | Defines extent of validity of the license. |
| Last valid generation of the product 136. | Defines extent of validity of the license. |
| Encrypted data key 138. | Key to access the data. |
| Standard permissions 140. | List of basic access permissions for data. |
| Extended permissions 142. | List of extended access permissions for data. |
| Custom permissions 144. | Executable code modules. |
| Co-requisite rules (permissions) for source data 145. | Indicates which source data rules are needed. |
| Token/biometrics 146 | Indicates the physical tokens and/or biometric characteristics (if any) required for identification of each authorized user. |
| System IDs/Public keys 147 | Other systems to which these rules may be redistributed. |

A complete introduction and references to further reading concerning cryptography and cryptographic techniques and mechanisms are found in Abrams, M. D. and Podell, H. J., "Cryptography," *Security-An Integrated Collection of Essays*, Abrams, M. D. et al, eds. IEEE Computer Society Press, 1995, which is hereby incorporated herein by reference.

The Authoring Mechanism

As shown in FIG. 1, the authoring mechanism 112 of the distributor 102 takes data 106 and produces packaged data 108 for distribution. The process of producing the packaged data which includes rules 116 is described with reference to FIGS. 1–4.

The authoring mechanism 112 incorporates existing source data 106 into a packaged format for dissemination. As noted above, data 106 can include but are not limited to combinations of computer software, text, graphics, audio, video and the like. The data 106 may be provided to the authoring mechanism 112 in various proprietary data for-

**12**

mats used in vendor software packages as well as having lower level formats for graphics, tables, charts, spreadsheets, text, still and motion pictures, audio and the like.

Using the authoring mechanism 112, those elements of the data 106 that are to be encrypted are selected, as are the cryptographic algorithms and protocols to be employed, the payment procedures for the use of the data, and other decisions governing how the user 104 will be permitted to use the data. These decisions are used in constructing the permission lists to be included in the rules 116. Different classes of users can be defined, based, for example, on age, fee paid, qualifications and the like.

The presently preferred embodiment employs asymmetric encryption algorithms in the authoring and access mechanisms. The keys for these algorithms are protected within the system and are never exposed. The data-encrypting key, $K_D$, is the same for all copies of the data. $K_D$ is selected by the distributor 102 and may be different for each product (i.e., for each packaged data 108). The symmetric encryption algorithm used for encrypting the data is associated with $K_D$ and may also be selected by the distributor. $K_D$ is encrypted using a rule-encrypting key $K_R$. When the rules are distributed with the product (packaged data 108), $K_R$ is the same for all products and all embodiments of the system. When the rules are distributed separately from the product, $K_R$ can be unique for each version of the system. The rule-encrypting key $K_R$ is known only to (and protected within) each receiving computer of each user.

With reference to FIG. 4 which shows a flow chart of a version of the authoring mechanism of the present invention in which the rules are distributed with the packaged data 108, the distributor 102 (acting as a representative of the owner of the data 106) selects a data-encrypting algorithm (DEA) (step S400) and data-encrypting key $K_D$ (step S402), and encrypts the data-encrypting key $K_D$ using $K_R$ (step S404). The encrypted data-encrypting key $K_D$ is then stored in the encrypted ancillary information 126 of the packaged data 108 (in step S406).

The algorithm selection (in step S400) is based on an assessment of risk, the degree of protection desired as well as other factors such as speed, reliability, exportability and the like. As used herein, risk refers to the expected loss due to, or impact of, anticipated threats in light of system vulnerabilities and strength or determination of relevant threat agents. Alternatively, risk can refer to the probability that a particular threat will exploit a particular vulnerability of the system. An analysis of risk, threats and vulnerability is provided below. Examples of possible data-encryption algorithms include, but are not limited to, DES, RSA, PGP and SKIPJACK. The system may use a preferred encryption algorithm and may also provide a mechanism for using algorithms provided with the data 106 by the owner of the data.

The data-encrypting key $K_D$ may be generated in a typical manner, suitable for the selected data-encrypting algorithm. For data having lower value to its owner, or having lower risk of loss, all distributions may rely on a single data-encrypting key (or perhaps a small number of data-encrypting keys). Another encryption method, uses a unique data-encrypting key for each item of data to be distributed.

Having selected a data-encrypting algorithm and key, $K_D$, (S400–S402) and having encrypted and stored the key (S404–S406), the distributor 102 proceeds to process the various elements of the data 106. The data are processed at a granularity dependent on the type of restrictions needed on their use and on the form of the data themselves, that is, the form in which the data have been provided. The distributor

US 6,314,409 B2

13

14

obtains (step S407) and examines each part or element of the data (at the desired granularity) and determines whether or not the element being processed (the current element being examined) is in the body of the data (step S408) (as opposed to being rules or ancillary information). If the current element being examined is determined to be in the body of the data, the distributor then decides whether or not the current data element is to be protected (step S410), that is, whether or not access to that element of the data is to be controlled and the data element is to be encrypted.

If the current data element is not to be protected, it is stored (step S412) in the unencrypted body part 122 of the packaged data 108. Otherwise, if the current data element is to be protected, it is encrypted using the data-encrypting key $K_D$ (step S414) and then the encrypted current data element is stored in the encrypted body part 120 of the packaged data 108 (step S416), after which the next element is processed (starting at step S407).

For example, if the data 106 are a textual article, the abstract of the article might not be protected (encrypted) while the rest of the article would be.

If the current data element is determined not to be in the body of the data (step S408), the distributor then determines if the current data element is access rules provided by the data owner (step S418). If so, the rules are protected by encrypting them using the rule-encrypting key $K_R$ (step S420) and the encrypted rules are then stored in the encrypted rules part 124 of the packaged data 108 (step S422).

If the current data element (being processed) is not access rules, the distributor determines whether or not it is ancillary information (step S424). This information includes such things as the identification of the publisher and the like. If the current data element is determined to be ancillary information, the ancillary information is protected by encrypting it using the data-encrypting key $K_D$ (step S426) and then the encrypted ancillary information is stored in the encrypted ancillary information part 126 of the packaged data 108 (step S428).

If the data are rules or ancillary information to be encrypted, then, after appropriate processing, the next data element is processed (step S407).

If the current data element is not a body part, access rules or ancillary information, some form of error is assumed to have occurred and is processed (step S430). After the error has been processed, the mechanism can continue processing the next data element (step S407) or terminate, depending on the implementation.

The operation of the system 101 shown in FIG. 5 differs from system 100 of FIG. 1 in that the rules 116 are distributed to users 104 separately from the packaged data 108. This is achieved with an authoring mechanism 148 which takes as input data 106 and rules 116 and produces, separately, packaged data 150 and packaged rules 152. The packaged data 150 without the rules has the form shown in FIG. 6, which is essentially the same as the structure shown in FIG. 2, but without the encrypted rules 124.

Note that an hybrid system, wherein some rules are packaged with the data and other rules are packaged separately is foreseen, using a combination of the mechanisms shown in FIGS. 1 and 5. In such a system, an operator selects which mode of operation to employ.

FIG. 7 shows a flow chart of a version of the authoring mechanism 148 of the present invention in which the rules 116 are distributed by distributor 102 separately from the packaged data 150. Rules 116 and data 106 can be presented to the authoring mechanism 148 in any order, or in an interleaved fashion. In fact, the rules 116 need not all be provided together. The distributor 102 first selects a data-encrypting algorithm and a data encrypting key, $K_D$ (step S700). Then the authoring mechanism 148 processes the data element-by-element (starting at step S702). As in the case of the mechanism shown in FIG. 4, a data element is assumed to be one of either a body part, ancillary information or access rules.

First it is determined whether or not the current data element is a body part (step S716). If it is determined (in step S716) that the current data element is a body element, then it must be determined (in step S718) whether or not the data are to be protected. As in the case when the rules are distributed with the packaged data 108, the decision as to whether or not to protect a specific data element depends on the owner of the data and the distribution policies as implemented in the rules.

If the data are to be protected (step S718), the data in the current data element are encrypted using data-encrypting key $K_D$ (step S720) and then the encrypted data are stored in the encrypted body part section 120 in the encrypted body part section 120 (step S722). On the other hand, if the data in the current data element are not to be protected, the data are stored in the unencrypted body part section 122 of the packaged data 150 (in step S724). In either case, after the data element is stored (steps S722 or S724), the next data element is processed (starting at step S702).

If the current data element is determined not to be a body element (step S716), then the mechanism checks to determine whether or not the current data element is ancillary information (step S726). If the current data element is determined to be ancillary information, it is protected by encrypting it using data-encrypting key $K_D$ (step S726) and then the encrypted current data element is stored in the packaged data 150 in the encrypted ancillary information section 126 (in step S730). Then the next data element is processed, starting at step S702.

If the current data element is neither a body element (step S716) nor ancillary information (step S726), then the it is determined whether or not the current data element is access rules (step S732). If so, the rules are to be distributed separately from the packaged data 150, and are processed accordingly as follows:

If this is the first time the access mechanism is processing rules for this data set then a rule-encrypting key $K_R$ must be determined. Accordingly, it is determined whether these are the first rules being processed for this data set (step S734). If so, obtain and validate the serial number, SN, of the system (steps S736 and S738). Then calculate the rule-encrypting key $K_R$ as a function of the validated serial number ($K_R$=f(SN), for some appropriate function f (step S740). Function f may, for example, be an inquiry to a certification database or certification authority to obtain the public key so as to ensure that the serial number is authentic. Having determined the rule-encrypting key (step S740), encrypt the data key $K_D$ with the calculated rule-encrypting key $K_R$ (step S742) and store the keys (step S744). Next, encrypt the rules using the rule-encrypting key $K_R$ (step S746). The encrypted rules and the encrypted data key $K_D$ are stored as packaged rules 152 for subsequent distribution. The rule-encrypting key $K_R$ may be stored or recalculated from the serial number whenever needed.

If it is determined (in step S734) that the this is not the first rules being processed for this data set, then the rule-encrypting key $K_R$ has already been calculated (step S740) and stored (step S744). In that case, the rules in the current data element are encrypted using the rule-encrypting key $K_R$ (step S742).

US 6,314,409 B2

15

Once the rules in the current data element are processed, processing continues with the next data element (step S702).

If the authoring mechanism 148 determines that the current data element is not a body part (step S716), ancillary information (step S726) or rules (step S732), then some form of error has occurred and is processed (step S748). After an error has occurred, the mechanism 148 can either cease processing (step S750) or, in some embodiments, continue processing further data elements (step S702).

The data 106 provided to the distributor 102 and the packaged data 108 (or 150 and packaged rules 152, if provided separately) provided to the user 104, may be provided and distributed in various ways, including but not limited to, via digital communications networks (for example, the Internet or the projected National Information Infrastructure (NII)), magnetic media (for example, tape or disk), CD-ROM, semiconductor memory modules (for example, flash memory, PCMCIA RAM cards), and wireless (for example, broadcast). The packaged data 108 may be provided to a user as a single packaged entity or as a continuous stream of data. For example, a user may obtain a CD-ROM having a movie stored as packaged data thereon or the user may obtain the movie as a continuous stream of broadcast data for one-time viewing.

Information (such as the packaged data 108 from the distributor 102 to the user 104) can be transmitted openly, that is, using mechanisms and media that are subject to access and copying. In other words, communication channel 105 may be insecure.

The Access Mechanism

The access mechanism 114 allows a user 104 to access the data in packaged data 108 (or 150) according to the rules provided with (or separately from, as packaged rules 152) the packaged data and prevents the user or anyone else from accessing the data other than as allowed by the rules. However, having granted a user controlled access to data (according to the rules), it is necessary to prevent the user or others from gaining unauthorized access to the data. It is further necessary to prevent the data from being further distributed without authorization.

The access mechanism 114 used by the user 104 to access data is described with reference to FIG. 8 and includes a processing unit 154, read-only memory (ROM) 156, volatile memory (RAM) 158, I/O controller 165 and some form of energy source 166 such as, for example, a battery. Access mechanism 114 may also include electrically-alterable non-volatile memory 160, a hard disk 162, a display 164, and special purpose components such as encryption hardware 168.

The access mechanism 114 is also connected via insecure channels 174 and 176 and I/O controller 165 to various controlled display or output devices such as controlled printer 178 and controlled display monitor 180. (Interaction with these controlled devices is described in detail below.)

Various other devices or mechanisms can be connected to I/O controller 165, for example, display 155, printer 157, network connection device 159, floppy disk 161 and modem 163. These devices will only receive plaintext from the I/O controller 165, and then only such as is allowed by the rules. The network connection device 159 can receive either plaintext or encrypted text for further distribution.

All components of the access mechanism 114 are packaged in such a way as to exclude any unknown access by a user and to discover any such attempt at user access to the components or their contents. That is, the access mechanism 114 is packaged in a tamper-detectable manner, and, once tampering is detected, the access mechanism is disabled.

16

The line 167 depicted in FIG. 8 defines a so-called security boundary for the components of the access mechanism 114. Any components required for tamper detection (tamper detect mechanism 169) are also included as part of the access mechanism 114. Tamper detect mechanism 169 is connected in some appropriate manner to processing unit 154, energy source 166, and non-volatile memory 160.

This invention employs a combination of physical self-protection measures coupled with means for detecting that the self-protection has been circumvented or that an attempt to circumvent the self-protection measures is being or has been made. When such intrusion is detected, passive or active mechanisms can be employed to destroy data. For example, the following can occur (not necessarily in the order stated, and usually in parallel): the access mechanism 114 is made inoperative, all cryptographic keys within the mechanism, the private key and any other keys and data are destroyed (zeroized), and power may be applied to clear non-volatile memory 160 and then is removed, resulting in loss of all data stored in volatile memory 158 so as to deny access to decryption keys as well as to any cleartext in those memories. As noted above, several operations can be accommodated or performed simultaneously when tampering is detected. This can be done by hardware circuits. Based on risk assessment and the availability of particular technology, other implementations may be selected.

Tamper detection allows the access mechanism 114 to ensure that all internal data (both the system's data and any user data) are destroyed before any tamperer can obtain them.

One way to deny access to the data within access mechanism 114 is to package all of the components within a physical case which defines the area which is excluded from user access. As an example, a typical portable lap-top computer meets the requirement of having all components within the same physical package or case. Detection that the case has been opened is straightforward and well known.

As an alternative embodiment of the access mechanism 114, the components of the access mechanism 114 can be used as a co-processor of another processor or computer. In this case, as shown in FIG. 9, the access mechanism 114 communicates with the other computer 170 via a communications channel 172. The co-processor can be implemented as a circuit board and is designed to be plugged into the bus 172 on the main board (that is, the mother board or planar board) of the other computer 170. In that case, the computer 170 will operate normally unless it needs to access controlled data, at which time it will pass control to the access mechanism 114.

The degrees of protection used in the access mechanism (for example, tamper-detect features) and the cryptographic tools employed will depend on the nature of the data to be protected as well as the user environment.

Several techniques for physically secure coprocessor packaging are described by Yee (Yee, B., Using Secure Coprocessors, Carnegie Mellon University, School of Computer Science, CMU-CS-94-149, 1994 (also available Defense Technical Information Center as AD-A281 255)). In Yee, physical protection is described as a tamper-detecting enclosure. The only authorized way through the enclosure is through a coprocessor-controlled interface. Attempts to violate physical protection in order to gain access to the components of the coprocessor module will be detected and appropriate action taken. For example, detection of attack results in erasure of non-volatile memory before attackers can penetrate far enough to disable the sensors or read memory contents.

US 6,314,409 B2

17                                                           18

Any known form of tamper protection and detection can be used, as long as it functions to destroy the data as required.

Any data which are to be sent out of the security boundary 167 are under the control of the access mechanism 114. All I/O requests and interrupts are handled by the access mechanism 114.

All communication between the components of the access mechanism 114 and the enclosed hard disk 162 is encrypted. Therefore, if the hard disk is removed from the mechanism, any data stored thereon will be inaccessible without the appropriate keys. The encryption of the data stored on the hard disk can use cryptographic keys generated within the access mechanism and which are never known outside of the mechanism. In this way, when tampering is detected, the cryptographic keys will be lost.

In general, within the system, the data are encrypted on any non-volatile storage devices so that they remain unavailable in the case of tampering. Unencrypted data are only present within the access mechanism 114 inside the security boundary 167 in components where the data can be destroyed when tampering with the access mechanism 114 is detected.

With reference to FIGS. 8 and 9, the access mechanism 114 is also connected via insecure channels 174 and 176 and bus 177 to various controlled or uncontrolled display or output devices such as described above. This allows the system to communicate with uncontrolled devices (so-called standard devices) as well as networks, within the context of the rules/permission list. (Interaction with these controlled devices is described in detail below.) All communications on the insecure channels 174 and 176 and on bus 177 is encrypted by the access mechanism 114 (and by the authoring mechanism 112), and the controlled output devices 178 and 180 must have suitable processing capabilities within them (including an access mechanism 114) to decrypt and process data which they receive. The display or output devices used will depend on the application and the type of data, and include, but are not limited to, printers, video display monitors, audio output devices, and the like.

The embodiment shown in FIG. 9 can also include other standard devices (connected to bus 177) such as, for example, standard printer 181, floppy disk 185, modem 187 and the like.

The Accessing Operation

When a user 104 obtains packaged data 108 (or 150) from a distributor 102, the user can then access the data according to the rules provided therewith or provided separately. Data access is supported by the access mechanism 114 and is described with reference to FIGS. 8, 9 and 10(a), where FIG. 10(a) is a flow chart of the data access using the access mechanisms shown in FIGS. 8 and 9.

Note initially that, depending on the type of data to be accessed and viewed, as well as the rules, the viewing process may or may not be interactive. For example, if a user is accessing a textual document, the user may choose to access only selected portions of that document, the choice being made by viewing an index of the document. On the other hand, if a user is accessing a movie, the viewing may be continuous (if the rules do not allow a user to re-watch portions of the movie without additional payment). The access and viewing process is described here for an interactive case, since non-interactive access can be considered access with a single ("start-viewing") interaction.

Note further that initiation of the access mechanism activates monitoring for interrupts and polling by the access mechanism 114. A user may also implicitly invoke the access mechanism by accessing an object (data) protected by the system. This invocation also activates monitoring for interrupts and polling.

The following discussion assumes, without loss of generality, that the data are being accessed by an application via an insecure operating system (OS) which invokes the access mechanism 114. The intent is to show the manner in which controlled access of the data takes place. In some foreseen environments, the operating system will be little more than a simple run-time system or there will be only one program running at all times. For example, in a video cassette recorder and playback machine (VCR), a single control program may be running at all times to control the VCR's operations. In this case, this control program is considered the application, and all access to controlled data is initiated by the control program which invokes the access mechanism 114.

To initiate an input access to a data element, a user must request the operating system to read such data into memory from an I/O device. Initiating I/O gives control to the access mechanism 114.

For input access to an input data element, the access mechanism 114 first determines whether the dataset containing the data element is already open (step S1000). If the dataset is not already open, it is opened (step S1001). Once opened, it is determined whether or not the dataset is protected (step S1002). Note that the data being accessed may or may not be part of packaged data. In some embodiments the access mechanism 114 can maintain a record of which open datasets are protected.

If it is determined that the dataset is not protected (step S1002), then control returns to the invoking process (step S1006). On the other hand, if the dataset is protected (step S1002) then it is determined whether or not the rules for this dataset are usable (present, available and valid) (step S1004). (The process of determining whether the rules are useable, i.e., step S1004 is described below with reference to FIG. 11.)

If the rules are determined to be useable (step S1004) then it is determined whether the data element being accessed is different from the most recently accessed data element (step S1008). If so, the data element is opened (step S1010) (otherwise the data element is already opened and available).

Next it is determined whether or not the data element is protected (step S1012). If the data element is not protected then control returns to the invoking process (step S1006). Otherwise, it is determined whether or not access is permitted (according to the rules) (step S1014). If no access to the data element is permitted then an access denial operation is performed (step S1016). For example, depending on the rules, the access mechanism 114 could either return to the invoking process (e.g., the operating system) or abort or perform some other operation. Following the access denial operation (step S1016), control returns to the invoking process (step S1006).

If access to the data element is permitted (step S1014), then the data element is made available, consistent with the rules, (step S1018) and control returns to the invoking process (step S1006).

If, in step S1004, it is determined that the rules are not useable, then an access denial operation is performed (step S1016), following which control returns to the invoking process (step S1006).

In some embodiments and/or uses of the system, the system obtains and sets up for enforcement all of the rules in the encrypted rules 124 prior to any data access or selection. In other embodiments and/or uses, rules are set up

US 6,314,409 B2

**19**

or interrogated for enforcement as needed. Depending on the type of the data and the intended application, a minimal set of global rules (governing any or all access to the data) is typically set up prior to any data access. Accordingly, the enforcement of some of the rules is set up when the package is obtained, prior-to any user access.

