2016-1077

# United States Court of Appeals
# for the Federal Circuit

INTELLECTUAL VENTURES I LLC and
INTELLECTUAL VENTURES II LLC,

*Plaintiffs-Appellants*,

v.

CAPITAL ONE FINANCIAL CORPORATION,
CAPITAL ONE BANK (USA), NATIONAL ASSOCIATION, and
CAPITAL ONE, NATIONAL ASSOCIATION,

*Defendants-Appellees*.

Appeal from the United States District Court for the District of Maryland
in No. 8:14-cv-00111-PWG, Judge Paul W. Grimm.

## BRIEF OF APPELLEES

Jeffrey G. Homrig
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 328-4600

Robert A. Angle
Dabney J. Carr IV
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
(804) 697-1246

Matthew J. Moore
Gabriel K. Bell
Adam M. Greenfield
LATHAM & WATKINS LLP
555 Eleventh St. NW, Suite 1000
Washington, DC 20004
(202) 637-2200
matthew.moore@lw.com

Kenneth R. Adamo
David W. Higer
Vishesh Narayen
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
(312) 862-2000

*Counsel for Appellees*

## CERTIFICATE OF INTEREST

Counsel for Appellees certifies the following:

1. The full name of every party or amicus curiae represented by me is:

    Capital One Financial Corporation;
    Capital One Bank (USA), National Association; and
    Capital One, National Association

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    N/A.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    Capital One Financial Corporation, a publicly held company, is the parent corporation of—and owns more than 10% of the stock of—Capital One Bank (USA), National Association and Capital One, National Association.

    Capital One Financial Corporation has no parent corporation and no publicly held corporation owns more than 10% of its stock.

4. The names of all law firms and the partners or associates that appeared for the party or amicus curiae now represented by me in the trial court or agency or are expected to appear in this court are:

    **Latham & Watkins LLP**: Matthew J. Moore, Adam M. Greenfield, Jeffrey G. Homrig, Marguerite M. Sullivan, Gabriel K. Bell, Alan J. Devlin (former), Peter O. Schmidt (former), Patricia Young, Christopher S. Yates, Clement Naples, Elizabeth V. Johnson, Ethan Y. Park (former), Katherine M. Schon, Kristopher Davis, Michelle P. Woodhouse

    **Troutman Sanders LLP:** Robert A. Angle, Dabney J. Carr IV, Mary Catherine Zinsner, Syed M. Reza, Megan C. Rahman, Christopher J. Forstner, Lesley W. Fierst (former), Paul E. McGowan

**Kirkland & Ellis LLP:** Kenneth R. Adamo, David W. Higer, Brent P. Ray, Vishesh Narayen, Kristina Hendricks, Joel Merkin, Ryan M. Hubbard, Megan M. New

**Kramon & Graham PA:** Andrew J. Graham, James P. Ulwick

Dated: March 28, 2016                              Respectfully submitted,


/s/ Matthew J. Moore
Matthew J. Moore
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004

*Counsel for Appellees*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ....................................................................i

TABLE OF AUTHORITIES ........................................................................v

STATEMENT OF RELATED CASES ........................................................1

COUNTERSTATEMENT OF THE ISSUES.............................................2

COUNTERSTATEMENT OF THE CASE...................................................2

    A.    The Patents-in-Suit .................................................................4

        1.    '081 Patent (Data Organization And Modification) ..................4

        2.    '002 Patent (User Resource Retrieval) .....................................6

        3.    '084 Patent (Anomaly Detection) ..............................................8

    B.    District Court Proceedings ....................................................11

        1.    Summary Judgment Of Invalidity Under § 101 ......................11

        2.    Rule 54(b) Judgment On The Patent Claims ...........................12

SUMMARY OF THE ARGUMENT ....................................................13

ARGUMENT ........................................................................................16

I.     STANDARD OF REVIEW ....................................................16

II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ENTERING RULE 54(B) JUDGMENT ON THE PATENT CLAIMS ......17

III.   THE DISTRICT COURT PROPERLY PRECLUDED IV FROM RELITIGATING THE INVALIDITY OF THE '084 PATENT CLAIMS BASED ON ISSUE PRECLUSION ...........................................22

IV.   IV'S ASSERTED PATENT CLAIMS ARE INVALID UNDER § 101 ......25

    A.    The '081 Patent Claims Are Not Patent Eligible ................28

        1.    The Claims Are Directed To An Abstract Data-Manipulation Idea ..................................................................28

**Page**

2.    The Claims Add Nothing Inventive To The Abstract Data-Manipulation Idea ...........................................35

B.    The '002 Patent Claims Are Not Patent Eligible ...............................40

1.    The Claims Are Directed To An Abstract Resource-Retrieval Idea .......................................................40

2.    The Claims Add Nothing Inventive To The Abstract Resource-Retrieval Idea........................................44

3.    Claims 34 And 37 Of The '002 Patent Do Not Fall Within Any Category Of Patent-Eligible Subject Matter........47

C.    The '084 Patent Claims Are Not Patent Eligible ...............................50

1.    The Claims Are Directed To An Abstract Anomaly-Detection Idea .........................................................50

2.    The Claims Add Nothing Inventive To The Abstract Anomaly-Detection Idea.........................................53

D.    IV's Other Arguments Fail.........................................................56

1.    *DDR Holdings* Does Not Save The Invalid Claims.................56

2.    *Diehr* Does Not Save The Claims............................................59

3.    Overcoming Prior Art Is Not Sufficient To Satisfy § 101........61

4.    The Clear And Convincing Evidentiary Standard Does Not Save The Claims ............................................61

CONCLUSION .......................................................................63

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Accenture Global Services, GmbH v. Guidewire Software, Inc.*,
　728 F.3d 1336 (Fed. Cir. 2013) ...................................................*passim*

*Alice Corp. Pty. Ltd. v. CLS Bank International*,
　134 S. Ct. 2347 (2014)...............................................................*passim*

*Allvoice Developments US, LLC v. Microsoft Corp.*,
　612 F. App'x 1009 (Fed. Cir.), *cert. denied*, 136 S. Ct. 697 (2015) ..................49

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
　788 F.3d 1371 (Fed. Cir. 2015) .........................................................39

*Bilski v. Kappos*,
　561 U.S. 593 (2010)...........................................................26, 39, 52

*Blonder-Tongue Laboratories, Inc. v. University of Illinois
　Foundation*,
　402 U.S. 313 (1971)......................................................................22

*Burr v. Duryee*,
　68 U.S. 531 (1864)......................................................................48

*buySAFE, Inc. v. Google, Inc.*,
　765 F.3d 1350 (Fed. Cir. 2014) .......................................45, 46, 54, 62

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
　776 F.3d 1343 (Fed. Cir. 2014) ..................................................*passim*

*Curtiss-Wright Corp. v. General Electric Co.*,
　446 U.S. 1 (1980)........................................................................16

*Cyberfone Systems, LLC v. CNN Interactive Group, Inc.*,
　558 F. App'x 988 (Fed. Cir. 2014) ....................................................31

*CyberSource Corp. v. Retail Decisions, Inc.*,
　654 F.3d 1366 (Fed. Cir. 2011) ...................................................31, 52

*Dana v. E.S. Originals, Inc.*,
　342 F.3d 1320 (Fed. Cir. 2003) ...................................................24, 25

**Page(s)**

*Datascope Corp. v. SMEC, Inc.*,
  879 F.2d 820 (Fed. Cir. 1989) ..............................................................28, 48, 50

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014) ...........................................................16, 56, 57

*Dealertrack, Inc. v. Huber*,
  674 F.3d 1315 (Fed. Cir. 2012) ....................................................................*passim*

*Diamond v. Diehr*,
  450 U.S. 175 (1981)...........................................................................................59

*In re Diehr*,
  602 F.2d 982 (C.C.P.A. 1979) ........................................................................59

*Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.*,
  758 F.3d 1344 (Fed. Cir. 2014) ..................................................................48, 49

*Gelboim v. Bank of America Corp.*,
  135 S. Ct. 897 (2015).......................................................................................17

*Gottschalk v. Benson*,
  409 U.S. 63 (1972)......................................................................................53, 55

*Intellectual Ventures I LLC v. Capital One Bank (USA), N.A.*,
  792 F.3d 1363 (Fed. Cir. 2015) ...............................................................*passim*

*Intellectual Ventures II LLC v. JP Morgan Chase & Co.*,
  No. 13-cv-3777, 2015 WL 1941331 (S.D.N.Y. Apr. 28, 2015).................*passim*

*Internet Patents Corp. v. Active Network, Inc.*,
  790 F.3d 1343 (Fed. Cir. 2015) ...............................................................*passim*

*Key Pharmaceuticals v. Hercon Laboratories Corp.*,
  161 F.3d 709 (Fed. Cir. 1998) ........................................................................21

*Lismont v. Alexander Binzel Corp.*,
  813 F.3d 998 (Fed. Cir. 2016) ........................................................................16

*Microsoft Corp. v. i4i Ltd. Partnership*,
  546 U.S. 91 (2011)............................................................................................62

**Page(s)**

*Mikels v. City of Durham,*
183 F.3d 323 (4th Cir. 1999) ............................................................23

*Mortgage Grader, Inc. v. First Choice Loan Services, Inc.,*
811 F.3d 1314 (Fed. Cir. 2016) ...............................................35, 39, 40

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
134 S. Ct. 2120 (2014) ......................................................................62

*In re Nuijten,*
500 F.3d 1346 (Fed. Cir. 2007) ...................................................48, 49

*Ohio Willow Wood Co. v. Alps South, LLC,*
735 F.3d 1333 (Fed. Cir. 2013) ...................................................16, 22

*OIP Technologies, Inc. v. Amazon.com, Inc.,*
788 F.3d 1359 (Fed. Cir.), *cert. denied,*
136 S. Ct. 701 (2015) ...............................................................*passim*

*Parker v. Flook,*
437 U.S. 584 (1978) ............................................................39, 53, 54, 61

*Pharmacia & Upjohn Co. v. Mylan Pharmaceuticals, Inc.,*
170 F.3d 1373 (Fed. Cir. 1999) .........................................................20

*Ramsay v. U.S. Immigration & Naturalization Service,*
14 F.3d 206 (4th Cir. 1994) ...............................................................22

*Saudi v. V. Ship Switzerland, S.A.,*
93 F. App'x 516 (4th Cir. 2004) ........................................................23

*Swentek v. USAIR, Inc.,*
830 F.2d 552 (4th Cir. 1987) .............................................................23

*Tyco Healthcare Group LP v. Mutual Pharmaceutical Co.,*
407 F. App'x 481 (Fed. Cir. 2011) ....................................................19

*Ultramercial, Inc. v. Hulu, LLC,*
772 F.3d 709 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 2907 (2015) .........*passim*

*United States v. American Railway Express Co.,*
265 U.S. 425 (1924) ..........................................................................50

**Page(s)**

*Vardon Golf Co. v. Karsten Manufacturing Corp.*,
294 F.3d 1330 (Fed. Cir. 2002) ..........................................................25

*Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC*,
No. 2015-1411, 2015 WL 9461707 (Fed. Cir. Dec. 28, 2015) .............30, 37, 55

*Versata Development Group, Inc. v. SAP America, Inc.*,
793 F.3d 1306 (Fed. Cir. 2015) .......................................................35, 39, 47, 57

*W.L. Gore & Associates, Inc. v. International Medical Prosthetics Research Associates, Inc.*,
975 F.2d 858 (Fed. Cir. 1992) ............................................................16, 18, 19

## STATUTES AND RULES

35 U.S.C. § 101 ...............................................................................2, 3, 25

Federal Rule of Civil Procedure 54(b)...............................................2, 17

## OTHER AUTHORITIES

HTML, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/HTML ............................................................4

Restatement (Second) of Judgments § 13 (1982) .............................23, 24

18A Charles Alan Wright et al., *Federal Practice and Procedure* (2d ed.), Westlaw (database updated Apr. 2015).....................................20

## STATEMENT OF RELATED CASES

The three Intellectual Ventures I LLC and Intellectual Ventures II LLC (collectively "IV") patents at issue in this appeal—U.S. Patent Nos. 7,984,081 ("'081 patent"), 6,546,002 ("'002 patent"), and 6,715,084 ("'084 patent")[1]—are the subject of numerous district court and/or Patent Office proceedings and decisions, some of which are now on appeal to this Court. *See* Br. 1, ECF No. 27 (listing related cases). All three patents have had some or all of their asserted claims invalidated under 35 U.S.C. §§ 101, 102 and/or 103.