In some embodiments some of the required rules may not actually be provided, but are indicated by reference. In those cases, the referenced rules must be obtained when needed before data processing can continue.

Once the appropriate rules, if any, are set up (stored within the access mechanism 114), and the access mechanism is ready to enforce them, then, according to the rules, the user can access an element of the data.

The operating system is notified of the termination (normal or otherwise) of each program so that it may close any files opened by the program. Because it is possible that multiple programs may be executing at the same time, the system will remain in a protected state (if any protected data has been accessed) until all active programs conclude their execution. At that time all protected data in addressable memory are destroyed, and all rules/permission lists of files that have been created are updated, all files are closed and system status flags are reset.

Whenever a user wishes to access protected data, the access mechanism 114 may determine that the rules are not yet available for determination of whether or not to allow that access. Three possibilities exist regarding the presence of the rules.

1. The rules are packaged with the data.
2. The rules are not packaged with the data but are already present in the access mechanism 114 (i.e., in memory). This situation occurs if, for example, the user loaded a disk containing the rules and then the access mechanism 114, upon receiving the interrupt announcing the disk's presence, read the first record, recognized it as rules and decrypted them, storing them for later use. (Reading a disk's contents in advance of any actual use is presently done, for example, by some virus checking programs.) If the implementor chose not to respond to interrupts when a device is loaded, then, when rules are required, the access mechanism 114 checks all "ready" devices and inputs those rules that are present. This covers the case where the rules are present on the hard disk.
3. The rules are not present. That is, the rules are not packaged with the data and do not reside on any device attached to the system. In this case, the access mechanism 114 notifies the user that the rules are required. The user responds by either:
   (a) indicating that the rules are not available (in which case the access mechanism 114 denies permission to the program); or
   (b) loading the rules (in which case the access mechanism 114 confirms their identity and continues). If the access mechanism is unable to confirm their identity, it can reissue a request for the rules.

With reference to FIG. 11, first the access mechanism 114 checks to determine whether or not the rules are already determined useable (step S1100). If so, the process returns a "success" indication to the invoking process (step S1102).

If the rules have not already been determined to be useable (step S1100), then the rules are located. First it is determined whether or not the rules are packaged with the data (step S1104). If so, the rules are made available (by decrypting them, if needed) (step S1106). If the rules are successfully made available (e.g., decryption succeeds) (step

**20**

S1108), then the rules are checked for integrity (step S1110). If the rules pass an integrity check, then a "success" indication is returned to the invoking process (step S1112), otherwise a "fail" indication is returned (step S1127).

If the rules are not packaged with the data (step S1104), then the access mechanism 114, determines whether the rules are on a device attached to the access mechanism 114 (steps S1116–S1118). If the rules are not found on any device, then the user is asked to provide the rules (step S1114). At that time the user can abort the process (step S1120), in which case a "fail" indication is returned to the invoking process (step S1127). If the user chooses not to abort but to provide rules, those rules are read (step S1122) and, if they are a correct set of rules (step S1124), made available (step S1106). If the rules are not a correct set of rules (step S1124), then the user is informed (step S1126) and is prompted again for the rules (step S1114).

Regardless of whether or not the rules are provided with the packaged data, once the rules have been decrypted they are stored in the access mechanism 114.

The process of executing an application to access the data according to the stored rules is described with reference to the flow chart shown in FIG. 12. For each data access operation to be performed by the application, first the operation is identified (step S1200) and the rules are checked (step S1202) to determine whether that operation is permitted (step S1204).

If it is determined (step S1204) that the operation is not permitted by the rules, a "failure" return-code is set (step S1206) and control is returned to the caller (operating system) (step S1208). On the other hand, if the operation is permitted (step S1204) then, if payment is determined to be acceptable (step S1210), then processing continues. (Payment is discussed further below.) If payment is determined to be unacceptable (step S1210), a "failure" return-code is set and control returns to the invoking application (steps S1206 and S1208).

If payment is determined to be acceptable (step S1210), then it is determined whether or not the rules apply any restrictions on the data (step S1212) (for example, whether or not the rules restrict the output format or amount of the data in some way). If it is determined that the rules restrict the data then the restriction is enforced (step S1214) and the I/O is performed based on the restriction (step S1216), otherwise the I/O is performed without restriction (step S1216).

After performing I/O (step S1216), a "successful" return code is set (step S1218), and control returns to the invoking application.

The Writing Operation

The process of writing data is described here with reference to FIG. 10(b). When an application attempts to write to a dataset, control is passed to the access mechanism 114 which opens the dataset for writing if it is not already open (steps S1020, S1022). Once opened, it is determined whether or not the dataset is to be protected (step S1024). The dataset (output file) would be protected if, for example, a protected dataset has been opened since the last time the access mechanism 114 cleared its memory or if the user indicated that output is to be protected (as when authoring a work).

Note that an output dataset may begin as unprotected and be written as unprotected (i.e., in the form it would have on a machine which does not have an access mechanism 114) and later additions to the dataset may require protection and therefore be written in the appropriate format. The transition between unprotected/protected data in a dataset are discussed below.

US 6,314,409 B2

21

22

If the dataset is not to be protected (step S1024), control returns to the invoking process which writes the unprotected data (step S1026). On the other hand, if the dataset is to be protected (step S1024, then the rules are checked to determine whether or not output access is permitted (step S1028). If output access is not permitted, a denial operation is performed (step S1030). For example, depending on the rules, as part of this denial operation the access mechanism 114 could destroy the output data allowing randomized data to be written in their stead, could abort the function, or could abort the job. If access is permitted (step S1028), it is then determined whether a new data element is about to be written or whether new rules have been incorporated since the last write (step S1032). If either is the case, the rules are written (step S1034). After writing the rules (step S1034), or if neither was the case (step S1032), the data are encrypted if the rules so require (step S1036), and control returns to the invoking process (step S1026) where the (possibly encrypted) data are written.

Compatibility Issues

A protected dataset (packaged data) read by a system which does not employ an access mechanism 114 according to the present invention (or a dataset read by a system in non-protected mode) will be treated as data without any decryption taking place (by an access mechanism). In such a system, protected data elements will not be available to the user. This allows datasets (packaged data) freely to be copied and transmitted. Recipients will need to obtain any needed permission lists (rules) prior to being able to read the encrypted data in such datasets.

A non-protected (e.g., legacy) dataset (read using a system employing an access mechanism 114) that is treated as a protected dataset would require that rules be present before it would be accessed. The probability of such a misidentification may be made vanishingly small, e.g., by computing a hash function of the data.

The user can be provided the opportunity to indicate that the dataset should be treated as unprotected. In order to do this, the access process described above with reference to FIGS. 10(a) and 11 allows a user to override the decision made in step S1002 as to whether or not the dataset is protected. Note that if a user incorrectly indicates that a protected dataset is unprotected, no access to the data would be available other than in encrypted (unusable) form.

Tamper Detection

If and when tampering is detected, the access mechanism 114 performs at least the following operations illustrated in FIG. 13. The cryptographic variables (e.g., keys) are destroyed (step S1305), all rules are destroyed (step S1302), all cleartext (un-encrypted) information is destroyed (step S1300), all files are closed (step S1304), and the device is otherwise deactivated (step S1306). While these operations are described sequentially, in preferred embodiments they occur simultaneously or in some concurrent or parallel order, as shown in FIG. 13. If some order must be imposed on these operations, the first priority is to erase the cryptographic variables (step S1305).

Operational Considerations

Certain operational procedures may also be important to maintaining the protections and controls inherent in the present invention. Specific operational procedures may be employed to prevent equipment being built that would operate with an access mechanism according to the present invention and that also contained methods for circumventing the protections and controls in the access mechanism.

These operational procedures involve inspection, analysis, testing, and perhaps other procedures followed by certification of authorized access mechanism implementations. The inspection might include design analysis and physical chip inspection. Upon successful inspection, a cryptographically sealed certificate is stored within the protection perimeter. Note that this certificate is one of the data items that is destroyed upon detection of tampering. The certificate is issued by an authorized Certification Authority (CA) and includes therein a decryption key issued by that CA.

In some preferred embodiments, the rule-encrypting key $K_R$ is encrypted using the encryption key corresponding to the decryption key included in the certificate in each device. Then, in order to obtain $K_R$ within the device, the device must have the decryption key which was stored in the certificate by the CA.

Payment

In our market economy, producers and distributors of goods and services expect to be compensated. Intellectual property producers and distributors are no exception. The needs of commerce have been a primary factor in the evolution of information technology throughout history. Many of today's information infrastructure activities also deal with billing and payment.

Existing payment mechanisms either assume that the parties will at some time be in each other's physical presence or that there will be a sufficient delay in the payment process for frauds, overdrafts, and other undesirable conditions to be identified and corrected. Many of these payment mechanisms have already begun to adapt in response to the conduct of business over networks. Entirely new forms of electronic payment are evolving.

The following is a representative (but not definitive) list of electronic payment systems (some of the following names are trademarks): Anonymous Internet Mercantile Protocol; "BITBUX" from "MICROSOFT" and "VISA"; CARI (Collect All Relevant Information) the Internet Voice Robot, uses virtual credit cards to provide secure transactions from the Web; "CHECKFREE" plans for expanding the way commerce is conducted on the Internet; "COMMERCENET" secure commerce on the Internet based on Secure HTTP; "CYBERCASH"; "DIGICASH"; "DOWNTOWN ANYWHERE" has a system using account numbers, and personal payment passwords; First Bank of Internet (FBOI); First Virtual Internet Payment System allows real payment on the Internet; IkP, A Family of Secure Payment Protocols from IBM; Internet Banking White Paper from WebTech; NetBill Electronic Commerce Project; "Net-Cash"; "NetCheque"; "NetChex"; "NetMarket"; "Netscape Communications Netsite Commerce Server" and "Netscape Navigator"; "NexusBucks"; "Open Market"; Security First Network Bank is an Internet Savings Bank; SNPP: A Simple Network Payment Protocol; Sun Internet Commerce Group; Virtual Bank of the Internet.

Some electronic payment systems operate in real time by communicating through the Internet or direct dial. Others employ a prepaid balance which is debited against merchant credits, with periodic batch updating and transmission.

It is envisioned that embodiments of the present invention will employ an appropriate payment mechanism such as are well known in the art. Accordingly, the actual payment mechanism is not specified.

Rules and Policies

The rules (provided together with or separately from the packaged data) embody the data owner's control policies with respect to a user's access rights to the data.

The present invention permits the owner of intellectual property to realize a gain by selling or licensing various

US 6,314,409 B2

**23**

levels of access rights to the property and then ensuring that access beyond those rights is not obtained. The present invention ensures that only such qualities and quantities of access as released by the owner (generally, in exchange for payment) are allowed.

The rules are preferably embodied in a permission list. An example of permissions in such a list is shown in FIG. 3, and was described above.

While the rules allowed are open ended, an example set of rules (access control parameters) is given below. Access control parameters may be combined to provide varying sets of capabilities and to implement the enforcement of various policies. Some parameters are independent of any other parameters; some parameters are mutually exclusive; and other parameters must be used in combination to define fully the actions to be allowed or disallowed.

No Restriction

This would be the status if no restrictions were placed on the associated data. If this parameter is explicitly stated it overrides any contradictory parameter that may also be present. The data may be read, printed, executed, modified and copied.

No Modify

The associated data may not be edited or changed.

No Copy

The data may not be copied and a derivative work may not be made from the data.

No Execute

The data may not be executed.

No Print

The data may not be printed.

Print With Restriction of Type n

If the user prints after accessing the data, a simulated watermark will be printed as background or a header and/or footer will be placed on each page. The numeral n specifies the specific restriction to be applied, e.g., standard watermark (such as "do not copy"), personal (watermark such as "printed for name of user"), standard header/footer (such as "Company Name Confidential"), or personal header footer (such as "Printed for name of user").

No Access

Any user access, including an attempt to execute, will retrieve only encrypted data (ciphertext). This is the default case when there are no rules associated with data or the rules are corrupted.

No Child Access

Unless the user has been identified as an adult (for example by use of a password or a token) access will not be allowed for items identified as "adult material."

Access Cost=(Unit, Price)

Each time a unit of data (e.g., book, volume, chapter, page, paragraph, word, map, record, song, image, kilobyte, etc.) is opened, a cost of price is incurred.

Print Cost=(Unit, Price)

Each time a unit (e.g., page, file, image, etc.) is printed, a cost of price is incurred.

Copy/Transmit Cost=(Unit, Price)

Each time a unit (e.g., volume, file, record, page, kilobyte, image, etc.) is output, a cost of price is incurred.

Execute Only

The user may execute a program but may not read, print, modify or copy it. This rule protects against disclosure of an algorithm.

A permission list consists of rules governing the qualities and quantities of access made available by the owner to a

**24**

particular user or group or class of users, and defines those ways in which the user may (and may not) interact with the owner's data/information. An encrypted permission list (for example, encrypted rules 124 in FIG. 2) is made available by the owner to the user, generally in exchange for fees (in the commercial domain) (for example, payment 110 in FIG. 1). The system denies the user direct access to manipulate the permission list, although in some cases it may allow the user to view the permission list. (The permission list may include rules governing access to the permission list itself). Use of a permission list may be limited to a particular computer system, a particular token (such as a smart card), a user-supplied password, or any combination of these or other items.

At the discretion of the intellectual property (data) owner, a permission list may also be valid for future releases of the data. This allows, for example, a software owner to plan for future releases that resolve problems discovered in an initial software release. In this example, the user of a particular version of a program, for instance, Version 6, might be allowed to use a subsequent version of the program, version 6.1, without further payment and without needing to obtain a new permission list or license. One who had not already licensed Program Version 6 would be required to purchase a new permission list/license in order to use Program Version 6.1.

A permission list may authorize and permit the user of intellectual property to create a derivative product for which the original owner may or may not have rights. In the case of a derivative product for which the owner of the original intellectual property has no rights, the owner of the derivative intellectual property can unilaterally issue a permission list governing use of that intellectual property.

Program execution occurs when a computer device follows a series of steps, or instructions, expressed in some symbology. The program may be linear, with one step always following its predecessor without variation, or the program may involve branching based on comparison of variables related to internal or external events and status. In the field of computer science a distinction is sometimes made according to the time at which the instructions comprising the program are translated into the computer's machine language in order to control the operation of the computer. Accordingly, terms such as assembly, compilation, and interpretation are used. This distinction is not important with respect to the present invention. The term execution is used herein to refer to all forms of program execution.

Controlling Primary Distribution

As noted above, digital information is transmitted openly. Accordingly, the data are typically distributed in an encrypted form.

Enforcing an Authorized User List

In some cases, it is useful to have a rule which controls access to data for certain specific users or classes of users. For example, data may only be accessible to people over the age of eighteen, or to people having a rank greater than or equal to that of captain, or to managers have a security clearance greater than top-secret. In these cases, each user can be provided with a separate set of rules for that specific user. In other words, each user can be provided with a unique set of rules. However, if the status of a user changes, then the rules for that user have to be changed. Accordingly, it is useful and convenient to have the rules be parameterized based on the status of the user and then have the user's status provided to the access mechanism 114 in a secure fashion.

The invention can be used in combination with software and other identification technology (for example, biometric

US 6,314,409 B2

25

sensors) to limit data access to users that possess an appropriate physical or logical token (for example, a dongle or password), or personal characteristic (for example, a fingerprint pattern). The secure hardware (via tamper detection) eliminates the potential for modifying and subverting the identification software.

An embodiment having such a configuration is shown in FIG. 14, wherein the access mechanism 114 is connected to an external secure device 182 in order to obtain the user's status. Channel 183, connecting the secure device 182 and the access mechanism 114 is preferably a secure channel (within the security boundary 167), however, if it is insecure, the device 182 must send information to the access mechanism 114 in a protected (e.g., encrypted) manner.

Controlling Access and Use

The invention can restrict the qualities or quantities of access to data in any manner that can be calculated or enumerated. A non-exhaustive, representative set of examples is given below.

Access Control Qualities

(a) Local Display (for example, display of data on the computer's monitor).

(b) Printing (i.e., fixation in a form intelligible to a person).

(c) Copying (i.e., fixation on an electronic medium such as a disk or tape).

(d) Transmission (see below regarding controlling secondary distribution).

(e) Modification (i.e., changes to a copy of the primary distribution).

Access Control Quantities

(a) Number of read-accesses (where "read access" refers to any kind of examination or retrieval of data/information).

(b) Size of read-access.

(c) Expiration date.

(d) Intensity of access (number/total volume of read-accesses in a unit of time).

(e) Resolution of access (for example, in the context of a map this would be the maximum scale allowed; for sensor data this would be the precision (number of bits) returned to the user).

(f) Delay (Accesses are permitted to data after a delay of n time units. This allows different user groups to view the same dataset with different results to queries. For example, a stock broker would be able to view the latest data, while a customer, paying less for the service, might receive data that are delayed by 15 minutes.)

Access Control Granularity

The above access control policies can be applied differently to different portions of the intellectual property. For example, a document's chapters might be controlled at different levels of quantity and quality; is a map's information might be controlled differently at different latitudes and longitudes; portions of an image may be restricted in availability, resolution, and the like.

Controlling Secondary Distribution

The invention provides absolute control of secondary distribution of data (for example, preventing or restricting potential use).

Transmission of (an unencrypted copy of) the primary distribution data (either to a network or to an output device such as a tape or disk) can only be effected when the system, acting under the rules embodied in the owner's permission list, allows external output. Denial of permission to transmit

26

an unencrypted copy may result in no output or may result in transmission of an encrypted copy (for which the recipient must then negotiate permissions in order to use). Alternately, denial of permission to transmit may result in the transmission of random data, thereby denying the user knowledge of whether or not encrypted data was transferred.

Since all storage of data on internal non-volatile memory devices (for example, disks, flash memory, and the like) is encrypted, this ensures that a physical attack on the system will not result in compromise of plaintext.

Controlling Printing or Display

Printing or display of data is controlled in a manner similar to that used for controlling secondary distribution. One option is to disallow the ability to send appropriate information to a printer or display. If printing or display is allowed, the data stream to the output device is encrypted to ensure that an unauthorized user cannot intercept data sent to an external printer or display (that is, to a printer or display outside the tamper-detect protected enclosure). This necessitates that the receiving device contain a decryption subsystem. Thus, as shown in FIG. 8, data from access mechanism 114 via I/O controller 165 to either the controlled printer 178 or the controlled display 180 is encrypted on channels 174 and 176, respectively.

As discussed above when addressing the threat of capture of the output signal, an encryption mechanism is used for protecting data transfers to printer or display so that, if the data owner wishes, printing or display may be restricted to a specific printer or display device.

Instead of disallowing printing or display, these functions may be allowed with limitations as imposed by the owner. For example, output might contain a header/footer on each page indicating the identity of the authorized user; a watermark might be printed in the background; or other identifying material might be placed on each image. Of course, the data stream would be encrypted (as above) to prevent interception.

Document marking and identification techniques can be used to discourage the illicit copying of documents distributed in either paper or electronic form. The exact form of printer characters as well as line and word shifting have been used for document marking and identification ("Document Marking and Identification using Both Line and Word Shifting," Low, S. H., et al. 1995 *INFOCOM Proceedings, IEEE*, pp. 853–, 1995).

One of the major technical and economic challenges faced by electronic publishing is that of preventing individuals from easily copying and illegally or without authorization distributing electronic documents. Cryptographic protocols used to discourage the distribution of illicit electronic copies are described in "Copyright Protection for Electronic Publishing over Computer Networks," Choudhury, A. K., et al., *IEEE Network*, pp. 12–20, May–June 1995.

Preferably, each controlled peripheral device (e.g., controlled printer 178 or display 180) is provided with an access mechanism which allows the device to process data it receives. This allows the data being sent to a controlled peripheral device from a system using an access mechanism to be treated as either a copy of data or a derivative work that is being sent to another user (that happens to be a peripheral). In other words, if a peripheral device contains an access mechanism, the data sent to the device can be packaged data. Using this approach, requires that the receiving access mechanism (the peripheral's access mechanism) may include the rules (permission list(s)) in order to obtain the key needed to decrypt the data in order to print or display them (or do whatever the peripheral does with data). If no

US 6,314,409 B2

27

permission list is included and the data are encrypted by the printer's public key, the printer's access mechanism decrypts the data and prints them (just as they would have been printed had the unencrypted data stream been received by a standard printer).