For example: all the '081 patent claims asserted here were held invalid under § 103 in an *inter partes* review, *Int'l Bus. Machs. Corp. v. Intellectual Ventures I LLC*, IPR2014-01385, 2016 WL 212794 (P.T.A.B. Jan. 15, 2016) (notice of appeal filed but not yet docketed at Fed. Cir.); all of the '002 patent claims were held invalid under § 101 in *Intellectual Ventures I LLC v. Erie Indem. Co*., Nos. 1:14-cv-220 et al., 2015 WL 5686643 (W.D. Pa. Sept. 25, 2015), *appeals pending* Nos. 2016-1128, and 1132 (Fed. Cir.) (calendared for argument with this appeal) ("*Erie Indemnity*"); and several of the '084 patent claims were held invalid under § 101 in *Intellectual Ventures II LLC v. JP Morgan Chase & Co.* ("*JPMC*"), No. 13-cv-3777, 2015 WL 1941331 (S.D.N.Y. Apr. 28, 2015).

---

[1] On March 8, 2016, IV moved in this appeal for leave to withdraw U.S. Patent No. 6,314,409, the fourth asserted patent. ECF No. 31. IV's motion was granted on March 23, 2016. ECF No. 33.

This Court's decision may affect or be affected by any of these cases.

## COUNTERSTATEMENT OF THE ISSUES

1. Whether the district court properly exercised its discretion in entering final judgment under Federal Rule of Civil Procedure 54(b) after granting summary judgment that all of IV's asserted patents are invalid, which left pending only Capital One's antitrust counterclaims.

2. Whether the district court correctly granted summary judgment as to the '084 patent based on issue preclusion because another district court had conclusively found claims of that patent invalid under 35 U.S.C. § 101.

3. Whether, in any event, the asserted claims of the '081, '002, and '084 patents (eleven total claims) are invalid for lack of patent-eligible subject matter under § 101 because they are directed to abstract ideas and at most require the type of generic computer implementation found insufficient to make claims patent eligible in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014), and numerous cases since in this Court.

## COUNTERSTATEMENT OF THE CASE

In January 2014, IV sued Capital One for alleged infringement of five patents. A57-58. Capital One initially asserted defenses and counterclaims for invalidity and noninfringement, and subsequently counterclaimed that IV violated antitrust laws by, among other things, amassing a portfolio of thousands of low-

2

quality patents, concealing the scope of its patent portfolio and demanding hundreds of millions of dollars for these weak patents or threatening companies with an endless wave of patent cases. A505-84.[2] On March 31, 2014, IV dropped one of the patents because Capital One did not make, use or sell the accused service. A3001-05.

In September 2015, the district court granted summary judgment to Capital One on all of IV's remaining patent claims, concluding that (1) the '081 and '002 patents are invalid under 35 U.S.C. § 101 and (2) IV is precluded from re-litigating the § 101 validity of the '084 patent and U.S. Patent No. 6,314,409 ("'409 patent") in light of the *JPMC* court conclusively resolving those issues against IV. The district court then entered final judgment under Rule 54(b) on all of the patent claims, finding no just reason for delay because only Capital One's antitrust counterclaims remained pending.

On March 8, 2016, after the PTAB found the '409 patent invalid under § 101 in a covered business method review and IV elected not to appeal that decision, IV withdrew the '409 patent from this appeal. ECF No. 31 at 2. Therefore, only three patents remain in this appeal: the '081, '002 and '084 patents.

---

[2]   The antitrust claims are not at issue in this appeal.

## A.    The Patents-in-Suit

IV's appeal addresses a total of eleven claims in the '081, '002, and '084 patents.

### 1.    '081 Patent (Data Organization And Modification)

The '081 patent addresses the basic idea of organizing and modifying data relating to business records and other documents. A137-79. At the time of the alleged invention, it was "typical[]" and "convenient" for companies to store business information in a format called Extensible Markup Language ("XML") and it was well-known that XML documents could be reorganized and modified. A168-69 (1:28-43, 3:23-25). XML, developed in the mid-1990s, is "a markup language that defines a set of rules for encoding documents in a format which is both human-readable and machine readable." A663-64 (citing 1996 XML specification); *see also* A675.[3] "The type of information in such XML documents is frequently common transactions [sic] such as invoices and purchase orders and common reference documents such as customer profiles and price lists." A168 (1:29-33). But because companies could create their own XML formats within the rules, not all XML formats were compatible with each other, making it potentially difficult to share from one company to another. *Id.* (1:37-38, 1:43-45). The '081

---

[3]    Another common markup language, Hypertext Markup Language ("HTML"), is used for web pages. *See* HTML, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/HTML.

patent purported to solve this problem with a computer system that extracts the information from an XML document, displays it to the user for editing, and propagates changes back to an XML document.  A168 (1:52-63), A169 (3:13-65).

At issue here are independent claim 21 and dependent claims 22 and 24. Claim 21 (which IV conceded is representative (A12)) recites a generic computer "apparatus" with a set of "component[s]" that, in some unspecified way, "organizes," "identifies," "maps," "defines," "detects," and "modifies" data in XML documents:

> **21.** An apparatus for manipulating XML documents, comprising:
>
> a processor;
>
> a component that *organizes* data components of one or more XML documents into data objects;
>
> a component that *identifies* a plurality of primary record types for the XML documents;
>
> a component that *maps* the data components of each data object to one of the plurality of primary record types;
>
> a component that *organizes* the instances of the plurality of primary record types into a hierarchy to form a management record type;
>
> a component that *defines* a dynamic document for display of an instance of a management record type through a user interface; and
>
> a component that *detects* modification of the data in the dynamic document via the user interface, and in response thereto *modifies* a data component in an XML document.

A177 (emphasis added).

Based on IV's proposed constructions (which the district court and Capital One adopted for purposes of summary judgment), a "primary record type" ("PRT") is just an unspecified "data structure to contain data extracted from XML documents" and a "management record type" ("MRT") is just an unspecified "collection of primary record types."  A30; *see* A169 (4:13-14, 20-23); A3065, A3067.  The patent states that a dynamic document ("DD") is just a set of unspecified rules for "display[ing] and organiz[ing]" MRTs in a "user interface." A169 (4:11-12, 3:37-40); *see id*. (3:55-56).  Claim 22 describes the contents of the XML document and claim 24 states that it contains business information like "invoices, bills of material, [or] purchase orders."  A177-78 (cl. 22, 24).

The asserted claims do not explain how to perform the claimed data organization and modification and require no specialized hardware or software. *See* A177-78.

## 2.    '002 Patent (User Resource Retrieval)

The '002 patent relates to the basic idea of retrieving user-specific information and resources (such as "documents," "files," and "telephone numbers") using pointers.  A249 (3:66-4:4, 4:46-49); *see* A232-57.

The Background of the Invention acknowledges that a user interface "generally includes 'pointers'" and "pointers" are "commonly used to

6

retrieve/access" information and resources such as "applications, files, folders, [and] documents." A248 (1:34-45). The patent explains that typically, a "user interface" (such as the Windows "Start" menu) has a list of such "pointers" from which the user can access the information and resources on the user's computer. *Id.* But according to the specification, there was a need for an interface able to retrieve the user's information from a different computer. A249 (3:57-63).

The specification's proposed solution is a "mobile interface agent" that displays a list of pointers allowing the user to retrieve resources and information from another location. A249 (4:50-51) ("mobile interface agent" is "basically an agent that allows the user to access" such resources and information); A250 (5:57-58). For example, a "mobile interface agent" might retrieve the user's "phone numbers" from another location or respond to "voice command[s]" such as "Call Mom" or "find a Korean restaurant within 5 miles from my home." A250 (5:59, 5:66, 6:48-55).

At issue here are dependent claim 9 and independent claims 11, 34, and 37. Claim 9 (which depends from claim 1 and which IV treats as representative, e.g., Br. 57) provides:

> **1.** A method for retrieving user specific resources and information stored either on a local device or a network server, the method comprising the steps of:
>
>> retrieving a mobile interface from the network server to the local device;

> displaying the mobile interface on the local device, the mobile interface including a plurality of pointers corresponding to the user specific resources and information; and
>
> retrieving the user specific resources and information using the plurality of pointers displayed on the mobile interface.
>
> **9.** A method according to claim 1, wherein the step of retrieving the mobile interface from the network server comprises the step of retrieving the mobile interface via a cellular network.

A256.  Based on IV's construction (which the district court and Capital One adopted for purposes of summary judgment), a "mobile interface" is "[a] user interface accessible on different computing devices and capable of dynamically accessing user specific data stored on a network server and local device."  A34 (citation omitted).

Claim 11 includes largely the same activities except also recites retrieving "user profile and configuration data" and using it to "update" the "mobile interface."  A256.  Claims 34 and 37 recite a "mobile interface" for performing the functions described in claims 1 and 9.  A257.  The claims do not specify or require any specialized hardware or software for implementing that information-retrieval concept.

### 3.     '084 Patent (Anomaly Detection)

The '084 patent relates to the basic idea of analyzing data from multiple sources in some unspecified way to detect an anomaly and using some unspecified

pattern correlations to determine targets likely to be affected by the anomaly. A259-72.

The specification explains that when computers are connected to a network they are vulnerable to unauthorized users attempting to gain access. A265 (1:12-32). To combat such threats, the specification acknowledges that computers have long used "intrusion detection techniques" to spot anomalous events: "existing security systems determine when computer misuse or intrusion occurs." A266 (3:41-43, 4:17-18). The specification contends that existing techniques are inadequate because they are "directed to the analysis of a single customer's data to determine intrusion events," as opposed to analyzing data from multiple sources to recognize broader patterns of anomalous activity. *Id.* (4:64-67).

The patent's purported innovation is to analyze data from multiple sources. *Id.* (4:55-63), A267 (5:45-56), A268 (8:39-41), A270 (11:9-11). The disclosed system "monitors the traffic" from multiple sources (i.e., collecting the data from "existing customer's conventional intrusion detection system[s]"), looks for "patterns" to detect suspicious activity, and then provides "warnings" to computers that could be at risk of future intrusions. A268-69 (8:25-31, 8:66-9:6, 9:56-60). The disclosed system can be implemented using a "conventional computer running a conventional operating system, available as commercial-off-the-shelf products," is "not limited to the components or configurations described," and "may be

9

practiced with software programs written in various ways, or different equipment."

A269-70 (10:51-52, 12:6-11).

At issue here are dependent claims 15, 18, 27, and 32. Claims 15 and 18

(which are representative and depend from claim 9) recite:

> **9.** A method of alerting a device in a networked computer system comprising a plurality of devices to an anomaly, comprising:
>
>> detecting an anomaly at a first device in the computer system using network-based intrusion detection technicques [sic] comprising analyzing data entering into a plurality of hosts, servers, and computer sites in the networked computer system;
>>
>> determining a device that is anticipated to be affected by the anomaly by using pattern correlations across the plurality of hosts, servers, and computer sites; and
>>
>> alerting the device that is anticipated to be affected by the anomaly.
>
> **15.** The method of claim **9**, wherein alerting the device comprises alerting a firewall associated with the device that the anomaly has been detected.
>
> **18.** The method of claim **9**, further comprising adjusting anomaly detection sensitivity and alarm thresholds based on the detected anomaly.