The access mechanism in the controlled peripheral device need not be a full system whenever the peripheral device is limited in function, for example, to only printing or displaying data. The peripheral and its access mechanism subsystem must be in a tamper-detecting enclosure.

As noted, it is envisioned that a computer or other device equipped with an access mechanism will be used with a controlled output device (printer or display) so equipped. If the data owner allows (via the rules) output (e.g., printing) to a controlled output device (e.g., printer) (equipped with an access mechanism), then there are two possibilities. The access mechanism in the user's computer can process any required payment and send the data, encrypted with the device's public key, to the printer or display for output. Alternately, the access mechanism processes the data as a derivative work (discussed below), packaging rules with the data, and the output device is responsible for separate payment (for example, allowing retention and multiple copies).

In order to limit the number of copies output, a short time window is included in the rules so that the recipient cannot capture (record) the file and replay it multiple times to the output device. Additionally, the access mechanism in the output device can contain a relatively small non-volatile memory that would hold the checksum of a file that is not to be output again for a certain time period, say, for 15 minutes from the first output (and an output permission list in the rules would specify "n copies, only valid for 15 minutes from x to x+15").

In the case of standard output devices (non-controlled, i.e., without access mechanisms), data are provided unencrypted (to the extent that the rules permit and payment has been provided).

Controlling Distributions of Derivative Works

In many application environments where intellectual property is created it is common to include extracts from other intellectual property. Such environments include writing scholarly papers, reviews, regulations, etc. The intellectual property containing the extract is a so-called derivative work. The intellectual property from which the extract was copied is called the parent work.

This invention controls the distribution of derivative works (that is, works created using information owned by another). Transmission of (an unencrypted copy of) a derivative work (to a network, to an output device such as a tape or disk, or to a printer or display device or the like) can only be effected when the system, acting under the rules embodied in permission lists created by each of the owners of any intellectual properties used in the derivative work, allows external output. Denial of permission to transmit an unencrypted copy may result in no output or may result in transmission of an encrypted copy (or, as noted above, may result in the transmission of random data). Use of an encrypted copy of a derivative work will, in general, require permissions from the owners of the derivative work as well as of the original work. The permission list associated with a work is incorporated into the permission list of any derivative work, either directly or by reference. License fees and restrictions imposed by the owner of a work are inherited by any derivative works. An n-th generation derivative work inherits the license fees and restrictions of each of its n–1 ancestors. If permission lists (rules) are incorporated by

28

reference, the access mechanism ensures that the referenced permission lists (rules) are present (or it will deny access).

For example, if printing of an original work requires a watermark, then printing of any derivative work (if allowed at all) will require a watermark. This monotonicity/cascading of restrictions (i.e., each generation of a work must be at least as restricted as the prior generation) ensures that a derivative work that is only trivially changed from the original does not escape restrictions imposed on the original.

Creation of a derivative work for subsequent distribution requires an distributor 190 similar to distributor 102 shown in FIGS. 1 and 5. However, derivative work distributor 190 (shown in FIG. 15) includes an access mechanism 114 and can process, as input data, packaged data 108a. The output produced by distributor 190 is packaged data 108b which includes any rules (or references to rules) required by data which is derived from the input packaged data 108a. The access mechanism 114 within distributor 190 incorporates a global rule which enforces the distribution of rules with derivative works.

As noted earlier, the difference between the embodiments of the distributors 102 and 190, shown in FIGS. 1 and 15, respectively, is that the distributor 102 shown in FIG. 1 does not include an access mechanism 114. Accordingly, the distributor 102 deals only with newly created data (that is, with non-derivative data). The embodiment shown in FIG. 15 includes that of FIG. 1, and can also deal with input of protected data (previously packaged by a distributor). The embodiment of the system shown in FIG. 1 can be implemented purely in software, whereas the embodiment shown in FIG. 15 requires some hardware implementation.

It is envisioned that a standard computer, equipped with an access mechanism 114 will function as an authoring/distribution system. This allows all computer users to become authors and to incorporate previously published material into derivative works.

The rules associated with the parent work determine whether creation of derivative intellectual property is permitted, as well as the inheritance rules for incorporating the rules of the parent into the derivative work. Note that the rules derived from the parent apply only to the extract and that these rules applying to the extract need not be identical to the rules of the parent. The rules applying to the extract are specified by the owner of the parent, not by the creator of the derivative work.

For example, the rules applying to the extract might require payment to the owner of the parent for use of the derivative work containing the extract. If the creator of the derivative also required payment, the user of the derivative would make payments to two owners for use of the derivative. In an automated system the details of such multiple payments would be invisible to a user.

This invention enables such payment arrangements that would otherwise be prohibitively difficult and complex.

Another example relates to integrity and moral rights of the owner of the parent. The owner might wish to ensure that an extract was made without alteration or deletion, or that certain related information were included (for example, to prevent the extract from being taken out of context).

Data extracted from the parent comes with rules already attached or associated. These rules propagate into the derivative, but are applicable only to the extract. Extracts from the same parent may or may not share rules. Extracts from multiple parents may result in multiple rules applying to different extracts. As noted, a derivative work may contain references to data and rules rather than the actual data and rules. For certain commercial products it may be desirable to

US 6,314,409 B2

29

30

have the final packaged data 108*b* be fully self-contained. Accordingly, the packaged data 108*b* output from this distributor 190 may require further processing in order to optimize it for commercial distribution. Such optimization might include, for example, obtaining and including copies of all rules and data referenced in the package.

Extract Authentication

Digital signatures authenticate digital information by providing proof that information received is precisely that which was sent, with no changes. This system provides a similar capability to authenticate extracts (quotes) of information.

Application environments, such as providing a legal trail of evidence or authenticating that a quotation is accurate, are enhanced by the ability to prove that the information has not been subject to unauthorized alteration.

Authenticated extraction is implemented by creating an extraction editor, that runs in the access mechanism 114. This extraction editor, possibly under human direction, can extract selected text but is unable to change the extract. When extraction is complete, the access mechanism 114 digitally signs the extract with a digital signature. This digital signature includes identification of the specific computer in which the access mechanism 114 is executing as well as identification of the specific extraction editor used.

The extraction editor can, optionally, be permitted or required to insert ellipsis to indicate deletions, and certain specified insertions, such as, for example, "[sic]," might be allowed.

In another embodiment, a so-called hyperlink can be used in newly created data to indicate the insertion location of a quotation. When an output operation is performed, the access mechanism 114 creates a separate quotation, with its own checksum and digital signature. Any recipient of data containing the hyperlink can verify that the contents of the hyperlink were captured by access mechanism 114 and delivered unchanged.

Controlling Use of Executable Software

Control of Primary Distributions

The invention enables the creator of executable software to restrict the use of the software to only those who have acquired permissions for various of its capabilities. Executable software will be distributed in encrypted form, externally treated as data, as described above. In general, execution of a program can be controlled for multiple purposes in a number of ways. Purchase of a license to execute software can be evidenced by a cryptographically protected certificate which is decrypted internally by the access mechanism 114. The executable software can check for the presence of the certificate, or for permission keys or other information contained in the certificate, once or many times during execution. Since the algorithm embodied in an executable program may be valuable intellectual property, the access mechanism 114 can prevent a licensee from reading, copying, or modifying unencrypted executable code. In order to prevent disclosure of the unencrypted executable code, it is kept wholly within the security perimeter of the access mechanism 114 for execution.

Elimination of the Distributor (Middleman)

The invention enables the executable software owner to make copies easily available on a network server in encrypted form. Users may download the executable software and then separately purchase the rights to utilize the executable software. Thus, a standard purchase of software may be accomplished electronically, dealing with the owner's electronic commerce system. Thereby, the entire process of acquiring the executable software package and then

purchasing the rights to use it may be effected without going through a distributor.

Offering discounted upgrades to software licensees is also simplified. When a licensee claims eligibility for a discounted upgrade the executable software owner can check the record of purchase of rights for the prior version of the product. Once again, the entire process can be automated.

Simplification of Configuration Management

The executable software owner can elect to make available on a network server product improvements that operate with existing permission lists, thus immediately releasing product improvements and fixes.

Multiple levels of product capability can be incorporated into a single release and can be selectively enabled by different permission lists. The tailoring of different distributions, with differing capabilities is no longer necessary.

Active Control of Capability of Executable Software

The invention's control of distribution of data or information (that are not executable software) may be characterized as passive or transparent in that no changes are required in the data or information for them to be protected. The permission list that controls their use may be separately created, packaged, and supplied.

The control of primary distribution of data or information as well as the secondary distribution or distribution of modifications (derivatives) of data or information is passive. However, the invention's control of executable software capability is active and requires that the executable software developer use the programming interface provided by the system. At each point where the developer requires authorization, the executable software requests-a permission-check. As a result, the process of FIG. 16 is performed. If the requisite authorization is received, the function of the software is performed. If authorization is denied, an alternative action is chosen. The system may itself take certain actions including, for example, terminating a program or erasing data, when authorization is denied. As executable software is distributed in encrypted form, it can only be decrypted and executed (used) on a machine employing the access mechanism of the present invention.

With reference to FIG. 16, first the operation is identified (step S1600) and the rules are checked (step S1602). Next it is determined whether the operation (step S1604). If the operation is not permitted (or it is permitted but payment is not acceptable (step S1606)), then it is determined whether any system action is required (step S1608). If no system action is required, the return code for "not allowed" is set and control is returned (step S1610), otherwise the system action is performed (step S1612) after which the return code for "not allowed" is set and control is returned (step S1610).

If the operation is permitted (step S1604) and payment is acceptable (step S1606), then the return code for "allowed" is set (step S1616).

The invention can be used to restrict the qualities or quantities of executable software execution in any manner that can be calculated or enumerated. Representative non-exhaustive examples of restrictions are given below. These restrictions may combined in any fashion.

Levels of Capability

Access to Specific Parts of Code or Features

Control of sizes or quantities that can be handled. For example, files may be allowed up to a specific size; complexity or accuracy of a solution may be limited, number of parameters or data points may be restricted, etc.

Quantitative Modifiers of Levels of Capability

US 6,314,409 B2

**31**

Control of expiration dates, time of use, number and frequency of uses and permitted users. For example, rights to use of a file of data (whatever it contains) may expire on a certain date; access to certain data may be limited to certain times of day, days of the week or specific dates; a user may only be allowed to access certain data a specified number of times (or a specified number of times per day); or access to some data may be restricted based on the identity of the user.

Control of Secondary and Derivative Executable Software Distributions

This is handled in the same fashion as are data files, as described above.

Control of Executable Software as a Module of Other Executable Software

When protected executable software is incorporated into or used by other executable software on the system for which it was licensed, any limitations on its execution are maintained in the new context.

Restricting Use to Certified Software

The access mechanism 114 can be factory configured to restrict operation only to such software as is certified (e.g., by using a digital signature to ensure that the software was received unaltered from a certified source). Other contemplated applications include key escrow (also called "data recovery") systems (described below), systems for counting election ballots, systems for exchanging cryptographic data or algorithms, and systems for safeguarding financial, medical, or other personal data. Further, a system employing an access mechanism may be used to ensure that such software is not modified after being received or accessed for execution.

Process Control

Computer control of processes is the basis for automation and quality control in many industries. This technology extends into various specialties such as computer-aided manufacturing, control systems engineering, concurrent engineering, expert systems, intelligent sensors, just-in-time manufacturing, programmable logic controllers, robotics, robotic programming languages, and visualization techniques in engineering.

Formula, processes, procedures, and techniques may convey product differentiation, aesthetic and functional innovation, and increased cost-effectiveness. The computer programs and data involved in process control may constitute valuable intellectual property. The mechanisms of the present invention permit such data to be stored in process-control computers, transmitted to suppliers and subcontractors and otherwise employed without unauthorized disclosure, substitution, or modification.

The permissions associated with process control data may, for example, allow execution only—reading or observing the data would be prohibited. Execution may be restricted to specific equipment and to specific times. In general, the process controller is external to the equipment implementing the process. Hence, communication between the process controller and the process equipment must be cryptographically protected. Like the access mechanism in a controlled computer peripheral discussed herein, the access function in the process equipment need not be a full system whenever the peripheral device is limited and can not output data.

Key Escrow (Data Recovery) Systems

This system allows a provider of key escrow cryptographic executable software to require, by using a rule, certification that a key has been installed and deposited with a specified certification authority in order for the executable

**32**

software to function. The access mechanism ensures the integrity of executable software that uses cryptographic executable software (whether or not key escrow), guarding against change or replacement.

Control of Classified Data

The invention can be used to support limitations on the (primary and secondary) distribution of data, access to data, and distribution of derivative data where the data are classified. Similarly, the execution of classified programs, or programs operating on classified data may be controlled by the system.

Ensured Issuance of Receipts

This system can be used to ensure that a receipt is issued under a number of circumstances, as demonstrated by representative examples given below. A software program (or electronic mail message) may request that a receipt be issued whenever it is loaded or executed (or when a mail message is received); a receipt may be issued when a mail message is read for the first time; or a program will not be loaded or executed (or mail opened for reading) unless the user first agrees to allow a receipt to be issued.

Ensuring Privacy

This system can be used to ensure privacy of sensitive records in a database. Examples include financial, census, medical, and political databases and the like. The system can allow inquiries that provide statistical summaries but do not reveal information about individuals. The rules would be used to limit the queries that might be posed.

Owner Control/Privileges

At the time of purchase the identity of the owner may be stored within the access mechanism. The access mechanism may allow the owner to place a global set of rules (a global permission list) in the mechanism. These global rules could control, for example, hours of access (e.g., when the computer might be operated) based on a clock within the access mechanism or an external time reference with which the access mechanism communicates; acceptable software which can be run using the access mechanism (i.e., a list of those software products that would be allowed to be used, thus enforcing a system administrator's configuration control rules); user and password lists, and the like. A user can thereby customize a particular access mechanism.

The rules may also include or specify certain programs to be run under certain conditions. For example, if the rules specify that all printed output must contain a watermark, the rules might also provide the watermark generating program. In these cases, the programs are either pre-loaded into the access mechanism 114, or are loaded when needed. These programs will then be executed when the corresponding rules or functions are invoked. For example, various types of watermark programs can reside in the access mechanism 114, and, depending on the rules, the appropriate one of these can be selected and executed.

Note that the data structures in FIGS. 2 and 6 depict logical organizations of the data. However, the actual physical format of the data depends on the type of the data as well as on the manner in which the data are to be used. Further, as noted above, the data package may be distributed in many ways, including networks, magnetic media, CD-ROM, semiconductor memory modules, and wireless broadcast and the like. In certain types of data distribution, e.g., continuous cable or wireless broadcast, a user may wish to begin accessing the data at an arbitrary point during its distribution. For example, if the data represent a broadcast movie which begins at 8 p.m., a particular user may only begin viewing at 8:30 p.m. In this case the user will have to initiate reception of the distribution while it is in progress.

US 6,314,409 B2

33    34

Accordingly, as shown in FIG. 17(*a*), in some embodiments, the packaged data are distributed in discrete packets 236 of data. The packets 236 include information 238 which enables a user to synchronize with the data distribution and further enables the user to begin accessing the data according to the rules. An example of such a packetized stream of data is shown in FIG. 17(*b*) wherein the stream 234 consists of discrete packets 236 of data, each packet containing synchronization data 238.

EXAMPLES

The following examples indicate some envisioned data and its packaging and rules. These examples are only intended to show some of the envisioned uses of the present invention, and are in no way intended to limit its uses.

Books

With reference to FIG. 18(*a*), a digital book 191 consists of an abstract 192, an index 194, and various chapters 196. Each chapter 196 comprises sections 198, and each section comprises text 200 and figures 202. The distributor can decide to package the book 191 such that the abstract 192 and the index 194 are available for browsing, but all other data are protected (encrypted). If the rules specify that the text is restricted in certain ways, then the packaged data structure 108 has the form shown in FIG. 18(*b*), wherein encrypted body part 120 includes all chapters 196, unencrypted body part 122 includes the abstract 192 and index 194, and encrypted rules 124 contains the encrypted version of the rules.

Movies

With reference to FIG. 19(*a*), a movie 204 can be made such that different parts of the movie combine to form either a trailer 206, a G-rated version (from G-rated parts 208), an R-rated version (formed from G-rated parts 208 and R-rated parts 210) or an X-rated version (formed from G-rated parts 208, R-rated parts 210 and X-rated parts 212). The packaged data structure 108 for this movie has the form shown in FIG. 19(*b*), wherein encrypted body part 120 includes all the G, R and X-rated parts 208–212, unencrypted body part 122 includes the trailer 206, and encrypted rules 124 contains the encrypted version of the age-based rules which control viewing of the various versions of the movie.

In one embodiment, as shown in FIG. 19(*c*), a movie may be released with a main body 207 (having elements common to all three versions) and sections for each of the G, R and X-rated parts (208, 210, 212, respectively). Sections of the movie are selected from one of the rated parts, depending on the permission level (G, R or X) set. FIG. 19(*d*) shows packaged data structure 108 for such an arrangement.

Software

With reference to FIG. 20(*a*), a software program such as, for example, a word-processor 214 may include a controlled file access part 216, an editor 218, a grammar checker 220, and other features 222. The rules obtained by the user will govern the features of the software that may be used and the quantities of data that may be processed. The rules shown in FIG. 20(*c*) indicate that the user may not employ the grammar checker and may operate on no more than nine files. The packaged data structure for this software (without rules) 150 is shown in FIG. 20(*b*), wherein encrypted body part 120 includes the file access mechanism 216, the grammar checker 220 and various other functions 222, and unencrypted body part 122 includes the editor 218. The encrypted rules 124 are shown separately in FIG. 20(*c*).

Documents

With reference to FIG. 21(*a*), a document such as a legal document 224 comprises paragraphs 226 of words 228. In

order to limit access to non-redacted portions of the document, the rules would require blacking out all redacted words. Accordingly, the corresponding packaged data structure is shown in FIG. 21(*b*), wherein encrypted body part 120 includes the redacted portions of the document and unencrypted body part 122 contains the non-redacted portions of the document.

Map Image Data

With reference to FIG. 22(*a*), map image data 230 may be available at three resolutions (high, medium and low). The rules may specify that people with a security clearance of greater than "top-secret" can view the data at high resolution, and all non-military users can only view the map data at low resolution. The corresponding packaged data structure is shown in FIG. 22(*b*), wherein encrypted body part 120 includes all data beyond low resolution (that is, those data required for medium and high resolution) and unencrypted body part 122 contains the low resolution data.

Global Positioning System (GPS) Software

With reference to FIG. 23(*a*), GPS software includes an output routine 232 which can produce output at various degrees of accuracy. The degree of accuracy depends on the security clearance of the user. A corresponding packaged data structure is shown in FIG. 23(*b*), wherein encrypted body part 120 includes the resolution calculation routine 232 and unencrypted body part 122 contains the other parts of the GPS software 230.

Relationship Among Rule Sets

In some embodiments, the access mechanism may be supplied with a set of rules built-in. In such an access mechanism the built-in rules might include rules that can or cannot be overruled (made less restrictive) by rules provided with packaged data. These initial rules can perform a number of functions and implement a number of policies. As examples, the access mechanisms provided in controlled output devices can include built-in rules (that cannot be overruled), which limit the device only to being an output device; or, the access mechanism provided with a VCR or a videodisc player can include rules (that cannot be overruled) which require the device to enforce the copyright laws of the country in which the device is sold. Whether or not internal built-in rules can be overruled by rules provided externally can be specified in the internal rules themselves.

While the present invention may be used to protect intellectual property by controlling access to that property, the mechanisms discussed herein are technical in nature and are independent of any form of legal protection—a purely technological approach has been presented to controlling access to data. Indeed, the invention offers the intellectual property owner the opportunity to restrict access and use of his or her data beyond the protections that may be available in law. The protection offered by the present invention may be used to enforce rights in intellectual property whether the protection at law is categorized as copyright, trade secret, contract, or something else. The cost-benefit tradeoff of seeking protection at law must be made by those with a vested interest in the intellectual property.

Typical computer systems are implemented at various levels, each level effectively defining a different virtual machine. Generally, each level of implementation can access the levels below it. In many systems it is desirable to have each level only access the level immediately below it. In that way, various policies can be enforced.

Typically the higher level virtual machines are implemented in software and the lower level machines are implemented in hardware. However, there is no precise hardware/software boundary between levels.

US 6,314,409 B2

35

With reference to FIG. 24, for example, a computer system has a high-level application environment (level L4). These applications invoke (call) operating system level (L3) processes to perform various system functions. The OS level (L3) processes in turn invoke lower-level Basic Input/ Output System (BIOS) machine dependent instructions as required (level L2). Note that application level (L4) programs might be permitted to bypass the OS level (L3) and invoke BIOS level (L2) processes directly, thereby avoiding any OS level (L3) policy checking and enforcement.