A270-71. The other two asserted claims (claims 27 and 32) are materially the

same, except couched as a "data collection and processing center" rather than

methods. A271. The '084 patent claims disclose no specialized hardware or

software for implementing the anomaly-detection idea.

10

## B.     District Court Proceedings

### 1.     Summary Judgment Of Invalidity Under § 101

On January 20, 2015, Capital One moved for summary judgment that the asserted claims of all asserted patents are invalid for lack of patent-eligible subject matter under § 101.  A1-2 & n.2; Dk. Sh. 77 (ECF No. 147).  Capital One applied IV's proposed claim constructions for purposes of resolving the § 101 invalidity question.  *E.g.*, A287, A294; A1548; A3108 n.4; A3139.

Specific to the three patents remaining on appeal, an appointed Special Master recommended denying Capital One's motion as to the '081 and '002 patents, A1375-410 (May 12, 2015), but granting it as to the '084 patent, A1523-73 (June 11, 2015).  The Special Master found that (a) the '081 and '002 patent claims are eligible under § 101 and (b) a previous district court decision finding the '084 patent claims ineligible under § 101 (the *JPMC* decision in New York) does not preclude IV from re-litigating that issue in this case, but (c) the '084 patent claims are ineligible under § 101 on the merits.  A1410; A1536, A1573.  The parties each objected to the Special Master's recommendations.

In September 2015, after reviewing the Special Master's recommendations and hearing argument from the parties, the district court granted summary judgment to Capital One on all of the asserted patent claims.  Applying the two-step *Alice* framework, the district court found the '081 and '002 patent claims

11

ineligible under § 101. A1-40, *published at* 2015 WL 5165442 (D. Md. Sept. 2, 2015); *see also* A3238-348. In a separately issued opinion, the district court also held the '084 patent claims invalid based on issue preclusion because the *JPMC* court already conclusively determined that certain of its claims are invalid under § 101. A43-54, *published at* 2015 WL 5201356 (D. Md. Sept. 4, 2015). Although the issue was fully briefed and the Special Master found the '084 patent claims invalid under § 101, the district court did not reach the underlying merits of the '084 patent claims' § 101-eligibility. A53-54.

## 2. Rule 54(b) Judgment On The Patent Claims

On March 2, 2015, the district court observed that Capital One's antitrust counterclaims are "not … narrowly focused on specific patents" but instead "allege as wrongful conduct Plaintiffs' intentional acquisition of 'a massive patent portfolio,' encompassing 3,500 patents." A3026 (citation omitted). On September 8, 2015, the district court entered final judgment under Rule 54(b) on IV's patent claims, finding "no just reason [to] delay" an appeal on those issues because only Capital One's antitrust counterclaims remained pending. A55-56. IV subsequently moved to vacate the Rule 54(b) judgment as to the '084 patent; Capital One opposed; and the district court denied the motion. A3367-410; A1687-713; A1714-26; A1727-28.

## SUMMARY OF THE ARGUMENT

The district court properly granted summary judgment to Capital One and correctly entered Rule 54(b) judgment on IV's patent claims.

1.    IV's argument that the district court abused its discretion in entering partial judgment under Rule 54(b) is without merit.  The court disposed of all of IV's remaining patent claims, leaving only Capital One's antitrust counterclaims—which, as the district court previously recognized, are not focused on specific patents but instead are much more broadly directed to IV's intentional acquisition of over 3,500 patents.  The district court properly saw no just reason to delay an appeal on the invalid patent claims.

2.    IV's perfunctory, one-page challenge to the district court's issue preclusion ruling on the '084 patent also fails.  IV argues only that the *JPMC* decision was not sufficiently "final" for issue preclusion because it was not yet appealable.  That is not the standard for issue preclusion finality in the Fourth Circuit, whose law IV concedes controls.  *See* Br. 23-24.  Under this governing law, the *JPMC* decision is final because it is conclusive and thorough, not avowedly tentative.  IV's reliance on the Seventh Circuit's different standard for issue preclusion finality is misplaced.

3.    Under the Supreme Court's two-step *Alice* framework, the asserted claims of the three patents on appeal are not directed to patent-eligible subject

13

matter under § 101.  The district court correctly applied that framework in finding the asserted claims of the '081 and '002 patents ineligible.  In addition, although the '084 patent claims are here on review of a finding of collateral estoppel, this Court can affirm on the alternative ground that, as the *JPMC* court and Special Master found, these claims are invalid under § 101.

At step one of the *Alice* analysis, the asserted claims are directed to abstract ideas—organizing and modifying data relating to documents ('081 patent), retrieving user resources and information using pointers ('002 patent), and analyzing data from multiple sources to detect anomalies and determine targets likely to be affected ('084 patent).  Those ideas and claims are just like ones the Supreme Court and this Court have repeatedly held abstract and ineligible, and are all akin to longstanding human activity.  At *Alice* step two, the claims, at most, recite generic computer implementation and append other inconsequential steps— precisely the same features that the Supreme Court and this Court have repeatedly held do not make claims patent eligible under § 101.

IV's arguments in this appeal mirror its unsuccessful § 101 arguments in its prior appeal against Capital One, and reflect IV's continued misapplication of the *Alice* framework.  *See Intellectual Ventures I LLC v. Capital One Bank (USA), N.A.*, 792 F.3d 1363 (Fed. Cir. 2015).  IV principally contends that its claims are not directed to abstract ideas (at *Alice* step one) because they are recited in

particular technological environments (such as "computer networks" and "electronic data," Br. 49) and that, in any event, the claims add enough to be patent eligible (at *Alice* step two) because they solve technological problems by reciting various functional and generic computer components (such as user "interfaces," "components," and "hierarchical data structures") and routine activities that are the most basic functions of a computer (such as receiving, modifying, and displaying user data).

*Alice* and *Intellectual Ventures* (and a host of other cases) foreclose those arguments. That IV's claims are recited in a particular "technological environment" does not make the underlying ideas "any less abstract." *Intellectual Ventures*, 792 F.3d at 1366-67. The basic flaw in IV's patent claims is that they are recited in aspirational terms, laying claim to essentially the entire abstract idea, rather than some specific manifestation of it. IV's claims include generic computer features—sometimes cloaked in technical-sounding constructs like "primary record type" ('081 patent) and "mobile interface" ('002 patent) or seemingly elaborate but generic language like "pattern correlations" ('084 patent)—that don't meaningfully limit the claims. At most, each of IV's claims generically recites a "software brain tasked with … applying [the] abstract idea"—which is the hallmark of claims that fail to pass muster under § 101. *Id.* at 1371 (internal quotation marks omitted).

Ignoring the vast majority of this Court's § 101 decisions, IV argues its claims are computer-centric, specific, and inventive in the same way as the patent-eligible claims in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014). However, like the claims in *Intellectual Ventures*, despite being sited in a particular "technological environment, such as the Internet," the claims here "do not address problems unique to the Internet, so *DDR* has no applicability." *Intellectual Ventures*, 792 F.3d at 1371. Finally, IV's perfunctory references to "evidence" are unavailing; all of its claims are ineligible as a matter of law.

## ARGUMENT

## I.   STANDARD OF REVIEW

This Court reviews the district court's Rule 54(b) "no just reason for delay" determination in entering final judgment on IV's patent claims for abuse of discretion. *W.L. Gore & Assocs., Inc. v. Int'l Med. Prosthetics Research Assocs., Inc.*, 975 F.2d 858, 862 (Fed. Cir. 1992). It should be disturbed only if "clearly unreasonable." *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 9-10 (1980).

This Court reviews the district court's application of issue preclusion and entry of summary judgment *de novo* under Fourth Circuit law. *See Lismont v. Alexander Binzel Corp.*, 813 F.3d 998, 1002 (Fed. Cir. 2016); *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1341-42 (Fed. Cir. 2013). Whether a patent claims eligible subject matter is likewise an issue of law this Court reviews *de*

*novo.  OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir.), *cert.*

*denied*, 136 S. Ct. 701 (2015).

## II.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ENTERING RULE 54(B) JUDGMENT ON THE PATENT CLAIMS

Under Federal Rule of Civil Procedure 54(b), "[w]hen an action presents

more than one claim for relief …, the court may direct entry of a final judgment as

to one or more, but fewer than all, claims or parties only if the court expressly

determines that there is no just reason for delay."  The rule "is designed to permit

acceleration of appeals in multiple-claim cases."  *Gelboim v. Bank of Am. Corp.*,

135 S. Ct. 897, 906 (2015).

After finding all of IV's remaining patent claims invalid under § 101, the

district court properly exercised its discretion in finding no just reason to delay an

appeal on the patent counts.  IV challenges the district court's finding and entry of

Rule 54(b) final judgment on three grounds.  None has merit.

First, IV contends the Rule 54(b) judgment should be "vacated for failure to

provide findings and reasoning" and requests a remand for the district court to

more clearly explain its rationale.  Br. 19-20.  The district court, however, did

explain its reasoning.  Having disposed of IV's patent claims (leaving only Capital

One's antitrust counterclaims pending), the district court in its Rule 54(b) order

expressly found "there is no just reason for delay."  A55.  Then, in rejecting IV's

motion to vacate the Rule 54(b) judgment, the district court elaborated on why

17

allowing an immediate appeal was the most efficient course and would not unduly risk increasing the number of appeals. A1728. The court explained, for example, that going forward as to all asserted patents now would produce one appeal on the patent issues, "which *could* be followed by a second appeal" under certain circumstances, whereas granting IV's motion would "necessarily result[] in two appeals" on the patent issues because IV only asked the district court to vacate the Rule 54(b) judgment as to *some* (but not all) of the patent claims. *Id*. In any event, specific findings are not required where, as here, "[t]he posture of the case and the factors justifying entry of judgment are apparent from" the briefs and record. *W.L. Gore*, 975 F.2d at 865.

Second, IV contends that "the presence of the Antitrust Counterclaims" makes Rule 54(b) judgment improper because the antitrust claims are "interrelate[ed]" with the specific patent claims IV asserts in this appeal. Br. 20. But, as the district court recognized, Capital One's antitrust counterclaims are "*not … narrowly focused on specific patents*," but instead are much more broadly focused on IV's "intentional acquisition of 'a massive patent portfolio,' encompassing 3,500 patents." A3026 (emphasis added). Capital One's antitrust claims also allege as wrongful conduct, among other things, IV's practice of concealing the scope of this portfolio and demanding supracompetitive licensing rates or threatening companies with endless patent litigation. *See* A3026-27;

A540-81, A551 ¶ 145. Therefore, Capital One's antitrust counterclaims are independent of the merits of any particular patent's validity; the continuing pendency of the antitrust counterclaims "is not adequate to show an abuse of discretion" in Rule 54(b) certification. *W.L. Gore*, 975 F.2d at 860, 864. Nor will the Rule 54(b) judgment unduly multiply the number of appeals; the potential for multiple appeals is inherent in any Rule 54(b) judgment because by definition one or more distinct claims remain, and the district court explained why Rule 54(b) certification is the most efficient course here. *See* A1728.