As an example, an application (executing a level L4) program which wishes to open a particular named file would invoke an operating system "open" procedure for that named file. The OS determines the location of the file (using, for example, an internal map between file names and locations) and then invokes a lower level (L2) BIOS routine to perform the actual seek to the file and the open and read. However, the application program might be permitted to bypass the operating system's "open" process and invoke the BIOS routines directly.

It is desirable to implement the access control mechanisms of the present invention at a low level, preferably at or below the BIOS level (level L1). This prevents users from by-passing the access control mechanisms of the invention and thereby circumventing the rule enforcement.

Thus, a system for controlling access and distribution of digital property is provided. One skilled in the art will appreciate that the present invention can be practiced by other than the described embodiments, which are presented for purposes of illustration and not limitation, and the present invention is limited only by the claims that follow.

What is claimed is:

1. A method of distributing data, the method comprising:

protecting portions of the data; and

openly distributing the protected portions of the data, whereby

each and every access to an unprotected form of the protected portions of the data is limited in accordance with rules defining access rights to the data as enforced by an access mechanism, so that unauthorized access to the protected portions of the data is not to the unprotected form of the protected portions of the data.

2. A method as in claim 1, wherein

the protecting of portions of the data comprises encrypting the portions of the data, whereby unauthorized access to the protected data is not to the un-encrypted form of the protected data.

3. A method as in claim 2, wherein the encrypting of portions of the data encrypts the portions of the data with a data encrypting key, the data encrypting key having a corresponding data decrypting key, the method further comprising:

encrypting the data encrypting key.

4. A method as in claim 3, further comprising:

providing a decrypting key corresponding to the key encrypting key.

5. A method as in claim 1, wherein the data represent at least one of software, text, numbers, graphics, audio, and video.

6. A method as in claim 1, wherein the rules indicate which users are allowed to access the protected portions of the data, the method further comprising

allowing the user access to the unprotected form of a protected portion of the data only if the rules indicate that the user is allowed to access that portion of the data.

36

7. A method as in claim 1 wherein the rules indicate distribution rights of the data, the method further comprising:

allowing distribution of the unprotected form of the protected data portions only in accordance with the distribution rights indicated in the rules.

8. A method as in claim 1, wherein the rules indicate access control rights of the user, the method further comprising:

allowing the user to access the unprotected form of the protected data portions only in accordance with the access control rights indicated in the rules.

9. A method as in claim 8, wherein the access control rights include at least one of:

local display rights,

printing rights,

copying rights,

execution rights,

transmission rights, and

modification rights.

10. A method as in claim 1, wherein the rules indicate access control quantities, the method further comprising:

allowing access to the unprotected form of the protected data portions only in accordance with the access control quantities indicated in the rules.

11. A method as in claim 10, wherein the access control quantities include at least one of:

a number of allowed read-accesses to the data;

an allowable size of a read-access to the data;

an expiration date of the data;

an intensity of accesses to the data;

an allowed level of accuracy and fidelity; and

an allowed resolution of access to the data.

12. A method as in claim 1, wherein the rules indicate payment requirements, the method further comprising:

allowing access to the unprotected form of the protected data portions only if the payment requirements indicated in the rules are satisfied.

13. A method as in claim 1, wherein the rules relate to at least one of:

characteristics of users;

characteristics of protected data; and

environmental characteristics.

14. A method as in claim 1 wherein the rules defining access rights include at least one internal rule built in the access mechanism.

15. A method as in claim 14 wherein the at least one internal rule cannot be made less restrictive by any other rules.

16. A method as in claim 14 wherein the access mechanism is contained in a stand-alone device.

17. A method as in claim 16 wherein the stand-alone device is selected from the group consisting of: a facsimile machine, a television, a VCR, a laser printer, a telephone, a laser disk player, and a computer system.

18. A method as in claim 1,

wherein the access mechanism is contained in a stand-alone device selected from the group comprising: a facsimile machine, a television, a VCR, a laser printer, a telephone, a laser disk player, and a computer system; and

wherein the rules defining access rights include at least one internal rule built-in to the access mechanism; and

US 6,314,409 B2

37

wherein the at least one internal rule comprises access control rights to the data.

**19.** A method as in claim 1, further comprising:

providing a distribution rule,

wherein the rules defining access rights comprise the distribution rule and at least one internal rule built in to the access mechanism.

**20.** A method as in claim 19 wherein the protecting of portions of the data comprises encrypting the portions of the data using a data encrypting key having a corresponding data decrypting key, and wherein the distribution rule comprises a data decrypting key.

**21.** A method of distributing data for subsequent controlled use of the data by a user, the method comprising:

protecting portions of the data;

protecting rules defining access rights to the data; and

openly distributing the protected portions of the data and the protected rules, whereby

controlled access to an unprotected form of the protected portions of the data is provided only in accordance with the rules as enforced by an access mechanism, so that unauthorized access to the protected portions of the data is not to the unprotected form of the protected portions of the data.

**22.** A method of distributing data for subsequent controlled use of the data by a user, some of the data having access rules already associated therewith, the access rules defining access rights to the data, the method comprising:

protecting portions of the data;

providing rules defining access rights to the data;

combining the provided rules with rules previously associated with the data;

protecting the combined rules; and

openly distributing the protected portions of the data and the protected combined rules, whereby

controlled access to the unprotected form of the protected portions of the data is provided only in accordance with the combined rules as enforced by an access mechanism, so that unauthorized access to the protected portions of the data is not to the unprotected form of the protected portions of the data.

**23.** A method of controlling secondary distribution of data, the method comprising:

protecting portions of the data;

protecting rules defining access rights to the data;

openly providing the protected portions of the data and the protected rules to a device having an access mechanism; and

limiting transmission of the protected portions of the data from the device (a) only as protected data or (b) in accordance with the rules as enforced by the access mechanism, so that unauthorized access to the protected portions of the data is not to an unprotected form of the protected portions of the data.

**24.** A method of accessing openly distributed data, the method comprising:

obtaining openly distributed data having protected data portions and rules defining access rights to the protected data portions; and

limiting each and every access to an unprotected form of the protected data portions in accordance with the rules as enforced by an access mechanism, so that unauthorized access to the protected portions of the data is not to the unprotected form of the protected data portions.

38

**25.** A device for displaying images represented by data comprising protected data portions and rules defining access rights to the data, the device comprising:

means for storing the rules;

an access mechanism for accessing the data only in accordance with the rules, whereby user access to an unprotected form of the protected data portions is permitted by the access mechanism only if the rules indicate that the user is allowed to access the protected portions of the data, the access being enforced by the access mechanism; and

means for displaying the images represented by the accessed data.

**26.** A device as in claim 25 wherein the rules defining access rights include at least one internal rule built in the access mechanism.

**27.** A device as in claim 26 wherein the internal rules cannot be made less restrictive by any other rules.

**28.** A device as in claim 26 wherein the internal rules limit the device only to being an output device.

**29.** A device as in claim 26 wherein the device is selected from the group consisting of: a VCR, a laser disk player, and a computer system.

**30.** A device for outputting images represented by data comprising protected data portions and rules defining access rights to the data, the device comprising:

means for storing the rules;

an access mechanism for accessing the data only in accordance with the rules, whereby user access to an unprotected form of the protected data portions is permitted by the access mechanism only if the rules indicate that the user is allowed to access the protected portions of the data, the access being enforced by the access mechanism; and

means for outputting the images represented by the accessed data.

**31.** A device for outputting an audio signal represented by data comprising protected data portions and rules defining access rights to the data, the device comprising:

means for storing the rules;

an access mechanism for accessing the data only in accordance with the rules, whereby user access to an unprotected form of the protected data portions is permitted by the access mechanism only if the rules indicate that the user is allowed to access the protected portions of the data, the access being enforced by the access mechanism; and

means for outputting the audio signal represented by the accessed data.

**32.** A device for outputting an output signal based on data comprising protected data portions and rules defining access rights to the data, the device comprising:

means for storing the rules;

an access mechanism for accessing the data only in accordance with the rules, whereby user access to an unprotected form of the protected data portions is permitted by the access mechanism only if the rules indicate that the user is allowed to access the protected portions of the data, the access being enforced by the access mechanism; and

means for outputting the output signal represented by the accessed data.

**33.** A device for generating an output signal corresponding to data comprising protected data portions and rules defining access rights to the digital data, the device comprising:

US 6,314,409 B2

<div style="display:flex">

**39**

means for storing the rules;

an access mechanism for accessing the digital data only in accordance with the rules, whereby user access to an unprotected form of the protected data portions is permitted by the access mechanism only if the rules indicate that the user is allowed to access the protected portions of the data; and

means for generating the output signal from the accessed data.

**34.** A device for distributing data for subsequent controlled use of the data by a user, the device comprising:

means for protecting portions of the data;

means for protecting rules defining access rights to the data; and

means providing the protected portions of the data and the protected rules;

whereby a user is provided controlled access to the data only in accordance with the rules as enforced by an access mechanism, so that unauthorized access to the protected portions of the data is not to an unprotected form of the protected portions of the data.

**35.** A device for distributing data for subsequent controlled use of the data by a user, some of the data having access rules already associated therewith, the access rules defining access rights to the data, the device comprising:

means for protecting portions of the data;

means for providing rules concerning access rights to the data;

means for combining the provided rules with rules previously associated with the data;

means for protecting the combined rules; and

means for providing the protected portions of the data and the protected combined rules;

whereby the user is provided controlled access to an unprotected form of the protected portions of the data only in accordance with the combined rules as enforced by an access mechanism, so that unauthorized access to the protected portions of the data is not to the unprotected form of the protected portions of the data.

**36.** A process control system comprising a device for controlling access to data, the data comprising protected data portions and rules defining access rights to the data, the device comprising:

means for storing the rules; and

an access mechanism for accessing the unprotected form of the protected data portions only in accordance with

**40**

the rules, whereby output of an unprotected form of the protected data portions is permitted by the access mechanism only in such manner as is permitted by the rules.

**37.** A process control system as in claim **36** wherein the rules defining access rights include at least one internal rule built in the access mechanism.

**38.** A general purpose computer system comprising

a device for controlling access to data, the data comprising protected data portions and rules defining access rights to the data, the device comprising:

storage means for storing the rules; and

an access mechanism for accessing the unprotected form of the protected data portions only in accordance with the rules, whereby user access to an unprotected form of the protected data portions is permitted by the access mechanism only if the rules indicate that the user is allowed to access the protected portions of the data.

**39.** A computer system as in claim **38** wherein the rules defining access rights include at least one internal rule built in the access mechanism.

**40.** A computer system as in claim **40** wherein the system is implemented at various levels, and wherein at least one low level effectively defines a virtual machine in which the access mechanism is implemented, and wherein

mechanisms implemented at each level of system implementation can invoke the levels below their level of implementation.

**41.** A computer system as in claim **40** wherein the various levels of the computer system comprise:

an application environment level;

an operating system (OS) level which is at a lower level than the application environment level; and

a Basic Input/Output System (BIOS) level which is lower than OS level, and wherein the access mechanism is preferably implemented at or below the BIOS level.

**42.** A computer system as in claim **40** wherein the implementation of the access mechanism prevents a user from by-passing the access mechanism and thereby prevents a user circumventing rule enforcement by the access mechanism.

**43.** A computer system as in claim **40** wherein a mechanism implemented at a particular level can invoke only its implementation level and the level immediately below its implementation level.

* * * * *

</div>

US006546002B1

(12) **United States Patent**
Kim

(10) Patent No.: **US 6,546,002 B1**
(45) Date of Patent: **Apr. 8, 2003**

(54) **SYSTEM AND METHOD FOR IMPLEMENTING AN INTELLIGENT AND MOBILE MENU-INTERFACE AGENT**

(76) Inventor: **Joseph J. Kim**, 1375 Montecito Ave.,# 17, Mountain View, CA (US) 94043

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/346,788**

(22) Filed: **Jul. 7, 1999**

(51) Int. Cl.$^7$ ............................................... H04L 12/28
(52) U.S. Cl. .................................................... 370/351
(58) Field of Search ............................... 370/350–354, 370/401, 402, 338; 345/327, 721, 700, 719; 709/232, 207, 315–317; 707/513, 103, 104; 725/110–113; 455/552–556, 426, 445, 414, 423, 401–403

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,093,718 A | 3/1992 | Hoarty et al. | 358/84 |
| 5,155,806 A | 10/1992 | Hoeber et al. | 395/157 |
| 5,181,107 A | 1/1993 | Rhoedes | 358/86 |
| 5,347,632 A | 9/1994 | Filepp et al. | 395/200 |
| 5,433,614 A | 7/1995 | Beye | 434/307 |
| 5,524,195 A | 6/1996 | Clanton, III et al. | 395/155 |
| 5,594,490 A | 1/1997 | Dawson et al. | 348/6 |
| 5,737,560 A | 4/1998 | Yohanan | 395/349 |
| 5,740,549 A | 4/1998 | Reilly et al. | 705/14 |
| 5,774,121 A | 6/1998 | Stiegler | 345/354 |
| 6,047,327 A | * | 4/2000 | Tso et al. | 709/232 |
| 6,101,510 A | * | 8/2000 | Stone et al. | 707/513 |
| 6,141,003 A | * | 10/2000 | Chor et al. | 345/327 |

OTHER PUBLICATIONS

S.S. Chakraborty, Mobile Multimedia: In Context to ATM Transport and GSM/GPRS Mobile Access Networks, May 1995, IEEE Globecom 95, entire document.*

* cited by examiner

*Primary Examiner*—Kwang B. Yao
*Assistant Examiner*—Prenell Jones
(74) *Attorney, Agent, or Firm*—Pillsbury Winthrop LLP

(57) **ABSTRACT**

The present invention provides a system and method for using a mobile interface agent to dynamically access programs, applications, bookmarked URLs, IP addresses, telephone numbers, television channels, radio stations, user profiles, and the like that are specific to a user via any computer type device. The mobile interface agent can be accessible using any computer from any geographical location so long as the computer can be connected to a network. The mobile interface agent is basically an agent that allows the user to access documents, files, programs, applications, URL bookmarks, IP addresses, telephone numbers, television channels, radio stations, and other menu items from any computer. Moreover, the present invention relates to a per user based licensing model that allows the user to remotely access and use computer programs.

**49 Claims, 15 Drawing Sheets**



U.S. Patent        Apr. 8, 2003        Sheet 1 of 15        US 6,546,002 B1

FIG. 1A



FIG. 1B





# FIG. 2

**U.S. Patent**          Apr. 8, 2003          Sheet 3 of 15          US 6,546,002 B1



FIG. 3



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10



# FIG. 11



FIG. 12



FIG. 13



FIG. 14



FIG. 15

US 6,546,002 B1

| 1 | 2 |

## SYSTEM AND METHOD FOR IMPLEMENTING AN INTELLIGENT AND MOBILE MENU-INTERFACE AGENT

### FIELD OF THE INVENTION

The present invention relates generally to the field of computer networks. More particularly, the present invention is directed to an information management and storage system and method. The present invention is further directed to a mobile interface agent that can be used to dynamically access resources stored either locally in the computer device or across a network including programs, applications, bookmarked URLs, user profiles, IP addresses, telephone numbers, television channels, radio stations, and the like that are specific to a user via any computer device. Moreover, the present invention relates to a per user based licensing model that allows the user to locally or remotely access and use computer programs from any computer device.

### BACKGROUND OF THE INVENTION

Most computers and portable digital assistants (PDA) have an operating system (OS) such as MS-DOS, UNIX, Windows 98INT/CE, or Linux loaded thereon for managing basic operations. In general, an OS apportions the computer's main memory, handles requests, receives and transmits instructions to and from the input/output (I/O) devices, manages the flow of information into and out of the main processor and the I/O devices, and performs other tasks that are commonly known.

The OS is also used to organize and manage menu items such as software programs, applications, files, folders, documents, and the like that are stored on the computer or PDA. A user interface in an OS generally includes "pointers" to software programs, applications, files, folders, documents, and other menu items. A pointer in this context is a reference to a type of menu item that can be accessible on the computer, PDA or a server.

In the current versions of the Windows 98/NT (believed to be a registered Trademark of Microsoft Corp.) OS, pointers are commonly used to retrieve/access menu items. Pointers can be found in a "Start" menu bar on the Windows 98/NT user interface and includes a list of pointers to folders, files, and programs (e.g., word processing program, spreadsheet data file, personal software folder, etc.). For example, FIG. 2 illustrates a screen shot of a conventional Windows NT "Start" menu bar.

The "Start" menu bar's main function is to provide easy access to commonly used applications and files. The menu bar also has some basic configuration capability so that a user can personalize the pointer data by adding or removing pointer data found in the menu bar. However, the "Start" menu bar information and configuration for a particular user is limited to the personal computer on which the configuration and pointer information reside. Hence, a user using a different personal computer cannot dynamically recreate the configuration and pointer information stored on another personal computer. Further, the menu bar does not have any intelligence about a network connected to the personal computer so a user may not receive accessibility information about pointer data that may depend on a network connection. Even further, the current Windows "Start" menu bar information cannot be accessed across multiple operating systems or platforms such as on a Macintosh computer running MacOS or within a web browser.

Even further, the "Start" menu bar keeps no user information or profile data associated with the user of the menu bar. A user could save time if the menu bar kept certain user profile data, and applications linked to the menu bar could access this data. Hence, a user who accesses a word processor's Fax template could automatically have the word processor access data kept by the menu bar interface such as his name, address, and telephone number and automatically insert this information into the Fax template. Applications would simply be given some kind of interface such as a software API to query data stored by the menu bar interface, and the stored data could be assumed to be associated with the current user using the menu bar interface.

Computers in many environments are connected to a network such as a local area network (LAN), a metropolitan area network (MAN), or a wide area network (WAN). Computers on the network can conveniently manage and access software programs, applications, files, folders, documents, and the like from another computer or server. For example, most businesses store such menu items at a centralized location, e.g. central server, so that multiple users connected to the network can gain access to them.

Another popular and common use of a computer or PDA is to access information on the Internet. A web browser such as the Internet Explorer 4.0/5.0 (believed to be a registered Trademark of Microsoft Corp.) or Navigator (believed to be a registered Trademark of Netscape, Inc.) is loaded onto the computer or PDA so that the user can access web sites. The web browser is also used so that the user can receive and transmit data. Because the user may visit many web sites during a given session, each web browser allows the users to store and save the addresses (URLs) of commonly visited web sites. This is done by bookmarking them. The user bookmarks commonly visited web sites so that the user can create shortcuts for future use. As a result, the user does not have to type the complete URLs to access these sites.

It is not uncommon for many users to have multiple computers, PDAs, and other computer-related devices. Each individual computer or PDA may include specific menu items and bookmarks that do not exist in another computer or PDA. For example, a computer used at work may be the only device that includes a spreadsheet program while a computer used at home may be the only device that includes bookmarked URLs. Thus, the user will not have access to the bookmarks from the user's work computer and likewise, will not have access to the spreadsheet program from the user's home computer. As a result, this causes much inconvenience and inefficiency for the computer user.

Further, the bookmarks pointer data is specific to a particular output interface; specifically, the web browser. It would be desirable to have bookmarks that can attach various types of output applications for the pointer data contained in the bookmarks. It would also be desirable to be able to attach various types of interfaces to the bookmarks themselves instead of being tied as a feature of a web browser: an independent entity that can optionally attach various kinds of user interfaces such as some kind of intelligent agent using a graphical icon of a human-like figure (for children to interact with on a Windows 95/98 PC) or a voice activated and controlled menu system (for cellular telephones).

It is common for users to have two computers of two different OS's running an application such as Microsoft Word. In order to share a particular Microsoft Word data file, it is currently necessary in the prior art to manually export the file in the required format so that a computer using one OS can read the file of the computer using the other OS. Time would be saved if there existed a mechanism allowing

A0248

US 6,546,002 B1

3

files to be exported to the network in a format specified using mobile interface agent application data. When the mobile interface agent running on one OS changes to a computer running a different OS, the mobile interface agent can signal a server daemon to perform an OS conversion of the data and get the data file in the proper format. To the user, this process would be automatic and transparent since the user can simply click a data file, which is a pointer data in his/her mobile interface agent.