This Court already reached this same conclusion under similar circumstances in *W.L. Gore*. There, the district court entered judgment of noninfringement and invalidity followed by a Rule 54(b) certification even though antitrust counterclaims remained pending. 975 F.2d at 864-65. This Court affirmed the decision over the defendant's argument that certification was improper due to the purported "factual overlap" between the patent infringement counts and antitrust counterclaims. *Id.* at 860, 864; *see also Tyco Healthcare Grp. LP v. Mutual Pharm. Co.*, 407 F. App'x 481, 482 (Fed. Cir. 2011) (no abuse of discretion in Rule 54(b) judgment where antitrust counterclaim remained pending).

Third, IV contends that Rule 54(b) judgment was improper as to the '084 patent for the added reason that the district court granted summary judgment based

19

on issue preclusion and the underlying *JPMC* order was not yet appealable. This Court has rejected that argument too.

In *Pharmacia & Upjohn Co. v. Mylan Pharmaceuticals, Inc.*, this Court affirmed summary judgment based on issue preclusion, rejecting the patentee's argument that the "district court should have stayed the proceedings" until the underlying merits ruling could be appealed. 170 F.3d 1373, 1379 (Fed. Cir. 1999). This Court explained that if the underlying invalidity decision is later reversed, the patentee "may then move the district court to modify its [preclusion-based] judgment accordingly." *Id.* at 1382. Here, the district court likewise rejected IV's argument that it should await final judgment in *JPMC* (A1647-48) and found no cause here to delay an appeal of its preclusion ruling on the '084 patent.[4]

In any event, this procedural posture—what IV calls "the cart before the horse" (Br. 4)—is a problem of IV's own strategic decision making. As the district court explained when IV made the same argument below (A1647), IV represented to the *JPMC* court that it would seek a Rule 54(b) judgment on any adverse § 101 ruling in that case but delayed doing so for nearly five months, during which time it tried to leverage the *lack* of a Rule 54(b) judgment in *JPMC* as the primary basis

---

[4]   Wright & Miller does not compel a contrary conclusion. It acknowledges that, "[d]espite the manifest risks of resting preclusion on a judgment that is being appealed, the alternative of retrying the common claims, defenses, or issues is *even worse*." 18A Charles Alan Wright et al., *Federal Practice and Procedure* § 4433 (2d ed.), Westlaw (database updated Apr. 2015) (emphasis added).

to oppose issue preclusion in this case. Only after IV lost the issue preclusion argument in this case did IV then, unsuccessfully, seek a Rule 54(b) judgment in *JPMC*. The district court did not abuse its discretion in rejecting IV's gambit to "have it both ways" on the '084 patent. A1728; *see also* A1691-92 (citing A1706), A1696-97.

Finally, IV has waived any argument the Rule 54(b) judgment was improper as to the '081 and '002 patents. When IV moved to vacate the Rule 54(b) judgment (A1643), it only did so as to the '084 patent and the now-abandoned '409 patent; IV admitted that "[t]he validity of the '081 and '002 patents is ready for substantive review by the Federal Circuit." A1647. IV cannot change course now; this argument is waived. *See Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 715 (Fed. Cir. 1998) ("[D]octrines of estoppel, waiver, invited error, or the like … prohibit a party from asserting as 'error' a position that it had advocated ….."). With this appeal inevitably going forward on the '081 and '002 patents and IV's related appeal in the *Erie Indemnity* case going forward on the '002 patent, there is likewise no sound reason to delay an appeal on the '084 patent.

Far from clearly abusing its discretion, the district court properly entered Rule 54(b) judgment on IV's patent claims.

21

### III. THE DISTRICT COURT PROPERLY PRECLUDED IV FROM RELITIGATING THE INVALIDITY OF THE '084 PATENT CLAIMS BASED ON ISSUE PRECLUSION

Issue preclusion, or collateral estoppel, "protects [Capital One] from having to litigate issues that have been fully and fairly tried in a previous action and adversely resolved against [IV]," such as the invalidity of the patent claims that IV asserted against Capital One. *See Ohio Willow Wood Co.*, 735 F.3d at 1342; *see also Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 349-50 (1971).

There are five requirements for collateral estoppel under Fourth Circuit law. *Ramsay v. U.S. Immigration & Naturalization Serv.*, 14 F.3d 206, 210 (4th Cir. 1994). IV does not contest four of the requirements—i.e., that the issue in the prior proceeding was identical, actually determined, and necessary, and that the affected party was afforded a full and fair opportunity to litigate the issue. *See id.*; Br. 23-24. IV contests only the "finality" requirement. Br. 23. The district court held that the recent *JPMC* decision was sufficiently "final" and satisfied the other requirements for issue preclusion under Fourth Circuit law. A43-54; *see supra* at 1, 3; A1365-74. IV concedes that Fourth Circuit law controls, but argues that the *JPMC* decision was not sufficiently final because it was not an appealable judgment. Br. 23-24.

The Fourth Circuit rejected IV's narrow concept of "finality" in *Swentek v. USAIR, Inc.*, holding that an appealable judgment is not required for issue preclusion to apply. 830 F.2d 552, 560-61 (4th Cir. 1987).[5] Instead, it explained that "[f]inality for purposes of collateral estoppel is a flexible concept and 'may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again.'" *Id.* at 561 (citing Restatement (Second) of Judgments § 13 (1982) ("Restatement of Judgments")).[6] The *Swentek* court held that "[a]s long as the prior adjudication of the identical issue is conclusive," there is no need for "the formality of an express [Rule 54(b)] order and a 'no just reason for delay' determination." *Id.* In other words, the Fourth Circuit looks past labels and formalities to determine whether a trial court has, practically speaking, conclusively resolved the issue for which preclusion is sought.

The *JPMC* decision is final under Fourth Circuit issue preclusion law. It is a thoroughly reasoned opinion finding the '084 patent claims invalid under § 101, and was not preliminary or tentative, but rather fully and finally resolved the issue.

---

[5]   *Swentek* was abrogated on other grounds. *See Mikels v. City of Durham*, 183 F.3d 323, 329 & n.4 (4th Cir. 1999).

[6]   *See also Saudi v. V. Ship Switz., S.A.*, 93 F. App'x 516, 517-20 (4th Cir. 2004) (discussed at A49); Restatement of Judgments § 13 ("'[F]inal judgment' includes any prior adjudication of an issue in another action that is determined to be *sufficiently firm* to be accorded conclusive effect." (emphasis added)).

2015 WL 1941331, at *2-7, *12-17. Indeed, the *JPMC* court itself considered the § 101 issues conclusively resolved: it held a hearing (A1705), disposed of the counts alleging infringement of the '084 patent (*JPMC*, 2015 WL 1941331, at *17), ordered the clerk to mark the summary judgment motion "terminated" (*id.*), and "denied as moot" additional discovery motions relating to that patent (Order Regulating Discovery, No. 13-cv-3777 (S.D.N.Y. May 4, 2015), ECF No. 83). Given all these indicia, the *JPMC* order is final for purposes of issue preclusion.

As the district court recognized (A50-51), this Court's decision in *Dana v. E.S. Originals, Inc.* is instructive. 342 F.3d 1320 (Fed. Cir. 2003). Although *Dana* applied Eleventh Circuit preclusion law and therefore is not controlling, it is persuasive authority because, like the Fourth Circuit, "the Eleventh Circuit follows the more flexible approach employed by the Restatement of Judgments, which gives collateral estoppel effect to orders that do not constitute final, appealable judgments if they are 'sufficiently firm to be accorded conclusive effect.'" *Id.* at 1325. Under that flexible approach, "[t]he test … is whether the prior decision was 'adequately deliberated and firm' or 'avowedly tentative,' and whether the parties were fully heard in the prior proceeding." *Id.* at 1323 (quoting Restatement of Judgments § 13, cmt. g). Applying that standard, this Court in *Dana* found the finality requirement for issue preclusion satisfied because the court (1) "conducted hearings"; (2) "set forth its findings of fact and conclusions of law in fully

reasoned opinions" that "were not preliminary in nature, but made clear that they fully and finally resolved the matters addressed"; and (3) "clearly considered the issue … to be conclusively decided and complete." *Id.* at 1324. The same is true of the *JPMC* decision. *See supra* at 23-24; A52-53.

IV's reliance (Br. 23) on *Vardon Golf Co. v. Karsten Manufacturing Corp.*, 294 F.3d 1330 (Fed. Cir. 2002), is misplaced. Instead of applying the Fourth Circuit's flexible test, *Vardon* applied the Seventh Circuit's stricter test that "to be 'final' for purposes of collateral estoppel the decision need … be immune, as a practical matter, to reversal or amendment." *Id.* at 1333. *Vardon*'s holding that Seventh Circuit law requires an appealable judgment for preclusion is inapplicable because the Fourth Circuit applies a more flexible standard, which the district court correctly applied.[7]

## IV.   IV'S ASSERTED PATENT CLAIMS ARE INVALID UNDER § 101

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. As the Supreme Court has long recognized, § 101 "contains an important implicit exception" for abstract ideas, *Alice*, 134 S. Ct. at 2354 (citation omitted), which are not patent eligible as a matter of law because

---

[7]   Also, in *Vardon*, the plaintiff was unable to appeal the underlying decision *at all*, 294 F.3d at 1334, whereas IV can eventually appeal the *JPMC* decision.

they are basic tools in the "storehouse of knowledge" that are "free to all … and reserved exclusively to none," *Bilski v. Kappos*, 561 U.S. 593, 602 (2010) (citation omitted). "'[M]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it,' thereby thwarting the primary object of the patent laws." *Alice*, 134 S. Ct. at 2354 (alteration in original) (citation omitted). The Supreme Court's two-part framework governs the § 101 analysis. *Id.* at 2355.

At step one, the Court asks whether the claims are, at their core, directed to an abstract idea. *Id.* In particular, "[a]n abstract idea does not become nonabstract by limiting [it] to a … technological environment, such as the Internet." *Intellectual Ventures*, 792 F.3d at 1366. The Court must determine whether, notwithstanding computer implementation, the "heart" of the claims amounts to an abstract idea. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714-15 (Fed. Cir. 2014) (eleven-step claim is at "heart" directed to abstract idea), *cert. denied*, 135 S. Ct. 2907 (2015); *see also Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015) ("most important aspect" of Internet claims is abstract idea (citation omitted)); *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344-45 (Fed. Cir. 2013) ("heart" of computer claims is abstract idea); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) (multi-step claim in its "simplest form" is directed to abstract idea).

26

At *Alice* step two, the Court must determine whether the claims add "an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application."    134 S. Ct. at 2357 (citation omitted).    The prohibition on patenting abstract ideas cannot be circumvented through mere "draftsman's art," or by trying to dress up an abstract idea with inconsequential steps or features.    *Id.* at 2359.    Taking an abstract idea and adding "well-understood," "routine," or "conventional" activities or features "previously known to the industry" contributes nothing inventive.    *Id.*    Patentees cannot merely recite generic computer functions and components at a high level of generality—like a "'software' 'brain'" (*Intellectual Ventures*, 792 F.3d at 1370-71)—to perform the idea without specifying "how [it is] specially programmed to perform the steps claimed" (*Dealertrack*, 674 F.3d at 1333 (citation omitted)) and "how the result is accomplished" (*Internet Patents Corp.*, 790 F.3d at 1348).

In *Alice*, for example, although the claims purported to describe "a computerized scheme for mitigating 'settlement risk,'" 134 S. Ct. at 2352, the Supreme Court found the claims ineligible because they merely recited performing the abstract idea of intermediated settlement using "purely functional and generic" computer components and "generic computer functions" (such as creating, obtaining, and adjusting user data).    *Id.* at 2359-60.    Applying those principles, this Court repeatedly has held that implementing an abstract idea in a computer

environment or on the Internet does not transform the idea into a patent-eligible invention. *E.g.*, *Intellectual Ventures*, 792 F.3d at 1366, 1369-71; *Internet Patents Corp.*, 790 F.3d at 1348-49; *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1346-49 (Fed. Cir. 2014); *Ultramercial*, 772 F.3d at 716-17.