Currently, users may save a list of phone numbers on her personal computer's telephone directory software. Similarly, a user may go to a television guide web site and save a list of favorite television shows and times. Time and effort could be saved if the list of phone numbers were transparent to the user's telephone and the list of favorite television shows transparent and accessible to the user's television. In other words, besides the advantage of being cross platform, using the mobile interface agent system allows user profile, configuration and settings information to be handled intelligently by network services to export information between networks such as the Internet, cable television network, or telephone network. This allows not only cross platform advantages, but cross network advantages as well.

Most software programs and applications are currently licensed on either a node locked paradigm in which the software is usable on a per device basis or as a floating license in which a fixed number of licenses are available to a certain group of users limited by the number of concurrent users. In the case of node locked licensing, a user is generally not allowed to install a software program in multiple computers unless a software developer grants a license to the user for such use. Thus, most users cannot install the same software program on both their home and work computers unless the user purchases two identical programs (one for home and one for work). For floating licenses, the number of instances of program execution is tracked and any additional attempt to execute a program above the licensed limit is blocked by some kind of license manager. However, this method does not allow the tracking of the usage of specific users and involves guessing an optimal number of concurrent licenses to purchase so that users are not blocked from using the program while minimizing the cost of the licenses. Also, current licensing models are generally restricted by platform so that a user with a license for a software program is allowed to re-install the program when the user is changing/upgrading computers of the same platform. However, when the user is changing to a different platform such as from a Windows 98 device to an Apple MacOS device, the re-installation is not possible.

The trend in the future is that many software programs and the like may be licensed per user rather than per device/platform or number of concurrent users in a network. In this case, the user has a license to use such programs from any computer that is capable of running such programs. The present invention provides a system and method for implementing such a licensing model so that the user can access and run programs from any computer and from any geographical location.

Accordingly, the ability to dynamically access any software programs, files, documents, URL bookmarks, IP addresses, telephone numbers, television channels, radio stations, and the like from any computer is highly desirable. There is a need for a system and method that can provide access to such menu items and bookmarks using any computer.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide a system and method that allows a user to access specific documents,

4

files, programs, applications, URL bookmarks, IP addresses, telephone numbers, television channels, radio stations, and other menu items from any computer device located in any geographic location.

It is another object of the present invention to provide a system and method that allows a user to access specific documents, files, programs, applications, URL bookmarks, IP addresses, telephone numbers, television channels, radio stations, and other menu items using a mobile interface agent.

It is yet another object of the present invention to provide a system and method that allows different applications or services to share information between them.

It is another object of the present invention to provide a system and method that allows applications and services to access user profile information.

It is another object of the present invention to provide a system and method that allows applications and services to access user configuration and settings information.

It is another object of the present invention to provide a system and method that allows a mobile interface agent to be accessible by a user using any computer type device connected to the network.

It is another object of the present invention to provide a system and method that allows an intelligent platform or OS conversion of documents, files, or other data that are listed in mobile interface agent pointer data.

It is another object of the present invention to provide a system and method that allows a mobile interface agent to be accessible by a user using any digital communication device such as a cellular phone or a cable set top box that is connected to the network.

It is another object of the present invention to provide a system and method that allows a profile manager to export a user's profile, configuration, or settings data from one communications network such as the Internet to another network (such as the cellular phone network or the cable television network) to be accessible by mobile interface agents or other software or devices on the other network.

These and other objects of the present invention are obtained by providing a network based mobile interface agent. The mobile interface agent can be accessible using a computer, cable set top box, cellular phone, or other device from any geographical location. Once the mobile interface agent has been accessed, the user can gain access to any documents, files, programs, applications, URL bookmarks, and other pointer data that are available to the user. The mobile interface agent is basically an agent that allows the user to access documents, files, programs, applications, URL bookmarks, IP addresses, telephone numbers, television channels, radio stations, and other menu items from any computer that is connected to a network. The present invention also provides a method for remotely accessing and using computer programs from any computer device based upon a per user licensing model.

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other objects and advantages of the present invention will become apparent and more readily appreciated from the following detailed description of the presently preferred exemplary embodiment of the invention taken in conjunction with the accompanying drawings, of which:

FIG. 1a illustrates a user login screen associated with a mobile interface agent in accordance with the present invention;

US 6,546,002 B1

**5**

FIG. 1b illustrates a graphic interface used by a mobile interface agent once a user has logged on in accordance with the present invention;

FIG. 2 illustrates a screen shot of a conventional Windows NT "Start" menu bar;

FIG. 3 illustrates a block diagram of an information and storage system implementing a mobile interface agent in accordance with the present invention;

FIG. 4 illustrates a detailed block diagram of a mobile interface agent in accordance with the present invention;

FIG. 5 illustrates a detailed diagram of a profile manager interacting with a mobile interface agent in accordance with the present invention;

FIG. 6 illustrates the relationships between the mobile interface agent, the profile manager, and the application/services server in accordance with the present invention;

FIG. 7 illustrates a state diagram for the mobile interface agent in accordance with the present invention;

FIG. 8 illustrates an implementation of the present invention using multiple platforms;

FIG. 9 illustrates an implementation of the present invention using multiple application/service servers;

FIG. 10 illustrates a flow chart for initializing and creating a mobile interface agent in accordance with the present invention;

FIG. 11 illustrates a flow chart for synchronizing and updating a user profile in accordance with the present invention;

FIG. 12 illustrates a graphical mobile interface agent and a visiting graphical mobile interface agent used for educational purposes on a user interface screen in accordance with the present invention;

FIG. 13 illustrates an implementation of the present invention having an information distribution with client side filtering;

FIG. 14 illustrates an implementation of the present invention having a third party server communicating with the profile manager; and

FIG. 15 illustrates an implementation of the present invention having profile managers of multiple communication networks connected by a gateway.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The preferred embodiments of the present invention will now be described with reference to FIGS. 1–15, wherein like components/steps are designated by like reference numerals throughout the various figures. As noted above, conventional systems and methods for information management, retrieval, and storage can be inefficient and burdensome. The present invention overcomes the disadvantages of prior art systems and methods.

The present invention is directed to a mobile interface agent (MIA) that is used to store, distribute, and access information. The MIA is specifically used to access menu items (e.g., software programs, applications, files, folders, documents, telephone numbers, radio stations, television channels, URL bookmarks, and user profile data. The MIA is also used to periodically update or query user profile data, facilitate the sharing of memory and data structures between applications/services both local and remote, allow various types of user interfaces to be attached (voice menu system, human-like graphical icon, etc.) and perform intelligent multi-platform conversion of application data.

**6**

FIG. 1a illustrates an example of a user login screen associated with the MIA that is running as software on a computer or PDA device. FIG. 1a illustrates a conventional log in window showing a userid dialog box for inputting the userid code and a password dialog box for inputting the user's pre-selected password code. Once the correct userid and password codes are inputted into the two boxes, the user can now access and use the MIA. Once the user has successfully logged in, a graphical interface such as that illustrated in FIG. 1b is displayed to the user. Although FIG. 1b illustrates one such user interface that may be used in the present invention, other interfaces having different menu items than those illustrated herein may be included. As described in more detail later herein, the menu items/pointers shown in the user interface can be used to access and retrieve user specific resources and information.

FIG. 3 illustrates a block diagram of an information and storage system implementing an MIA in accordance with the present invention. The diagram illustrates three sections of the overall system. Section 104 represents user input/output (I/O) components of a user interface that can be used with the present invention. Section 106 represents a local memory that is used to store profile data for a particular user. Section 108 represents a network that is accessible by a computer (standalone, LAN, MAN, WAN), a PDA, a television (cable network), or a cellular phone (cellular network). Other networks that are accessible using different electronic devices that are now specifically mentioned herein can also be used with the present invention.

The MIA 102 interfaces the three sections (user I/O section 104, local memory section 106, network section 108) of the system. The MIA 102 is used to manage, access, retrieve, etc. information from the network and local memory. The MIA 102 is also used to initiate programs, applications, URL bookmarks, and other menu items, and can be implemented by way of software, firmware, or hardware.

The MIA 102 receives input commands through an input interface 110 and transmits output information through an output interface 112. Several methods of inputting commands via the MIA 102 can be used with the present invention. For example, the user can input commands via an action command 114. The action command 114 can be an action such as dragging and dropping a document, folder, etc., or selecting and clicking a specific menu item. The action command 114 is generally performed using a conventional keyboard, mouse, or pad. The user may also input commands to the MIA 102 via a voice command 116. A voice recognition program is commonly used to provide the capability to input the voice command 116. Examples of voice commands are the following: "MIA, what time is it?" or "MIA, find a Korean restaurant within 5 miles from my home." As another example for cellular phones, the MIA 102 could accept voice commands such as "Call Mom" or "Send phone conversation to my E-mail". Another type of input command that can be used is a scheduled event command 118. An example of the scheduled event command 118 includes launching certain applications at a specified time. Also, scheduled event command 118 can launch applications with a scheduled activity such as when a system backup program is initiated. Lastly, other event command 120 includes other types of commands that are commonly associated with external agents or modules that are unrelated to the user. Examples of such other event command 120 is when one MIA attempts to contact another MIA or when a request is received from another input source other than the user (e.g., profile manager 134).

US 6,546,002 B1

7

The MIA 102 will also output information in different forms. The most notable output information is when MIA 102 launches an external application 130 such as Microsoft Word or Excel. The MIA 102 can also launch an application 128 via the output interface 112. Alternatively, the MIA 102 can itself drive output to the user that includes graphics 122, animation 124, and sound/music/voice 126. In certain embodiments, the MIA 102 will use appropriate types of output for the particular device that it is running on. For example, an audio message output for a cellular telephone, text output for a television screen, etc.

The MIA 102 is also coupled to a network 132 so that a user can access software programs, applications, files, folders, documents, services, URLs, , IP addresses, telephone numbers, television channels, radio stations, multimedia data, user profile data, other MIAs, and other items located remotely on the network. The MIA 102 can connect to the network 132 via the Internet, LAN, MAN, WAN, cable TV network, cellular phone network, etc. These items are stored either in an Application/Services (AppServ) server 150 or a master database 136. The AppServ server 150 is generally used by third parties to store applications that can be retrieved by the MIA 102 for the user or that execute other services on the network. When a computer device having the MIA 102 is connected to the network 132, the user can access applications/services from the AppServ 150 and profile data 138a from the master database 136. The user can access such information using any computer device from any geographic location so long as the user is able to connect to the network 132.

A profile manager 134 is connected to the network 132 and manages the contents of the master database 136, which includes profile data 138a. The profile manager 134 is responsible for managing and updating a user's profile data 138a that is stored in the master database 136. The master database 136 may be a part of the AppServ server 150 or can be a database in another server.

The local memory 106 includes a local database 160, which further includes a profile data 138b. Profile data 138a, 138b are stored in two locations; in the database master 136 and also in the local database 160 in a form of a "cached" copy. The profile data 138a, 138b must be synchronized for each MIA user.

When a particular user accesses the MIA 102 with a computer device for the first time on that device, a copy of the profile data 138a needs to be cached to the local memory 106. The MIA 102 will send a request to the profile manager 134 to send a cached copy of the profile data 138a to the local database 160 in order to create the profile data 138b. Information specific to a particular user is stored in the form of the profile data 138a, 138b.

When the MIA 102 is first used, it will contact the profile manager 134 to initialize itself. From then on, the MIA 102 will periodically update and synchronize itself with the profile data 138a. The profile manager 134 will track changes to the MIA 102 for a particular user.

As discussed earlier, the profile data 138a, 138b needs to be synchronized whenever possible. In certain instances when a network connection between the MIA 102 and the network 132 is not established, modifications and changes are stored in the local database 160 in the form of profile data 138b. Thereafter, when the network connection is reestablished, these modifications and changes in the local database 160 will be synchronized with the profile data 138a in the master database 136.

There may also be multiple MIAs 140 connected to the network 132. MIAs 140 may be on other computer devices

8

or may be the same device. Each MIA is specific to a particular user or users. Network 132 can also be used to transfer information, files, data, applications, etc. between the MIA 102 and other remote MIAs 140. For example, the MIA 102 that is specific to user X could be used to transmit information to another user Y through MIA 140.

There are countless uses of the present invention. For example, the present invention can be used to conduct online financial transactions more efficiently. The MIA 102 can be used to allow multiple financial transactions using billing or bank information specific to the user. Another implementation would be to use the user profile on the network for online advertising or promotional services. Yet another implementation would be for an application to check whether any or certain other applications are running concurrently. For instance, a chat/messaging program can check to see if a user is running any educational or instructional applications before sending a message or chat request to the user. A word processing program could be used to automatically look into the user profile database and pull out the user's address and name and automatically insert this information into document templates for a letter, resume, etc.

The profile data 138a, 138b includes information relating to different fields of a particular user. These fields include a user identification 170, pointer data 172, user information 174, attributes/behavior 176, statistics 178, and applications/services 180. First, the profile data 138a, 138b includes a user identification field 170 for identifying a particular user. For example, identification codes such as "jokim123" or "11234678" can be used so that the MIA 102 can identify the code with a particular user.

Pointer data 172 can be used to quickly access an application, service, or other menu item. The pointer data 172 is similar to bookmarks used in web browsers, but can include more than URLs. For example, pointer data 172 can be used to retrieve and access documents in multiple formats, applications, application data, images in various formats, etc. The pointer data 172 can also be used to properly display pointers. For example, a URL pointer will include data of the browser location such that the browser is launched when a particular URL is requested. Pointer data 172 may exist either locally in the computer device or may exist as a resource accessible across a network.

User information 174 includes user information such as name, age, sex, address, occupation, salary, etc. This information is updated continuously as the data changes with the particular user.

Attributes/behavior information 176 includes information and data relating to the user interface. This information includes graphics and animation data specific to a particular user interface. For example, attributes and behavior data are used to create a user interface that is more personal to the user. Attributes include specific characteristics such as strength, charm, etc. that can be used to represent the user through the user interface. For example, an attribute could be a type of character such as a teddy bear that the user interface will use to graphically representation himself/herself. User behaviors such as playful, cute, or sarcastic can also be used to create an interface that interacts with other users in a particular manner. Inputting a particular attribute/behavior into the user interface allows the user to interject artificial intelligence to the user interface.

Statistics information 178 includes data such as how many times a particular menu item has been accessed or the number of times a particular advertisement has been accessed. Examples could include the number of cyber

US 6,546,002 B1

9

dollars used in e-commerce transactions or the amount of time the user was connected to the Internet.

Applications/services data 180 includes the MIA specific data required by the applications/services. This includes application and services data using the user interface, licensing information for applications, user and password information to access network services, and any data related to the MIA that an application or service would like stored.

Applications/services data 180 include any data required by a particular application or service associated with the menu user interface. For example, a service that provides children's stories in audio form through an animated character can be stored in the story data in a data structure of the MIA 102. Another example would be for an application such as Microsoft Word (believed to be a registered trademark of Microsoft, Inc.) to be able to store the number of times that the program was accessed and for how long. The previous example would be beneficial where the copy of Microsoft Word was stored across a network and the client using an MIA was paying to use the Microsoft Word application on a per usage basis.

Next, applications or services (such as external application 130)can have the ability to query or modify data relating to profile data fields. For example, when a user is running educational software via the MIA 102, the user can set a variable in the attribute data field 176 in the form of DO_NOT_DISTURB. This will prevent other MIAs 140 from interrupting the user until the user has completed the session. For example, when another MIA 140 user requests a chat session with the MIA 102 user during the educational session, the DO_NOT_DISTURB variable is presented to a chat application. The chat application can then disable notifications for incoming chat requests or queue the request until the MIA 102 user has completed the educational session. Other types of locks and semaphore data could similarly be established within the attribute or other fields.

Profile data 138a and 138b can also be shared among other applications or services. Using the example described above, a child's story service can store which stories were accessed by a particular user through the MIA 192. This type of information can be provided to, for example, a toy manufacturer, which can then use the information to send promotional materials relating to the story to the user. The promotional materials can be sent via the Internet or traditional mail.

Applications/services data 180 can be either external to MIA 102 or internal to the MIA 102. For example, a menu item can be built into the MIA 102 called "recommend," which can include options such as "Chinese restaurant." The MIA 102 can also check for other information regarding the user's preference from the profile data 138a, 138b. For example, the user may include in the profile data 138a, 138b that he/she enjoys spicy food. In this case, the name and location of a Chinese restaurant located near the user that serves spicy food will be displayed to the user. In another example, a menu item such as "Sing" can be used to animate the graphical user interface agent to play music or sing while the character is shown on the screen. As can be appreciated, there are countless applications and uses associated with the profile data 138a, 138b.

FIG. 4 illustrates a detailed block diagram of an MIA in accordance with the present invention. In one embodiment of the present invention, the MIA 102 includes a controller 200, a pointer resolver 206, a scheduler 208, an output filter 210, a connection detector 212, a network interface 214, an application server interface (AppServ interface) 216, and a

10

profile filter 218. The controller 200 is coupled to the input interface 110 and the output interface 112 via the output filter 210. The controller 200 receives input commands via the input interface 110 and decodes them into a more compact or standardized code. The controller 200 then processes the input commands in order to determine how to respond to them.

As discussed earlier, a pointer is a link/shortcut to an item such as a file, URL, IP address, telephone number, television channel, radio station, application, or service. When a user activates a pointer using one of the input commands, this command signal will be transmitted to the pointer resolver 206 via the input interface 110 and the controller 200. The pointer resolver 206 then receives the decoded input commands and accesses the corresponding item. For example, a URL access may launch a web browser or a word processing document will launch the word processing software/application.

The MIA 102 can also have menu functions or applications to schedule certain actions to be performed at specified periods. The scheduler 208 is used to queue requests for certain actions to be executed at specified periods. For example, the MIA 102 can have a backup application that backs up certain files weekly at a specified time, or an application that connects to the Internet and loads certain URL pages for later viewing, or a video cassette recorder that records a user's favorite television shows.

The output filter 210 is used to enable/disable functionality accessible by the user depending on various state information. For example, access to a particular service initiated via a menu item may be disabled using the filter 210 if a user has not paid for the particular service. As another example, when the connection detector 212 detects that there is no network connection, URL data present to the user as menu items may be made inaccessible or invisible to the user. As yet another example, a multicast video stream including various news segments could be sent to the user. The video stream would be tagged with special codes indicating what kind of news it represents. The output filter 210 would disable video news segments from being displayed on the user's output screen that did not match the user's indicated preferences stored in the profile data 138b. The network interface 214 is used to connect the controller 200 to the network 132.

Also depicted in FIG. 4 as part of the MIA 102 is the AppServ interface 216. Applications/services may share data or access a user's MIA profile data 138b via the profile data filter 218. The AppServ interface 216 is used to access profile data 138b by applications or services. AppServ interface 216 is preferably a software API with library functions used to write and read appropriate information. Security levels could also be implemented to allow the user to select the level and kind of information accessible to a particular application. Further, applications and services will have an interface to change, write and read data into a user's profile data 138b. In a similar way, an interface may also be provided to directly access profile data 138a stored on the network.

The controller 200 will write and read data to the profile data 138b for a particular user and also control access to this data by applications and services through the AppServ interface 216. The profile data filter 218 is used by the controller 200 to restrict various data from being written to the profile data 138b. The profile data filter 218 could also be used for non-security reasons. For example, if a multicast data stream were sending news information, then the profile

US 6,546,002 B1

11

data filter 218 could be programmed by the controller 200 based on rules supplied by the user's profile data 138b to only write certain news items to be read by the user at a later time.

FIG. 5 illustrates a detailed diagram of a profile manager interacting with a mobile interface agent in accordance with the present invention. The embodiment depicted herein is based on the UNIX BSD Sockets interface. One skilled in the art can easily implement other socket interfaces in accordance with the present invention.

When the MIA 102 and the profile manager 134 are interacting, the MIA 102 can obtain profile data from the profile manager 134 that is stored in the database 136. Also, profile data 138a can be updated and synchronized during such interaction. Finally, the MIA 102 can request information from the profile manager 134 such as the IP address of a server for a particular service, information about another user, online connection status for a list of contacts, etc.

During operation, a user 300 first inputs a command to the MIA 102. If such command requires the MIA 102 to interact with the profile manager 134, then an initial request is sent to the profile manager 134 from the MIA 102. This request is received by a profile manager server daemon 310 that is listening on a specific port. The parent daemon 310 then forks a new child process 312 to handle further interactions with the MIA 102. The child process 312 then handles subsequent requests from the MIA 102. The embodiment depicted herein uses a UNIX sockets system. In a similar fashion as the MIA 102 and profile manager server daemon 310 relationship, the profile manager child process 312 sends a request to a SQL database engine daemon 314 through another specific port. The database engine daemon 314 then forks a SQL database child process 316 to handle any queries from the profile manager child process 312. The SQL database child process 316 then interacts with the profile data database 136 and handles queries, directives, or modifications to the profile data 138a.