Here, the district court correctly held the asserted claims of the '081 and '002 patents ineligible under § 101 because they are directed to an abstract idea and add nothing inventive. A12-40. The asserted '084 patent claims likewise are ineligible under § 101, as the Special Master and the *JPMC* court found. A1563-73. Although the district court did not reach the merits of § 101 for the '084 patent claims—instead properly disposing of it based on issue preclusion (A53, A54 ¶ 5)—it was fully briefed and argued below (Dk. Sh. 77, 79, 85-87, 94-96 (ECF Nos. 147-1, 169-1, 227, 246, 325, 336, 344); A1458-65), and is an alternative ground on which this Court can affirm. *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 822 n.1 (Fed. Cir. 1989).

## A. The '081 Patent Claims Are Not Patent Eligible

### 1. The Claims Are Directed To An Abstract Data-Manipulation Idea

The asserted claims of the '081 patent (21, 22 and 24) are directed to the abstract idea of organizing and modifying data relating to documents (occasionally referred to as the "data-manipulation" idea), as the district court found. *See* A13

(abstract idea at the "core" of the '081 claims is "organizing, displaying, and manipulating data related to business documents").

Viewed in its "simplest form" (*Dealertrack*, 674 F.3d at 1333), independent claim 21 recites retrieving data from a document ("data components"), (re)organizing the data in some unspecified way ("organiz[ing]," "identif[ying]," "map[ping]," and "organiz[ing]"), and presenting it to a user for editing ("defin[ing]," "detect[ing] modification," and "modif[ying]").  All the basic data manipulation steps are recited at a high level of generality.  First, the claim recites that data components of XML documents are "organized" into data objects, but does not explain how the "organiz[ing]" is to be done; "organizing" is such a broad verb that it could be applied to nearly any manipulation of information.  Second, the claim recites that "primary record types" (PRTs) (which are just unspecified "data extracted from XML documents," A30) are "identifie[d]" for the XML documents, but again says nothing about how the PRTs or this unspecified data are to be identified.  Third, the claim recites that the data components are "map[ped]" to PRTs, but again says nothing about what this "map[ping]" actually entails or how it is carried out.  Fourth, the claim recites "organiz[ing]" the PRTs "into a hierarchy" to form a "management record type" (MRT) (which is just "a collection of primary record types," *id.*)—but fails to specify how this data is "organiz[ed]" or "collected."

At each of those steps, claim 21 recites the organization or reorganization of data, but provides no detail (and no meaningful limit) on how these steps should be carried out; the claim merely recites performing them on a generic "processor." The remaining limitations call for "display[ing]" the reorganized data "through a user interface," allowing "modification of the data," and making corresponding changes to an XML document.

It is not an oversimplification to conclude that claim 21 simply calls for retrieving data from XML documents, (re)organizing it in some manner not specified in the claims, and presenting it to a user for editing, as the district court recognized. The claims' substantial breadth alone makes clear that the claims are directed to an abstract idea. *See Intellectual Ventures*, 792 F.3d at 1369 (at step one, "it is often useful to determine the breadth of the claims"); *Internet Patents Corp.*, 790 F.3d at 1348 (claims that "describe[] the effect or result *dissociated from any method* by which [it] is accomplished" are directed to abstract idea (emphasis added)); *Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC*, No. 2015-1411, 2015 WL 9461707, at *5 (Fed. Cir. Dec. 28, 2015) (claims that "do not specify *what* … should be done or *how* the expert system would" do it are directed to abstract idea (emphasis added)).

In fact, claim 21's generic data manipulation steps are indistinguishable from the "data collection, recognition, and storage" found abstract in *Content*

30

*Extraction*, 776 F.3d at 1347, the idea of "collecting information in classified form, then separating and transmitting that information according to its classification" found abstract in *Cyberfone Systems, LLC v. CNN Interactive Group, Inc*., 558 F. App'x 988, 992 (Fed. Cir. 2014), and the data manipulation or processing ideas found abstract in numerous other cases, *see*, *e.g*., *Intellectual Ventures*, 792 F.3d at 1369-70 (customizing content based on user characteristics); *Dealertrack*, 674 F.3d at 1333 ("processing information through a clearinghouse"); *CyberSource*, 654 F.3d at 1370 ("collection and organization of data regarding credit card numbers and Internet addresses").

As in such cases, the data manipulation here is the same type of "well-known" activity that "humans have always performed." *Content Extraction*, 776 F.3d at 1347. For example, banks extract and categorize relevant information from banking documents (checks and deposits) and reorganize and reformat it into new documents such as monthly statements. *Id.* Military officers have long received intelligence reports, extracted key information, reorganized that information into intelligence summaries, and sent the summaries on to others. Accountants have long received business and financial documents, extracted key information, and used it to prepare periodic balance sheets or other summaries for business owners. As the district court explained, humans have been organizing and modifying data relating to documents for as long as there have been documents. A13 ("This

concept addresses a fundamental activity in which businesses have engaged as long as businesses have relied on documents.").  The '081 patent claims are directed to the same fundamental data manipulation concepts.

IV argues the '081 patent claims are not directed to an abstract idea because they recite certain computer elements and that the district court erred by "simply ignor[ing] these limitations."  Br. 32, 36.  But IV's approach improperly conflates the *Alice* steps.  Courts *first* (at step one) look past such superficially technical-sounding components and computer implementation to identify whether the claims are, at root, directed to an abstract idea and *then* (at step two) examine whether the additional features add anything inventive.  *Alice*, 134 S. Ct. at 2355-57.  In countless cases, the Supreme Court and this Court saw through far more complex-sounding components and elaborate steps when identifying the underlying abstract ideas.  *E.g.*, *id.* at 2359-60; *Content Extraction*, 776 F.3d at 1347-49; *Ultramercial*, 772 F.3d at 712, 714-16; *Accenture*, 728 F.3d at 1338-39.

Likewise, here, none of the "specific" features IV cites—the (1) "XML documents" limitation, (2) "specific data structures" (PRTs and MRTs) for storing the documents' data, and (3) a "user interface" (the "dynamic document") for displaying and editing the data (Br. 34-35)—makes the underlying data-manipulation idea non-abstract.

First, limiting the claims to XML documents (as opposed to other documents) at most recites a "technological environment," which does not make the idea "any less abstract." *Intellectual Ventures*, 792 F.3d at 1366, 1367. The specification and IV both acknowledge that XML was (even at the time of the patent) a format "frequently" used to store "common" business records, such as invoices and purchase orders. A168 (1:29-33); Br. 9. It is an insignificant field of use limitation just like limiting the data "collection and organization" concept in *CyberSource* to "credit card numbers and Internet addresses," or limiting the "information clearinghouse" idea in *Dealertrack* to automobile loan applications. *See* A17 (finding that XML limitation is an insignificant "field of use").

In *Intellectual Ventures*, this Court rejected IV's reliance on a similar (if not *more* complex) "technological environment." The claims there recited organizing and modifying (i.e., customizing) data in a Hypertext-Markup Language (HTML) document (i.e., web page) and displaying it for the user in an "interactive interface." 792 F.3d at 1369, 1372.[8] This Court found the claims directed to an abstract concept (tailoring content based on user characteristics) that humans long used in newspapers and television—an idea that "does not become nonabstract by limiting the invention to a particular field of use or technological environment, such as the Internet." *Id.* at 1369-70, 1366. The same conclusion follows here:

---

[8]    *See supra* note 3.

nothing about the claims is intrinsic (or, as IV puts it, "indigenous") to XML. *Cf.* Br. 35. "XML document" can readily be replaced with any non-technical descriptor of the underlying information (such as "business document") or any other format the information could be stored in, without changing the essential character of the claim—(re)organizing data in some manner and presenting it to the user for editing.

Second, the "specific data structure[s]" (PRTs and MRTs) that IV repeatedly alludes to without explanation, Br. 35-36, 43, may sound technical but in reality are made-up labels (coined by the inventor) for generic data types where extracted data is stored. *See* A168 (2:4-11); A3065-68. Under IV's proposed constructions (which the district court and Capital One accepted for purposes of the § 101 analysis), a PRT is just a "data structure to contain data extracted from XML documents" and a MRT is just "a collection of primary record types." A30; *supra* at 6.

The Court should not be misled by the use of these labels. The Supreme Court and this Court have held that including such seemingly-technical names and arrangements of data records does not make the underlying idea less abstract. The courts have found claims patent ineligible, for example, despite reciting "shadow credit record[s]" and "shadow debit record[s]" (*Alice*, 134 S. Ct. at 2352 n.2, 2355-56), an "insurance transaction database" with "a claim folder containing the

information … decomposed into … a policy level, a claim level, a participant level and a line level" (*Accenture*, 728 F.3d at 1338, 1344), and a "hierarchical data structure" (*Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1327, 1333-34 (Fed. Cir. 2015)).  In each of those cases, the claims were drawn to an abstract idea despite sophisticated-sounding data structures.  The same is true here.

Third, the DD (dynamic document) is just a set of unspecified rules for "display[ing] and organiz[ing]" MRTs in a "user interface."  A169 (4:10-12, 3:38-39); *see id.* (3:55-56) ("The DDs provide user interfaces as well as display and organization rules for displaying the data to the user.").  That is no different from the "interactive interface" in *Intellectual Ventures*, 792 F.3d at 1369, the "intelligent user interface" in *Internet Patents Corp.*, 790 F.3d at 1344, or the multiple user "interface[s]" in *Mortgage Grader, Inc. v. First Choice Loan Servs., Inc.*, 811 F.3d 1314, 1318, 1324-25 (Fed. Cir. 2016), none of which made the underlying ideas less abstract.

### 2. The Claims Add Nothing Inventive To The Abstract Data-Manipulation Idea

As the district court found, the '081 patent claims fail at *Alice* step two because they add nothing inventive to the abstract data-manipulation idea.  A17-31.

IV contends that claim 21 is inventive because it includes "seven interrelated components" that "allow a user to dynamically manage and modify otherwise

incompatible XML documents." Br. 45. But the claim merely recites a generic "processor" (which IV conceded is a "known computer component[]," A3249, A3251 (12:10-23, 14:2-6)) and six other generic functional "components" that restate, in broad strokes, the functions (e.g., "organiz[ing]," "identif[ying]," "display[ing]" and "modif[ying]" data) for performing the abstract idea itself. A177 (cl. 21).

Significantly, the claims nowhere describe *how* to organize, identify, display or modify this data—no specialized programming or specific software algorithms are recited at any level. Indeed, IV admits that "software must be designed and written to perform the desired functions." Br. 35. At most, the recited components amount to a generic "'software' 'brain'" "tasked with" executing the data-manipulation concept—which is insufficient to add an inventive concept at *Alice* step two. *Intellectual Ventures*, 792 F.3d at 1370-71; *see Alice*, 134 S. Ct. at 2360; *Dealertrack*, 674 F.3d at 1333-34. Not incorporating even a modicum of the "how" in the claims is fatal under § 101, as the district court discussed at length. A17-18, A20-23, A25, A28.

This Court has repeatedly reached the same conclusion in similar circumstances. For example, in *Internet Patents Corp.*, this Court held ineligible a patent directed to retaining information when navigating online forms using a web browser because the "mechanism" for performing the abstract idea ("maintaining

the state") "is not described, although this is stated to be the essential innovation" and the claims "contain[ed] no restriction on how the result is accomplished." 790 F.3d at 1348. Likewise, in *Dealertrack*, this Court held claims ineligible because they described selectively forwarding information through a clearinghouse but did not specify "how [the computer was] specially programmed to perform the steps claimed." 674 F.3d at 1333 (citation omitted).