In some embodiments, the profile manager 134 uses a referral system such that a single server does not maintain all of the user profile data, but is rather distributed throughout multiple and redundant servers. The referrals will be passed back to the MIA 102 that will then query the next profile manager servers 320.

FIG. 6 illustrates the relationships between the MIA, the profile manager, and the application/services server in accordance with the present invention. The MIA 102, the profile manager 134, and the AppServ server 150 can interact directly/indirectly with each other.

The following examples describe a sample of the commands/responses between the MIA 102, profile manager 134, and the AppServ server 150. The MIA 102 will interact with the profile manager 134 when a user is connected to the network. The MIA 102 will transmit a request 400 to the profile manager 134 when a network connection is present and MIA needs to access the profile manager 134. The profile manager 134 will then respond to the MIA 102 in step 402 by authenticating the user code so that the MIA can have access to the profile manager 134. The MIA 102 can also transmit a request 420 to the profile manager 134 to update/synchronize the profile data.

When calling up applications/services, if the MIA 102 cannot locate the application/service requested on the local device, the MIA 102 will interact with the profile manager 134 before requesting the actual application/services from the AppServ server 150. For example, the MIA 102 will send a request 430 to the profile manager 134 to determine the

12

location of the desired application/service on the network. The profile manager 134 will then respond in step 432 with the location of the application/service. The MIA 102 uses this information to send a request 434 to the AppServ server 150 to initiate the application/service. The AppServ server 150 will then initiate the application/service in the response 436.

One of the advantages of the present invention is that it allows a licensed program/service to be accessible for a particular user on a per user basis, without regard to platform, and anywhere in the world rather than on a particular machine. The licensing aspect of the present invention can be implemented in different ways. The preferred embodiment depicted herein shows the AppServ server 150 interacting with the profile manager 134 for a particular user's licensing information. Once the MIA 102 requests an application/service in request 434, the AppServ server 150 communicates with the profile manager 134 to check the licensing information in step 440. After the profile manager verifies that the user is licensed to use the requested application/service in step 442, this verification is sent to the AppServ server 150 and/or MIA 102. The AppServ server 150 then returns the application/service to the MIA 102. Alternatively, the MIA 102 could directly send the licensing information to the AppServ server 150. The AppServ 150 can also access and/or modify the profile data managed by the profile manager 134 in step 450.

FIG. 7 illustrates a state diagram for the MIA in accordance with the present invention. After the start state 500, the MIA 102 enters the initialization state 510 where routine initialization is performed. In addition, MIA 102 will check to see whether it is connected to the network. If it is not connected to the network, then the MIA 102 may disable network dependent menu items such as URLs or applications that are on the network. Similarly, MIA 102 will check to determine what computer device it is on and based on the device's profile and list of registered applications, it will enable local applications and services that are available.

After the initialization state 510, the MIA 102 will then enter "event handler" state 520. In this state 520, the MIA 102 waits for an input such as an action command 114, voice command 116, scheduled event command 118, or other event command 120. When an input command is received by the MIA 102, the command is decoded. Then, based on the kind of input command received, an appropriate handler will be activated. For example, if a menu item is selected to be modified, added, or deleted, the MIA 102 will enter state 530, which will handle the modification of the menu item. Another example is when an update to the profile manager 134 is requested, then the MIA 102 will check for a network connection in state 540 and if the connection exists, it will check for the new profile data on the profile manager 134 in state 542. The MIA 102 will then update the profile manager 134 in state 544, and clear the request to update/synch profile information in state 546.

If the user selects a menu item, then the MIA 102 will enter state 550. In state 550, the MIA 102 will check the menu item and dereference a particular pointer. For example, if it is a URL, then the MIA 102 may launch a web browser with the requested URL. If, on the other hand, a local application is selected, then the MIA 102 will launch that particular application. For an application residing on the network, the MIA 102 will locate the application and send the appropriate request for the application to the AppServ server 150.

For some other kind of input command that does not utilize the menu item interface, an appropriate event handler

US 6,546,002 B1

13

will be called. This could take the form of, for example, the menu interface having a different graphical look, or it could be dragging the menu interface onto a trash can icon to log the user out of the MIA 102.

FIG. 8 illustrates an implementation of the present invention using multiple platforms. A first platform 600 represents a computer device using a Windows based OS and the second platform 610 represents a computer using a Mac based OS. This figure illustrates how MIA 102 can be used both on a PC system 600 at a first location and also on an Apple Macintosh system 610 at a second location. Stated broadly, the user can connect to the network 132 and profile manager 134 using the MIA 102 from any computer and location.

When a user implementing the MIA 102 transfers from one computer device to another, then a pointer data that is accessible via network 132 may be valid and kept intact. However, pointer data to local applications may no longer be valid and will be filtered. Also, local applications may require their pointers readjusted if those local applications were resident on the local machine. For example, MIA 102 could have a pointer to Microsoft Word program in location 1 on the Windows 95 machine but can not resolve that pointer now that the user has moved to location 2 on the Apple Macintosh machine. Thus, the MIA 102 may search for Word locally on the Macintosh and adjust the pointer to point to the copy of Microsoft Word on the Macintosh. Further, this allows licensing to be carried with a particular user rather than the software. Hence, the MIA 102 can carry the licensing information for the user and may thus access Microsoft Word on any machine so long as his/her MIA has the proper license. Further, the application could alternatively be accessed via network.

In the case of a network-connected application or some kind of services, AppServ server 150 is connected to network 132, and the MIA 102 may access applications or services remotely. There may exist a plurality of AppServ server 150 on the network 132. Hence the MIA client 102 could request applications directly from some third party applications server 150. An example would be if MIA 102 was running on a Sony Playstation-like device and the user had purchased a license for a particular game. The third party application server (e.g., Sony server) can include a collection of Sony Playstation games 630, and the user can access a copy of the licensed game. Further, the application server could carry all types of applications or services including PC applications 632 or Apple MacOS applications 634. So the user in the second location could request Microsoft Word from the application server 150 and either download the application and run it locally or the application could be run remotely and the display interface returned to the user.

When a user saves a MS Word document from the Windows 95 PC 600 in the profile manager 134 and then later attempts to access the MS Word document from the Apple MacOS machine 610, another feature of MIA is that since it is able to detect/know the platform it is running on and has information about the format of documents that reside on the profile manager, MIA can request a document from the Apple MacOS machine 610 that is converted by the profile manager 134 to the proper format.

FIG. 9 illustrates an implementation of the present invention using multiple application/service servers. The MIA 102, network 132, profile manager 134, profile database 136, and the profile data 138a are similar to those described with reference to FIG. 3. In FIG. 9, however, there is shown

14

multiple AppServ servers 150a, 150b. This allows the MIA 102 user to access applications/services via any AppServ server that are connected to the network 132. Each AppServ server 150a, 150b can gain access to the profile data 138a for user information.

Further, applications or services can use MIA's user profile information to add value and functionality. Application 1 900a and application 2 900b can both access a user's profile data as well as shared locks, variables, memory segments, or other data stored in the profile data 138a. For example, a user could use an application 1 900a called global status that sets the user's status information such as "working" or "away" or "do not disturb". Other applications that describe a user's state information such as Mirabilis ICQ (e.g. application 2 900b), which tells other online user's a particular user's status could map a user's state information set by global status to ICQ status and automatically set ICQ status to match global status information.

FIG. 10 illustrates a flow chart for initializing and creating a mobile interface agent in accordance with the present invention. In step 800, a user will input a user id number and a user password to begin accessing the MIA. The user can connect to the logon screen via the Internet or any other network connection. An example of a sample logon screen was illustrated in FIG. 1a. A user enters his ID and password on any machine of any platform that can implement the MIA 102. The option bar may be used to spawn another MIA client or to implement other features accessible outside of user login. Alternatively, the user may have a pre-configured ID associated with a device such as in the case of a cellular phone and thus may not require keyed input of a user ID.

Once the user has logged on, FIG. 1b again illustrates a graphic interface used by a MIA 102 once a user has logged on. In this example, a set of menu's associated with a user's specific configuration and profile is shown. MIA options are accessed through the menu system. In addition to a simple menu interface, a user can elect to associate a graphical icon such as a teddy bear graphical icon or other figure to the menu system.

Next, the system implementing the MIA 102 will determine whether a profile exists on the local computer for the user in step 810. If a user profile does not exist for the user, then a profile is created locally for the user in step 820. After creating the initial user profile, the next step is to determine whether the network connection is established in step 830. In step 850, if a network connection has been established, the MIA 102 contacts the profile manager 134 and determines whether the user id and password entered in step 800 is registered, unless the user has selected an option to not authenticate on each use. If the user is authenticated, then the MIA 102 downloads the appropriate information such as user profile, URL links, applications registered, etc. Some of the information downloaded may depend on the platform, geographical location, etc. that corresponds to the user's connection location. For example, if a user has purchased a Windows 98 only license for MS Word and moved to an Apple MacOS device, then the MS Word menu item may be disabled or not downloaded. As another example, if a user using a cellular phone has not purchased the *69 callback feature then the voice command "Callback" may be disabled. As yet another example, if the user is shown to be connecting from an IP address known to be in a certain geographical region, or if the user has entered geographical information of a certain country, then advertising information specific to that country or region can be downloaded. The subset of information downloaded can depend on quite a number of variables and downloaded information may be filtered even further by filter 210.

US 6,546,002 B1

15

If, on the other hand, the network connection in step 830 is not established, then the MIA 102 sets some status to indicate that there is a need to synchronize and update the operating parameters in step 840.

If the system determines that a profile exists in step 810, the system checks to determine whether the operating parameters need to be synchronized and/or updated in step 870. If no synchronizing or updating is required, then the appropriate output based on state variables such as network connection, platform, or geographic region of MIA is transmitted to the user based on the user profile data in step 950. If, on the other hand, the system determines that operating parameters need to be synchronized and updated, the system determines whether a network connection is established in step 880. If no network connection is detected, then the MIA 102, in step 890, will set state information requiring the MIA 102 to synchronize/update it's profile information with the profile manager 134 once a network connection is detected. If the network connection has been detected, then the MIA 102 will, in step 900, contact the profile manager 134 and download all of the required user profile, application, etc. data. In step 910, the profile manager 134 may update it's own information such as last log in time, last connected IP address, last synchronization time, etc. Thereafter, an appropriate output is displayed to the user in step 950.

FIG. 11 illustrates a flow chart for synchronizing and updating a user profile in accordance with the present invention. This flow chart illustrates the process for synchronizing and updating a user profile data that is stored in the profile manager database and in the local memory database using the MIA.

In step 1000, the MIA will contact the profile manager and check the serial number and/or date of the last modification listed in the profile manager database. If the MIA serial number or date is older than the most recently updated serial number or date in step 1010, the MIA may be configured to not update or synchronize it's information in step 1020. If, on the other hand, the MIA serial number or date is not older, then the MIA profile data is updated with the profile manager profile data in step 1030. After such updating, setting the MIA's update/synchronize status is not necessary as indicated in step 1020.

FIG. 12 illustrates a graphical mobile interface agent on a user interface screen in accordance with the present invention. A graphical figure representing a MIA 1220 and a home 1210 is displayed in the screen 1200. Left clicking on the MIA 1220 will display the list of MIA menu options shown in FIG. 1b.

Also illustrated is a visiting MIA 1230 named Professor Math. This MIA has a subset of MIA functionality and can be used to access specific options such as executing a link to a lesson such as an Algebra Tutor application 1250. The visiting MIA 1230 could first appear and "knock" on the MIA home 1210 to gain access. to a user's desktop 1200. The user may then have a list of available responses such as: (1) allow Professor Math 1230 to enter; (2) ask Professor Math 1230 to go away; or, (3) send a message to Professor Math 1230 to come back later. Educational lessons can be downloaded to a MIA's 1220 local site or can be remotely accessed via the visiting MIA 1230.

By associating a lifelike graphical icon such as the MIA 1220 character attributes can be associated with the MIA such as strength, personality, etc. Further some kind of status bar could be provided with information concerning the MIA 1220 as well as other MIAs. The MIA status bar could also include advertisements from advertisers.

16

FIG. 13 illustrates an implementation of the present invention having a third party server communicating with the profile manager. In this embodiment, information distribution is performed on the server side. The example provided herein shows advertisement servers 1310 coupled to the profile manager 134. The ads will have characteristics and keywords associated with them. The ad server 1310 via the profile manager 134 checks the profile data 138a to determine whether users want advertising and if so what kinds of advertising they are interested in. The user information can be very sophisticated and be used to target a very specific audience. A filter 1300 is used to determine which users receive what advertisements. Then the Ad server 1310 places links in the profile data 138a specifically in his/her applications/services area about advertising information. The links will be pointers to the full advertisement in Ad database 1320. The MIA 102 then at some later point can retrieve particular ads and display them to the user through an output source.

FIG. 14 illustrates an implementation of the present invention having an information distribution with client side filtering. In this example, the AppServ server 150 is serving a news feed via a multicast connection to MIA 102 as well as a plurality of other MIAs 140 through the network 132. The MIA 102 accepts the multicast stream but filters the data based on Profile Data 138b kept in the MIA's local memory 106. Thus only a desired subset of multicast news stream data is stored into the local applications/services memory by filter 1410. Later a user may launch a news program in which a newscaster 1420 reads the news stored in local memory 106. The environment the newscaster reads news from could be a PC desktop, a set top box, a mobile telephone, or any other environment that the MIA 102 can run.

FIG. 15 illustrates an implementation of the present invention having profile managers of multiple communications networks connected via a gateway. In this example, a MIA 102a is running on a Windows 95 PC 1520 connected to the Internet 1510. The MIA 102a connects to the profile manager 134a via the Internet 1510 and saves a list of telephone numbers inputted by the user to her MIA 102a. The telephone numbers are subsequently stored in the profile manager database 136 and into the user's profile data 138a.

The gateway 1500 is used to interface certain user profile information or application data from the profile manager 134a connected to the Internet 1510 to the profile manager 134b connected to the cellular telephone network 1515. The cellular telephone network 1515 is connected to MIA 102b which resides as part of the cellular telephone 1525. In this example, the MIA 102b can download the telephone numbers that a user using MIA 102a had originally inputted in her Windows 95 PC 1520 to program telephone numbers accessible via the cellular telephone 1525.

Similarly, this concept can be extended to other types of networks. For example, a user can use a listing of television program listings configured on a MIA running on a PC connected to the Internet to program a cable set top box on a cable television network. As another example, a cable set top box user on a cable television network could use a MIA to record viewing habits. This information could later be transferred from the cable television network profile manager, via a gateway, to a profile manager running on the Internet and be used to determine the types of web banner advertising a user would be interested in viewing.

In the previous descriptions, numerous specific details are set forth to provide a thorough understanding of the present

US 6,546,002 B1

**17**

invention. However, as one having ordinary skill in the art would recognize, the present invention can be practiced without resorting to the details specifically set forth.

Although only the above embodiments have been described in detail above, those skilled in the art will readily appreciate that many modifications of the exemplary embodiment are possible without materially departing from the novel teachings and advantages of this invention.

I claim:

1. A method for retrieving user specific resources and information stored either on a local device or a network server, the method comprising the steps of:

retrieving a mobile interface from the network server to the local device;

displaying the mobile interface on the local device, the mobile interface including a plurality of pointers corresponding to the user specific resources and information; and

retrieving the user specific resources and information using the plurality of pointers displayed on the mobile interface.

2. A method according to claim 1, wherein the user specific resources and information comprise programs, applications, files, documents, bookmarked URLs, and user profiles.

3. A method according to claim 1, wherein the user specific resources and information comprise television channels.

4. A method according to claim 1, wherein the user specific resources and information comprise telephone numbers.

5. A method according to claim 1, wherein the user specific resources and information comprise television program listings.

6. A method according to claim 1 further comprising the step of licensing the user specific resources to a user based on a per user licensing model.

7. A method according to claim 1, wherein the step of retrieving the mobile interface from the network server comprises the step of retrieving the mobile interface agent user profile and configuration data via the Internet.

8. A method according to claim 1, wherein the step of retrieving the mobile interface from the network server comprises the step of retrieving the mobile interface via one of a LAN, a MAN, and a WAN.

9. A method according to claim 1, wherein the step of retrieving the mobile interface from the network server comprises the step of retrieving the mobile interface via a cellular network.

10. A method according to claim 1, wherein the step of retrieving the mobile interface from the network server comprises the step of retrieving the mobile interface via a television network.

11. A method for retrieving user specific resources and information stored either on a local device or a network server, the method comprising the steps of:

displaying the mobile interface on the local device, the mobile interface including a plurality of pointers corresponding to the user specific resources and information;

retrieving user profile and configuration data from the network server to the local device, wherein the user profile and configuration data is used to update the data associated with the mobile interface;

retrieving the user specific resources and information using the plurality of pointers displayed on the mobile interface.

**18**

12. A method according to claim 11, wherein the user specific resources and information comprise programs, applications, files, documents, bookmarked URLs, and user profiles.

13. A method according to claim 11, wherein the user specific resources and information comprise television channels.

14. A method according to claim 11, wherein the user specific resources and information comprise telephone numbers.

15. A method according to claim 11, wherein the user specific resources and information comprise television program listings.

16. A method according to claim 11 further comprising the step of licensing the user specific resources to a user based on a per user licensing model.

17. A method according to claim 11, wherein the step of retrieving the user profile and configuration data from the network server comprises the step of retrieving the user profile and configuration data via the Internet.

18. A method according to claim 11, wherein the step of retrieving the user profile and configuration data from the network server comprises the step of retrieving the user profile and configuration data via one of a LAN, a MAN, and a WAN.

19. A method according to claim 11, wherein the step of retrieving the user profile and configuration data from the network server comprises the step of retrieving the user profile and configuration data via a cellular network.

20. A method according to claim 11, wherein the step of retrieving the user profile and configuration data from the network server comprises the step of retrieving the user profile and configuration data via a television network.

21. A method according to claim 11 further comprising exporting user profile and configuration data from a first network to a second network.

22. A method according to claim 21, wherein the first network comprises an Internet network and the second network comprises one of a cellular network and a telephone network.

23. A method according to claim 21, wherein the first network comprises one of a cellular network and a telephone network and the second network comprises an Internet network.

24. A method according to claim 11, wherein the step of displaying the user interface on the local network comprises the step of audioly presenting the user interface on a cellular device.

25. A mobile interface used for accessing user specific resources and information stored either on a local computer device or a network server, the mobile interface comprising:

means for interfacing any local computer device with the network server;

means for presenting a plurality of pointers on any local device corresponding to the user specific resources and information to a user; and

means for accessing the user specific resources and information using the plurality of pointers.

26. A mobile interface according to claim 25, wherein the user specific resources and information comprise programs, applications, files, documents, bookmarked URLs, and user profiles.

27. A mobile interface according to claim 25, wherein the user specific resources and information comprise television channels.

28. A mobile interface according to claim 25, wherein the user specific resources and information comprise telephone numbers.

US 6,546,002 B1

19

20

**29.** A mobile interface according to claim **25,** wherein the user specific resources and information comprise television program listings.

**30.** A mobile interface according to claim **25,** wherein the plurality of pointers access the user specific resources and information stored on the network server via the Internet.

**31.** A mobile interface according to claim **25,** wherein the plurality of pointers access the user specific resources and information stored on the network server via one of a LAN, a MAN, and a WAN.

**32.** A mobile interface according to claim **25,** wherein the plurality of pointers access the user specific resources and information stored on the network server via a cellular network.

**33.** A mobile interface according to claim **25,** wherein the plurality of pointers access the user specific resources and information stored on the network server via a television network.

**34.** A mobile interface used for retrieving user specific resources and information stored either on a local device or a network server, the mobile interface being adapted to move from one local device to another and adapted to be displayed on the local device, the mobile interface comprising:

a plurality of pointers that correspond to the user specific resources and information, wherein upon initiating a pointer, a user specific resource or information from either the local device or the network server is retrieved.

**35.** A mobile interface according to claim **34,** wherein the user specific resources and information comprise programs, applications, files, documents, bookmarked URLs, and user profiles.

**36.** A mobile interface according to claim **34,** wherein the plurality of pointers access the user specific resources and information stored on the network server via the Internet.

**37.** A mobile interface according to claim **34,** wherein the plurality of pointers access the user specific resources and information stored on the network server via a cellular network.

**38.** A mobile interface according to claim **34,** wherein the plurality of pointers access the user specific resources and information stored on the network server via a television network.

**39.** A mobile interface according to claim **34,** wherein the user specific resources is retrieved based on a per user licensing model.