More recently, in *Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC*, this Court found ineligible claims directed to the abstract concept of screening equipment operators for impairments because they did not specify "*what* screening should be done or *how* the expert system would perform such screening"; "*how* to select the tests to run or even what tests to select from"; "*how* the 'time-sharing allocation' on a processor should be done"; or "*how* the expert system works to screen for impairments or how such systems can be portioned out over one or more equipment modules." 2015 WL 9461707, at *5 (emphasis added); *see also*, *e.g.*, *Intellectual Ventures*, 792 F.3d at 1370-71 (merely reciting computer "brain" without more is insufficient).

The same is true here. Contrary to IV's insistence that the '081 patent claims a "very specific technological solution" (Br. 11), the lack of specificity in the claims dooms them under § 101.

The computer functions recited in claim 21 are indistinguishable from the steps for "creating," "obtaining," and "adjusting," data records in *Alice*, 134 S. Ct. at 2352 n.2, or "collecting," "recognizing," and "storing" data in *Content Extraction*, 776 F.3d at 1347, or "download[ing]," "tailor[ing]," and "display[ing]" data in *Intellectual Ventures*, 792 F.3d at 1369.  Those same data-manipulation activities add nothing inventive because they are "the most basic functions of a computer." *Alice*, 134 S. Ct. at 2359.  IV does not and could not contend that manipulating XML data is itself any more inventive. *See* A168 (1:41-43) (specification acknowledging that, "[i]n many cases [in the prior art], the user is forced to have [a] programmer create a program to merge, filter and transform XML documents into the format they want").  As discussed, narrowing the claims to organizing and modifying XML data merely limits them to a particular field of use or technological environment, which does not make the claims eligible any more than limiting data-manipulation claims to other types of data (such as *HTML* data). *See Intellectual Ventures*, 792 F.3d at 1366, 1369-70; A17; *supra* at 33-34.

IV further contends that claim 21 is inventive because it recites a "new and specific data structure" ("PRTs … hierarchically organized to form MRTs").  Br. 43.  But those are, again, just technical-sounding names for generic data structures that are no more inventive than the data structures recited in the ineligible claims in *Alice* ("shadow credit record[s]" and "shadow debit record[s]," 134 S. Ct. at 2352

n.2), *Accenture* (database for storing digital "folder" with nested "levels," 728 F.3d at 1338), and *Versata* ("hierarchical data structure," 793 F.3d at 1327). *See supra* at 34-35. IV also points to the recited user interface (a "dynamic document that displays the MRTs and permits the modification of data components") as an inventive feature. Br. 44. But that is just a functional component like the non-inventive "interactive interface" that was "tasked with tailoring information and providing it to the user" in *Intellectual Ventures*, 792 F.3d at 1370-71, and the generic "interfaces" in *Internet Patents Corp.*, 790 F.3d at 1344-45, and *Mortgage Grader*, 811 F.3d at 1318, 1324-25.

IV's "preemption" argument also misses the mark. IV seems to contend that the claims add something inventive under § 101 as long as they do not "foreclos[e] all ways to manipulate XML documents." Br. 46. IV's position is contrary to the Supreme Court's and this Court's precedent that field of use limitations do not transform a patent-ineligible abstract idea into a patent-eligible invention, *see*, *e.g.*, *Bilski*, 561 U.S. at 612; *Parker v. Flook*, 437 U.S. 584, 594 (1978), and that "the absence of complete preemption does not demonstrate patent eligibility," *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015); *see also OIP*, 788 F.3d at 1362-63.

Because IV conceded below that independent claim 21 is representative (A12) and does not here argue the two asserted dependent claims (22 and 24) add

anything inventive (Br. 43), this Court need not consider them separately.  *See Mortg. Grader*, 811 F.3d at 1324 n.6; *Content Extraction*, 776 F.3d at 1348.  Regardless, those claims add only inconsequential details or field of use limitations.  *Supra* at 6.

There is nothing inventive in the asserted '081 patent claims.  Individually or collectively the limitations do not "improve the functioning of the computer itself" or "improve[] … any other technology or technical field" as they provide no specific programming, tailored software, or meaningful guidance for implementing—or limits on the scope of—the abstract data-manipulation idea.  *See Alice*, 134 S. Ct. at 2359.  They simply direct programmers to "apply it" on a computer.  *Id*. at 2358.

### B.    The '002 Patent Claims Are Not Patent Eligible

#### 1.    The Claims Are Directed To An Abstract Resource-Retrieval Idea

The asserted '002 patent claims (claims 9, 11, 34, and 37) are directed to the abstract idea of retrieving user-specific information and resources using pointers (occasionally referred to as the "resource-retrieval idea").  As the district court held, they are drawn to the concept of "retrieving data located in another place by using a device with information that pinpoints the data's location to facilitate its retrieval."  A33.  Each of the asserted claims, at "heart" (*Ultramercial*, 772 F.3d at 714) and in its "simplest form" (*Dealertrack*, 674 F.3d at 1333), simply recites

"retrieving … user specific resources and information using … pointers."  A256 (cl. 1, 9, 11); *see* A257 (cl. 34, 37) (equivalent language).[9]

That is an age-old idea, long performed by humans using intermediaries (such as paper indices or human assistants) to retrieve information that is not immediately at hand.  As the district court explained, "[t]his concept of retrieving data from a remote location by relying on a label that identifies its location is a 'fundamental … practice long prevalent in our system.'"  A33 (second alteration in original) (quoting *Alice*, 134 S. Ct. at 2356).  For example, humans have long "retriev[ed]" an index (e.g., from a card catalogue), "display[ed]" the index (e.g., on a library table), and "retrieve[d]" user-specific information using the index's "pointers" (e.g., by visiting the identified location in the stacks).  Or, when an attorney needed a court pleading or client telephone number while away from the office, she could call her secretary, who would use the docket sheet or client index (or mental "pointers" to the attorney's filing cabinets) to retrieve the requested pleading or telephone number and report back.  Indeed, the patent itself analogized the invention to such real-world human actions.  A250 (5:56-60, 5:66, 6:47-55) ("mobile interface agent" can retrieve "telephone numbers," can be represented as

---

9    All asserted claims are materially the same for § 101 purposes and can be considered collectively—and IV does not contend otherwise.  *See*, *e.g.*, *Content Extraction*, 776 F.3d at 1348.

a "human-like graphical icon," and can respond to "voice command[s]" to "find a Korean restaurant within 5 miles from my home" or answer "what time is it?").

The basic information or resource retrieval concept at issue here is indistinguishable from the abstract ideas for providing customized user-specific content in *Intellectual Ventures*, 792 F.3d at 1369-70 and maintaining user information in online forms in *Internet Patents Corp.*, 790 F.3d at 1348, and at least as abstract as similar data-collection ideas found abstract in *Content Extraction*, 776 F.3d at 1347 ("data collection, recognition, and storage") and the other cases discussed—all of which, like the claims here, were dressed up with various computer components. *Supra* at 26, 30-31. As in such cases, the resource retrieval concept here involves "undisputedly well-known" activities that "humans have always performed." *Content Extraction*, 776 F.3d at 1347.

At step one, IV again argues that the '002 patent claims are not directed to an abstract idea because they recite computer features—such as "[c]omputer files, electronic data, and computer networks." Br. 49. IV relies on the computerized "mobile interface" that, according to IV, must "work on different computer devices, be displayed to the user, and the user must interact with it to dynamically retrieve the requested data." Br. 50.

As discussed, this Court rejected the same arguments when IV made them in IV's previous appeal against Capital One (*Intellectual Ventures*). In that case, IV

42

argued that the claims were not directed to an abstract idea because they recited an "interactive interface" that (like the "mobile interface" here) provided user-specific content over a network. This Court, however, found that the claims were directed to an abstract idea (providing customized user content) because, at step one, courts must look beyond the "particular … technological environment, such as the Internet," or technical sounding functional components, such as an "interface" that processes electronic data. *Intellectual Ventures*, 792 F.3d at 1366, 1370; *see supra* at 26. The same conclusion follows here.

IV also argues that the claims are not abstract because the mobile interface does not just locate the user's information but actually "delivers the information to the user." Br. 52. But the same is true of a secretary or other human assistant, *see supra* at 41, and the ineligible computerized claims in *Intellectual Ventures* (delivering customized content to user), *Ultramercial* (displaying free media for user), and *Internet Patents Corp*., 790 F.3d at 1348 ("generating information to the user based on information inputted by the user"). In any event, the '002 patent does not claim "delivery" of information by the mobile interface; rather, it claims "retrieving" information "using" the pointers of the mobile interface.

### 2.    The Claims Add Nothing Inventive To The Abstract Resource-Retrieval Idea

The asserted '002 patent claims add nothing inventive to the abstract idea of retrieving user-specific information and resources using pointers, as the district court found.  A34-40.

According to IV, the "inventive concept" in the claims is the "mobile interface" that "work[s] on multiple different devices … to retrieve user resources and information … using computer pointers."  Br. 55-56.  But that purportedly inventive concept simply restates the abstract idea—i.e., allowing users to access their information using pointers.  As discussed, it is insufficient under § 101 to identify an idea and then recite a functional computer component (a "'software' 'brain'" such as an "interface") that, in some non-specific way, implements the idea.  *Intellectual Ventures*, 792 F.3d at 1370-71; *see supra* at 27.

The "mobile interface" is indistinguishable from the user "interfaces" that added nothing inventive to the patent-ineligible claims in *Internet Patents Corp.* and *Intellectual Ventures*.   In *Internet Patents Corp.*, the claims recited an "intelligent user interface" that "display[s] to a user of a web browser" a group of "hyperlink[s]" (like displaying the list of pointers here) and, when the user clicks a hyperlink, provides an "online application form set" that was "dynamically generated" based on "user input" (like retrieving user specific information using the pointers here).   790 F.3d at 1344-45, 1348-49.   And, as discussed, in

44

*Intellectual Ventures*, the claims recited an "interactive interface" that "display[s]" web content customized based on user characteristics (again, like providing user-specific information here).  792 F.3d at 1369.  Just as in those cases, the '002 patent claims' "mobile interface" is nothing more than "a 'software' 'brain' 'tasked with tailoring information and providing it to the user,'" which adds nothing inventive.  *Id.* at 1370-71.

IV's "mobile interface" is comprised entirely of well-known and conventional components and activities and is nowhere defined or limited by the claims as IV suggests.  Even under IV's construction (which the district court adopted for purposes of § 101), the claims require only that the "mobile interface" use "pointers" to retrieve user resources and information over a network, and be displayable on a computer.  A256-57 (cl. 9, 11, 34, 37); *see* A34 ("mobile interface" is "user interface accessible on different computing devices and capable of dynamically accessing user specific data stored on a network server and local device" (citation omitted)).  Receiving transmitted data over a network and displaying information for a user are purely conventional activities—some of the most basic functions of a computer.  *See Alice*, 134 S. Ct. at 2359 (receiving and transmitting data are "the most basic functions of a computer"); *Intellectual Ventures*, 792 F.3d at 1369 (retrieving user characteristics and "display[ing]" user-specific data is non-inventive); *buySAFE, Inc. v. Google, Inc*., 765 F.3d 1350, 1355

(Fed. Cir. 2014) (receiving information over a network "is not even arguably inventive").