**40.** A system for storing and accessing user specific resources and information, the system comprising:

a network for accessing the user specific resources and information stored in a network server; and

a local device communicating with the network and having a local memory and a mobile interface, wherein the local memory also includes user specific resources

and information, and the mobile interface includes pointers corresponding to the user specific resources and information that are stored either on the local device or the network server, wherein the pointers provide links to access the corresponding user specific resources and information.

**41.** A system according to claim **40,** wherein the user specific resources and information comprise programs, applications, files, documents, bookmarked URLs, and user profiles.

**42.** A system according to claim **40,** wherein the plurality of pointers access the user specific resources and information stored on the network server via the Internet.

**43.** A system according to claim **40,** wherein the plurality of pointers access the user specific resources and information stored on the network server via one of a LAN, a MAN, and a WAN.

**44.** A system according to claim **40,** wherein the plurality of pointers access the user specific resources and information stored on the network server via a cellular network.

**45.** A system according to claim **40,** wherein the plurality of pointers access the user specific resources and information stored on the network server via a television network.

**46.** A system according to claim **40,** wherein the user specific resources is retrieved based on a per user licensing model.

**47.** A system according to claim **40,** wherein the mobile interface is adapted to be loaded onto the local device from any geographical location so long as the local device is communicating with the network server.

**48.** A system according to claim **40,** wherein the mobile interface is permanently stored in the network server.

**49.** A system providing a user access to a user specific resource or information using a local device capable of connecting to a network, the user specific resource or information being stored either on the local device or a network server, the system comprising:

means for connecting the local device to the network server;

means for downloading a mobile interface from the network server to the local device;

means for displaying the mobile interface on the local device;

means for inputting a request for the user specific resource or information through the mobile interface displayed on the local device;

means for retrieving the requested user specific resource or information from either the local device or the network server; and

means for displaying the requested user specific resource or information on the local device.

\* \* \* \* \*

US006715084B2

(12) **United States Patent**
Aaron et al.

(10) **Patent No.:**    **US 6,715,084 B2**
(45) **Date of Patent:**    **Mar. 30, 2004**

(54) **FIREWALL SYSTEM AND METHOD VIA FEEDBACK FROM BROAD-SCOPE MONITORING FOR INTRUSION DETECTION**

(75) Inventors: **Jeffrey A. Aaron**, Atlanta, GA (US); **Thomas Anschutz**, Conyers, GA (US)

(73) Assignee: **BellSouth Intellectual Property Corporation**, Wilmington, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 28 days.

(21) Appl. No.: **10/108,078**

(22) Filed: **Mar. 26, 2002**

(65) **Prior Publication Data**

US 2003/0188191 A1 Oct. 2, 2003

(51) Int. Cl.$^7$ ........................... **G06F 11/30**; G06F 12/14; H04L 9/00

(52) U.S. Cl. ........................ **713/201**; 713/200; 709/235

(58) Field of Search ..................... 713/200, 201

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,621,889 A | 4/1997 | Lermuzeaux et al. | ........ 395/186 |
| 5,784,569 A | * 7/1998 | Miller et al. | ................ 709/235 |
| 5,826,014 A | 10/1998 | Coley et al. | ........ 395/187.01 |
| 5,892,903 A | 4/1999 | Klaus | ........ 395/187.01 |
| 5,931,946 A | 8/1999 | Terada et al. | ............ 713/201 |
| 5,991,881 A | 11/1999 | Conklin | ........... 713/201 |
| 6,026,502 A | 2/2000 | Wakayama | .............. 714/38 |
| 6,061,798 A | 5/2000 | Coley et al. | ........... 713/201 |
| 6,119,236 A | * 9/2000 | Shipley | ............. 713/201 |
| 6,134,664 A | 10/2000 | Walker | ............... 713/201 |

| | | | |
|---|---|---|---|
| 6,167,358 A | 12/2000 | Othmer et al. | .............. 702/188 |
| 6,205,551 B1 | * 3/2001 | Grosse | ...................... 713/201 |
| 6,321,338 B1 | * 11/2001 | Porras et al. | ............ 713/201 |
| 6,405,318 B1 | * 6/2002 | Rowland | ............. 713/200 |
| 6,460,141 B1 | * 10/2002 | Olden | ............... 713/201 |
| 6,513,122 B1 | * 1/2003 | Magdych et al. | ........... 713/201 |

OTHER PUBLICATIONS

Julia Allen et al, "State of the Practice of Intrusion Detection Technologies" Jan. 2000, Carnegie Mellon University, pp. 1–220.*
Julia Allen et al, "A Safe Bet Cert Cercurity Practices" Summer 2001, IAnewsletter, vol. 4, No. 3, pp. 5–7.*
Security Focus HOME Tools Archive, wysiwig://22/http://www.security–portal.com/tools/categor.*

* cited by examiner

*Primary Examiner*—Ly V. Hua
(74) *Attorney, Agent, or Firm*—Woodcock Washburn LLP

(57) **ABSTRACT**

A broad-scope intrusion detection system analyzes traffic coming into multiple hosts or other customers' computers or sites. This provides additional data for analysis as compared to systems that just analyze the traffic coming into one customer's site. Additional detection schemes can be used to recognize patterns that would otherwise be difficult or impossible to recognize with just a single customer detector. Standard signature detection methods can be used. Additionally, new signatures can be used based on broad-scope analysis goals. An anomaly is detected in the computer system, and then it is determined which devices or devices are anticipated to be affected by the anomaly in the future. These anticipated devices are then alerted to the potential for the future anomaly. The anomaly can be an intrusion or an intrusion attempt or reconnaissance activity.

**33 Claims, 5 Drawing Sheets**



**U.S. Patent**     Mar. 30, 2004     Sheet 1 of 5     US 6,715,084 B2



FIG. 1
(PRIOR ART)

U.S. Patent          Mar. 30, 2004      Sheet 2 of 5          US 6,715,084 B2



FIG. 2



FIG. 3

**U.S. Patent**    Mar. 30, 2004    Sheet 4 of 5    US 6,715,084 B2



FIG. 4

**U.S. Patent**          Mar. 30, 2004          Sheet 5 of 5          US 6,715,084 B2



FIG. 5

A0264

US 6,715,084 B2

1

# FIREWALL SYSTEM AND METHOD VIA FEEDBACK FROM BROAD-SCOPE MONITORING FOR INTRUSION DETECTION

## FIELD OF THE INVENTION

The present invention relates in general to intrusion detection systems for computer systems and, more particularly, to network-based intrusion detection systems.

## BACKGROUND OF THE INVENTION

Numerous present-day computer installations, be they provided with centralized processor units or be they organized in networks interconnecting geographically distributed processor units, have various access points for serving their users. The number of such points and the ease with which they are often accessible have the drawback of facilitating attempts at intrusion by people who are not authorized users and attempts by users of any kind, whether acting alone or in concert, to perform computer operations which such users should not be capable of performing legitimately. These unauthorized users are typically called "hackers" or "crackers".

Moreover, the open network architecture of the Internet permits a user on a network to have access to information on many different computers, and it also provides access to messages generated by a user's computer and to the resources of the user's computer. Hackers present a significant security risk to any computer coupled to a network where a user for one computer may attempt to gain unauthorized access to resources on another computer of the network.

In an effort to control access to a network and, hence, limit unauthorized access to computer resources available on that network, a number of computer communication security devices and techniques have been developed. One type of device which is used to control the transfer of data is typically called a "firewall". Firewalls are routers which use a set of rules to determine whether a data message should be permitted to pass into or out of a network before determining an efficient route for the message if the rules permit further transmission of the message.

One fundamental technique used by firewalls to protect network elements is known as "packet filtering". A packet filter may investigate address information contained in a data packet to determine whether the source machine, from which the packet originated, is on a list of allowed addresses. If the address is on the list, the packet is allowed to pass. Otherwise the packet is dropped. Packet filtering using lists of allowed protocols (e.g., file transfer FTP, web access HTTP, email POP) is also sometimes done, either alone or in combination with the more stringent address-based packet filtering method.

One problem with address-based packet filtering is that hackers have developed a technique known as "address spoofing" or "IP spoofing" wherein address information within a fabricated packet is manipulated to bypass a packet filter (e.g., by placing the address information of a machine which is on the allowed list within the packet, even though the true source address which would normally be placed within the packet is different and disallowed). Address spoofing may also be used to make it appear that the packet originates in the network that the firewall protects, and thus is on a default allowed list.

An example of a conventional firewall arrangement is depicted in FIG. 1. A host computer 100 communicates with

2

an institutional computer system 106 over a public network 102 through a router 104. A router is a network element that directs a packet in accordance with address information contained in the packet. The institutional computer system 106 supports a variety of applications including a Web server 108, and an e-mail system 114. A firewall system 110 with ports 111, 112, 113 is placed between the router 104 and the institutional computer 106. Port 112 connects an internal network 116 to the firewall 110, while ports 111 and 113 connect the public network 102 and the institutional computer 106, respectively. The internal network 116 may support communication between internal terminal(s) 118 and a database 120, possibly containing sensitive information. Such a firewall system 110, however, although intended to protect resources 118 and 120 connected to the internal network 116, is subject to attack in many ways.

A hacker operating the host computer 100 can utilize publicly accessible applications on the institutional computer system 106, such as the Web server 108 or the e-mail system 114, to attack the firewall system 110 or connect to the internal network port 112. The Web server 108 or the e-mail system 114 may have authority to attach to and communicate through the firewall system 110. The hacker might be able to exploit this by routing packets through, or mimicking these network elements, in order to attach to, attack, or completely bypass the firewall system 110.

Most conventional firewalls, unless configured otherwise, are transparent to packets originating from behind the firewall. Hence, the hacker may insert a source address of a valid network element residing behind the firewall 110, such as the terminal 118, to a fictitious packet. Such a packet may then be able to pass through the firewall system 110. The hacker may even set the packet to be configured to contain a message requesting the establishment of a session with the terminal 118. The terminal 118 typically performs no checking itself, instead relying on the firewall, and assumes that such a session request is legitimate. The terminal 118 acknowledges the request and sends a confirmation message back through the firewall system 110. The ensuing session may appear to be valid to the firewall system 110.

The hacker can also initiate multiple attempts to attach to the port 111. Technically, a connection to the port is formed before the firewall 110 is able to filter the authority of the request. If enough connection requests hit the port 112, it may be rendered unavailable for a period of time, denying service to both incoming requests from the public network, and more importantly, denying access to the internal network 116 for outgoing messages. It is readily apparent that conventional firewall systems, such as the one depicted in FIG. 1, are unacceptably vulnerable in many ways.

Hackers have also developed other ways which may be helpful in bypassing the screening function of a router. For example, one computer, such as a server on the network, may be permitted to receive sync messages from a computer outside the network. In an effort to get a message to another computer on a network, a hacker may attempt to use source routing to send a message from the server to another computer on the network. Source routing is a technique by which a source computer may specify an intermediate computer on the path for a message to be transmitted to a destination computer. In this way, the hacker may be able to establish a communication connection with a server through a router and thereafter send a message to another computer on the network by specifying the server as an intermediate computer for the message to the other computer.

In an effort to prevent source routing techniques from being used by hackers, some routers (including some

US 6,715,084 B2

3

firewalls) may be configured to intercept and discard all source routed messages to a network. For a router configured with source routing blocking, the router may have a set of rules for inbound messages, a set of rules for outbound messages and a set of rules for source routing messages. When a message which originated from outside the network is received by such a router, the router determines if it is a source routed message. If it is, the router blocks the message if the source routing blocking rule is activated. If blocking is not activated, the router allows the source routed message through to the network. If the message is not a source routed message, the router evaluates the parameters of the message in view of the rules for receiving messages from sources external to the network. However, a router vulnerability exists where the rules used by the router are only compared to messages that are not source routed and the source routed blocking rule is not activated. In this situation, the router permits source routed messages through without comparing them to the filtering rules. In such a case, a computer external to the network may be able to bypass the external sync message filter and establish a communication connection with a computer on the network by using source routed messages.

A typical secure computer network has an interface for receiving and transmitting data between the secure network and computers outside the secure network. A plurality of network devices are typically behind the network. The interface may be a modem or an Internet Protocol (IP) router. Data received by the modem is sent to a firewall. Although the typical firewall is adequate to prevent outsiders from accessing a secure network, hackers and others can often breach a firewall. This can occur by a variety of methods of cyber attack which cause the firewall to permit access to an unauthorized user. An entry by an unauthorized computer into the secured network, past the firewall, from outside the secure network is called an intrusion. This is one type of unauthorized operation on the secure computer network.

There are systems available for determining that a breach of computer security has occurred, is underway, or is beginning. These systems can broadly be termed "intrusion detection systems". Existing intrusion detection systems can detect intrusions and misuses. The existing security systems determine when computer misuse or intrusion occurs. Computer misuse detection is the process of detecting and reporting uses of processing systems and networks that would be deemed inappropriate or unauthorized if known to responsible parties, administrators, or owners. An intrusion is an entry to a processing system or network by an unauthorized outsider.

Misuse detection and reporting research has followed two basic approaches: anomaly detection systems and expert systems.

Anomaly detection systems look for statistically anomalous behavior. Statistical scenarios can be implemented for user, dataset, and program usage to detect "exceptional" use of the system. Since anomaly detection techniques do not directly detect misuse, they do not always detect most actual misuses. The assumption that computer misuses would appear statistically anomalous has been proven unreliable. When recordings or scripts of known attacks and misuses are replayed on computers with statistical anomaly detection systems, few if any of these scripts are identified as anomalous. This occurs for a variety of reasons which reduce the indirect detection accuracy.

In general, anomaly detection techniques cannot detect particular instances of misuses unless the specific behaviors

4

associated with those misuses also satisfy statistical tests (e.g., regarding network data traffic or computer system activity) without security relevance. Anomaly detection techniques also produce false alarms. Most of the reported anomalies are purely coincidental statistical exceptions and do not reflect actual security problems. These false alarms often cause system managers to resist using anomaly detection methods because they increase the processing system workload and need for expert oversight without substantial benefits.

Another limitation with anomaly detection approaches is that user activities are often too varied for a single scenario, resulting in many inferred security events and associated false alarms. Statistical measures also are not sensitive to the order in which events occur, and this may prevent detection of serious security violations that exist when events occur in a particular order. Scenarios that anomaly detection techniques use also may be vulnerable to conscious manipulation by users. Consequently, a knowledgeable perpetrator may train the adaptive threshold of detection system scenarios over time to accept aberrant behaviors as normal. Furthermore, statistical techniques that anomaly detection systems use require complicated mathematical calculations and, therefore, are usually computationally expensive.

Expert systems (also known as rule-based systems) have had some use in misuse detection, generally as a layer on top of anomaly detection systems for interpreting reports of anomalous behavior. Since the underlying model is anomaly detection, they have the same drawbacks of anomaly detection techniques. Expert systems attempt to detect intrusions by taking surveillance data supplied by a security system of the computer installation and by applying knowledge thereto relating to potential scenarios for attacking the computer installation. This is not fully satisfactory either, since that method only detects intrusions that correspond to attack scenarios that have previously been stored.

In contrast to the two research approaches, most recent practical attempts at detecting misuse have relied on a signature or pattern-detection mechanism with a signature being the set of events and transitions/functions that define the sequence of actions that form an attack or misuse. A signature mechanism uses network sensors to detect data traffic or audit trail records typically generated by computer operating systems. The designer of the product which incorporates the mechanism selects a plurality of events that together form the signature or the attack or misuse. Although the signature mechanism goes a step beyond expert systems, it is similar to an expert system because it relies upon signatures or rules.

Importantly, intrusion detection methods used today are plagued by false positive events, and the inability to detect the earliest stages of network attacks. Conventional intrusion detection techniques are based on specialized equipment located at a specific customer's premises and hence cannot see the hacker's activities over a broader scale. A need exists for an intrusion detection system which can provide early warning of potential misuses and intrusions with greater knowledge than can be obtained from detection at a single customer's premises. Early warning can be provided by specially examining detection events over a broader scale or scope, i.e., that of many aggregated customers or of the intervening network.

Intrusion detection products and services presently available are directed to the analysis of a single customer's data to determine intrusion events, but lack the capability to perform broad-scope intrusion analysis/detection.

US 6,715,084 B2

**5**

It is readily apparent that the design, implementation, and limitations of conventional firewalls has rendered them highly vulnerable to hacker attack. What is needed is an improved firewall functionality or system that overcomes the foregoing disadvantages and is resistant to hacker attack.

It is also readily apparent that the design, implementation, and limitations of conventional intrusion/misuse detection systems has rendered them unreliable and inefficient. Furthermore, these intrusion detection systems are vulnerable to hacker techniques which render them insensitive to misuse. What is needed is an improved intrusion detection functionality or system that overcomes the foregoing disadvantages and is resistant to hacker attack.

In security, there is a trade-off between safety and other conflicting goals such as usability, usefulness, allowed features, freedom of action, etc. Firewalls currently must be configured non-optimally, i.e., at one extreme of the security trade-off since they cannot react to the current and/or future security environment, and lacking this ability, security must err on the side of safety. Without knowledge of the current (and potentially the expected/predicted) security forecast, the firewall must be configured for the worst-case scenario. But in reality, the security forecast is seldom so extreme. Thus, the firewall should ideally be configured most of the time on a less strict basis, allowing many additional services to be opened through the firewall which, although adding potential vulnerabilities, also add considerable value for the user and the organization/enterprise. However, if this somewhat lax configuration is maintained even in the face of attacks, when the potential vulnerabilities introduced by the presence of the valuable services are much more likely to be exploited, then overall security is lost. So it is desirable for security in this case to have the ability to rapidly respond in the appropriate manner to deteriorating forecast conditions by closing the firewalls (i.e., adding the required firewall filtering) when the situation deteriorates. Feedback to security devices from broad-scope monitoring is needed to make such optimal configuration control/adjustment possible, thereby solving the current problems and thus improving the value of security by avoiding the need for excessive "worst-casebased" restrictions.

SUMMARY OF THE INVENTION

The present invention is directed to a system and method for broad-scope intrusion detection. The system analyzes traffic coming into multiple hosts or other customers' computers or sites. This provides additional data for analysis as compared to systems that just analyze the traffic coming into one customer's site (as a conventional intrusion detection system does). Therefore, additional detection schemes can be used to recognize patterns that would otherwise be difficult or impossible to recognize with just a single customer detector. Standard signature detection methods can be used. Additionally, new signatures and methods/algorithms can be used based on broad-scope analysis goals.

Other embodiments of the present invention are directed to a system and method of alerting a device in a networked computer system comprising a plurality of devices to an anomaly. An anomaly is detected in the computer system, and then it is determined which devices or devices are anticipated to be affected by the anomaly in the future. These anticipated devices are then alerted to the potential for the future anomaly. The anomaly can be an intrusion or an intrusion attempt or reconnaissance activity.

According to aspects of the invention, the devices are polled in a predetermined sequential order, and a device

**6**

anticipated to be affected by the anomaly is a device that has not been polled.

According to other aspects of the invention, an anomaly warning is transmitted from a first device to a central analysis engine, responsive to detecting the anomaly at the first device. Preferably, the anomaly warning comprises a unique device identifier.

According to further aspects of the invention, detecting the anomaly comprises analyzing a plurality of data packets with respect to predetermined patterns. Analyzing the data packets can comprise analyzing data packets that have been received at at least two of the plurality of devices including the first device.

According to further aspects of the invention, alerting the device comprises alerting a firewall associated with the device that an anomaly has been detected. Moreover, the device that is anticipated to be affected by the anomaly can be controlled (e.g., have its firewall adjusted).

The foregoing and other aspects of the present invention will become apparent from the following detailed description of the invention when considered in conjunction with the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 depicts a computer network arrangement having a conventional firewall arrangement;

FIG. 2 shows in, schematic form, a computer network system including an intrusion detection system in accordance with the present invention;

FIG. 3 is a detailed block diagram of an exemplary computer system with which the present invention can be used;

FIG. 4 shows in block form aspects of the intrusion detection system in accordance with the present invention; and

FIG. 5 shows a flow chart of an exemplary intrusion detection method in accordance with the present invention.

DESCRIPTION OF EXEMPLARY
EMBODIMENTS AND BEST MODE

The invention uses components, such as a computer system with a multi-tasking operating system, a network interface card, and network surveillance software, acting together to provide system functionality. This combination of hardware and software attached to a network is described more fully below and will perform the processes described below.