IV concedes that "pointers" are a "conventional" computer concept—nothing more than a "reference[]" to identify (point to) where information is located. Br. 56-57. IV nonetheless argues that the "genius" of the '002 patent is "overrid[ing] the routine use of pointers" by allowing access to remote files. Br. 57. But IV already acknowledged that the pointers are "*not the crux of the invention.*" A628 (emphasis added). Setting that aside, IV's argument fails because there is nothing inventive about using "pointers" to retrieve information remotely. Pointers simply locate information or resources—whether local or remote, and whether on a computer or otherwise. *See* A250 (6:14-16). As the patent acknowledges, it is conventional for "pointers" to direct the user to information that is "accessible on the computer … *or a server.*" A248 (1:36-38) (emphasis added). In fact, *any* computer program retrieving information across a network must use "pointers" of one sort or another, as it could not otherwise locate the information. So the purported "genius" of IV's claims amounts to nothing more than retrieving information remotely—which is not remotely inventive. *See Alice*, 134 S. Ct. at 2359; *buySAFE*, 765 F.3d at 1355.

IV further contends that the "mobile interface" is inventive because it allows users to access (1) *any* type of files (including files from "*any* platform"), (2) using

"*any* [type] of device," and (3) from "'*any* location.'"    Br. 48, 61 (emphasis added).  Those features, however, are not found in the claims; IV pulled them from the specification.  And unclaimed features and purported benefits cannot supply the inventive concept.  *See Accenture*, 728 F.3d at 1344-45 (rejecting argument that "the complexity and detail of the specification demonstrate that the patent is an advance in computer software and not simply a claim to an abstract idea"); *see also Versata*, 793 F.3d at 1335; *Dealertrack*, 674 F.3d at 1333-34.  In any event, the "mobile interface" (even with the unclaimed features that IV engrafts and the purportedly novel use of pointers) adds nothing inventive because the claims are nowhere limited to a particular way of programming the admitted conventional computer components to perform the recited functions.  *See Intellectual Ventures*, 792 F.3d at 1370-71; *Dealertrack*, 674 F.3d at 1333; *Internet Patents Corp*., 790 F.3d at 1348.

IV's effort to manufacture an inventive concept out of one of the most basic uses of a computer—retrieving information—fails.  Individually or collectively, the claims recite nothing patent eligible under § 101.

### 3.    Claims 34 And 37 Of The '002 Patent Do Not Fall Within Any Category Of Patent-Eligible Subject Matter

Apart from the *Alice* analysis, claims 34 and 37 of the '002 patent do not fall within any of the four statutory categories of patent-eligible subject matter under § 101 (processes, compositions of matter, machines, and manufactures).  Although

the district court did not reach the issue, this issue was fully briefed and argued below and thus is an independent basis on which to find those two claims invalid under § 101. *Datascope Corp.*, 879 F.2d at 822 n.1.

For claims other than process claims, "the eligible subject matter must exist in some physical or tangible form." *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1348 (Fed. Cir. 2014). Under § 101, a "machine" must be a "concrete thing, consisting of parts, or of certain devices and combination of devices." *Id.* at 1348-49 (quoting *Burr v. Duryee*, 68 U.S. 531, 570 (1864)). And "[t]o qualify as a manufacture, the invention must be a tangible article that is given a new form, quality, property, or combination through man-made or artificial means." *Id.* at 1349.

Claims 34 and 37 are not process claims and do not recite any "tangible articles" or "concrete things" consisting of parts, devices or combinations of devices. *See* A257. Instead, they claim a "mobile interface" in the abstract—computer software with certain functional capabilities. *See id.* They are not, therefore, patent eligible under § 101.

In *Digitech*, 758 F.3d at 1348, and *In re Nuijten*, 500 F.3d 1346, 1352 (Fed. Cir. 2007), this Court held that claims directed to data and signals, respectively, did not fall into any § 101 category because they were not themselves sufficiently tangible. In *Digitech*, the claimed "device profile" did not require "*any* physical

embodiment" and was just "a collection of intangible … information."  758 F.3d at 1350.  And, in *Nuijten*, even though the claimed signals "had … 'tangible causes and effects,'" that was not enough.  *Digitech*, 758 F.3d at 1350 (quoting *Nuijten*, 500 F.3d at 1353).  Here, like the claims in *Digitech*, claims 34 and 37 just recite an intangible collection of information and, even if they had tangible effects like the signals in *Nuijten* (they do not), that would not be enough.

Even more recently in *Allvoice Developments US, LLC v. Microsoft Corp.*, 612 F. App'x 1009 (Fed. Cir.), *cert. denied*, 136 S. Ct. 697 (2015), the Court confirmed that intangible computer software is not patent eligible under *Digitech* and *Nuijten*.  There, as here, the Court addressed a claim directed to a computer software interface (a "speech recognition interface" rather than a "mobile interface") that claimed no hardware limitations.  *Id*. at 1017-18.  The Court reiterated that "instructions, data, or information alone, absent a tangible medium, is not a manufacture," refused to "'imply' a tangible medium into claims that fail to recite or reference any such medium," and held the claims were not patent eligible because they "are not directed to a tangible article and are not process claims."  *Id*. at 1018.  The same is true of claims 34 and 37; even apart from the *Alice* framework, they are invalid under § 101.

### C.    The '084 Patent Claims Are Not Patent Eligible

The district court held the '084 patent claims § 101-ineligible based solely on issue preclusion from the *JPMC* decision, but because it was fully briefed and argued below, this Court can affirm on the merits of § 101 as an alternative ground. *Datascope Corp.*, 879 F.2d at 822 n.1 ("Appellees always have the right to assert alternative grounds for affirming the judgment that are supported by the record."); *United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924). In fact, the Special Master found that all the asserted claims in the '084 patent were patent-ineligible under § 101 (A1559-73); the district found it unnecessary to address that ruling after holding the claims invalid based on issue preclusion.

### 1.    The Claims Are Directed To An Abstract Anomaly-Detection Idea

The '084 patent claims are directed to the abstract idea of analyzing data from multiple sources (in some unspecified way) to detect an (unspecified) anomaly and using (some unspecified) pattern correlations to determine targets likely to be affected by the anomaly (occasionally referred to as the "anomaly-detection" idea). As the Special Master explained, the abstract idea at the heart of the '084 patent claims is "collecting and analyzing information from multiple sources and taking steps to use the results of that analysis so that corrective action can be taken." A1565; *see also JPMC*, 2015 WL 1941331, at *15-16 (finding '084 claims directed to abstract idea).

Representative claims 15 and 18 (and claim 9, upon which they depend) simply break the abstract idea into its constituent steps and recite them at a high level of generality, i.e., (1) "detecting an anomaly" by analyzing data from multiple "hosts, servers, and computer sites" in a computer network; (2) "determining a device that is anticipated to be affected by the anomaly by using pattern correlations" across the network sites; and (3) "alerting the device."  A270-71; *supra* at 10.[10]  The other two claims (claims 27 and 32) are substantially the same except couched as "data collection and processing center[s]" instead of "methods."  A271.[11]

In other words, at root, the claims describe detecting an unspecified "anomaly" by analyzing (in some unspecified way) multiple sources of data, determining likely targets (in some unspecified way), and alerting those targets. As the specification acknowledges, the "innovation over the prior art, and the essential, 'most important aspect'" of the claims (*Internet Patents Corp.*, 790 F.3d at 1348) is detecting and warning about anomalies by analyzing data based on *multiple* sources, instead of just *one* source.  A266 (4:60-63); A267 (5:45-50);

---

[10]  Claims 15 and 18 further provide that the device is a "firewall" (claim 15) and that the threshold for detecting anomalies is adjusted (claim 18).  A271.

[11]  All asserted '084 patent claims can be considered collectively—and IV does not contend otherwise.  *See*, *e.g.*, *Content Extraction*, 776 F.3d at 1348.

A268 (8:39-41); A270 (11:9-11); *supra* at 8-9; *see also Ultramercial*, 772 F.3d at 714 ("heart" of claims is abstract idea).

That abstract, theoretical concept has been around for decades—"before computer technology and the internet existed," as the Special Master recognized. A1565. For example, it is the same concept as a neighborhood watch organization that collects tips and information from multiple homes ("hosts, servers, and … sites" in a network), from which it deduces a pattern of break-ins on a certain street ("anomalies") and therefore warns others in the neighborhood who might be at risk ("alerting" those who are "anticipated to be affected by the anomaly"). *See* A270-71 (cl. 9, 15, 18). Other commonplace examples include military, meteorological, seismological, or financial organizations that detect anomalies (such as troop incursions, tornados, earthquakes, or stock market crashes) from multiple locations and sources, analyze patterns, and alert other likely-to-be-affected areas or persons. The abstract anomaly-detection idea at the heart of these claims undoubtedly has a venerable history and is (like the other abstract ideas that IV is attempting to monopolize) a basic tool in the "storehouse of knowledge" that is "free to all ... and reserved exclusively to none." *Bilski*, 561 U.S. at 602 (citation omitted).

That anomaly-detection idea is similar to, but more abstract than, the abstract idea underlying the patent-ineligible computer claims in *CyberSource*, 654 F.3d at 1371-72, for detecting anomalies (fraud) in credit card transactions by

matching current transaction information against information gathered from past transactions, and in *Accenture*, 728 F.3d at 1344, for detecting changes in insurance transaction information and providing an alert as to what tasks need to be performed based on certain "rules." Indeed, unlike the relatively more confined claims in *CyberSource* and *Accenture*, the '084 patent claims could conceivably apply to detecting *any* anomaly or change using *any* pattern or rule. The broad anomaly-detection idea here is also far more abstract than the ideas underlying the ineligible computer-related claims in cases like *Gottschalk v. Benson*, 409 U.S. 63, 71-72 (1972) (converting binary coded decimal numbers to pure binary using a particular algorithm), *Flook*, 437 U.S. at 593-94 (updating alarm values using a particular formula), and the others discussed above. *Supra* at 26, 30-31, 42.

### 2. The Claims Add Nothing Inventive To The Abstract Anomaly-Detection Idea

The asserted '084 patent claims add nothing inventive. All of the claimed functions (collecting data, matching patterns, and providing alerts), *see* A270-71 (cl. 9, 15, 18, 27, 32), are routine computer activity, mere data-gathering, or insignificant pre- and post-solution activity that does not make the claims patent eligible. Collecting data and looking for anomalies or patterns was insufficient in *CyberSource*, *Content Extraction*, and *Vehicle Intelligence*. And providing users with an alert or notification was insufficient in *Flook*, 437 U.S. at 594, *Accenture*, 728 F.3d at 1338-39, and *Intellectual Ventures*, 792 F.3d at 1367. The patent itself

acknowledges that such activities are "conventional." A266 (3:38-4:56) ("conventional intrusion detection techniques" involve collecting "surveillance data," using "pattern-detection," and providing alerts).

The same is true of "adjusting detection and alarm thresholds" and "alerting firewalls." A3215. The patent admits (e.g., A265 (1:37-43)), that firewalls are conventional computer technology for selectively allowing data to enter or exit a computer—a function akin to limitations found insufficient in several cases, such as *Ultramercial*, 772 F.3d at 716 ("restrict[ing] public access" to computer data), and *Dealertrack*, 674 F.3d at 1333 ("selectively forwarding" data). Adjusting the thresholds in some unspecified way is even less inventive than the limitations found insufficient in *Flook*, 437 U.S. at 586-87, 590 ("automatic adjustments in alarm settings" after applying a presumed-to-be novel, specific formula). And performing the idea over a network is "not even arguably inventive." *buySAFE*, 765 F.3d at 1355. Individually or collectively, the claims do nothing more than implement the abstract anomaly-detection idea using generic computer components and functions—which is insufficient under § 101. *See Alice*, 134 S. Ct. at 2359-60; *see also JPMC*, 2015 WL 1941331, at *16 (ineligible '084 patent claims only recite "generic computer technology").