FIG. 2 shows in, schematic form, a computer network-system including an intrusion detection system in accordance with the present invention. A plurality of network devices such as hosts, servers, and personal computers attached within customer site networks (shown here as customer site networks 220, 230, 240, 250), are shown coupled to an intervening computer network 204, such as a public network like the Internet. Routers (not shown) are typically used in the coupling. The customer site networks represent "internal" protected networks local to a particular corporation or site, for example. The customer site networks may or may not be publicly accessible or may comprise a publicly accessible network and an internal "private" network. Each customer site network or LAN (Local Area Network) comprises one or more hosts (e.g., customer site network 220 is shown with hosts 224, 226; customer site network 230 is shown with host 234; customer site network 240 is shown with hosts 244, 246; and customer site network

US 6,715,084 B2

7

250 is shown with hosts 254, 256). Each site network is connected to the intervening computer network 204 via a firewall (e.g., host 220 is shown with firewall 221; host 230 is shown with firewall 231; host 240 is shown with firewall 241; and host 250 is shown with firewall 251).

A firewall connects the network 204 to an internal network. The firewall is a combination hardware and software buffer that is between the internal network and external devices outside the internal computer network. The firewall allows only specific kinds of messages to flow in and out of the internal network. As is known, firewalls are used to protect the internal network from intruders or hackers who might try to break into the internal network. The firewall is coupled to an interface (not shown). The interface is external to the internal network and can be a modem or an Internet Protocol (IP) router and serves to connect the internal network to devices outside the internal network.

A separately maintained data collection and processing center, comprising a computer or server 205 with firewall 210, is also coupled to the computer network. Although the data collection and processing center is implemented as a network device which is part of a wired local network, it is also envisioned as possibly being connected to the network 204 by a wireless link.

Each network device can be considered a node because each device has an addressable interface on the network. As can be appreciated, many other devices can be coupled to the network including additional personal computers, mini-mainframes, mainframes and other devices not illustrated or described which are well known in the art.

The system performs broad-scope intrusion detection by monitoring the communications on a network or on a particular segment of the network. The data collection and processing center receives information from the various network devices attached to the computer network 204. For example, all communications sent to each host 220, 230, 240, 250 are forwarded to, or otherwise captured by, the data collection and processing center. Thus, the data collection and processing center receives all communications (i.e., the data) originating from a user on the computer network 204 and flowing to host 220 (and vice versa), for example, as well as all communications originating from the computer network 204 and flowing to all other hosts (and vice versa).

It should be noted that certain devices can be used as sensors to sense data traffic and pass their findings on to the data collection and processing center or other central processing system, and other separate devices may include computer hosts, firewalls, and other systems which may be the potential targets of attack by a hacker, and/or may be adjusted in response to detected attacks, either manually or automatically.

The present invention is usable on such networks as ARCnet, Ethernets and Token-Ring networks, wireless networks, among other network types. The network, in this example, has a network cable, also known as media, which may be of any known physical configuration including unshielded twisted pair (UTP) wire, coaxial cable, shielded twisted pair wire, fiber optic cable, and the like. Alternatively, the network devices could communicate across wireless links.

The system of the present invention is designed and intended to operate compatibly on networks which communicate using the Transmission Control Protocol/Internet Protocol (TCP/IP) standard, although other communications standards (or even proprietary protocols) could be used. Network TCP/IP data is packetized, and sent in frames

8

which are structured to be compatible with any network device which complies with the TCP/IP standards. A typical frame or packet transmitted across the Internet contains a preamble, destination address, source address, type field, data field, and a cyclical redundancy check (CRC). The preamble contains data used by the communicating computer systems to synchronize or handshake. Destination and source Internet Protocol (IP) addresses represent the principals communicating and the packet type indicates the type of communication. The data field contains the actual information content of the dialogue. The CRC is an integrity check facilitated between the two systems participating in the conversation.

The present invention provides aggregate traffic/intrusion monitoring in the provider network. This allows for a broader scope of network activity to be considered and analyzed, not just relevant to a single customer, but across some or all customers. The additional data is valuable because the probing/reconnaissance activities of would-be intruders typically cover a large number of customers, so as to select those with security weaknesses for more in-depth attack. Additional patterns of broadly suspicious activity can thus be correlated/recognized across many customers.

The present invention uses a multi-stage technique in order to improve intrusion detection efficacy and obtain broader scope detection. First, suspicious network traffic events are collected (potentially in context) and forwarded to a central database and analysis engine, then the centralized engine uses pattern correlations across multiple customer's events in order to better determine the occurrence and sources of suspected intrusion-oriented activity prior to actually alarming. Second, upon detection of suspected reconnaissance and probing, the detection process can adjust its matching parameters and alarm thresholds to focus sensitivity on attacks from suspected sources (hackers) against specific targets (customers). Third, actual occurrence of anticipated attacks against specific targets can be used to adjust the broad-scope matching parameters, providing both positive and negative feedback which selectively adjusts specific pattern sensitivity. This process is different from conventional approaches, in that a broader scope of data is utilized in new ways. It should be noted that, in addition to multistage techniques, the present invention can implement monolithic techniques in which a broad scope of customers' events are correlated at a central analysis engine.

The system analyzes traffic coming into multiple hosts or other customer's computers or sites. This provides additional data for analysis as compared to systems that just analyze the traffic coming into one customer's site (as a typical firewall does). Therefore, additional detection schemes can be used to recognize patterns that would otherwise be difficult or impossible to recognize with just a single customer detector. Standard scanning patterns can be used for the data as well, such as sequential or pseudorandom techniques.

The data collection and processing center collects data from multiple or all the customers and analyzes the data. In this manner, the number of false alarms is decreased (because multiple occurrences of an activity may trigger an alarm, but the present invention can scan a large number of customers, so certain types of harmless activity that otherwise would be perceived as a threat can be viewed and discounted as not a threat). Moreover, predictions can be made about future events that may affect customers in the sequence. Thus, the present invention can be used to block future hacks and determine the source address of the hacker.

The present invention monitors the traffic from a plurality of customers. Different types of algorithms can be used to

US 6,715,084 B2

9

look for different types of patterns that would not be recognizable by a conventional intrusion detection system at a single customer site. The algorithms preferably reside in a back end data center. Data from existing customer's conventional intrusion detection system is provided to the central database and then analyzed. Data records comprise, for example, a time-stamp, a description of the activity, and the source of the probe.

FIG. 3 is a detailed block diagram of an exemplary computer system 205 of a data collection and processing center with which the present invention can be used. The system includes a bus 302 or other communication mechanism for communicating information, and a processor 304 coupled with the bus 302 for processing information. The system also includes a main memory 306, such as a random access memory (RAM) or other dynamic storage device, coupled to the bus 302 for storing information and instructions to be executed by processor 304. Main memory 306 also may be used for storing temporary variables or other intermediate information during execution of instructions to be executed by processor 304. The system further includes a read only memory (ROM) 308 or other static storage device coupled to the bus 302 for storing static information and instructions for the processor 304. A storage device 310, such as a magnetic disk or optical disk, is provided and coupled to the bus 302 for storing information and instructions.

The system 205 may be coupled via the bus 302 to a display 312, such as a cathode ray tube (CRT) or a flat panel display, for displaying information to a computer user. An input device 314, including alphanumeric and other keys, is coupled to the bus 302 for communicating information and command selections to the processor 304. Another type of user input device is cursor control 316, such as a mouse, a trackball, or cursor direction keys for communicating direction information and command selections to processor 304 and for controlling cursor movement on the display 312.

The system 205 also includes a communication interface 318 coupled to the bus 302. Communication interface 318 provides a two-way data communication as is known. For example, communication interface 318 may be an integrated services digital network (ISDN) card or a modem to provide a data communication connection to a corresponding type of telephone line. As another example, communication interface 318 may be a local area network (LAN) card to provide a data communication connection to a compatible LAN. Furthermore, the communication interface 318 may be coupled to the network cable 302. Wireless links may also be implemented. In any such implementation, communication interface 318 sends and receives electrical, electromagnetic or optical signals which carry digital data streams representing various types of information. Of particular note, the communications through interface 318 permits the transmission or receipt of broad-scope intrusion detection information. The system 205 receives data from each of the nodes being monitored on the network.

The system 205 collects the data, filters the data, and processes the data to provide security indications and warnings.

The processor 304 can execute sequences of instructions contained in the main memory 306. Such instructions may be read into main memory 306 from another computer-readable medium, such as storage device 310. However, the computer-readable medium is not limited to devices such as storage device 310. For example, the computer-readable medium may include a floppy disk, a flexible disk, hard disk,

10

magnetic tape, or any other magnetic medium, a CD-ROM, any other optical medium, punch cards, paper tape, any other physical medium with patterns of holes, a RAM, a PROM, an EPROM, a FLASH-EPROM, any other memory chip or cartridge, a carrier wave embodied in an electrical, electromagnetic, infrared, or optical signal, or any other medium from which a computer can read. Execution of the sequences of instructions contained in the main memory 306 causes the processor 304 to perform the process steps described below. In alternative embodiments, hard-wired circuitry may be used in place of or in combination with software instructions to implement the invention. Thus, embodiments of the invention are not limited to any specific combination of hardware circuitry and software.

FIG. 4 shows in block form aspects of the system 205 in accordance with the present invention. The intrusion detection portion of the system receives data from the various intrusion detection systems on the network and analyzes this data to detect an attempted intrusion or an intrusion or reconnaissance activity. The data is logged and analyzed. If an intrusion is detected, an alert is logged.

The broad-scope intrusion monitoring system operates through a computer, attached to the network, in the preferred embodiment by an interface card or network interface board 340. In the preferred embodiment, the network interface board 340 contains a preset and unique identifier such as an Internet address or a hardware address. The unique address provides the means for an attached computer system to identify intended packets and ignore the rest, as is well known in the art. The system utilizes standard device drivers 350 to forward all packets into the host 205 from the network 204 regardless of the address in the packets. Preferably, the system is transparent and inaccessible to an intruder, thereby preserving the authenticity of the logged entries made by the system. To this end, encryption and authentication means can be used, as known to those skilled in the art.

The system preferably monitors the network traffic substantially in its entirety. Upon receipt of the network packets, the interface board 340 passes the packet and all data contained within to the operating system 305 of the system computer. Once there, it is stored in memory (e.g., memory 306) awaiting entry to the next phase which is the intrusion detection process 360, described below. In the intrusion detection process, the data is first logged into a data log 362. The data is then analyzed 364, and alerts or notifications 366 are thereafter generated.

The computer equipment configuration which may be used in the preferred embodiment may be, for example, conventional computer running a conventional operating system, available as commercial-off-the-shelf products as known to one skilled in the art.

FIG. 5 shows a flow chart of an exemplary intrusion detection method in accordance with the present invention. At step 400, data is collected or otherwise received at the data collection and processing center from the sensors coupled to the network, whether they be computers or special-purpose devices. Preferably, the data is collected in a predetermined order from the hosts. At step 410, the data is analyzed to determine if any intrusions have been (or are being) attempted. At step 420, if any intrusions or attempted intrusions or reconnaissance activity have been detected, the appropriate alerts or notifications are transmitted to the pertinent administrators of the hosts on the network. In this manner, the administrators, and thereby the hosts for which they are responsible, can be prepared for an incoming

US 6,715,084 B2

11

intrusion, or can take other precautions against future intrusions, or can check their systems to determine if any access was gained in previous intrusion attempts. Because the data is determined in a predetermined order from the sensors, an intrusion attempt that is detected at an earlier, already polled sensor, can be determined and administrators of other hosts, that have not yet been hit by the intrusion attempt, can be alerted about the possibility of such an intrusion attempt. Thus, the present invention gathers and exploits intrusion monitoring data related to many customers rather than just a single customer, thereby reducing inaccurate declarations of intrusion events and more readily detecting the earliest stages of attempted attacks.

It is contemplated that feedback from the broad-scope intrusion detection system is provided to firewalls, secondary (narrow-scope) intrusion detection system devices, hosts (computers), routers, etc. so that the associated firewalls can adjust in response to expected attacks determined to be forthcoming by the intrusion detection system. Such feedback to customer site devices (of all sorts, and especially the firewalls) is useful to enhance security. Such feedback can also be provided to a service provider's network to further deter the attack.

To prevent this approach from itself being attacked, exploited, or fooled by hackers, secure feedback connectivity could be accomplished using encrypted communication via either specially-designed encrypting methods or tunneled via standards such as IPsec (IETF "IP security" standard) or SSL ("secure sockets layer") or SSH ("secure shell"), which provide authentication and encryption functions to secure the transmitted feedback or "configuration change" data. Via the encrypting protocol or inside the encrypted "tunnel", standard data transfer protocols such as FTP could be used to actually transfer information and SNMP to collect/poll status (additionally or alternately, CORBA objects or JAVA programs or applets could be transferred back and forth). These are exemplary methods, and proprietary protocols rather than standards could also be used. These could be done on virtually any sort of network.

Each device and each type of device being controlled/adjusted/reconfigured preferably has that capability in software, which could be done via a device driver or API (application programming interface) or other technical means which allows control or adjustment. It is contemplated that, in addition to notifying the firewall or other host device of an impending attack, the system could control the firewall or other host device to reconfigure or adjust pertinent parameters in anticipation of the attack, at optional step 430. For each type of device, the parameters or items controlled/adjusted would be different (e.g., filtering parameters/rules for firewalls, allowed services and open ports for hosts, detection parameters or "extent of detection" parameters for intrusion detection system devices, etc.). The present invention provides the ability to detect pre-attack events—this provides lead time to adjust the firewall (or other device) parameters on each of a plurality of hosts before the actual attack occurs. Adjustments after the fact are a less desirable way to maintain security. The broad-scope intrusion detection system algorithms and operation can be adjusted and tuned to specifically gather the information needed to specify the configuration changes/adjustments needed.

Conventional intrusion detection systems merely provide indications of already occurred hacker events and attacks. There is no functionality or capability present in conventional intrusion detection systems to determine near-real-time parameter adjustments for firewalls, etc. which solve

12

the problem. Even if a conventional intrusion detection system was improved so that it could adjust firewall parameters based on what it detects, this adjustment would necessarily happen after the attack, and thus be of little value.

It should be understood that the inventive principles described in this application are not limited to the components or configurations described in this application. It should be understood that the principles, concepts, systems, and methods shown in this application may be practiced with software programs written in various ways, or different equipment than is described in this application without departing from the principles of the invention.

Although illustrated and described herein with reference to certain specific embodiments, the present invention is nevertheless not intended to be limited to the details shown. Rather, various modifications may be made in the details within the scope and range of equivalents of the claims and without departing from the invention.

What is claimed is:

1. A method of alerting at least one device in a networked computer system comprising a plurality of devices to an anomaly, at least one of the plurality of devices having a firewall, comprising:

detecting an anomaly in the networked computer system using network-based intrusion detection techniques comprising analyzing data entering into a plurality of hosts, servers, and computer sites in the networked computer system;

determining which of the plurality of devices are anticipated to be affected by the anomaly by using pattern correlations across the plurality of hosts, servers, and computer sites; and

alerting the devices that are anticipated to be affected by the anomaly.

2. The method of claim 1, further comprising:

determining which of the plurality of devices have been affected by the anomaly; and

alerting the devices that have been affected by the anomaly.

3. The method of claim 1, further comprising adjusting the firewall of each of the devices that is anticipated to be affected by the anomaly responsive to the detection of the anomaly.

4. The method of claim 1, wherein the anomaly comprises one of an intrusion and an intrusion attempt.

5. The method of claim 1, wherein detecting the anomaly comprises analyzing a plurality of data packets with respect to predetermined patterns.

6. The method of claim 5, wherein analyzing the data packets comprises analyzing data packets that have been received at at least two of the plurality of devices.

7. The method of claim 1, wherein detecting the anomaly comprises recognition of an intrusion and further comprising generating an automated response to the intrusion.

8. The method of claim 1, further comprising adjusting anomaly detection sensitivity and alarm thresholds based on the detected anomaly.

9. A method of alerting a device in a networked computer system comprising a plurality of devices to an anomaly, comprising:

detecting an anomaly at a first device in the computer system using network-based intrusion detection techniques comprising analyzing data entering into a plurality of hosts, servers, and computer sites in the networked computer system;

determining a device that is anticipated to be affected by the anomaly by using pattern correlations across the plurality of hosts, servers, and computer sites; and

US 6,715,084 B2

13

14

alerting the device that is anticipated to be affected by the anomaly.

10. The method of claim 9, wherein the plurality of devices are polled in a predetermined sequential order, the first device being polled prior to detecting the anomaly, and the device anticipated to be affected by the anomaly is a device that has not been polled.

11. The method of claim 9, further comprising transmitting an anomaly warning from the first device to a central analysis engine, responsive to detecting the anomaly at the first device, the anomaly warning comprising a unique device identifier.

12. The method of claim 9, wherein the anomaly comprises one of an intrusion and an intrusion attempt.

13. The method of claim 9, wherein detecting the anomaly comprises analyzing a plurality of data packets with respect to predetermined patterns.

14. The method of claim 13, wherein analyzing the data packets comprises analyzing data packets that have been received at at least two of the plurality of devices including the first device.

15. The method of claim 9, wherein alerting the device comprises alerting a firewall associated with the device that the anomaly has been detected.

16. The method of claim 9, wherein alerting the device comprises generating and transmitting an electronic notification to one of the device and an administrator of the device.

17. The method of claim 9, further comprising controlling the device that is anticipated to be affected by the anomaly.

18. The method of claim 9, further comprising adjusting anomaly detection sensitivity and alarm thresholds based on the detected anomaly.

19. An intrusion detection and alerting system for a computer network comprising:

a plurality of devices coupled to the computer network, each device adapted to at least one of: (1) sense data and provide the data to a data collection and processing center, and (2) be adjustable; and

the data collection and processing center comprising a computer with a firewall coupled to the computer network, the data collection and processing center monitoring data communicated to at least a portion of the plurality of devices coupled to the network, detecting an anomaly in the network using network-based intrusion detection techniques comprising analyzing data entering into a plurality of hosts, servers, and computer sites in the networked computer system, determining which of the devices are anticipated to be affected by the anomaly by using pattern correlations across the plurality of hosts, servers, and computer sites, and alerting the devices.

20. The system of claim 19, wherein the data collection and processing center further determines which of the devices have been affected by the anomaly and alerts the devices.

21. The system of claim 19, wherein at least one of the plurality of devices comprises a firewall, and the data collection and processing center further adjusts the firewall of each of the devices that is anticipated to be affected by the anomaly responsive to the detection of the anomaly.

22. The system of claim 19, wherein the anomaly comprises one of an intrusion, an intrusion attempt, and reconnaissance activity.

23. The system of claim 19, wherein the data collection and processing center detects the anomaly by analyzing a plurality of data packets with respect to predetermined patterns.

24. The system of claim 23, wherein the data collection and processing center analyzes data packets that have been received by at least two of the plurality of devices.

25. The system of claim 19, wherein the data collection and processing center adjusts anomaly detection sensitivity and alarm thresholds based on the detected anomaly.

26. A data collection and processing center comprising a computer with a firewall coupled to a computer network, the data collection and processing center monitoring data communicated to the network, and detecting an anomaly in the network using network-based intrusion detection techniques comprising analyzing data entering into a plurality of hosts, servers, and computer sites in the networked computer system.

27. The data collection and processing center of claim 26, further comprising determining which of a plurality of devices that are connected to the network are anticipated to be affected by the anomaly by using pattern correlations across the plurality of hosts, servers, and computer sites, and alerting the devices.

28. The data collection and processing center of claim 26, wherein the data collection and processing center further determines which of a plurality of devices that are connected to the network have been affected by the anomaly and alerts the devices.

29. The data collection and processing center of claim 26, wherein the data collection and processing center further adjusts a firewall of each of a plurality of devices that is connected to the network that is anticipated to be affected by the anomaly responsive to the detection of the anomaly.

30. The data collection and processing of claim 26, wherein the anomaly comprises one of an intrusion, an intrusion attempt, and reconnaissance activity.

31. The data collection and processing of claim 26, wherein the data collection and processing center detects the anomaly by analyzing a plurality of data packets with respect to predetermined patterns.

32. The data collection and processing of claim 31, wherein the data collection and processing center analyzes data packets that have been received by at least two devices that are connected to the network.

33. The data collection and processing of claim 26, wherein the data collection and processing center adjusts anomaly detection sensitivity and alarm thresholds based on the detected anomaly.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,715,084 B2                                   Page 1 of 1
DATED         : March 30, 2004
INVENTOR(S)   : Jeffrey A. Aaron and Thomas Anschutz

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

<u>Column 1,</u>
Line 57, "P spoofing" should read -- IP spoofing --

Signed and Sealed this

Eighth Day of June, 2004

JON W. DUDAS
*Acting Director of the United States Patent and Trademark Office*