IV argued below that the claims were inventive because the anomaly detection and adjustments occurred "in near-real time" and tracked data from

multiple sources.  *E.g.*, A3213-14, A3230.  The claims, however, say nothing about "in near-real time."  Once again IV improperly relied on the specification to add purportedly inventive implementation details to the exceedingly generic claims.  *See Accenture*, 728 F.3d at 1344-45; *supra* at 47.  Regardless, processing data "in near-real time" from multiple sources is a routine and conventional computer function that is non-inventive.  *See*, *e.g.*, *Alice*, 134 S. Ct. at 2352, 2359 (using computer to "track multiple transactions," "update[] … records in real time," and complete "simultaneous" transactions); *Intellectual Ventures*, 792 F.3d at 1367 (using computer to perform idea "more efficiently").

With or without irrelevant specification details, the '084 patent claims are not meaningfully limited to any particular way of accomplishing these goals.  They provide no instructions on how the "data entering into a plurality of hosts, servers, and computer sites" should be analyzed to detect an anomaly, or what kinds of "pattern correlations" to use to "determin[e] a device that is anticipated to be affected by the anomaly."  A computer could be programmed to perform these activities in innumerable known or even uncontemplated ways, *see Dealertrack*, 674 F.3d at 1333, and the claims are "so abstract and sweeping as to cover both known and unknown uses" of the abstract idea, *Benson*, 409 U.S. at 68; *see also Vehicle Intelligence*, 2015 WL 9461707, at *5 (claims "do not specify … how the expert system would perform [the] screening").

The asserted '084 patent claims, like all of IV's asserted claims, are ineligible under § 101.

### D.    IV's Other Arguments Fail

The rest of IV's arguments also fail to save its invalid claims.

### 1.    *DDR Holdings* Does Not Save The Invalid Claims

IV ignores most of this Court's § 101 cases and instead relies on *DDR Holdings*.  Br. 6, 35-36, 38, 40, 42.  *DDR Holdings* is inapposite.

The claims in that case were eligible because they (1) had no pre-Internet analogue (as they prevented website visitors from being "instantaneous[ly] transport[ed]" to another site, a phenomenon unknown in the brick and mortar context) and were "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks" and (2) recited a "specific" and "inventive" way that "interactions with the Internet are manipulated to yield a desired result."  773 F.3d at 1257-59.  The claims in this case are different in both respects.

First, IV's claims have pre-Internet (even pre-computer) analogues because they relate to activities humans have long performed.  *Supra* at 31-32, 41-42, 52.  IV's claims, therefore, are the type that *DDR Holdings* itself recognized are invalid—they merely "recite the performance" of a common pre-computer practice.  773 F.3d at 1257.  Although IV argues that such analogies are "inapt"

and "divorced" from the claims' technology (Br. 24, 27), this Court has found the same type of computer claims ineligible based on similar analogies, in decisions such as *Intellectual Ventures*, 792 F.3d at 1369 (likening claims for customizing and displaying web pages to tailoring inserts in newspapers), *Content Extraction*, 776 F.3d at 1347 (likening claims for organizing and storing digital data from documents to a banker reading information off of checks), and *Versata*, 793 F.3d at 1333-34 (likening computer claims for processing data to "commonplace business method aimed at processing business information"). As in those cases, despite occasionally reciting seemingly complex computer technology, IV's claims have brick-and-mortar analogies and "do not address problems unique to the Internet, so *DDR* has no applicability." *Intellectual Ventures*, 792 F.3d at 1371.

Second, even if IV's claims were uniquely Internet- or computer-centric, they still would not be patent eligible. As *DDR Holdings* cautioned, "not all claims purporting to address Internet-centric challenges are eligible for patent." 773 F.3d at 1258. The claims must also provide a specific and inventive contribution to the art by "specify[ing] how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." *Id*.

In contrast, IV's claims lack any such specific inventive features, *supra* at 35-40, 44-47, 53-55, just as in numerous other post-*DDR Holdings* cases. *See*, *e.g.*, *Internet Patents Corp.*, 790 F.3d at 1348 (ineligible claims directed to abstract idea of "retaining information in the navigation of online forms" but "contain[ed] no restriction on how the result is accomplished" and described no inventive "mechanism"); *OIP*, 788 F.3d at 1363 (ineligible claims lacked inventive "programming"). *DDR Holdings* cannot save IV's asserted claims.

IV hyperbolically argues that finding its claims ineligible would "overrule" *DDR Holdings*, "make all software patents ineligible," and "swallow all of patent law." Br. 24, 38. The patentee in *Alice* made a similar argument, contending that finding its claims ineligible because they recite only "standard computing functions" would have a "devastating impact in the software industry" and signal "'the death of … all … software patents.'" Reply Brief at 20, 16, *Alice*, 134 S. Ct. 2347 (2014) (No. 13-298), 2014 WL 1101443 (second alteration in original) (citation omitted). IV itself made similar arguments in *Intellectual Ventures*, *see* Response and Reply Brief of Plaintiffs-Appellants at 2-3, *Intellectual Ventures*, 792 F.3d 1363 (Fed. Cir. 2015) (Nos. 2014-1506, 2014-1515), and this Court rejected them. *See also Ultramercial*, 772 F.3d at 714 (rejecting patentee's concern for "swallow[ing] all of patent law"). Those arguments are unavailing again here.

### 2.    *Diehr* Does Not Save The Claims

IV's reliance on *Diamond v. Diehr*, 450 U.S. 175 (1981), also is misplaced because IV's claims are distinguishable from the claims upheld in that case.  The claims in *Diehr* were directed to "an industrial process for the molding of rubber products," and the Court found them eligible because they "transform[ed] or reduc[ed] an article to a different state or thing."  450 U.S. at 192-93.  IV's claims perform no such transformation, and IV does not contend otherwise.

Instead, IV suggests the claims in *Diehr* were found eligible because they "use[d] … a computer [to] improve[] an existing technological process."  Br. 42.  However, far from relying on computer implementation to make the claims eligible (as IV does here), the applicant in *Diehr* argued that the claimed process is "chemical and physical in nature, *not a computer program*," and that, regardless, a process that is "otherwise statutory" is not rendered ineligible by adding a computer.  *In re Diehr*, 602 F.2d 982, 984-85 (C.C.P.A. 1979) (emphasis added).  The Supreme Court, agreeing with the latter, found that the otherwise eligible (i.e., transformational) process "does not thereby become unpatentable subject matter" by incorporating a computer.  *Diehr*, 450 U.S. at 187; *see also Alice*, 134 S. Ct. at 2358 (*Diehr* claims "were patent eligible because they improved an existing technological process, *not because they were implemented on a computer*" (emphasis added)).  *Diehr* is, therefore, inapplicable.

In *OIP*, this Court rejected a patentee's similar reliance on *Diehr*. The Court explained that, read in light of *Alice*, *Diehr* involved claims directed to solving a problem in "conventional industry practice" and "does not stand for the general proposition that a claim implemented on a computer elevates an otherwise ineligible claim into a patent-eligible improvement." *OIP*, 788 F.3d at 1364 (citation omitted); *see also Versata*, 793 F.3d at 1334 (distinguishing *Diehr*). The same is true here.

IV's arguments that its claims "improve an existing technological process" (Br. 6) and "addressed … new problem[s]" purportedly unique to computers (Br. 54) echo those that IV itself and others made unsuccessfully in several recent cases. *See*, *e.g.*, *Intellectual Ventures*, 792 F.3d at 1371 (rejecting patentee's argument that claims for customizing web pages "address[ed] problems unique to the Internet"); *Internet Patents Corp.*, 790 F.3d at 1345 (rejecting argument that claims recited "a tangible and useful improvement over prior computer-implemented methods of entering information into online application forms"); *Ultramercial*, 772 F.3d at 712, 714 (rejecting argument that claims were "directed to a specific method of … content distribution that was previously unknown and never employed on the Internet before"). Here, too, IV's claims provide no patent-eligible improvement in computers or technological processes.

### 3.    Overcoming Prior Art Is Not Sufficient To Satisfy § 101

IV also argues that its claims satisfy § 101 because the particular combination of elements in the claims was purportedly not found in the prior art—i.e., the claims were "novel"—when the patents were filed. *See*, *e.g.*, Br. 28, 43-44, 57-61; A3205, 3207. But § 101 "does not involve the familiar issues of novelty and obviousness that routinely arise under §§ 102 and 103." *Flook*, 437 U.S. at 588. In *Flook*, for example, the Supreme Court assumed that the claims were novel and nonetheless held them ineligible under § 101. *Id.* at 588, 594. Similarly, in *Ultramercial*, this Court stated: "That some of the [computer-implemented claim] steps were not previously employed in this art is not enough—standing alone—to confer patent eligibility upon the claims at issue" under § 101. 772 F.3d at 716. In any event, the PTAB has determined in related IPR proceedings that many claims of the asserted patents are not patentable under §§ 102 and/or 103. *Supra* at 1. IV's "novelty" argument is, therefore, misplaced.

### 4.    The Clear And Convincing Evidentiary Standard Does Not Save The Claims

IV passingly invokes a "clear and convincing evidentiary standard" or "expert evidence." *E.g.*, Br. 54. These (undeveloped) arguments lack merit.

The Supreme Court, in *Alice* and other cases, repeatedly has resolved § 101 patent eligibility as a matter of law without mentioning the "clear and convincing" standard that IV espouses. That is unsurprising because "[w]here the ultimate

question of patent validity turns on the correct answer to legal questions," the clear and convincing evidence standard "has no application." *Microsoft Corp. v. i4i Ltd. P'ship*, 546 U.S. 91, 114 (2011) (Breyer, J., concurring); *see also Nautilus, Inc. v. Biosig Instruments, Inc*., 134 S. Ct. 2120, 2130 n.10 (2014) (clear and convincing evidentiary standard inapplicable when invalidity is an issue of law).

This Court likewise has held that § 101 is a question of law. *OIP*, 788 F.3d at 1362. And, since *Alice*, this Court has *never* relied on the clear and convincing evidentiary standard in analyzing § 101. *Cf. Content Extraction*, 776 F.3d at 1348 (implicitly rejecting reliance on "clear and convincing" evidentiary standard).

This Court also routinely has found claims ineligible as a matter of law at the pleading stage without requiring any "evidence" beyond the patent itself. *See Internet Patents Corp.*, 790 F.3d at 1344; *Content Extraction*, 776 F.3d at 1349; *OIP*, 788 F.3d at 1362; *Ultramercial*, 772 F.3d at 717; *buySAFE*, 765 F.3d at 1351-52. As in such cases, IV's claims are ineligible as a matter of law under § 101.

## CONCLUSION

The district court's judgment should be affirmed in all respects. As to the '084 patent, this Court can affirm based either on the preclusive effect of the *JPMC* decision or, as an alternative ground, patent-ineligibility under § 101.

Dated: March 28, 2016

Jeffrey G. Homrig
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 328-4600

Robert A. Angle
Dabney J. Carr IV
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
(804) 697-1246

Respectfully submitted,

/s/ Matthew J. Moore
Matthew J. Moore
Gabriel K. Bell
Adam M. Greenfield
LATHAM & WATKINS LLP
555 Eleventh St. NW, Suite 1000
Washington, DC 20004
(202) 637-2200
matthew.moore@lw.com

Kenneth R. Adamo
David W. Higer
Vishesh Narayen
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

*Counsel for Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2016, I caused the foregoing Brief of Appellees to be served by electronic means through the Court's CM/ECF system on counsel for all parties who are registered CM/ECF users.


Dated: March 28, 2016                    /s/ Matthew J. Moore
                                         Matthew J. Moore

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 13,992 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this brief was prepared using Microsoft Word 2010 in 14-point Times New Roman font.

Dated:  March 28, 2016                    /s/ Matthew J. Moore
                                          Matthew J. Moore